UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Filed Under Seal** |

**GOVERNMENT'S REPLY IN FURTHER SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE WHY TWITTER INC. SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH A SEARCH WARRANT**

Twitter Inc. ("Twitter") declined to comply with a clear order issued by this Court: a search warrant requiring Twitter to provide information associated with the Twitter account "@realDonaldTrump." ECF No. 4 (the "Warrant"). Twitter acknowledges the Warrant's validity but nonetheless refuses to comply unless it is first permitted to disclose the Warrant to former President Donald J. Trump and the former President is provided with an opportunity to challenge it. Indeed, Twitter claims that it will refuse to execute the Warrant *even were* the government to retract the Non-Disclosure Order ("NDO")—which the government will not do. The Court should require Twitter to comply with this Warrant just like any other. Twitter should not be permitted to dictate a special protocol.

**I.     Legal Standard**

"A civil contempt action is characterized as remedial in nature, used to obtain compliance with a court order or to compensate for damages sustained as a result from noncompliance." *United States v. Shelton*, 539 F. Supp. 2d 259, 262 (D.D.C. 2008) (citing *Evans v. Williams*, 206 F.3d 1292, 1294-95 (D.C. Cir. 2000)). The party seeking the finding of contempt has the burden of establishing by clear and convincing evidence that "(1) there was a clear and unambiguous court order in place; (2) that order required certain conduct" by Respondent; and (3) Respondent "failed

to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014); *see also Food Lion, Inc. v. United Food and Commercial Workers*, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (rejecting argument that movant must demonstrate bad faith by contemnor); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). "[A litigant's] intent in failing to comply . . . is irrelevant." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 22, 26 (D.D.C. 2015).

If the party seeking contempt sanctions makes the above *prima facie* showing, the burden shifts to the putative contemnor to produce evidence justifying noncompliance either because of an inability to comply or good faith and substantial compliance. *MasTec Advanced Technologies v. National Labor Relations Board*, No. 1:20-mc-0022, 2021 WL 4935618, at *3 (D.D.C. June 3, 2021). Both good faith and substantial compliance "must be accompanied by adequate detailed proof." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010). "To prove good faith substantial compliance, the contemnor must show that it 'took all reasonable steps within [its] power to comply.'" *SEIU Nat'l Indus. Pension Fund v. Artharee*, 48 F. Supp. 3d 25, 30 (D.D.C. 2014) (alteration in original) (quoting *Int'l Painters*, 736 F. Supp. 2d at 40). A party's good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, but good faith alone is not sufficient to excuse contempt. *Food Lion, Inc.*, 103 F.3d at 1017-18.

## II.   The Requirements for Holding Twitter in Civil Contempt Are Satisfied Here

### A.   Twitter Has Failed to Comply with a Clear and Unambiguous Order

The Warrant issued by this Court unambiguously requires Twitter to produce the records delineated in Attachment B. Twitter knows full well what it must do to comply with the Warrant. Indeed, on February 5, 2023, Twitter informed the government that it is fully prepared and able to

"produce data responsive to the Warrant." Email from George Varghese, Feb. 5, 2023; *see* Opp. 10. But Twitter states it will comply with the Warrant and provide the data only if the government agrees not to review that data until this Court decides Twitter's motion to vacate or modify the separate NDO. In short, Twitter refuses to comply because it has purportedly decided to "safeguard the privacy" of a particular user.  Opp. 3.

> **B.     Twitter Does Not and Cannot Demonstrate an Inability to Comply or Good Faith Substantial Compliance**

Twitter offers no technical obstacle to complying with the Warrant.  Indeed, as noted above, it appears Twitter has already gathered the responsive information.  Instead, Twitter claims that legal obstacles prevent it from complying with this Court's order.  But Twitter can avail and has availed itself of an independent legal avenue to challenge the NDO.  It has entirely failed to comply with the Warrant, let alone substantially comply.  And even if it had substantially complied, its invocation of an unfounded executive privilege claim belies its purported good faith.

> **1.     Twitter Cannot Refuse to Comply Based on Potential Privileges Possessed by Third Parties**

Twitter does not dispute that no legal authority permits a third party served with a search warrant to contest that warrant before it is executed. *See* Opp. 4; Gov. Mot. at 1, 3. Twitter instead contends (Opp. 4) that the absence of any legal mechanism to press such a challenge is "entirely unsurprising" given the "unique situation" implicating "significant and unresolved legal issues" that the Warrant presents. But the potential for a legal challenge to information obtained through a search warrant, whether "unique" or not, provides no basis for the recipient of a search warrant to refuse, on behalf of a third party, to execute it.

The practical consequences of adopting Twitter's amorphous standard are momentous. As Twitter observes (Opp. 3-4), Twitter users on whose accounts a search warrant has been executed

could potentially advance any number of legal arguments, including privilege claims (such as attorney-client, clergy-penitent, Speech or Debate) and suppression claims under the Fourth Amendment. Twitter correctly acknowledges (Opp.3) that it lacks standing to assert its users' "rights and privileges" but nonetheless proceeds to advocate an approach that would permit Twitter not to comply with a court order directing it to execute a search warrant any time Twitter deems the situation "unique" (Opp. 4) or determines that the warrant presents "challenging and substantial issues" (Opp.1). Neither legal authority nor an overarching interest in protecting the privacy of its users permits Twitter to arrogate such power to itself. *See Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 56 (2d Cir. 2017) (Carney, J, concurring in the order denying rehearing en banc) (noting that a warrant "issued by a neutral magistrate judge upon a showing of probable cause . . . satisfied the most stringent privacy protections our legal system affords"). Here, Twitter seeks to deploy that power to characterize the Warrant as "unique" and, in contravention of the court's order, unilaterally impose heightened requirements for execution of a search warrant where a high-profile client is involved. The government merely seeks evenhanded application of established legal principles.

Furthermore, the potential for collateral litigation around search warrants under Twitter's approach is significant. Every time Twitter deems a case—or a user—"unique," it could intervene in a case to delay a criminal investigation. But even Twitter recognizes that that is not how the law works because it is not permitted to notify users of law enforcement requests where "legally prohibited from doing so." Opp. 3. Here, such a prohibition exists, yet Twitter nonetheless seeks special treatment for this user.

None of the cases that Twitter cites supports its novel approach. *See* Opp. 5-6. For one, none of those cases involved a potential executive privilege claim—a claim that lacks merit. *See*

*infra* at 6-9. Additionally, none of those cases involved a pre-enforcement challenge brought by a third party that held no cognizable privilege in the materials to be seized under the warrant. *See, e.g. In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, 11 F.4th 1235, 1238-39 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022) (challenge brought by attorneys "assert[ing] attorney-client and work-product privilege over at least some of [the] documents"); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 164-65 (4th Cir. 2019) (challenge brought by law firm invoking attorney-client and work-product privilege over materials); *Klitzman, Klitzman & Gallager v. Krut*, 744 F.2d 955, 956 (11th Cir. 1984) (post-search challenge brought by defendant, an attorney, whose materials were seized); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (pre-enforcement challenge to procedure for review of potentially privileged materials brought by the defendant); *United States v. Ritchey*, No. 21-cr-6, 2022 WL 3023551, at *1-*2 (S.D. Ohio June 3, 2022) (post-search challenge to filter protocol).[1] In each of those cases, moreover, the search warrant was executed, and the parties then litigated whether any right or privilege precluded full government access to them. In short, Twitter can point to no case approving its course of action here: refusing to execute a valid search warrant given the potential for a privilege claim.

Nor does Twitter's attack (Opp. 11-14) on *Google LLC v. United States*, 443 F. Supp. 3d 447 (S.D.N.Y. 2020), aid its argument. As relevant here, *Google* stands for the uncontroversial principle—borne out by the briefing schedule this Court has now adopted—that the Warrant and

---

[1] The Third Circuit's decision in *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987), which involved a physician seeking to protect the privacy rights of his patients, is nothing like Twitter's relationship to its users—as Twitter itself recognizes. *See* Opp. 3 (recognizing the "medical professional and patients" privilege); *see also United States v. Westinghouse Elec. Corp.*, 638 F.3d 570, 572 (3d Cir. 1980) (similar approach involving "privacy interests of employees in their medical records").

the NDO do not travel together.  *Id.* at 455.  Twitter criticizes *Google*'s reasoning with respect to the decision to deny the movant's efforts—similar to Twitter's here—to vacate or modify the NDO.  Whatever the merits of that reasoning, Twitter's obligation to comply with a clear court order does not turn on it.  To be sure, the court in *Google* relied largely on its analysis rejecting the motion to vacate the NDO, which in turn mooted Google's motion to stay execution of the warrant.  But even if Twitter succeeded on its NDO challenge, Twitter identifies no case for the proposition that enjoining execution of the Warrant would also be appropriate.[2]

> **2.    In Any Event, Executive Privilege Provides No Basis for Twitter to Refuse Compliance**

Even if Twitter could rely on a third party's potential privilege claims as a basis to refuse compliance with a search warrant, it fails to demonstrate a colorable claim of executive privilege here that could justify such non-compliance.  The executive-privilege claims that Twitter speculates might be available to the former President are entirely without merit.

The former President would have no basis to challenge the government's access to his Twitter account based on executive privilege because the warrant requires access to the materials by the Executive Branch itself. Executive privilege is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. at 708, and it "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. Gen. Servs. Admin.*, 433 U.S. 424, 447 (1977). The privilege exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449. Consistent with the privilege's function of protecting the Executive Branch as an institution, it may be invoked in

---

[2] Twitter's reliance on two First Amendment prior restraint cases (Opp. 14) is inapposite.  Among other things, neither case involved an ongoing criminal investigation where, as here, the government had obtained a search warrant.

appropriate cases to prevent the sharing of materials outside the Executive Branch—*i.e.*, with Congress, the courts, or the public. *Cf. Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (per curiam) (noting unresolved questions about whether and under what circumstances a former President can invoke the privilege to prevent such "disclosure"—there, to Congress). But the separation-of-powers principles that form the basis for executive privilege provide no justification to prevent the Executive Branch itself from accessing the materials.

      Twitter cites no case in which executive privilege has been successfully invoked to prohibit the sharing of documents within the Executive Branch, and the government is aware of none. To the contrary, in what appears to be the only case in which such an assertion has ever been made, *Nixon v. GSA*, the Supreme Court rejected former President Nixon's assertion that a statute requiring the General Services Administration to take custody of and review recordings and documents created during his presidency violated either the separation of powers or executive privilege. 433 U.S. at 433-36. Addressing the separation of powers, the Court emphasized that the Administrator of the GSA "is himself an official of the Executive Branch," and that the GSA's "career archivists" are likewise "Executive Branch employees." *Id.* at 441. The Court rejected the former President's invocation of privilege against the statutorily required review by the GSA, describing it as an "assertion of a privilege against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. The Court explained that the relevant question was whether review by Executive Branch officials within the GSA would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451. And it held that the question was "readily resolved" because the review in question was "a very limited intrusion by personnel in the Executive Branch sensitive to executive branch concerns." *Id.*

      Indeed, when the former President previously sought to prevent the Department of Justice

from accessing documents from his presidency on the basis of executive privilege, the United States National Archives and Records Administration ("NARA") flatly rejected that attempt.[3] After NARA found documents with classified markings within 15 boxes of presidential documents that the former President provided to NARA and notified the Department of Justice, the former President sought to prevent the Department of Justice from accessing the materials on the basis of executive privilege. *See* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022) at 1, *available at* https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf. NARA rejected those efforts, noting that with respect to the former President's attempt to assert executive privilege to prevent others within the Executive Branch from reviewing the documents, its decision was "not a close one." *Id.* at 3.

The issue here is similarly not close, and Twitter's speculation is even further afield given the extreme unlikelihood that the former President's Twitter account will contain confidential communications subject to executive privilege. The presidential-communications privilege, which appears to be the only form of executive privilege to which Twitter refers in its brief, applies to communications involving the President and his immediate White House advisers (and their staff) that "reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege applies only to "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *GSA*, 433 U.S. at 449 (internal citation and quotation omitted). Twitter provides no basis to conclude that the former President used his Twitter account—rather than face-to-face conversations, written memoranda, or even electronic

---

[3] At the time *Nixon v. GSA* was litigated, the National Archives was a part of the General Services Administration. In 1985, Congress created the National Archives and Records Administration as a separate agency.

communications through government accounts—to communicate confidentially with his advisors about presidential matters. Indeed, as the former President has acknowledged, he used the account during his presidency "as a channel for communicating and interacting with the *public* about his administration." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021) (emphasis added). Twitter's supposed concern about potential executive-privilege issues provides no basis to refuse compliance with the valid warrant here.

### III. The Court Should Enter an Order Imposing Monetary Sanctions Until Twitter Complies with the Warrant

Twitter's failure to comply with a clear and unambiguous order warrants a finding of contempt and coercive sanctions.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947) (citation omitted). A "per diem, coercive fine . . . is the epitome of a civil sanction" for contempt. *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004). "[F]ines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994). Contempt sanctions "must be sufficiently hefty such that the contemnors are induced to comply and the Court 'must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, Misc. Nos. 18-175, 18-176, 18-177 (D.D.C.

Apr. 10, 2019) (BAH), 2019 WL 2182436, at *4 (quoting *United Mine Workers of Am.*, 330 U.S. at 304).

To maximize the likelihood of obtaining Twitter's rapid compliance with this Court's decision, the government respectfully requests that the Court impose escalating daily fines. *See Pigford*, 307 F. Supp. 2d at 54 (adopting fine of $1,000 per day for first month of contempt, increasing by $1,000 for each subsequent month the contempt continued unpurged). The amount of any fine should be commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay.[4]  *See, e.g.*, *NLRB v. Local 3, International Brotherhood of Elec. Workers*, 471 F.3d 399, 405 (2d Cir. 2006) (affirming a per-violation prospective compliance fine plus an additional $5,000 per day for each day that a violation continues); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 2019 WL 2182436, at *5 (explaining that a "[d]aily imposition of a $50,000 fine is fitting" for "multi-billion-dollar banks disregarding an order to produce records or a witness essential to an investigation into a state-sponsor of terrorism's proliferation of nuclear weapons"); *id.* ("Courts previously have approved the amount of $50,000 per day as an appropriate sanction for other well-resourced corporations and international banks.") (citing multiple cases in support); *see also Pigford*, 307 F. Supp. 2d at 54.

---

[4] As of October 2022, Twitter was valued at over $40 billion.  *See* Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, New York Times (Oct. 27, 2022); *available at* https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

        Respectfully submitted,

        JACK SMITH
        Special Counsel

By:    /s/ *Mary L. Dohrmann*
        Mary L. Dohrmann (N.Y. Bar No. 5443874)
        Gregory Bernstein (California Bar 299204)
        Assistant Special Counsels
        950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
        (202) 714-9376