UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Filed Under Seal** |

**GOVERNMENT'S SEALED OPPOSITION TO TWITTER INC.'S MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT**

For what appears to be the first time in its history, Twitter Inc. ("Twitter") has filed a motion to vacate or modify an order that it not disclose the existence of a search warrant. ECF No. 7. Twitter takes this extraordinary action only for the account subject to the warrant: @realDonaldTrump ("Account"), used by former president Donald J. Trump. For the reasons stated in the application in support of the non-disclosure order ("NDO") and expanded upon here, there is reason to believe notification to the former president, a sophisticated actor with an expansive platform, would result in a statutorily cognizable harm. Yet Twitter, using the First Amendment as pretense, apparently wants the Court to place Twitter's economic interests over the Court's findings in the NDO—and the integrity of the Government's ongoing investigation. The Court should deny Twitter's Motion.

### BACKGROUND

Twitter is an electronic service provider that enables account holders to share and interact with content and to send and receive communications with other users, publicly or privately. The former president, from the Account, used Twitter in ways described in the Government's *ex parte* submission.

- 1 -

## I. The Warrant

On January 17, 2023, based on an affidavit establishing probable cause, this Court authorized a warrant (the "Warrant") to search the Account. ECF No. 4, Affidavit in Support of Application for a Search Warrant (the "Affidavit"), at ¶ 8. The Warrant incorporates by reference two attachments—describing the "Property to Be Searched" (Attachment A) and the "Particular Things to Be Seized" (Attachment B)—but not the warrant application or the probable cause Affidavit. ECF No. 4, at 2. In other words, of the extensive application, the Warrant itself (as served on Twitter) comprises only six pages. *See* Exhibit A. Nevertheless, those six pages reflect (1) the existence of the Warrant; (2) the Court and Judge from which the Warrant was obtained; (3) the date and time of the Warrant's issuance; (4) the specific account subject to the Warrant; (5) the specific categories of information sought by the Government, including certain content, subject areas, and persons of interest; and (6) the name, title, and official address of the agent with the Federal Bureau of Investigation ("FBI") to whom responsive information should be disclosed. *Id.*

## II. The Non-Disclosure Order

When it authorized the Warrant, the Court also issued an order sealing the Warrant and related materials and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days. ECF No. 3.[1] The NDO was granted based on facts showing that notifying the former president would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to an investigation or

---

[1] The Government's NDO application was based on § 2705(b)(3)-(5), ECF No. 3, ¶ 10, but its proposed non-disclosure order erroneously included language from § 3103a(b), which applies to delayed-notice Rule 41 warrants (not ECPA warrants) and which errantly included flight from prosecution as a predicate. The Government now seeks to strike from the NDO this language, which can be found at the bottom of page two of the NDO.

delaying of trial. *See* 18 U.S.C. § 2705(b)(3)-(5); NDO at 1. Facts supporting the NDO are detailed in the Government's *ex parte* submission.

### III. Procedural History

The Warrant commanded that Twitter disclose responsive information to the Government within ten days of its issuance, that is, by January 27, 2023. ECF No. 4, Attachment B.I, ¶ 5. Twitter was served with the Warrant, including Attachment A and Attachment B.I, *see* Exhibit A, and the accompanying NDO, but refused to comply with the Warrant's deadline. Consequently, on February 2, 2023, the Government filed a Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant. ECF No. 5. Later that same day, asserting in part that its "ability to communicate with its customers about law enforcement's efforts to access their communications and data . . . is essential to its business model," Twitter filed a motion to vacate or modify the NDO now pending before the Court. ECF No. 7; ECF No. 7-1, Twitter Inc.'s Memorandum of Points and Authorities in Support of Motion to Vacate or Modify Non-Disclosure Order Issued Pursuant to 18 U.S.C. § 2705(b) and Stay Twitter's Compliance with Search Warrant ("Twitter's Mem."), at 4.

After a hearing on February 7, 2023, the Court granted the Government's Motion and ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant. *See* Min. Order, dated Feb. 7, 2023. While Twitter made a production before 5:00 p.m. on February 7, it was not complete. Following multiple further conferences between the Government and Twitter, as well as a hearing before the Court on February 9, 2023, Twitter finally asserted compliance with the search warrant on February 9, 2023, at 8:28 p.m. Accordingly, Twitter was in contempt until at least February 9, 2023, at 8:28 p.m. and should be subject to a $350,000 fine

as a result. *See* ECF No. 19.

At the February 7 hearing, Twitter acknowledged that it had not "found any court decision in which a third-party company, like Twitter, has successfully stayed compliance with a search warrant pending a First Amendment challenge to a non-disclosure order." Sealed Hr'g Tr. (Feb. 7, 2023) at 61. The Court ordered Twitter to "submit a list of each case in which Twitter, Inc. has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the court's resolution of that challenge." Min. Order, dated Feb. 7, 2023. Twitter included in its response cases not involving § 2705(b), and even cases where Twitter simply "asserted," in Twitter's parlance, an informal—*i.e.*, not "filed"—challenge to the NDO. ECF No. 14. Twitter's list reveals that Twitter has *never before*, in its sixteen years of operating, filed a challenge to an NDO issued pursuant to § 2705(b) for a warrant.

The Government now opposes Twitter's Motion.

## ARGUMENT

**I. The Non-Disclosure Order is constitutional under the First Amendment.**

**A. Statutory background**

Congress enacted the Stored Communications Act (the "SCA") in 1986, as part of the Electronic Communications Privacy Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986). In pertinent part, the SCA regulates the Government's access to electronic communications and information stored by electronic communications service providers and remote computing providers, like Twitter. Within the SCA, Section 2703 defines how the Government obtains records and information pertaining to the users of electronic services. *See generally* 18 U.S.C. § 2703(a)-(c). Section 2703 provides for different means of obtaining the evidence—including grand jury subpoenas, court orders under Section 2703(d), and search warrants—and different levels of privacy protection depending on the type of evidence sought. *See* § 2703(c)(2).

Section 2705(b) complements Section 2703 by authorizing the Government to seek a court order to prevent an electronic communications service provider from disclosing the fact that it has received Section 2703 process regarding a user. *See* 18 U.S.C. § 2705(b); *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 208 (D.D.C. 2018). At the Government's request, a court may issue a non-disclosure order "for such period as the court deems appropriate," based upon an independent judicial determination that "there is reason to believe that notification of the existence of the [legal process pursuant to Section 2703] will result" in (1) endangerment of a person's life or physical safety; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) seriously jeopardizing an investigation or unduly delaying a trial. 18 U.S.C. § 2705(b). The SCA's statutory scheme thus requires that, once a court has found that the Government has demonstrated a "reason to believe" that disclosure would result in one or more of the listed harms, the court must issue an order prohibiting the service provider to whom the Section 2703 process is directed from notifying "any other person" of the legal process for a period of time that the court deems appropriate. *Id.*[2]

Section 2703 process, and related Section 2705(b) orders, are employed in a wide array of contexts, often involving grand jury investigations that are not yet public or where only some aspects of the investigation are publicly known. The Government may seek basic subscriber

---

[2] Section 2705(b) is far from the only statute limiting disclosure of information related to government investigations. *See, e.g.*, 18 U.S.C. § 3420 (providing that "[n]o officer, director, partner, employee, or shareholder of, or agent or attorney for, a financial institutional shall, directly or indirectly, notify any person named in a grand jury subpoena served on such an institution in connection with an investigation . . ."); 18 U.S.C. § 2511 (governing disclosures of wiretap surveillance; 18 U.S.C. § 3123 (governing disclosures of pen registers and trap-and-trace devices); *see also Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (observing that "even in a suit for damages based on disclosures allegedly made in a [suspicious activity report ("SAR")], a financial institution cannot reveal what disclosures it made in a SAR, or even whether it filed a SAR at all").

information at an early stage of an investigation, when investigators know nothing more than an IP or email address used in connection with a potential crime, and the identity of the individual is unknown. And the Government may seek a court order under Section 2703(d) to gather further information, such as identifying information about individuals with whom a suspect is communicating as an investigation progresses. Where, as here, probable cause exists to believe that the contents of an electronic account include evidence of a crime, warrants are sought to obtain such evidence.

In all of these situations, absent the limited secrecy provided for under the SCA, the ability of grand juries and government investigators to accumulate evidence and identify wrongdoers would be seriously undermined by an electronic communications service provider's decision to inform the target of legal process, or other potentially involved third parties, about the existence of, or steps taken in, a grand jury investigation. In recognition of the evolving nature of investigations, the U.S. Department of Justice policy regarding applications for orders pursuant to Section 2705(b) notes that "[w]hen applying for a § 2705(b) order to accompany a subpoena seeking basic subscriber information in an ongoing investigation that is not public or known to the subject(s) of the investigation, stating the reasons for the protection from disclosure under § 2705(b) . . . usually will suffice." U.S. Dep't of Justice, *Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 n.2 (Oct. 19, 2017). "At a later stage of the investigation," the policy notes, such as "when a search warrant is being sought, the prosecutors should include more specific facts, as available, in support of the protective order." *Id.*; *see also* U.S. Dep't of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 (May 27, 2022) (noting the prosecutors "must provide a court with

sufficient facts to permit the court to conduct" a "case- and fact-specific analysis," including by "identify[ing] which of the pertinent factors apply").

### B. The Non-Disclosure Order survives strict scrutiny.

Twitter contends that the NDO cannot withstand strict scrutiny.[3]  Twitter's Mem. 7–15. Under strict scrutiny, the challenged NDO is valid if it is "narrowly tailored to serve compelling state interests," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and there are no "less restrictive alternatives [that] would be at least as effective in achieving the [NDO's] legitimate purpose," *Reno v. ACLU*, 521 U.S. 844, 874 (1997).  The NDO at issue here satisfies strict scrutiny.  *See Matter of Subpoena 2018R00776*, 947 F.3d 148, 159 (3d Cir. 2020) (*Matter of Subpoena*) (applying strict scrutiny and affirming district court order denying challenge to a non-disclosure order under Section 2705(b)); *Matter of the Search of Information Associated with E-mail Accounts*, 468 F. Supp. 3d 556, 560–63 (E.D.N.Y. 2020) (*E-mail Accounts*) (applying strict scrutiny and denying Microsoft Corporation's challenge to a non-disclosure order under Section 2705); *Google LLC v. United States*, 443 F. Supp. 3d 447, 452–55 (S.D.N.Y. 2020) (same for challenge brought by Google);  *cf. In re National Security Letter*, 33 F.4th 1058, 1063 (9th Cir. 2022) (applying strict scrutiny and affirming a non-disclosure order obtained in connection with a national security letter issued under 18 U.S.C. § 2709(c)).

---

[3] No precedent from this Court or the D.C. Circuit has concluded that strict scrutiny applies when an electronic service provider challenges a non-disclosure order, and there are good reasons *not* to apply such "exacting" review to a non-disclosure order that "is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 877–78 (2d Cir. 2008).  Because the NDO here nonetheless survives strict scrutiny, the Court can assume without deciding that it applies.  *See Google LLC v. United States*, 443 F. Supp. 3d 447, 452 (S.D.N.Y. 2020) (adopting that approach).

### i. The Non-Disclosure Order serves a compelling interest.

The compelling government interests at stake include preserving the integrity and secrecy of an ongoing investigation. "Maintaining the integrity of an ongoing criminal investigation is a compelling government interest." *E-mail Accounts*, 468 F. Supp. at 560 (citation omitted). The interest is particularly "acute" where, as here, the investigation remains ongoing. *Matter of Subpoena*, 947 F.3d at 156. And that interest is all the more compelling for the reasons described in the *ex parte* submission. *Cf. Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation.") (quotation omitted).

Closely linked to the compelling interest in maintaining the integrity of an investigation is protecting its secrecy, which in turns facilitates its "proper functioning." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). Relatedly, erosion of grand jury secrecy "substantially increase[s] the ability of persons who have something to hide to impede legitimate investigations." *SEC v. Jerry T. O'Brien*, 467 U.S. 735, 750 (1984). Such secrecy also furthers several additional governmental interests, including (1) "prevent[ing] the escape" of individuals who may be indicted; (2) ensuring free deliberations by the grand jury, while "prevent[ing] persons subject to indictment or their friends from importuning the grand jurors"; (3) forestalling efforts to suborn perjury or tamper with witnesses; and (4) "encourag[ing] free and untrammeled disclosures by persons who have information with respect to the commission of crimes." *Matter of Subpoena*, 947 F.3d at 157 (citing *Douglas Oil Co.*, 441 U.S. at 291 n.10). Although articulated in the context of grand jury investigations, those factors parallel similar considerations described in Section 2705(b), including destroying or tampering with evidence, intimidating witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5).

For the reasons explained in the Government's *ex parte* submission, the NDO serves a compelling governmental interest.

Twitter offers (Twitter's Mem. 8–14) two unpersuasive arguments to the contrary. First, Twitter contends (*id.* at 8–12) that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the former president will "alter the current balance of public knowledge in any meaningful way" because such a disclosure would be merely "incremental." *Id.* at 11. That contention is flawed in several respects. Although the investigation's existence is no longer secret, it does not follow that the specific ongoing investigative steps the Government is pursuing are therefore publicly known. Many of the media accounts that Twitter cites (*id.* at 8–10) attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses.[4] Whatever the effect of those accounts on the "current balance of public knowledge," *id.* at 11, they provide nowhere close to the detail supplied in the Warrant. Providing the Warrant to the former president at this point in the investigation would thus far exceed some mere "incremental" step in informing the former president, as described in the *ex parte* submission.

Second, Twitter argues (Twitter's Mem. 12–14) that "[u]nique and [i]mportant" (*id.* at 12) executive privilege issues support the relief it seeks. That argument is also wanting. For one, Twitter does not explain the relevance of a putatively "unique" or "important" issue to strict scrutiny analysis, which asks whether the NDO sought under Section 2705(b) is narrowly tailored to serve a compelling governmental interest. *See In re National Security Letter*, 33 F.4th at 1072. A Twitter user's potential ability to challenge the legal process at issue—here, the Warrant—is

---

[4] The same is true of the 80 pages of articles and other documents that Twitter submitted as an exhibit to its opposition to the Government's Motion to Show Cause. *See* Twitter's Opposition to Government's Motion for an Order to Show Cause, Exhibit B (filed Feb. 6, 2023).

entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO.  *See, e.g.*, Twitter's Mem. 3 n.1 (Twitter not challenging the Warrant's validity); *id.* at 4 (Twitter acknowledging it "might lack standing to assert the rights and privileges of its users," and acknowledging many potentially privileged communications in which its users could engage).  But even if the executive privilege claim that Twitter postulates bore some relevance to the NDO, that claim lacks merit for the reasons given in the Government's briefing in the show cause litigation.  *See* Government's Reply in Further Support of Motion for an Order to Show Cause Why Twitter Inc. Should Not be Held in Contempt for Failure to Comply with a Search Warrant, at 6–9 (filed Feb. 6, 2023).

### ii. The Non-Disclosure Order is narrowly tailored.

The NDO is narrowly tailored to serve the Government's compelling interest because any restriction on Twitter is the least restrictive means of advancing governmental interests.  *See Matter of Subpoena*, 947 F.3d at 157–58.  The NDO restricts Twitter from disclosing only discrete investigation-related information—information that is in Twitter's hands only because it received legal process in connection with the investigation.  And the NDO is limited in duration.

The scope of speech regulated by the NDO is extremely narrow.  The NDO prohibits Twitter from disclosing the existence or contents of the Warrant.  The NDO does not purport to regulate Twitter's ability to speak about any other topic, such as the issue of non-disclosure orders generally or any information Twitter has obtained independent of its interactions with the Government (or the grand jury) in this case. *See Matter of Subpoena*, 947 F.3d at 158 (finding a non-disclosure order narrowly tailored where it permitted the service provider to "discuss[] the government's requests abstractly, as service providers have done by disclosing the number of data requests and NDOs they receive in public docket civil complaints").  Thus, "[b]y any measure,

[the NDO] restricts a narrow slice of speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 452 (2015). That approach is entirely consistent with cases permitting a protective order in civil litigation that prohibited disclosure of information obtained in discovery because "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times v. Rhinehart*, 467 U.S. 20, 33 (1984); *see Butterworth v. Smith*, 494 U.S. 624, 632 (1990) (extending *Rhinehart* to government investigations by striking down a provision that limited a witness from disclosing his own testimony but not addressing "information which he may have obtained as a result of his participation in the proceedings").

The NDO is further narrowly tailored because it does not apply indefinitely but rather is limited to 180 days. The presence of a "temporal limitation" in a non-disclosure requirement is an "important" consideration in assessing "the balance of government versus free speech interests." *John Doe, Inc.*, 549 F.3d at 877. Courts have upheld as narrowly tailored non-disclosure orders that lasted up to a year. *See Matter of Subpoena*, 947 F.3d at 159; *E-mail Accounts*, 468 F. Supp. 3d at 563. Here, the 180-day order appropriately balances the need for investigative secrecy and any speech interests.

Rather than dispute these straightforward factors, Twitter posits (Twitter's Mem. 14–16) three less restrictive means that it claims would preserve its "[e]ssential First Amendment [r]ights." *Id.* at 14. First, it suggests (*id.* at 14) notifying "just its user"—that is, the former president. That suggestion is a fallacy and a non-starter for all the reasons discussed above and in the Government's *ex parte* submission. Second, Twitter speculates (*id.* at 14–15) that one of the former president's "representative[s]" might fit the bill, perhaps even a representative under the Presidential Records Act ("PRA"), 22 U.S.C. § 2201 *et seq.* These "alternatives are untenable"

because they are "impractical," "would be ineffective in maintaining . . . secrecy," risk "undermin[ing] the government's interest in maintaining the confidentiality of an ongoing investigation," and require a court to "assess the trustworthiness of a would-be confidante chosen by a service provider." *Matter of Subpoena*, 947 F.3d at 158–59. In short, this Court should "'decline to wade into this swamp' of unworkable line drawing." *Id.* at 159 (quoting *Williams-Yulee*, 575 U.S. at 454).[5]

Twitter's final proposal (Twitter's Mem. 15) that the Government obtain the data in question from NARA fares no better. As an initial matter, this proposal is moot in light of Twitter's representation that it has fully complied with the warrant. But more so, even Twitter acknowledges that NARA *does not possess* the full universe of responsive documents required under the Warrant. *See id.* at 6 (suggesting that "much"—though not all—"of the information sought in the Warrant has been produced to NARA"); Sealed Hr'g Tr. (Feb. 7, 2023) at 41–46 (discussing entire categories of information required by the Warrant that are not in NARA's possession). Moreover, Twitter's purported inability to comply with the Court's order and fully execute the Warrant calls into question the credibility of Twitter's representations concerning what it has produced to NARA, since it took days after the Court held Twitter in contempt for Twitter to work through various "challenges and technical issues" and "take the extraordinary efforts" to meet the Warrant's requirements. ECF No. 18, Notice of Twitter's Position on Sanctions, at 2 (filed Feb.

---

[5] Twitter does not expand on why it thinks this approach would be workable. Presumably, Twitter would want to notify the PRA representative in an effort to permit the former president to litigate any executive privilege concerns. But the PRA representative would not have standing or authority to pursue such litigation, absent telling the former president of the Warrant and gaining the former president's consent to file suit.

13, 2023).[6]  Finally, Twitter identifies no authority for the proposition that a narrow-tailoring analysis under Section 2705(b) constrains the Government's choice of investigative tools.

## II. Twitter's meritless stay motion is moot.

Twitter's motion to vacate or modify the NDO includes a request to stay execution of the Warrant, Twitter's Mem. 15–16—relief that Twitter acknowledges no court has ever granted, *see supra* 4.  The Court's granting of the Government's separately filed Motion to Show Cause and ordering Twitter to comply by executing the Warrant necessarily mooted that stay request.  In any event, the request lacked merit.  The first two steps for obtaining a stay under *Nken v. Holder*, 556 U.S. 418 (2009), require that Twitter make "a strong showing" that it is "likely to succeed on the merits" and demonstrate that it "will be irreparably injured absent a stay." *Id.* at 434.  Twitter makes no showing, let alone a "strong showing," that it is likely to succeed on its claim that the NDO cannot withstand strict scrutiny.  Consistent with the weight of recent case law and for the reasons described above and in the Government's *ex parte* submission, Twitter's challenge to the NDO fails, which in turns demonstrates that it cannot satisfy the first stay showing of a strong likelihood of success on the merits.  *See Google LLC*, 443 F. Supp. 3d at 455 (denying service provider's motion to stay execution of a search warrant after concluding that the non-disclosure order satisfied strict scrutiny).  Twitter suggests that its loss of First Amendment "freedoms" necessarily amounts to irreparable injury, but this case is a far cry from the case that Twitter cites

---

[6] The Government does not take a position on whether the Account information held at NARA would necessarily qualify as "presidential records" as that term is defined in 44 U.S.C. § 2201(2), in part because it is unknown the extent to which the former president may have used any private settings in his Twitter account to create "personal records," *see* § 2201(3), which, while outside the ambit of the PRA, may nonetheless be relevant and probative evidence in an investigation.  It is unclear whether the Government could obtain any previously undisclosed presidential records without triggering the PRA regulation and related executive order that requires notification to the former president.  *See* 36 C.F.R. § 1270.44(a)(1) and (c); Executive Order 13489.

for that proposition—*Elrod v. Burns*, 427 U.S. 347 (1976), which involved claims by civil servants that they were discharged or threatened with discharge on account of their political affiliation or nonaffiliation, *see id.* at 349—or other similar situations where more than a "narrow slice of speech" is at issue. *See Williams-Yulee*, 575 U.S. at 452.[7]

## CONCLUSION

For the foregoing reasons, the Court should deny Twitter's motion to vacate or modify the non-disclosure order.

> Respectfully submitted,
>
> JACK SMITH
> Special Counsel
>
> By:   /s/ *Mary L. Dohrmann*
>       Mary L. Dohrmann (N.Y. Bar No. 5443874)
>       James I. Pearce (N.C. Bar No. 44691)
>       Assistant Special Counsels
>       950 Pennsylvania Avenue, N.W.
>       Washington, D.C.  20530

---

[7] Twitter's invocation (Twitter's Mem. 16) of *Freedman v. State of Md.*, 380 U.S. 51 (1965), is misplaced. The "procedural safeguards" that *Freedman* requires, 380 U.S. at 58, and on which Twitter relies (Twitter's Mem. 7, 16), apply to cases involving "government censorship and licensing schemes," not to a law that prohibits disclosure of government-requested information sought "to assist in an investigation." *In re National Security Letter*, 33 F.4th at 1077.