FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDERSEAL** |

## TWITTER'S REPLY IN SUPPORT OF ITS
## MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER
## ISSUED PURSUANT TO 18 U.S.C. § 2705(b)
## AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT

In its opposition, the government does not seriously contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that the Non-Disclosure Order operates as a prior restraint on such speech and is therefore subject to strict scrutiny. Instead, it asserts that disclosure of the Warrant in this case would undermine "the integrity and secrecy of an ongoing investigation." Opp. 8. But those vague and generalized interests are insufficient to justify the prior restraint in this case. Both the statute and the First Amendment require the government to establish that silencing Twitter is necessary to address the narrower and more concrete objectives that the government identified when it first obtained the order: preventing "destruction of or tampering with evidence," "intimidation of potential witnesses," and "serious jeopardy to the investigation."[1]

---

[1] In its opposition brief, the government abandons the first rationale (flight from prosecution) on which it relied, conceding it was included in error. Opp. 2 n.1. The government states that the errant language "can be found at the bottom of page two of the NDO," but it appears that the government instead means to refer to language found at the bottom of page one.

FILED UNDER SEAL

The government has not met and cannot meet that burden. The government's opposition does not even attempt to account for the unique and unparalleled level of publicity surrounding this investigation. It is undisputed that the public knows the government is seizing electronic communications in this (publicly-announced) criminal investigation, including from people who communicated directly with the Twitter user at issue in the Warrant. When an investigation's existence and details about the specific investigative technique at issue in a warrant are widely known, as here, secrecy alone cannot justify a gag order covering a warrant that any reasonable observer would expect the Special Counsel to obtain. Nor can the government claim to be concerned that the Twitter user might destroy the evidence sought, given that the government has now obtained that evidence from Twitter pursuant to the Warrant. And it cannot be credibly said that disclosing the Warrant would provide a particular reason for witness intimidation in view of all the prior reporting that this type of warrant has already been used to seize this type of communications.

Even if the government could establish that the Non-Disclosure Order furthered a compelling (and statutorily identified) interest, it still could not demonstrate that it is the least restrictive means of advancing that interest. The government cursorily dismisses Twitter's proposed alternatives as "untenable" or "impractical," but the Constitution demands more than that. The government may not just assert that proposed alternatives "do not work," or that its "chosen route is easier"—it "must demonstrate that alternative measures … would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 494-495 (2014) (applying intermediate scrutiny). The government has not done so here. It could prevent whatever investigative danger it fears by, for instance, permitting Twitter to disclose only the warrant form and Attachment A (and the relevant date range) to a representative of Mr. Trump who has

2

FILED UNDER SEAL

already been authorized to act on his behalf "in all respects that pertain to the records of [his] Presidency."[2]  Or it could disclose just the fact of the Warrant, but not its contents or attachments.

As a result, the government has failed to carry its burden of justifying the Non-Disclosure Order in this case.  The court should accordingly vacate or at least modify that order.

**I.      The Government's Asserted Interests Cannot Justify the Non-Disclosure Order**

Both the SCA and the Constitution require the government to make specific showings to justify a non-disclosure order.  But the highly public nature of the government's investigation and use of this investigative tool means that it cannot make the required showing.  Indeed, the government's opposition brief makes little effort to do so—instead, it appears to apply a different—and lesser—legal standard than the one mandated by the statute and the Constitution.

1.      The Government Cannot Satisfy the Proper Standard for Obtaining a Section 2705(b) Order

Strict scrutiny requires the government to "specifically identify an 'actual problem' in need of solving," and explain why the Non-Disclosure Order is "actually necessary to the solution."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).  The government cannot satisfy that burden here for the three statutorily-authorized rationales that remain in the Non-Disclosure Order.

**Destruction or Tampering With Evidence.**  The government cannot demonstrate a meaningful risk that the evidence at issue will be destroyed or tampered with, because Twitter has now produced the evidence from the Target Account that the government requested.  If

---

[2] Letter of Donald J. Trump to NARA Archivist David S. Ferriero (Jan. 19, 2021), available at https://www.archives.gov/files/foia/wh-ltr-to-u.s.-archivist-trump-pra-rep-1.19.2021.pdf (hereinafter "NARA Designation").

FILED UNDER SEAL

disclosure of the Warrant ever risked the destruction of the evidence it sought, it cannot do so now that the evidence is within the government's control.

Nor is it reasonable to conclude that disclosure of the Warrant could prompt the destruction of *other* evidence. As explained in Twitter's opening brief, the Special Counsel has made its investigations into Mr. Trump public. Mot. 8-12. These investigations are likely the most widely known and widely reported on criminal investigations in the Nation. The Department of Justice has itself confirmed the investigations' existence and scope, and has issued scores of subpoenas (now public) encompassing subjects' telephones, personal communications, and sensitive testimony (including that of aides who worked directly for the former President). Mot. at 9-11. As a result, everyone—including Mr. Trump—knows the following:

- The investigations target Mr. Trump and his associates;

- The investigations focus on, among other things, Mr. Trump's involvement in and responsibility for interference with Congress's certification of the presidential election on January 6;

- The government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and

- The investigations encompass Mr. Trump's personal communications, including communications stored electronically.

In short, Mr. Trump is at least constructively aware that the government has done or is doing what the Warrant does.

Adding the limited information reflected in the Warrant—that the government seeks information from the Target Account—to that vast body of public knowledge cannot constitute a reason to believe that anyone will destroy evidence (or, if notice were limited to Mr. Trump, that he will destroy evidence). If Mr. Trump or a witness were inclined to destroy evidence, they

FILED UNDER SEAL

already have ample reason to do so in view of the numerous public reports that the government

has taken the specific investigative step at issue here in this very case—seizing electronic

communications.  The statute and the Constitution require the government to draw a specific link

between disclosure of this Warrant and that act of destroying evidence—and the government

cannot do so.[3]

Indeed, since this court initially issued the Non-Disclosure Order, the rationale for it has

grown weaker, not stronger.  In just the past few weeks, the government has taken several highly

publicized investigatory steps[4]: the Special Counsel has subpoenaed the former President's

daughter and advisor Ivanka Trump and her husband and former presidential advisor Jared

Kushner[5]; subpoenaed former Vice President Mike Pence[6]; subpoenaed Mark Meadows, Mr.

Trump's last Chief of Staff[7]; required two of Mr. Trump's lawyers to appear before a grand

---

[3] Mr. Trump may be unique in this regard for this investigative step.  Because he was announced
as a principal subject of investigation and because the public reporting has focused on
investigative actions directed at him, he may have a unique level of knowledge about
investigative actions regarding him—even relative to other investigations of him that were
conducted with far less public awareness.

[4] The news articles Twitter cited its initial motion are attached here as Exhibit A.  The articles
cited in this Reply are attached as Exhibit B.

[5] Maggie Haberman & Michael S. Schmidt, *Jared Kushner and Ivanka Trump Subpoenaed in
Jan. 6 Investigation*, N.Y. TIMES (Feb. 22, 2023), available at
https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html.

[6] Maggie Haberman & Glenn Thrush, *Pence Gets Subpoena From Special Counsel in Jan. 6
Investigation*, N.Y. TIMES (Feb. 9, 2023), available at
https://www.nytimes.com/2023/02/09/us/politics/pence-subpoena-trump.html.

[7] C. Ryan Barber & Sadie Gurman, *Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by
Grand Jury*, WALL STREET JOURNAL (Feb. 15, 2023), available at
https://www.wsj.com/articles/mark-meadows-trumps-last-chief-of-staff-subpoenaed-by-grand-
jury-8c7ad44e?mod=Searchresults_pos2&page=1.

FILED UNDER SEAL

jury[8]; attempted to force one of those lawyers to provide "answers about direct conversations" he had with Mr. Trump[9]; "moved aggressively with subpoenas to associates of Mr. Trump and requests for prompt productions of documents"[10]; and subpoenaed state legislative leaders to acquire their communications with Mr. Trump and other Trump campaign officials.[11]  If there was any public uncertainty before (and there was not), there is now no hiding that the Special Counsel is investigating Mr. Trump and his associates, and that his investigative steps include obtaining the contents of direct communications between Mr. Trump and his associates.  The disclosure of the Warrant does not meaningfully add anything to that public knowledge.[12]

---

[8] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023), available at https://www.wsj.com/articles/trump-lawyers-appeared-before-grand-jury-as-part-of-classified-documents-probe-3d1c8040?mod=Searchresults_pos5&page=1.

[9] Katelyn Polantz et al., *Special counsel is locked in at least 8 secret court battles in Trump investigations*, CNN (Feb. 16, 2023), available at https://www.cnn.com/2023/02/16/politics/secret-grand-jury-special-counsel-trump/index.html.

[10] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023).

[11] Jim Small, *GOP Arizona legislators, including leaders of the house and senate, subpoenaed to testify in special counsel probe of Trump*, Arizona Mirror (Feb. 17, 2023), available at https://www.azmirror.com/blog/gop-arizona-legislators-including-leaders-of-the-house-and-senate-subpoenaed-to-testify-in-special-counsel-probe-of-trump/.

[12] Significant media coverage of an investigation may have different legal consequences in the context of grand jury sealing than in the context of Section 2705(b) non-disclosure orders.  *See In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *10 (D.D.C. Feb. 23, 2023) ("[M]aterials from grand jury matters of intense public interest … may have to remain entirely sealed in the name of grand jury secrecy.").  Rule 6(e) asks only whether sealing is required "to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e).  Section 2705(b), by contrast, requires the government to make a showing that specific adverse consequences may flow from disclosure.  Even if media publicity arguably lowers the bar for establishing a potential breach of grand jury secrecy (as relevant for Rule 6(e)), it can sometimes raise the bar for proving that a particular breach of secrecy will lead to specific adverse consequences for an investigation—as Twitter's motion and this reply have explained.

FILED UNDER SEAL

**Intimidation of Potential Witnesses.**  Nor is it reasonable to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications.  Just as with the destruction of evidence factor, any would-be intimidators, including Mr. Trump himself, have already had more than sufficient reason and opportunity to try to intimidate witnesses in this investigation.  Learning of this Warrant would add nothing meaningful to the mix of information already available.  And unlike the dozens of subpoenas that are already public, the Warrant here does not involve a witness at all—only data stored on Twitter's servers.  The types of revelations that would be logically tied to potential witness intimidation—the disclosure of an investigation's existence or the name of a potential witness—are not implicated by the limited disclosure of this Warrant.  And indeed, those categories of information have already been revealed, dozens of times over.

**Serious Jeopardy to an Investigation.**  For similar reasons, the government cannot show that disclosure would "seriously jeopardiz[e]" its already highly public investigation.  18 U.S.C. § 2705(b)(5).  Importantly, this factor cannot be satisfied merely by showing some vague impact on the "integrity" of the government's investigation.  *Contra* Opp. 8.  Only "serious[] jeopard[y]" to the investigation can justify restricting Twitter's First Amendment rights.

In a typical case, the government might demonstrate a risk of "serious[] jeopardiz[ation]" by observing that disclosure would "alert the targets to [an] ongoing investigation" of which they would otherwise be unaware.  *In re Grand Jury Subpoena Subpoena to Facebook*, 2016 WL 9274455, at *2 (E.D.N.Y. May 12, 2016); *see also, e.g.*, *In the Matter of the Application of the U.S. for a Warrant Authorizing, [Redacted]*, 2015 WL 667923 (D. Kan. Feb. 13, 2015), at *1 ("[T]he government contends such [serious] jeopardy 'would result from notifying a major target

FILED UNDER SEAL

of these investigations that he is under current scrutiny by law enforcement personnel.'"").  But that cannot justify the government's approach here—where the Attorney General of the United States held a nationally televised press conference and confirmed the investigation, its scope, and the identity of the target.  Once again, this Warrant adds nothing to the public knowledge of the investigation's existence or targets.  *See In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9287146, at *6 (N.D. Tex. Sept. 22, 2017) (vacating a non-disclosure order after indictment was unsealed, because the resulting public knowledge meant that "ongoing restriction on Twitter's communication with its subscriber[]" did "little to conceal that [its subscriber]—and, thus, his associates—are under investigation … ."), report and recommendation adopted, No. 3:17-MC-40-M-BN, 2017 WL 9287147 (N.D. Tex. Oct. 19, 2017).

**Past Conduct.**  That Mr. Trump may have previously engaged in obstructive behavior towards known cooperating witnesses (or potentially cooperating witnesses) with respect to other investigations or inquiries does not suffice.  Twitter does not question that such past behavior would justify concern that Mr. Trump might attempt to obstruct this investigation.  But that alone cannot justify restricting Twitter from speaking because the Warrant reveals little that is not already public and provides no new reason for Mr. Trump to engage in obstructive activity.  To silence Twitter the government must show that "there is reason to believe that notification of the existence of the" Warrant *here*—as opposed to all of the government's other public efforts— would prompt obstruction.  18 U.S.C. § 2705(b).  And for the reasons already described, the particular sorts of obstruction that could actually endanger the government's investigation—like the destruction of evidence or intimidation of witnesses—are not realistically likely to follow from the Warrant's disclosure.

8

FILED UNDER SEAL

    2.    <u>The Government's Counter-Arguments Cannot Justify The Non-Disclosure Order</u>

In its opposition, the government offers two counter-arguments for why disclosure of the Warrant is nonetheless likely to damage its investigations.  First, it argues that much of the public knowledge of its investigations stems from media accounts that "attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses."  Opp. 9.  But a significant portion of the public information about the investigations has, in fact, come from the government itself.  As explained in Twitter's opening brief, the Department of Justice confirmed the criminal investigations into Mr. Trump in a televised press conference.  Mot. 9.  It has issued scores of subpoenas to extremely high-profile witnesses who are close to the target of its investigations.  And the government "has supported the partial unsealing of two judicial decisions resolving filter team motions" that confirmed it has seized and is reviewing the email accounts of Mr. Trump's associates as part of the investigations.  *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *15 (D.D.C. Feb. 23, 2023) (citing *In re Search of Info. Associated with Two Accounts Stored at Premises Controlled by Google LLC*, 2022 U.S. Dist. LEXIS 237972 (D.D.C. Dec. 15, 2022)).  In any event, it is largely irrelevant whether the public's existing knowledge of the investigations arises from deliberate disclosures by the Special Counsel, or instead from investigative reporting.  Either way, the public— including Mr. Trump—has become aware of the investigation's existence, scope, and methods (including the Warrant's method and the Warrant's target type of material).  Regardless of how that came about, it means that disclosure of the Warrant is unlikely to substantially alter the balance of public knowledge about the investigations.

The government's second argument, that the public's knowledge is more general than what the Warrant reveals, fares no better.  In particular, the government argues that while "the

FILED UNDER SEAL

investigation's existence is no longer secret," the "specific ongoing investigative steps the Government is pursuing" are.  Opp. 9.  But as explained above, the public knows of far more than just "the investigations' existence."  The public knows that the investigations target Mr. Trump and a wide range of his associates; that the investigations focus on, among other things, Mr. Trump's involvement in the events of January 6; that the government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and that the investigations encompass Mr. Trump's personal communications, including those stored electronically.  The government cannot point to any piece of information in the Warrant that would meaningfully reveal something beyond that broad set of already-public facts.

3.      The Government Misstates the Legal Standard for Obtaining a Section 2705(b) Order

The SCA provides that a court may issue a non-disclosure order under 18 U.S.C. § 2705(b) only if "there is reason to believe that notification of the existence of the warrant … will result in" one of several specific adverse outcomes.  Those include the grounds on which the non-disclosure order in this case now relies: "destruction of or tampering with evidence," "intimidation of potential witnesses," and "otherwise seriously jeopardizing an investigation." 18 U.S.C. § 2705(b)(3)-(5).  The government's opposition, however, largely ignores these statutory requirements.  Instead, the government suggests an entirely separate rationale for non-disclosure: "preserving the integrity and secrecy of an ongoing investigation."  Opp. 8.

Contrary to what the government suggests, it cannot justify the non-disclosure order simply because there is a related grand jury proceeding.  *See* Opp. 8.  Grand jury secrecy rules do not speak to disclosure of a warrant, Fed. R. Crim. P. 6(e)(2)(B), and the fact of a search warrant

FILED UNDER SEAL

does not in and of itself reveal "a matter occurring before the grand jury."[13] *See In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *4 n.6 ("Search warrants … are not subject to Rule 6(e), even when the warrant is issued to obtain evidence as part of an ongoing grand jury investigation[.]").  Indeed, a warrant, unlike a grand jury subpoena, can be issued in the absence of a grand jury, such as post-indictment.  And given the level of public knowledge concerning the Special Counsel's investigations (discussed above), the Warrant in this case has far more in common with a post-indictment warrant, where maintaining secrecy is not an issue, than a pre-indictment grand jury subpoena issued in total secrecy. Moreover, the existence of a grand jury investigation does not cloak every related government action in grand jury secrecy.  *See Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 73 (D.C. Cir. 2018) ("Rule 6(e) does not … draw a veil of secrecy over all matters occurring in the world that happen to be investigated by a grand jury." (quotation marks and alteration omitted)).  Even the governing federal rule in the grand jury context begins with a presumption against secrecy, *see* Fed. R. Crim. P. 6(e)(2)(A) ("No obligation of secrecy may be imposed on any person except in accordance with [this rule]."), and courts that have upheld non-disclosure orders in the grand jury context have limited those orders to "exceptional cases," *see, e.g.*, *In re Grand Jury Proceedings*, 814 F.2d 61, 69 (1st Cir. 1987).

Moreover, the secrecy of a criminal investigation alone does not, "without more, provide a statutory basis for a nondisclosure order under Section 2705(b)."  *In re Grand Jury Subpoena Issued to Twitter*, Inc., 2017 WL 9287146, at *6.  Neither "secrecy" nor "integrity," as an end unto itself, appear in the statute.  Rather, the law spells out that a desire for secrecy justifies non-

---

[13] Were it otherwise, a non-disclosure order would be required for every search warrant to protect grand jury secrecy.

FILED UNDER SEAL

disclosure only where the government establishes a specific, factual link to the particular harms

Congress has identified.  "[S]ecrecy" and "integrity" could be invoked to justify any speech

restriction about any investigative step.  But both the First Amendment and the statute preclude

the government from asserting an interest that is "too broad … to serve as an effective constraint

on law enforcement decisions that may infringe First Amendment rights."  *Doe v. Harris*, 772

F.3d 563, 580 (9th Cir. 2014).

As explained above (and in Twitter's opening motion), the government cannot satisfy the

specific and concrete interests enumerated in Section 2705(b)(3)-(5).  To the extent that the

government's *ex parte* filing relies on some other interest, it should be required to disclose that

interest to Twitter.  That is particularly so in this case, where the government has already

conceded that it committed a substantive error in its initial *ex parte* filing to obtain the Non-

Disclosure Order.  Revealing the nature of the government's interest—as opposed to the facts

establishing a risk to that interest—is unlikely to disclose anything that could endanger the

government's investigation.  And keeping it secret (if that is what the government has done)

deprives Twitter of a meaningful opportunity to contest the Non-Disclosure Order by explaining

why that interest would not be endangered by limited disclosure.  "*Ex parte* communications

generally are disfavored because they conflict with a fundamental precept of our system of

justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party

and to meet them."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995)

(quotation marks omitted).  For that reason, particularly where an *in camera*, *ex parte* filing is

"dispositive," the government should at least make "available to both sides … the general

purport of the [*ex parte*] argument and evidence such that the other side will have an opportunity

to respond to the general tenor of the proposed submission," and "explain[] why more detail

FILED UNDER SEAL

should not be made available." *Ibrahim v. Dep't of Homeland Sec.*, 2012 WL 6652362, at *6

(N.D. Cal. Dec. 20, 2012); *see also United States v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007)

("If *ex parte* communications are to be allowed at all, they must continue no further than the

extent to which they are absolutely necessary to protect the state's compelling interest.").

      If the government is relying on a secret rationale for the Non-Disclosure Order, that also

raises the possibility that it has shifted its rationale since it first sought the order.  But because

prior restraints are constitutionally suspect, such a restraint cannot be defended based on "*post

hoc* rationalizations" or the use of "shifting … criteria," which too easily enable censors to

"permit[] favorable, and suppress[] unfavorable, expression."  *City of Lakewood v. Plain Dealer

Publ'g Co.*, 486 U.S. 750, 758 (1988).  The government was required to make the requisite

showing *prior to* the Non-Disclosure Order being signed.  The Court should not countenance any

post-hoc rationalizations that were not offered at the time the government first sought the Non-

Disclosure Order.

## II.    The Government Has Not Demonstrated That the NDO is Narrowly Tailored; Nor Has It Meaningfully Addressed Twitter's Proposed Less Restrictive Alternatives

      A speech restriction is narrowly tailored only "if it targets and eliminates no more than

the exact source of the 'evil' it seeks to remedy."  *Boardley v. U.S. Dep't. of Interior*, 615 F.3d

508, 519 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).  As Twitter

explained in its Motion, there are several ways that the Court could more narrowly tailor the

Non-Disclosure Order to achieve the government's asserted interests and minimize infringement

on Twitter's First Amendment rights.  Rather than seriously consider these less restrictive

measures, the government dismisses them with two paragraphs of cursory analysis.  But the

government may not just assert, as it does here, that the proposed alternatives simply "do not

work."  *McCullen*, 573 U.S. at 494 (applying intermediate scrutiny).  It must instead "show[] that

13

FILED UNDER SEAL

it seriously undertook to address the problem with less intrusive tools readily available to it," "that it considered different methods that other jurisdictions have found effective," and, ultimately, "that alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id*. at 494-495*; see also Billups v. City of Charleston, S.C.*, 961 F.3d 673, 688 (4th Cir. 2020) ("testimony from [government] officials regarding the predicted ineffectiveness of … suggested alternatives[,] … without more, is not sufficient to satisfy" even intermediate scrutiny).  Because the government fails to meaningfully respond to Twitter's proposals for a less restrictive alternative or itself demonstrate that alternative measures are insufficient, it has not shown that its Non-Disclosure Order is narrowly tailored to achieve its stated interests.

      1.   <u>The Government has not Demonstrated an Absence of Less Restrictive Means</u>

      First, the Court could partially modify the Non-Disclosure Order to permit Twitter to notify the user of the Target Account to the existence of the Warrant without disclosing the contents of Attachment B.  The government's articulation of its interest presupposes that Twitter would be "[p]roviding the Warrant to the former president" or otherwise providing to him "the detail supplied in the Warrant."  (Opp. 9.)  But the government makes no attempt to tailor its interest to mere disclosure of the Warrant's existence, and in fact makes several concessions suggesting that such a disclosure would not significantly impact its interest:  For example, the government acknowledges that its "investigation's existence is no longer secret."  (Opp. 9.)  Nor does it contest that the public is aware of the investigation's scope—in particular, that the investigation encompasses the sensitive personal communications of Mr. Trump and his associates.  *See supra* 4-6.  Instead, the government warns that "[p]roviding the Warrant to the former president at this point in the investigation" would "exceed some mere 'incremental' step,"

FILED UNDER SEAL

but instead impair its investigation.  Opp. 9.  Even accepting the government's argument, no such impairment would take place absent provision of the Warrant and attachments.  Similarly, to the extent that the risks to the government's interest arise from the user's confederates, and not from the user himself, then disclosure of the Warrant to the user alone would be sufficient.

Alternatively, the Court could permit Twitter to alert one of the former President's representatives authorized to assert his privileges in this case—for example, the former President's attorney, or the several designated "representatives in all respects that pertain to the records of my Presidency" on file with the National Archives and Records Administration (NARA).  NARA Designation.  As other courts in this District have done in similar cases, the Court could then order those individuals not to disclose the existence of the Warrant.  *See, e.g.*, Order, ECF No. 4 at 1, *In re Application of USA for 2703(d) Order for Six Email Accounts Serviced by Google LLC for Investigation of Violation of 18 U.S.C. §§ 641 and 793* [hereinafter "*In re Application re: Six Email Accounts*"], SC No. 20-sc-3361 (D.D.C. Mar. 3, 2021) (modifying gag order to permit disclosure to target's counsel but to no other entities); Order, ECF No. 6 at 1, *In re Application re: Six Email Accounts* (Mar. 8, 2021) (similar); Order, ECF No. 8 at 1, *In re Application re: Six Email Accounts* (Mar. 22, 2021) (similar); *see also In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 180 (D.D.C. 2004) (permitting attorney review of sensitive evidence through issuance of a protective order and prohibiting counsel from "disclos[ing] classified information not provided by [their client] to [their client]").

The government does not dispute this latter alternative would minimize the infringement on Twitter's speech while avoiding the harms set forth in their *ex parte* submission.  (Opp. 12.) Instead, the government asserts that it would be "untenable" or "impractical" to assess a representative's trustworthiness, and that such a representative would lack the ability to vindicate

FILED UNDER SEAL

Mr. Trump's interests without informing him of the Warrant.  (Opp. 11-12.)  But the government

nowhere explains why extending the Non-Disclosure Order to cover the representatives—as

other courts in this District have done—would not address any concerns about a representative's

trustworthiness.  *See* ECF Nos. 4, 6, 8, *In re Application re: Six Email Accounts*.  And courts

frequently assess the trustworthiness and discretion of representatives in many contexts,

including protective orders and conservatorships.  *See, e.g., In re Guantanamo Detainee Cases*,

344 F. Supp. 2d 174.  In any event, that disclosing to a representative would be less expedient for

the government than the blanket Non-Disclosure Order imposed on Twitter is not a permissible

reason to dismiss it: "[T]he prime objective of the First Amendment is not efficiency."

*McCullen*, 573 U.S. at 495.

　　　　Nor is there merit to the government's unsupported assertion that a designated

representative would not have standing or authority to vindicate the former President's legal

interests in this case.  The NARA grant of authority is sweeping and unconditional, designating

seven identified individuals as "representatives in *all* respects that pertain to the records of my

presidency."  NARA Designation (emphasis added).  The letter essentially grants power of

attorney to the named individuals within the specified domain.  Litigation of privileges related to

those records fall within that broad ambit, and a lawfully designated representative asserting a

pertinent privilege is a circumstance in which "federal courts routinely entertain suits which will

result in relief for parties that are not themselves directly bringing suit."  *Sprint Commc'ns Co.,

L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287-288 (2008) (noting also that "[t]rustees bring suits

to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to

benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates;

executors bring suit to benefit testator estates; and so forth").

FILED UNDER SEAL

    2.    <u>The Non-Disclosure Order is not Narrowly Tailored in Light of Twitter's</u>
<u>Significant First Amendment Rights at Stake</u>

Instead of meaningfully addressing these less restrictive alternatives, the government asserts that "any restriction on Twitter is the least restrictive means of advancing governmental interests."  (Opp. 10.)  It then offers two reasons why its non-disclosure order is narrowly tailored:  it is limited in duration to 180 days, and it restricts Twitter from disclosing only the existence or contents of the Warrant itself.  (Opp. 10-11.)

As to the former, the government asserts that the mere presence of a "temporal limitation … balances the need for investigative secrecy and any speech interests."  (Opp. 11.)  But even the case it cites acknowledges that "a temporal limitation alone may not be enough to satisfy strict scrutiny."  *Matter of Subpoena 2018R00776*, 947 F.3d 148, 157 (3d Cir. 2020); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (noting that "the burden on the Government" of justifying a prior restraint "is not reduced by [its] temporary nature[.]"). Twitter's First Amendment interest is in notifying its user of the Warrant at a time when that information would be meaningful to the user—here, when the user could assert his potential privilege before it has been invaded.  Though Twitter is not privy to the government's investigative timeline, 180 days is likely too late for the user to assert the privilege in a timely manner.  As courts routinely recognize, "[i]t is axiomatic that the timing of speech is often crucial to its impact."  *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990) (emphasis added); *see also White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (protest restriction upheld because it left "unaffected a multitude of possibilities for meaningful" speech) (emphasis added); *Wood v. Ga.*, 370 U.S. 375, 392 (1962) ("Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed.").

17

FILED UNDER SEAL

The government also argues that the Non-Disclosure Order is narrowly tailored because it impedes only a narrow swath of Twitter's speech.  But that swath goes to the heart of Twitter's First Amendment interest in this case:  consistent with its terms of service and express commitment to its users, Twitter has a vital interest in notifying users, who have entrusted Twitter with their private data, when the government compels Twitter to produce that data.

To this end, contrary to the government's representation that Twitter has uniquely brought this challenge to protect the former President, Twitter reviews non-disclosure orders issued to it and frequently challenges those appearing to contain procedural or substantive deficiencies.[14]   In its February 8, 2023 letter to this Court, Twitter identified 32 such instances dating back to 2011.  While Twitter does not challenge each and every one of the thousands of non-disclosure orders it receives on a yearly basis, where the statutory factors do not appear to be met, or where a non-disclosure order appears to be otherwise invalid, Twitter has pursued its First Amendment interests and challenged non-disclosure orders accompanying legal process requests for user data in cases like this one.[15]

Here, the Non-Disclosure Order appeared to be plainly invalid for two reasons: certain of the justifications in the order appeared facially to not apply, and (as outlined above) the

---

[14] Twitter's non-disclosure order challenges are often successful, and the Court should not discount—as the government does—situations where Twitter meets and confers with law enforcement and they withdraw or modify an order without court action.  These pre-filing conferences are appropriate actions to conserve judicial resources, and, as noted in its filing, Twitter's outreach to law enforcement challenging non-disclosure orders frequently results in law enforcement withdrawing or modifying the non-disclosure order.

[15] Twitter challenges facially invalid non-disclosure orders regardless of the legal process to which they are attached.  It is of no matter that, as the government points out, the invalid orders have typically attached to subpoenas or national security letters, rather than warrants.  The point is that Twitter has exercised its First Amendment right to contest non-disclosure orders where they have appeared to be improper on their face.

FILED UNDER SEAL

underlying investigative action all but matched other actions widely known to the public in a very public criminal case.  It was also clear that Twitter's exercise of its First Amendment rights was particularly important in this case because the targeted account contained communications written by the President himself that were potentially privileged.

  As submitted to Twitter, the Non-Disclosure Order stated that the former President was likely to flee from prosecution if the Warrant were disclosed.  (Doc. 3 at 1.)  The Court acknowledged that this justification did not apply.  (Sealed Hr'g Tr. (Feb. 7, 2023) at 48.)  And indeed, the Government now admits that this finding—one of the facial deficiencies identified by Twitter in its Motion—was, in fact, an error.  Opp. 2 n.1 (acknowledging that the templated language about flight applied to another statute and was "erroneously included" in the Non-Disclosure Order).

  Additionally, there is reason to believe that Twitter's user, the former President, may have a claim of privilege that presents unique issues not previously addressed by any court in a public decision.  As an initial matter, public reports indicate that during his presidency, Mr. Trump did not use email, text, or any other form of electronic communication besides Twitter.[16] The former President's private Twitter communications appear to be the only such electronic communications written by the former President himself, and the government seized those

---

[16] Jonathan Swan & Maggie Haberman, *OMG. Trump Has Started Texting.*, N.Y. TIMES (Jan. 25, 2023), available at https://www.nytimes.com/2023/01/25/us/politics/trump-texting.html; Alex Leary, *Trump Copes With Facebook, Twitter Ban By Relying On Email, Media Interviews*, THE WALL STREET JOURNAL (May 5, 2021), available at https://www.wsj.com/articles/trump-copes-with-facebook-twitter-ban-by-relying-on-email-media-interviews-11620226189.

For instance, the "message" from former President Trump to General Michael Flynn that he "stay strong" (cited by the court in the hearing on February 7, 2023) was passed in person by KT McFarland—not by an electronic communication written by former President Trump to Gen. Flynn.  Sealed Hr'g Tr. (Feb. 7, 2023) at 49 (referencing Mueller Report, Vol. II, p44, n.267).

FILED UNDER SEAL

private written communications from a third-party provider without some notice to him.  No court has ever addressed the application of executive privilege in that set of circumstances, and the plain text of Section 2703, Federal Rule of Criminal Procedure 41, and the Presidential Records Act did not contemplate this scenario.  Further, if the government has not yet reviewed the communications it seized, there remains for the real parties in interest the issue of whether the privilege may still be asserted at the outset.[17]

Finally, there remains the separate issue of how the government might make derivative use of those communications outside the Executive Branch, which raises a distinct and significant basis for the former President to claim privilege.  The Court and government both suggest that there is no executive-privilege issue here because the materials have been seized by the Executive Branch.  Gov. MTSC Reply 6-7 (citing *Nixon*, 418 U.S. at 708); Sealed Hr'g Tr. (Feb. 7, 2023) at 51-52.  But that does not account for possible derivative uses outside of the Executive Branch, such as the incorporation of privileged information into warrant affidavits, witness questioning, and—as the government suggests throughout its brief—disclosure to a grand jury.  Disclosure of the privileged materials in these contexts would raise precisely the

---

[17] As Twitter previously explained, the executive privilege at issue here is likely injured at the time communications are viewed by another party.  *See In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997) (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).  In other privilege contexts, courts have permitted the return of potentially privileged matter even after the materials were seized.  *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (granting defendant's motion to return attorney-client privileged materials seized during execution of search warrant); *see also In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 183-184 (4th Cir. 2019) (reversing district court's denial of injunction on federal agents reviewing seized attorney-client privileged materials obtained through execution of search warrant).

FILED UNDER SEAL

Separation-of-Powers issues that the government claims are not triggered when the material stays

within the Executive Branch.[18]

In short, while Twitter may not be able to assert the former President's potential

privilege—and takes no position here on whether it applies—the issues in play make Twitter's

exercise of its First Amendment rights particularly important in this case.[19]

### III. Twitter's Stay Motion is Not Moot

Twitter's Motion included a request that the Court stay execution of the Warrant until

litigation on the Non-Disclosure Order was resolved.  Mot. 16.  The government argues that the

Court's order that Twitter comply with the Warrant "necessarily mooted that stay request."  Opp.

13.

This is incorrect for two reasons.  First, the Court's compliance order ruled on, and

rejected, Twitter's stay request.  The request has thus been denied, not mooted.  Second, even if

the Court had not done so, the request would not be moot because it is "'capable of repetition,

yet evading review.'"  *People for the Ethical Treatment of Animals, Inc. v. United States Fish &*

*Wildlife Serv., et al*, 59 F. Supp. 3d 91, 97 (D.D.C. 2014).  A challenged action is not moot when

it is "'typically … in its duration too short to be fully litigated prior to its cessation or

expiration,'" and there is "'a reasonable expectation that the same complaining party would be

---

[18] Even if the government's possible use of a filter team might temporarily isolate privileged
materials, the former President retains an interest in actually asserting privilege such that his
private Presidential communications are not being protected by the mere exercise of a
prosecutor's discretion.

[19] The government states that "[a] Twitter user's potential ability to challenge the legal process at
issue—here, the Warrant—is entirely distinct from the First Amendment concerns that Twitter
claims it seeks to further through its own challenge to the NDO."  Opp. 9-10.  This concession—
that Twitter's First Amendment rights do not rise or fall with the success or failure of the user's
claims—underscores the point that Twitter's constitutional interest is in disclosing the privacy
breach to its user, not in litigating the user's claims.

FILED UNDER SEAL

subjected to the same action again.'"  *Id.*.  That is the case here, where litigation over this Non-Disclosure Order spanned less than one month, and Twitter expects to be subject to non-disclosure orders that it will challenge in the future.

On the merits of Twitter's stay request, Twitter has made a "a strong showing" that it is "likely to succeed on the merits" and "will be irreparably injured absent a stay."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Twitter has demonstrated that the government's Non-Disclosure Order cannot withstand strict scrutiny.  *See supra* 3-21.  And it has demonstrated "unquestionabl[e]" irreparable injury through "[t]he loss of First Amendment freedoms, for even minimal periods of time."  *Elrod v. Burns*, 427 U.S. 347, 373-374 (1976).

### IV. CONCLUSION

The Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) is a blanket prohibition prohibiting Twitter from notifying anyone about the Warrant or Non-Disclosure Order, and cannot be justified by a compelling governmental interest.  Accordingly, the Non-Disclosure Order impermissibly burdens Twitter's First Amendment rights and should be vacated or modified to allow Twitter to notify its user of the government's demand.  In addition, this Court should stay Twitter's compliance with the Warrant until resolution of these constitutional issues.

Dated: February 24, 2023

Respectfully submitted,

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
 *admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.*
 *admission pending)*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Twitter, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February 2023, I caused the foregoing to be

served by email upon:

James Pearce, Assistant Special Counsel

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363