**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 <br><br> **Under Seal and** <br> **Ex Parte to Government** <br><br> Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

For what appears to be the first time in their nearly seventeen-year existence as a company, *see generally* Letter from Counsel for Twitter, Inc. (SEALED), ECF No. 14, Twitter Inc. ("Twitter") seeks to vacate or modify an order, issued under the Stored Communications Act of 1986 ("SCA"), 18 U.S.C. § 2701 *et seq.*, commanding that the company not disclose the existence of a search warrant for a user's Twitter account, and further seeks to condition any compliance by the company with that search warrant on the user (or user's representatives) first being notified about the warrant and given an opportunity to stop or otherwise intervene in execution of the warrant. *See* Twitter's Mot. to Vacate or Mod. NDO and Stay Twitter's Compl. with Warrant ("Twitter's Motion") (SEALED), ECF No. 7; *see also* Twitter's Mem. Supp. Twitter Mot. ("Twitter Mem.") (SEALED), ECF No. 7-1. This is an extraordinary request. Twitter denies that this action is being taken by the company due to the identity of the targeted Twitter account ("Target Account") or its user, suggesting instead that Twitter regularly engages in challenging SCA nondisclosure orders ("NDOs")—though concededly never before regarding a covert search warrant—and assuring the Court that the fact that the user of the Target Account ("the User") is a high-profile public figure is merely coincidence. *See* Feb. 7, 2023 Hrg. Tr. at 60:9-22 (SEALED)

(Twitter's counsel declaiming that the company "has no interest other than litigating its constitutional rights").[1]

Twitter justifies initiating this dispute on grounds that the NDO violates the First Amendment as a content-based prior restraint on speech the company wants to have with a customer that fails to satisfy the exacting requirements of strict scrutiny.  Twitter Mem. at 2.  Specifically, Twitter is not satisfied with the government's proffered reasons for nondisclosure, based upon what the company has read in media reports, *id.*, notwithstanding that both the warrant and the NDO were issued by this Court after being apprised of extensive reasons sufficient to establish probable cause for issuance of the warrant and to meet the statutory requirements for an NDO, to which reasons Twitter is neither privy nor entitled to be privy.  The government opposes Twitter's motion, arguing that disclosure of the warrant's existence would result in statutorily cognizable harms, under 18 U.S.C. § 2705(b), *see* Gov't's *Ex Parte* Opp'n to Twitter's Mot. at 1 ("Gov't's *Ex Parte* Opp'n") (SEALED), ECF No. 22, and such harms provide compelling reasons for the NDO, even under the exacting requirements of strict scrutiny review, assuming that standard should apply here, *id.* at 13.[2]

Separately, the parties also dispute whether monetary sanctions are warranted against Twitter because, while focusing on intervening in this criminal investigation and obtaining

[1]    The Twitter account at issue is @realDonaldTrump, which is the recently reinstated account of former President Donald J. Trump. *See* Claire Duffy and Paul LeBlanc, "Elon Musk restores Donald Trump's Twitter account," CNN (Nov. 20, 2022), available at https://www.cnn.com/2022/11/19/business/twitter-musk-trump-reinstate/index html (last visited on Mar. 1, 2023) ("The much-anticipated decision from the new owner sets the stage for the former president's return to the social media platform, where he was previously its most influential, if controversial, user. With almost 90 million followers, his tweets often moved the markets, set the news cycle and drove the agenda in Washington.").

[2]    The government's opposition summarizes extensive evidence of the User's conduct, and those of his associates, raising legitimate concerns ██████████████████████████████. *See* Gov't's *Ex Parte* Opp'n at 3–9; *see infra* nn.4, 6.

permission to alert the User about the search warrant, the company failed fully and timely to comply with the Warrant, in violation of two court orders.

As explained below, the government has established that, even if strict scrutiny analysis applies—which the Court assumes without deciding—the compelling interests of avoiding the harms to the criminal investigation, as authorized in § 2705(b), warrant Twitter's continued nondisclosure of the warrant's existence, and the NDO is the narrowest possible way available to protect those compelling government interests. Accordingly, Twitter's motion to vacate or modify the NDO is denied. Moreover, Twitter must pay $350,000 in contempt fines for failing to comply with the warrant in a timely manner, a delay for which Twitter bears full responsibility.

## I. BACKGROUND

The relevant statutory, factual and procedural background is summarized below.

### A. Statutory Framework

The SCA governs how providers of "electronic communications service[s] ["ECS"]," as defined in 18 U.S.C. § 2510(15), and "remote computing service ["RCS"]" providers, as defined in 18 U.S.C. § 2711(2), may be compelled to supply records related to that service in response to a subpoena, court order, or search warrant. As relevant here, the SCA's §§ 2703(a), (b)(1)(A), and (c) provide that the government may obtain contents of communications, as well as non-content information and records or other information, about a subscriber or customer of such service, via a search warrant. *See Id.* § 2703(a)-(c). Twitter enables account holders to share and interact with electronic content and to send and receive electronic communications with other users, publicly or privately, and is indisputably an ECS and RCS provider. *See* NDO Appl. ¶ 3.

The SCA is silent as to any obligation of ECS/RCS providers to notify subscribers about the providers' production of records in response to subpoenas, court orders, or search warrants, implicitly allowing such notification on a voluntarily basis. Indeed, Twitter promotes a policy of

"notify[ing] its users of any requests from law enforcement for account information, particularly requests for contents of communications, unless prohibited from doing so." Twitter Mem. at 1. The SCA is explicit, however, in authorizing "governmental entit[ies]," which includes federal "department[s] or agenc[ies]" and those of "any State or political subdivision thereof," 18 U.S.C. § 2711(4), to apply for and obtain a judicial order "commanding" a provider of ECS or RCS "to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id*. § 2705(b). Upon receipt of such an application, the SCA requires that "[t]he court *shall* enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in" any of five enumerated harms. *Id*. (emphasis added). These enumerated harms broadly cover: "(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial." *Id*. "The explicit terms of section 2705(b) make clear that if a court[] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate." *Matter of Application of U.S. of Am.*, 45 F. Supp. 3d 1, 5 (D.D.C. 2014).

A service provider is authorized to move "promptly" to quash or modify an order for disclosure of the contents of communications, such as the warrant at issue here, under two specific circumstances: first, "if the information or records requested are unusually voluminous in nature," 18 U.S.C. § 2703(d), or, second, "compliance with such order otherwise would cause an undue

burden on such provider," *id*.  Twitter does not contend that either of those circumstances are present here. The SCA is notably silent in providing any statutory authorization for a service provider to challenge an NDO.  Instead, in a mechanism designed to encourage compliance with NDOs and minimize litigation, particularly during an ongoing criminal investigation when SCA authorities are employed by law enforcement, the SCA expressly relieves providers from any liability on any claim in any court for disclosing their customer's information in compliance with an SCA order.  *See id*. § 2703(e) ("No cause of action shall lie in any court against any provider of wire or [ECS], its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter.").

### B.    The Search Warrant and NDO At Issue

On November 18, 2022, Attorney General Merrick Garland announced the appointment of Jack Smith to serve as Special Counsel to oversee two ongoing criminal investigations into (1) unlawful interference with the transfer of power following the 2020 presidential election, including certification of the Electoral College vote held on January 6, 2021, ("the January 6th Investigation"), and (2) unlawful retention of classified documents and possible obstruction ("the Classified Documents Investigation").  *See* "Appointment of a Special Counsel," Department of Justice (Nov. 18, 2022), available at https://www.justice.gov/opa/pr/appointment-special-counsel-0 (last visited on Mar. 2, 2023).  As part of the January 6th Investigation, on January 17, 2023, the government applied for, and the Court issued, based on an affidavit establishing probable cause to believe the Target Account contains evidence of criminal activity, a search warrant to search the Target Account and seize responsive records ███████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████.  *See* Search and Seizure Warrant ("Warrant") (SEALED), ECF No. 4; *see also* Gov't's Appl. And Aff. in Supp. of Appl. for a Search Warrant ("Warrant Affidavit" and "Warrant Application"), ECF No. 1.  The Warrant itself has two attachments: Attachment A, describing the "Property to Be Searched," and Attachment B, the "Particular Things to Be Seized," and is separate from both the Warrant Application and the Warrant Affidavit.  Warrant at 2.

In addition to the Warrant, the government applied for, and this Court issued, an order sealing the Warrant and related materials, and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days.  *See* Order Granting the Gov't's Appl. for an Ord. Pursuant to 18 U.S.C. § 2705(b) as to Twitter, Inc. ("NDO") (SEALED), ECF No. 3.  The NDO was granted based on the government's proffered facts showing reasonable grounds to believe that notifying the Target Account's User of the existence of the Warrant "would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to this investigation." NDO Appl. ¶ 10; 18 U.S.C. § 2705(b)(3)-(5).[3]  The government's accompanying lengthy Warrant Affidavit detailed various actions of the User, and the User's associates, ████████████████████████████████████████

████████████████████████████████████████████[4]

---

[3]    By contrast to the Application for the NDO, the NDO itself also offered as grounds for nondisclosure the basis that the user of the Target Account would "flee from prosecution." NDO at 1.  The government has since explained that justification to the NDO was erroneously included. *See* Gov't's *Ex Parte* Opp'n at 3 n.1.

[4] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

### C.     Procedural History

The Warrant was issued on January 17, 2023, and required Twitter's compliance within ten days of "issuance," Warrant, Att. B. § I, ¶ 5, meaning by January 27, 2023.  Twitter's compliance ended up taking over double the amount of time provided in the Warrant.

#### 1.     *Service on Twitter of Relevant Part of Warrant and NDO*

On the same day as issuance of the Warrant, the government attempted to serve the Warrant and the NDO on Twitter through the company's Legal Requests Submissions online site.  Gov't's Mot. for Ord. Show Cause at 2 ("Gov't's Mot.") (SEALED), ECF No. 5.  Specifically, six pages



of the Warrant were submitted to Twitter, consisting of the Warrant with Attachment A and part of Attachment B.  *See* Gov't's *Ex Parte* Opp'n, Ex. A. (SEALED), ECF No. 22-1; *see also* Feb. 7, 2023 Hrg. Tr. at 9:1-19 (same). Twitter has thus never been privy to the remaining parts of Attachment B to the Warrant, the Warrant Affidavit or Application, nor even the Application for the NDO. Twitter Mem. at 1 (conceding "Twitter has not seen" the *ex parte* application for the NDO); Feb. 7, 2023 Hrg. Tr. at 9:1-19 (government counsel agreeing that Twitter has only seen the warrant, Attachment A, and Part 1 of Attachment B).

The government's initial service attempts on Twitter failed twice, with the government's receipt both times of an automated message indicating that Twitter's "page [was] down." Gov't's Mot. at 2 (alteration in original).  On January 19, 2023, the government was finally able to serve Twitter through the company's Legal Requests Submissions site.  *Id.*

Twitter, however, somehow did not know of the existence of the Warrant until January 25, 2023—two days before the Warrant returns were due.  That day, the government contacted Twitter about the status of the company's compliance with the Warrant, and Twitter's Senior Director of Legal, Katherine Lee Martin, "indicated she was not aware of the Warrant but would consider it a priority."  *Id.*; *see also* Decl. of Katherine Lee Martin, Senior Director of Legal for Twitter ("Martin Decl.") ¶ 2 (SEALED), ECF No. 9-1.  The government indicated that "they were looking for an on time production, in two days[,]" to which Martin responded, "without knowing more or taking any position that would be a very tight turnaround for us."  Martin Decl. ¶ 2.  The government sent the six pages of the Warrant and the NDO directly to Martin later that evening. Meanwhile, Martin directed Twitter's personnel to preserve data available in its production environment associated with the Target Account, and "have confirmed that the available data was preserved." *Id.* ¶ 4.

Twitter notified the government in the evening of January 26, 2023, that the company would not comply with the Warrant by the next day, *id.* ¶ 5, and responded to the government's request for more specific compliance information, by indicating that "the company was prioritizing the matter and taking it very seriously" but that Martin had the Warrant and NDO only "for two days," *id.* ¶ 8, even though the government had tried to submit the Warrant and NDO through Twitter's Legal Requests Submissions site nine days earlier. The Warrant's deadline for compliance makes no exception for the provider's failure to have a fully operational and functioning system for the timely processing of court orders.

On January 31, 2023, Twitter indicated for the first time that the company would not comply with the Warrant without changes to the NDO, stressing as "essential to Twitter's business model (including [its] commitment to privacy, transparency, and neutrality) that [Twitter] communicate with users about law enforcement efforts to access their data." *Id*. ¶ 10. Referencing that "on occasion, [Twitter has] challenged nondisclosure orders," Martin asserted that the NDO "did not . . . meet[] the factors outlined in § 2705(b), given the intense publicity around the investigation." *Id.* In a subsequent conversation with government counsel, Martin made clear that "Twitter's position would be that we should not produce until we resolved our questions as to the NDO." *Id.* ¶ 12.

### 2.    *Government and Twitter's Cross Motions*

Given Twitter's refusal to comply with the Warrant unless and until its condition was met allowing disclosure of the Warrant to the Target Account user (or user's representatives), on February 2, 2023, the government moved for an Order to Show Cause "why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant." Gov't's Mot. at 1. The government explained Twitter had no basis for refusing to comply with the Warrant, pointing out that the Warrant and NDO were different court orders, so Twitter could "not delay, to an unknown

future date, compliance with the Warrant by challenging the NDO," *id*. at 3, and arguing that neither "the Warrant itself nor Section 2703 provide for intervention by a third party before compliance with the Warrant is required," *id*.

The same day, Twitter filed its motion to vacate or modify the NDO and stay compliance with the Warrant, arguing that the requested stay was required to "(1) prevent irreparable injury to Twitter's interests that would occur if production under the Warrant were required prior to resolution, and (2) to preserve the status quo as to the user's interest in potentially seeking to assert privilege or otherwise curtail derivative use of potentially privileged communications." Twitter Mem. at 3. Twitter highlighted that the Target Account's User could, in theory, exert a privilege over his private communications on Twitter (through direct messages with other users), and should have the opportunity to exert privilege prior to Twitter turning over the information to the government. *Id.* at 12–14.

The parties were directed to confer and propose a briefing schedule for the pending motions, Min. Order (Feb. 2, 2023) (SEALED), and the schedule proposed by the government was ultimately adopted, *see* Min. Order (Feb. 3, 2023) (SEALED).

### 3. *Hearing on and Resolution of Government's Motion For Order To Show Cause*

At a hearing held on February 7, 2023 on the government's motion, *see* Minute Entry (Feb. 7, 2023) (SEALED), Twitter conceded that: (1) the company had no standing to assert any privilege by any of its users, including the Target Account's User, Feb. 7, 2023 Hrg. Tr. at 66:3-4; *accord* Twitter Opp'n Mot. Ord. Show Cause at 3 ("Twitter Opp'n") (SEALED) (same), ECF No. 9 (SEALED); (2) the company had no confirmation that the Target Account's User wanted or would seize on any opportunity to assert any privilege if such opportunity were provided, *see* Feb. 7, 2023 Hrg. Tr. at 54:11-25; and (3) the company was operating on a mere sliver of the

information presented to the Court in support of issuance of the Warrant and the NDO, *see id.* at 48:15-19.

Nevertheless, Twitter argued that "producing the requested information prior to allowing it the opportunity to alert the [Target Account's User] would irreparably injure its First Amendment rights." *Id.* at 65:10-14. This argument was rejected for both practical and logistical reasons as well as legal grounds. If accepted, Twitter's argument would invite repeated litigation by Twitter and other ECS providers to challenge NDOs in order to alert users to SCA orders, particularly for high profile, highly placed users, such as current or former government officials, with whom the providers might want to curry favor, with concomitant and inevitable delays in execution of SCA orders and resultant frustration in expeditiously conducting criminal investigations. *See id.* at 65:14-20. As a legal matter, the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each.

These concerns had been well articulated by another court in a similar situation of being confronted with a government motion to compel compliance with an SCA warrant and an ECS provider simultaneously seeking to challenge an NDO, and capsulized this Court's decision to grant the government's motion because the "public interest is served by prompt compliance with the [W]arrant" because "any challenge to a NDO is separate from a challenge to a search warrant [since] any further delay on the production of the materials responsive to the Warrant increases the risk that evidence will be lost or destroyed, heightens the chance the targets will learn of the investigation, and jeopardizes the government's ability to bring any prosecution in a timely fashion." *Id.* at 66:11-17 (paraphrasing *Google v. United States,* 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020)).

In response to the Court's direct question, Twitter's counsel represented that the company was prepared to and could comply with the Warrant by 5:00 PM that day.  *See* Feb. 7, 2023 Hrg. Tr. at 63:16-19 (THE COURT: Okay. Can Twitter produce the [W]arrant returns by 5 p.m. today? MR. VARGHESE: I believe we are prepared to do that. Yes, Your Honor.").  The government requested that if Twitter failed to comply with the Warrant by 5:00 PM that day, an escalating sanction should be imposed, starting at a sanction of $50,000, an amount that should "double each day thereafter." *Id.* at 33:6-22; *see also id.* at 33:2-5 (the Court noting that the company "was bought for $40 billion, and the CEO, sole owner is worth . . . over $180 billion"); Gov't's Reply Supp. Mot. Order Show Cause ("Gov't's Reply") at 10 (SEALED), ECF No. 11 (requesting "escalating daily fines" for continued noncompliance by Twitter with the Warrant, at an amount "commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay").  With Twitter's assurance of full compliance by close of business that day, and given Twitter's already tardy compliance with the Warrant, the Court ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant.  *See* Min. Order (Feb. 7, 2023) ("Show Cause Order") (SEALED).

### 4.    *Twitter Fails To Comply Timely With Court's Show Cause Order*

Despite representing that the company would and could comply with the Warrant by 5:00 p.m. on February 7, 2023—by that point, nearly two weeks late—Twitter failed timely to comply with the Show Cause Order.  Gov't's Notice Re. Twitter's Non-Compliance with the Warrant (SEALED), ECF No. 25.  The government explained that prior to 5:00 PM on February 7, "Twitter made a production to the [g]overnment," but "[i]n a follow up call on February 8, counsel for Twitter identified certain information that may (or may not) exist in their holdings and that had not been produced to the [g]overnment." *Id.*  Twitter made another production on February 9, and

in a subsequent call, alerted the government that further productions were expected, though the company could not provide a timeframe when "all materials responsive to the Warrant would be produced." *Id.* The government accordingly requested a prompt in-person hearing that day regarding Twitter's continued failure to fully comply with the Warrant. *Id.*

At a hearing held later on February 9, 2023, *see* Minute Entry (Feb. 9, 2023); Feb. 9, 2023 Hrg. Tr. 4:1-5 (SEALED), the Court reviewed with Twitter each part of Part I of Attachment B to the Warrant to assess the extent of compliance and noncompliance by identifying the responsive records Twitter had yet to produce. *See* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20. During this process, Twitter raised questions for the first time about certain requests, demonstrating that the company had failed to confer effectively with the government. *See, e.g.,* Feb. 9, 2023 Hrg. Tr. at 5:1-7 (government counsel commenting about Twitter "attempting to cabin one of the requests in the warrant," during a call earlier on February 9); *id.* at 18:25–19:4 (government counsel explaining that "[t]his is the first time I have heard a complaint about a date limitation on 1H"); *id.* at 31:21-24 (government counsel, stating, "What [the government was] told was that there was one preservation done of the entire history of the account on January 11th. This is the first time we are hearing about another preservation between January 3rd and January 9."); *id.* at 30:2-22, 31:25–32:3 (after Twitter counsel explained that they were collecting data on potentially responsive "fleets," *i.e.* "vanishing tweets," government counsel responded, "I have never heard of 'fleets' in part of any discussion that we have had. I don't know if that is information in this account; it may or may not be. It still will be relevant, it still will be responsive.").

After a line-by-line review of Twitter's responsive and not yet completed productions to the Warrant, Twitter promised to provide an update to the government, by 4:00 PM that day, explaining what responsive records were left to produce and when production would be completed.

*Id.* at 48:21-24.  At the end of the hearing, the Court instructed the government to calculate the total penalty for Twitter's failure to comply with the Show Cause Order by the 5:00 p.m. deadline on February 7, and submit notice of the same to the Court.  *Id.* at 49:5-14.

The government supplied notice, on February 13, 2023, *see* Gov't's Not. Re. Accrued Sanction ("Government Notice") (SEALED), ECF No. 19, that Twitter advised the government, at 8:28 p.m. on February 9, 2023, that "it believed 'Twitter's obligations under the Warrant and the Court's order were complete.'"  *Id.* at 1–2.  With respect to the fine amount, the government calculated that Twitter owed "$350,000, payable to the Clerk of the Court."  *Id.* at 2 ("By the terms of the Court's order, Twitter was in contempt as of 5:00 p.m. on February 7, 2023, at which point a $50,000 sanction came into effect.  An additional amount of $100,000 accrued at 5:00 p.m. on February 8, 2023, since Twitter still had not fully complied with the Warrant as of that time. And at 5:00 p.m. on February 9, 2023, an additional amount of $200,000 accrued.").

Twitter disputes that any sanction is appropriate, *see* Twitter Not. Re. Appl. Of Sanctions at 1 ("Twitter Notice") (SEALED), ECF No. 18, because the company acted in good faith to comply speedily after the February 7 hearing, and the government bears the fault for production delays due to the government's nonstandard requests combined with the government delaying clarifying the scope of the Warrant's requirements.  *See generally id.*

## II.   DISCUSSION

Twitter's motion asserts that the NDO violates its First Amendment right to inform the Target Account's User of the existence of the Warrant, and accordingly requests the NDO be modified to allow notification to that User (or his authorized representatives).  *See* Twitter Mem. at 2–3.  The government opposes Twitter's motion, with both a sealed opposition shared with Twitter and in an *ex parte* filing.  *See* Gov't's *Ex Parte* Opp'n; Gov't's Sealed Opp'n Twitter's

Mot. to Vacate or Modify NDO (SEALED), ECF No. 22.  As discussed below, Twitter's motion is denied and sanctions are appropriately levied here.

### A.    Twitter's Challenge to the NDO Is Without Merit

Twitter asserts that the NDO "constitutes a content-based prior restraint on [its] speech," and the government's interests in keeping the Warrant secret cannot "satisfy strict scrutiny in light of the significant publicity surrounding the Department of Justice's criminal investigation into the" January 6th Investigation and the Classified Documents Investigation.  Twitter Mem. at 2.  Claims under the Free Speech Clause of the First Amendment, U.S. CONST. AMEND. I, are analyzed in three steps: (1) "whether the activity at issue is protected by the First Amendment[;]" (2) "whether the regulation at issue is content based or content neutral, *i.e.*, if it applies to particular speech because of the topic discussed or the idea or message expressed[;]" and (3) whether the government's justifications for restricting the plaintiff's speech satisfy the relevant standard, *i.e.*, strict or intermediate scrutiny.  *Green v. United States Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (cleaned up).  Strict scrutiny requires that the government show its restriction on speech is "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

As to the first step, Twitter correctly points out that "the government does not seriously contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that the Non-Disclosure Order operates as a prior restraint on such speech[.]"  Twitter Reply Supp. Mot. to Vacate or Modify NDO ("Twitter Reply") at 1 (SEALED), ECF No. 27.  Other courts have concluded, and this Court so finds here, that a nondisclosure orders issued under the authority of the SCA's § 2705(b) "implicate First Amendment rights because they restrict a service provider's speech" and "also constitute[] prior restraint, a characterization typically used to describe 'judicial

15

orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155 (3d Cir. 2020) *("Matter of Subpoena")* (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)); *see also Google*, 443 F. Supp. 3d at 452; *In re Info. Associated with E-Mail Accts.*, 468 F. Supp. 3d 556, 560 (E.D.N.Y. 2020) ("*In re E-Mail Accounts*"); *Matter of Search Warrant for [redacted].com*, 248 F. Supp. 3d 970, 980 (C.D. Cal. 2017) (collecting cases).

With respect to the second step, no decision from this Court, the D.C. Circuit, or the Supreme Court has established whether strict scrutiny or intermediate scrutiny applies when an ECS provider challenges a nondisclosure order issued pursuant to the SCA's § 2705(b). On the one hand, a nondisclosure order is a content-based restriction on speech, and content-based restrictions are normally evaluated under strict scrutiny. *Green*, 54 F.4th at 745 ("[W]e apply . . . strict scrutiny for content-based statutes[.]"); *see also In re Nat'l Sec. Letter*, 33 F.4th 1058, 1072 (9th Cir. 2022) (applying strict scrutiny to a nondisclosure requirement because it "is content based on its face" since "the nondisclosure requirement prohibits speech about one specific issue"). At the same time, in this context, a "nondisclosure requirement" is "not a typical example of such a restriction for it is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 876 (2d Cir. 2008). Indeed, considering that nondisclosure orders tend to be narrow in scope, limited to their accompanying orders or warrants and the facts surrounding them, good reasons exist to subject such orders only to intermediate scrutiny instead of the exacting requirements of strict scrutiny. *See id.* at 876 ("[T]he nondisclosure requirement is triggered by the content of a category of information . . . is far more

limited than the broad categories of information that have been at issue with respect to typical content-based restrictions.").

The strict-scrutiny debate need not be resolved here. Assuming, without deciding, that strict scrutiny applies to nondisclosure orders, the NDO at issue here survives strict scrutiny review as a narrowly tailored restriction for which no less restrictive alternative is available that would be at least as effective in serving the government's compelling interests.

### 1. *The NDO serves a compelling government interest*

The government says that the NDO safeguards "the integrity and secrecy of an ongoing [criminal] investigation" ████████████████████████████. Gov't's *Ex Parte* Opp'n at 14–15. According to the government, these secrecy interests are particularly salient here because ████████████████████████████████████████████████████

███████████████ based on the evidence outlined in its *ex parte* opposition. *Id.* at 15; *see also supra* at n. 4, *infra* n.6, and associated text

The government is correct. For starters, "[m]aintaining the integrity of an ongoing criminal investigation is a compelling governmental interest." *In re E-Mail Accounts*, 468 F. Supp. 3d at 560; *see also United States v. Smith*, 985 F. Supp. 2d 506, 545 (S.D.N.Y. 2013) ("[T]he [g]overnment has demonstrated that there is good cause for a protective order because of its compelling interest in ongoing investigations into potentially serious criminal conduct that could be jeopardized by dissemination of the discovery."); *Matter of Subpoena 2018R00776*, 947 F.3d at 156 ("The government's interest is particularly acute where, as here, the investigation is ongoing."). That compelling interest here is magnified by the national import of the January 6th investigation into conduct that culminated in a violent riot at the U.S. Capitol on January 6, 2021, and the disruption of the Joint Session of Congress to certify the results of the 2020 presidential election. Ferreting out activity intended to alter the outcome of a valid national election for the

17

leadership of the Executive Branch of the federal government, which activity undermines foundational principles of our democracy, and assessing whether that activity crossed lines into criminal culpability, presents as compelling a governmental interest as our very national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) (quotation marks omitted) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *see also* Gov't's Opp'n at 14 ("And that interest is all the more compelling where the investigation concerns an effort to overturn the results of an election and thwart the transfer of presidential power—an effort that culminated in a mob attack on the United States Capitol as lawmakers sought to carry out their constitutional and statutory obligation to certify the Electoral College results.").

Additionally, the government has a strong interest in maintaining the "confidentiality of [its] investigative techniques and [not] cause the subjects of other investigations to change their conduct to evade detection and otherwise thwart future investigations of similar allegations." *Cf. In re Los Angeles Times Commc'ns LLC*, No. MC 21-16 (BAH), 2022 WL 3714289, at *8 (D.D.C. Aug. 29, 2022) (quotation marks omitted) (holding that these weighty law enforcement interests, in the context of an application to unseal court records under the common-law right of public access to judicial records, weighed in favor of continued sealing of certain search-warrant materials). Thus, the SCA deems certain factors to be sufficiently compelling to justify issuance of a nondisclosure order based on reason to believe that disclosure otherwise would pose a risk of destruction or tampering with evidence, intimidation of witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5). In short, maintaining the confidentiality of the government's criminal investigation into any efforts ███ ████████████████████████████████ to overturn the 2020 election to ensure that all those responsible and criminally liable, or not, are identified and that relevant documentary and

testimonial evidence is both preserved and collected, without spoliation, alteration or tampering, plainly serves compelling government interests.

Twitter disagrees. In Twitter's view, "the government cannot credibly show that the [NDO] . . . serves a compelling governmental interest," citing "the voluminous publicly available information about the investigation," Twitter Mem. at 8; *id*. at 9-10 (describing, *inter alia*, media reports about witnesses "subpoenaed to testify before a federal grand jury" and the appointment of Special Counsel Jack Smith); *see also* Twitter Opp'n at 13 (arguing that public revelation of the search and seizure Warrant at issue here would pose "no credible risk" because "the publicity surrounding the investigations" being conducted by Special Counsel Jack Smith "is widespread and unprecedented," making this investigation "wholly distinct from any typical covert law enforcement investigation where the targets are unaware of the government's activities"). With this perception of "no credible investigative reasons to bar disclosure [] of the existence of the Warrant," Twitter urges that the Target Account's User be alerted to the Warrant so he "may raise whatever concerns he has, if any, for determination by this Court in a full adversarial proceeding." Twitter Mem. at 14. While Twitter denies taking any position "on the applicability of [any] privilege or the validity of the Warrant," Twitter Opp'n at 1 ("Twitter is not taking a position . . . ."); *id*. at 7 ("Twitter takes no position on the applicability of [] privilege as to these communications in this circumstance."), Twitter's real objection then is that the government is proceeding covertly with a criminal investigation when, in the company's view, any privilege issue "should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing." *Id*. at 8; Twitter Mem. at 2 ("Allowing Twitter . . . to notify the account holder would afford the user . . . an opportunity to address the legal issues surrounding a

19

demand for [ ] communications in this unique context, and give this Court a full adversarial process in which to evaluate them.").

Twitter makes this demand for an adversarial assessment of privilege issues as a condition of complying with the Warrant, despite not being privy to the full Warrant, ███████████ ████████████████████████████████████████████, let alone the other proffered evidence presented to the Court in issuing the Warrant and the NDO. *See* Feb. 7, 2023 Hrg. Tr. at 9:20–10:19. Put another way, Twitter is taking the extraordinarily aggressive position as a service provider to demand that a covert step taken in an ongoing grand jury and criminal investigation be made public, at least to the account user, before complying with a court order, notwithstanding the informational void on which it stands.

Despite the fact that Twitter has been privy to only a sliver of the government documentation underlying the Warrant and NDO, and thus is quite ignorant of details about and the scope of the government's current investigation into unlawful interference with the transfer of power following the 2020 presidential election and ████████████████████████████ in such illegal activity, the company nonetheless boldly contests any compelling interest the government may have in continuing to conduct its investigation covertly, bolstered by the NDO, for three reasons, each of which is meritless. First, Twitter challenges each of the government's articulated justifications for the NDO under Section 2705(b), arguing that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the Target Account's User will "alter the current balance of public knowledge in any meaningful way" since that disclosure would at most be "incremental." Twitter Mem. at 11.[5] For instance, the

---

[5]    In support, Twitter cites news articles discussing the existence of the government's investigations and certain public steps the government has taken as part of its investigations or courthouse citing of witnesses. Twitter Mem. at 9–11; *see also* Twitter Opp'n, Ex. B (SEALED), ECF No. 9-2 (culling eighty pages of similar articles discussing the investigations); Twitter Reply at 5–6 (identifying several members of former president's administration that have been

company argues that disclosure of the Warrant is not likely to prompt "the destruction of *other* evidence," Twitter Reply at 4 (emphasis in original), because the public and the User know that the User is under investigation for any involvement in interfering "with Congress's certification of the presidential election on January 6," *id.* Nor would it be reasonable, Twitter asserts, "to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications," or that the investigation would be seriously jeopardized because the Attorney General "confirmed the investigation, its scope, and the identity of the target" to the country. *Id.* at 7–8.

Twitter misapprehends the risks of disclosure here. For one thing, without being privy to any non-public information about the investigation, including the full Warrant, Warrant Application and Affidavit, and NDO Application submitted to the Court, Twitter is simply in *no position* to assess how much of the media reports and general public information about the investigation are accurate and how limited that information may be compared to what is known to investigators. Put bluntly, Twitter does not know what it does not know.

More importantly, Twitter's argument is unmoored from the realities of what disclosure would mean here. As the government observes, Gov't *Ex Parte* Opp'n at 16, Attachment B to the Warrant provides significant insight into the type and nature of information that the government requested and targets a key social media account. No public reporting has, thus far, indicated execution of search warrants for the contents of the User's personal electronic communications and records, even if the User is aware of the general contours of the government's

---

subpoenaed or compelled to testify, including former vice president Pence, the former president's daughter and advisor Ivanka Trump and her husband Jared Kushner, his former chief of staff Mark Meadows, and others). Twitter also observes that government has itself "confirmed it has seized and is reviewing the email accounts of [the former president's] associates as part of the investigation." Twitter Reply at 9 (citing *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826 (D.D.C. Feb. 23, 2023) ("*In re N.Y. Times*")).

investigation.  Specific identification of the Warrant could prompt witnesses, subjects, or targets

of the investigation to destroy their communications or records, including on Twitter or other social

media platforms, and could lead the User to ratchet up public and private pressure on others to

refuse to be cooperative with the government, or even to engage in retaliatory attacks on law

enforcement and other government officials that have real world and violent consequences.  This

is not a "conclusory" harm Twitter dismisses out of hand based on its limited information, but

rather could "endanger the life or physical safety of" government officers or "otherwise seriously

jeopardiz[e]" the government's investigation.  *See* 18 U.S.C. §§ 2705(b).  Permitting Twitter to

alert the Target Account's User of the Warrant may prompt a response to this new investigative

scrutiny of the User's conduct that could very well result in one of the enumerated harms set out

in Section 2705(b).

Twitter points to "'the partial unsealing of two judicial decisions resolving filter team

motions'" in relation to one of Special Counsel Smith's investigations, Twitter Reply at 9 (quoting

*In re N.Y. Times*, 2023 WL 2185826 *15), but this is both unpersuasive and supports maintaining

the NDO.  The two unsealed judicial decisions addressed review of the contents of email accounts

that are not those of the Target Account's User, so the unsealing of those decisions raise entirely

different risk assessment contexts than here.  Furthermore, this Court's decision in *In re N.Y. Times*

makes clear that "reliance on and deference to the government is necessary" when considering

whether the release of grand jury materials might harm the government's investigation because

"courts are not made aware of the full scope of materials presented to the grand jury and therefore

are not best positioned to execute redactions[.]"  *Id.* at *9.  As Twitter correctly notes, the Warrant

exists outside the grand jury context—though Warrant returns may be presented to the grand jury

and to that extent become "a matter occurring before the grand jury," subject to secrecy, under

FEDERAL RULE OF CRIMINAL PROCEDURE 6(e). Yet, the exact same point made in *In re N.Y. Times* supports maintaining the NDO because the government remains, both in the grand jury and covert SCA warrant contexts, in the best position to understand how, when, and whether alerting the user of certain information might impair an ongoing criminal investigation. The government's *ex parte* filing, as well as the Warrant and NDO Application, provide ample good reason to support the NDO here to avoid any enumerated harm under the SCO's § 2705(b). *See John Doe*, 549 F.3d at 881 (explaining that "the court will normally defer to the Government's considered assessment of why disclosure in a particular case may result in an enumerated harm" if the government has "at least indicate[d] the nature of the apprehended harm and provide[d] a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial").[6] That justification for the NDO supplies sufficient compelling

---

[6]

reason for preventing Twitter from disclosing the Warrant to anyone, including the Target Account's User (or the User's representatives).

Second, Twitter believes that "[u]nique and [i]mportant" privilege issues support the relief it seeks, Twitter Mem. at 12, but that argument is irrelevant to whether the government has a compelling interest in maintaining the NDO.[7] Twitter's interests here are purely about its right to speak to the Target Account's User, not what privileges that User may assert. Indeed, Twitter concededly has no standing to raise any issue as to any privilege the User may hold. *See* Twitter Mem. at 4. As the Court previously explained, the Warrant and the NDO do not travel together "because any further delay on the production of the materials" creates an ongoing harm to the government's investigation, Feb. 7, 2023 Hrg. Tr. at 66:11-17; *see also Google*, 443 F. Supp. at

_____

Even though Twitter is not privy to the information contained in the government's *ex parte* filings, Twitter is plainly aware of, and even cites to, former Special Counsel Robert Mueller's investigation into then-President Trump. *See* Twitter Opp'n at 5 n.5 (citing Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election* ("Mueller Report"), Vol. II at pg. 82 n. 546, Dept. of Justice (March 2019), available at https://www.justice.gov/storage/report_volume2.pdf (last visited on Mar. 2, 2023)). The Mueller Report details extensively how former President Trump engaged in obstructive conduct to thwart the former Special Counsel's investigation into Russian Interference in the 2016 presidential election. *See, e.g.*, Mueller Report, Vol. II at pg. 85–90 (discussing how, in June 2017, the former president directed White House Counsel Don McGahn to order the firing of the Special Counsel after press reports that Mueller was investigating the former for obstruction of justice); *id.* at 109-13 (observing that, in 2017 and 2018, the former president pressed Attorney General Sessions to "un-recuse" himself from the Special Counsel Mueller's inquiry, and a "reasonable inference" could be made that, from those actions, the former president "believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing Russia Investigation"). Given that Twitter is aware of the former president's prior efforts to obstruct investigative efforts into his and his associates' conduct, it should be no surprise that the government can demonstrate that revealing the existence of the Warrant poses the reasonable risk of resulting in several of the deleterious consequences under the SCA's § 2705(b).

[7]      Twitter cites to the Mueller Report as an example of then-President Trump being given advance notice of interviews with witnesses that might implicate the executive privilege to give the former president the opportunity to invoke the privilege in advance of the interviews. Twitter Opp'n at 5 n.5 (citing Mueller Report, Vol. II at pg. 82 n. 546). This example, however, elides the fact that while the former president was given advanced notice to invoke executive privilege for witness interviews, no such representation is made about him being given advance notice to assert privilege as to evidence collected through the issuance of "more than 2,800 subpoenas under the auspices of a grand jury sitting in the District of Columbia; [] nearly 500 search-and-seizure warrants; [] more than 230 orders for communications records under 18 U.S.C. § 2703(d)," and other covert orders. Mueller Report, Vol. I at pg. 13.

455, and that harm plainly outweighs a temporary denial of Twitter's ability to speak to its user about the existence of the Warrant.  In any event, no matter the privileges the Target Account's User may hold, what matters for purposes of the First Amendment is whether the government has established that the NDO is narrowly tailored to serve a compelling government interest to keep the Warrant confidential.  The government's interests here are plainly compelling.  *See supra* at nn. 4, 6, and associated text.

Third, as a last-ditch argument, Twitter says that the government "was required to make the requisite showing prior to the [NDO] being signed[,]" and any new, "secret rationale" should be rejected as a "*post hoc* rationalization[.]"  Twitter Reply at 13.  Twitter's argument is both factually and legally flawed.  The government's argument is not a *post hoc* rationalization because the Warrant Affidavit, which was considered simultaneously with the NDO Application, provides ample reason justifying the NDO.  Furthermore, Twitter cites no decision in which an NDO has been vacated because the government offered *additional* evidence to support that order when challenged.  *See, e.g., John Doe*, 549 F.3d at 881 n. 15 (noting that the court permitted the government "to amplify its grounds for nondisclosure in a classified declaration submitted *ex parte* . . . and made available for [the court's] *in camera* review").

The case Twitter relies on to assert that the government cannot provide new support for the NDO "that [was] not offered at the time the government first sought the" order, Twitter Reply at 13 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("*Lakewood*")), is entirely inapposite.  *Lakewood* addressed a facial challenge to a city ordinance that gave unbridled discretion to the mayor to issue permits for placement of news racks on public property. *Id.* at 753–54. The Court struck down the ordinance, because, without objective standards for determining whether a permit should issue, impermissible, content-based rejections could be

disguised by "*post hoc* rationalizations, . . . making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* at 758. Unlike in *Lakewood*, the government here does not possess unbridled discretion to silence ECS/RCS providers when applying for an NDO. Rather, an NDO may issue when, as here, the government has adduced evidence to demonstrate to the Court that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b).

### 2. The NDO is narrowly tailored

In the strict-scrutiny context, which is assumed to apply here, the narrow-tailoring requirement is a least restrictive–means test. This test requires that "[i]f a less restrictive alternative for achieving that interest exists, the government 'must use that alternative.'" *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 510 (D.C. Cir. 2016) (quoting *Playboy Entm't Grp.*, 529 U.S. at 804). The less restrictive alternative must "be at least as effective in achieving the legitimate purpose that the [government action] was [taken] to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997); *see also McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (same). The government explains, correctly, that the NDO is narrowly tailored because: (1) "The scope of speech regulated by the NDO is extremely narrow" since the NDO only "prohibits Twitter from disclosing the existence or contents of the Warrant" and "is limited to 180 days[,]" Gov't's Opp'n at 17–18; and (2) notifying the user or his representatives is untenable because it would be ineffective in maintaining the confidentiality of its investigation, leading to the harms described above, *see id.* at 18–19.

Courts have routinely found that non-disclosure orders satisfy the narrow-tailoring requirement under strict scrutiny so long as the orders are limited in scope and time, and notifying the subject of the investigation, or any other authorized person, would not satisfy the government's

compelling interest in maintaining the confidentiality of its investigation.  For example, in *Google v. United States*, the court held the nondisclosure order in that case was narrowly tailored because "it prohibit[ed] only the disclosure of the existence of the Warrant and of the investigation[,] . . . [and it was] also limited to a one-year time period."  443 F. Supp. 3d at 453.  The government satisfied the least-restrictive-means requirement by demonstrating that notifying "the person or entity to whom the warrant is directed . . . would result in at least one of [§ 2705(b)'s] five enumerated harms" based on the government's lengthy *ex parte* "affidavit setting out . . .why premature disclosure of the warrant and the existence of the investigation could reasonably lead to the destruction of or tampering with evidence and intimidation of potential witnesses, thus making information inaccessible to investigators, and how the disclosure could seriously jeopardize the ongoing investigation."  *Id.*; *see also in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62 (rejecting a similar First Amendment challenge to a one-year NDO as to a warrant and existence of the investigation because the government's *ex parte* affidavit showed "there was a risk that other employees, including higher-ups, were involved in the conspiracy[,]" such that notifying the company of the existence of the warrant could lead to one of the numerated harms under Section 2705(b) and "jeopardize [the government's] investigation").

The NDO is narrowly tailored for the same reasons articulated in *Google* and *In re E-mail Accounts*.  First, the NDO here is even more narrow in scope and time duration than those at issue in *Google* and *In re E-mail Accounts*: the subject matter Twitter is barred from speaking about is limited to the Warrant's contents and existence, and does not impinge at all on the company speaking to the public about the general subject of the January 6th Investigation.  Plus, the NDO applies for 180 days, which is half the duration of the year-long NDOs at issue in *Google* and *In re E-Mail Accounts*.  Second, the NDO presents the least-restrictive-means for the government to

satisfy its compelling interests here because notifying the User or his representatives of the Warrant's existence would, for the reasons explained above, likely result in the enumerated harms outlined in 2705(b). *See supra* at nn. 4, 6, and associated text; *see also Google*, 443 F. Supp. 3d at 453; *in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62.

Twitter does not dispute that the NDO is narrow in scope and in time. Instead, Twitter posits that purportedly narrower alternatives could be adopted to preserve the company's "[e]ssential First Amendment [r]ights." Twitter Mem. at 14. Twitter's suggestions are untenable, however, and do not come close to satisfying the government's interests in maintaining confidentiality about this covert investigative Warrant. First, Twitter's suggestion that notifying "just its user" plainly fails because this would likely result in the statutory harms outlined in § 2705(b) for the reasons outlined above. *See supra* at nn. 4, 6, and associated text. Second, Twitter suggests notifying certain of the User's representatives, Twitter Mem. at 14–15; Twitter Reply at 16, but that proposal is preposterous since such the suggested representatives not only may themselves be witnesses, subjects, or targets of either the January 6th or Classified Documents Investigation, but also would be under no bar from immediately alerting the User.[8]

The Third Circuit's decision in *Matter of Subpoena* is instructive here. In challenging an order preventing disclosure of a grand jury subpoena for the data of a customer's employees, the SCA provider that received the grand jury proposed two alternatives, both of which involved notifying the customer's bankruptcy trustee. *Matter of Subpoena*, 947 F.3d at 158. The Third Circuit categorically rejected the proposals as "untenable" and "impractical" because notifying the trustee "would be ineffective in maintaining grand jury secrecy" and would "undermine[] the

---

[8]     Twitter's suggestion that the government obtain the responsive data from NARA, Twitter Mem. at 15, is a nonstarter, both because the Warrant demands more information from Twitter than Twitter provided to NARA about the Target Account, Feb. 7 Hrg. Tr. at 11:7-13, and because this proposal is moot in light of Twitter's representation that it has now fully complied with the Warrant.

government's interest in maintaining the confidentiality of an ongoing investigation." *Id.* at 158–59.  Similar to Twitter's naïve suggestion here that, if not the User, the User's associates should be trusted with the existence of the Warrant, the Third Circuit was invited to "assess the trustworthiness of a would-be confidante chosen by a service provider" for disclosure, but expressly rejected that invitation since neither "courts nor the government can be expected to vet individuals selected by service providers and determine their risk of subverting an ongoing investigation." *Id.* at 159.

For the same reasons articulated in *Matter of Subpoena*, evaluating the viability of Twitter's proposed alternative disclosure tactics is unnecessary since revealing the Warrant to either the User or one of his representatives fall far short of meeting the government's compelling interests in maintaining the confidentiality of its investigation for all of the ample reasons presented in support of the NDO. *See supra* at nn. 4, 6, and associated text.  In short, "[s]trict scrutiny does not demand that sort of prognostication," *Matter of Subpoena*, 947 F.3d at 159, so Twitter's proposed alternatives lack merit.

For the above reasons, the government has satisfied that the NDO meets the exacting requirements of strict scrutiny review under the First Amendment.

### B. Sanctions

The last dispute between the parties is whether Twitter should be sanctioned for failing to comply on a timely basis, first with the Warrant and then with the Show Cause Order, the latter of which required full compliance by February 7 at 5:00 PM.  Twitter does not contest—nor could it—that the company was in violation of the Warrant and the Show Cause Order as of February 7 at 5:01 PM.  Instead, the company claims a full defense to any sanctions, contending that Twitter substantially, if not fully, complied by the Show Cause Order deadline and acted diligently to finish production in response to the government's nonstandard requests, while accusing the

government of being dilatory in responding to Twitter's requests for clarification.  *See generally* Twitter Notice.

The D.C. Circuit has described three stages in a civil contempt proceeding: "(1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled."  *N.L.R.B. v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981).  "At the second stage[,] the recalcitrant party is put on notice that unless it obeys the court's decree and purges itself of contempt it will be fined or face other sanctions."  *Id.* at 1185.  "At the third stage the court determines whether the party has fulfilled the purgation conditions.  If it has, it escapes the threatened penalty; if it has not, the penalty is imposed."  *Id.*

Given that both parties agree that Twitter failed timely and fully to comply with the Warrant and Show Cause Order, which imposed monetary sanctions for failure to do so, stage three of the proceedings must be considered: whether monetary sanctions should be imposed.  "Once the [movant has] establish[ed] that the [contemnor] has not complied with the order, the burden shifts to the [contemnor] to justify its noncompliance."  *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 39 (D.D.C. 2010).  "The contemnor is required to show that it has 'done all within its power' to comply with the court's order."  *Id.* at 40.  (quoting *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004)).

Twitter asserts a good faith and substantial compliance defense to being assessed civil sanctions.  The D.C. Circuit has left open the ability of a contemnor to assert a defense of good faith and substantial compliance to avoid a civil sanction.  *See Food Lion, Inc. v. United Food and*

30

*Commercial Workers*, 103 F.3d 1007, 1017 (D.C. Cir. 1997); *see also id.* at n.16 (collecting three district court decisions leaving open the availability of a good faith and substantial compliance defense to avoid civil contempt sanctions); *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014) (quotation marks omitted) ("Once the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance by, for example, demonstrating its financial inability to pay the judgment or its good faith attempts to comply."). "Assuming that the defense survives in this circuit, however, the burden of proving good faith and substantial compliance is on the party asserting the defense[.]" *Food Lion*, 103 F.3d at 1017 (footnote omitted). "In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Id.* (quotation marks omitted); *see also Latney's Funeral Home*, 41 F. Supp at 30 (quoting *Int'l Painters*, 736 F.Supp.2d at 40) ("At this stage, conclusory statements about the financial inability to comply or good faith substantial compliance are insufficient; instead, [the contemnor] must demonstrate any offered justification 'categorically and in detail.'").

Ultimately, the decision to hold a party in contempt and assess civil sanctions against a party is left up to the discretion of the district court, based on the record evidence concerning that party's efforts to comply with the court order. *See In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 822–23 (D.C. Cir. 2009) ("District judges must have authority to manage their dockets . . . and we owe deference to their decisions whether and how to enforce the deadlines they impose. Though we recognize [the contemnor's] strenuous efforts to comply, the district court found them to be 'too little too late[.]' . . . Were we on this record to overturn the district court's fact-bound

31

conclusion that [the contemnor] dragged its feet until the eleventh hour, we would risk undermining the authority of district courts to enforce the deadlines they impose.")

Based on the record above, Twitter's good faith and substantial compliance defense is insufficient to avoid the sanction imposed because the company's substantial compliance with the Show Cause Order deadline (February 7 at 5:00 PM) occurred only *after* it had already delayed production since January 27, the original deadline for compliance with the Warrant in an important ongoing criminal investigation. Twitter repeatedly represented that the company stood ready to comply promptly with the Warrant soon after in-house counsel was made aware of the Warrant's existence on January 25, 2023. *See* Martin Decl. ¶ 4 (noting that Martin directed Twitter's personnel to preserve data available in its production environment associated with the Target Account on January 25, and "have confirmed that the available data was preserved"); Twitter Opp'n at 14 (promising "[a]s a continued demonstration of its good faith efforts to comply with this Court's orders while its First Amendment interests are resolved, . . . to be willing to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until [its Motion] is resolved"); Feb. 7, 2023 Hrg. Tr. at 63:16-19 (Twitter counsel responding to Court's query whether Twitter could comply with the Warrant by February 7 at 5:00 PM, that Twitter is "prepared to do that."). Yet, Twitter waited until after the Show Cause Order deadline passed on February 7 to raise, *for the first time*, multiple questions about the Warrant's document demands, *see* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20, including the company's inability to produce records responsive to data concerning "associated accounts," *id.* at 7:20-8:7 (discussing Warrant, Att. B, ¶ I.B), and cabining date and scope limitations in another request, *id.* at 20:12-20 (discussing Warrant, Att. B, ¶ I.H).

If Twitter had been diligent and serious in its good faith intention to comply with the Warrant, those questions should have been identified, raised, and resolved with the government upon receipt of the Warrant on January 19, 2023, or subsequently upon review by in-house counsel on January 25 and 26, 2023, or even during ongoing conversations with the government through February 1, 2023.  That did not happen.  To be sure, Twitter advised the government on February 1, 2023, about "want[ing] to further discuss . . . Attachment B and technical issues [it would] need to work through in responding once the issue is resolved."  Martin Decl. ¶ 14.  Yet, those issues were not pursued by Twitter and appeared to be dropped in favor of litigating, until raised at the February 9, 2023, hearing under the Court's supervision, with sanctions mounting.  That context for raising these issues for the first time does not demonstrate "adequate detailed proof" of good faith and substantial compliance.  *See Int'l Painters*, 736 F. Supp. 2d at 38; *cf. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d at 34-35 (citation omitted) (alteration in original) ("Although Defendants maintain that they are 'aggressively working to find monies to pay [their] past due taxes,' their good faith alone does not absolve them of the fact that they remain in substantial violation of the Injunction.").

Moreover, Twitter represented in its opposition to the government's Motion, and at the February 7, 2023 Hearing, that it stood ready promptly to produce responsive records in full, when required, but plainly this was not so.  Twitter's good faith and substantial defense fails because it did not attempt to resolve specific questions concerning the Warrant's document demands with the government prior to either the February 7 or February 9, 2023, hearings.  *Cf. Food Lion*, 103 F.3d at 1018 (holding that the contemnor "failed to prove that it complied substantially and in good faith with the order" because the order "clearly directed [the contemnor] to search all of its

records[,]" and the contemnor "did not seek a clarification of this order"). In short, Twitter was "too little too late." *In re Fannie Mae Sec. Litig.*, 552 F.3d at 822 (quotation marks omitted).

As a fallback position, Twitter seeks to excuse the incremental $200,000 penalty assessed on February 9, citing the fact that the government did not clarify its position regarding the scope of the Warrant on February 9 until 3:52 PM that day—giving Twitter just 68 minutes to comply before the final $200,000 penalty was purportedly triggered. Twitter Notice at 4. Twitter's argument is rejected for two reasons. For one thing, Twitter incorrectly assumes that the $200,000 fine was triggered at 5:00 PM on February 9. The Show Cause Order did not specify that the subsequent fine would trigger at 5:00 PM the next day, but merely provided that Twitter "shall be fined $50,000, a fine amount that shall double *every day*, for failing to comply with this Order[.]" Minute Order (Feb. 7, 2023) (emphasis added). That means that Twitter's additional fine of $200,000 accrued as soon as 12:00 AM on February 9, not at 5:00 PM. Even if Twitter's last fine were to have accrued at 5:00 PM on February 9, however, the government cannot be blamed for the timeliness of its response on February 9, when Twitter could have resolved all these issues with the government prior to the original return date for the Warrant on January 27, 2023, or even during conversations with Twitter's in-house counsel through February 1, 2023, but Twitter skipped those opportunities. *See Pigford*, 307 F. Supp. 2d at 58 (quoting *Twelve John Does v. District of Columbia*, 855 F.2d 874, 877 (D.C. Cir. 1988)) ("When a district court determines . . . that a contemnor has 'not done all within its power' to comply with the court's orders, contempt may be appropriate even where compliance is difficult.").

Accordingly, Twitter's civil sanction for failing to comply with the Warrant and the Show Cause Order stands at $350,000.

34

## III.   CONCLUSION

For the foregoing reasons, Twitter's Motion is denied, and the NDO shall remain in effect for 180 days from issuance, until, at least, July 16, 2023.   Additionally, Twitter is assessed a $350,000 sanction for failing timely and fully to comply with the Show Cause Order, which sanction is promptly payable to the Clerk of this Court within ten days.   Twitter shall file a notice for filing in the docket of this matter upon payment in full of the sanction.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 3, 2023

BERYL A. HOWELL
Chief Judge