# Attachment A:

# Documents to be unsealed with proposed redactions

* * * * * **SEALED** * * * * *

* <u>THIS PAGE LEFT INTENTIONALLY BLANK</u> *


<u>SEALED MATTER ENCLOSED</u>


<u>FOR AUTHORIZED PERSONS ONLY</u>

* * * * * **SEALED** * * * * *

━ **＊ ＊ ＊ ＊ ＊ SEALED ＊ ＊ ＊ ＊ ＊** ━

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

| | |
|---|---|
| In the Matter of the Search of | ) Case No. 23-SC-31 |
| Information That is Stored | ) |
| at Premises Controlled by | ) |
| Twitter, Inc. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) February 9, 2023 |
|       Interested Party, | ) 11:10 a.m. |
| | ) Washington, D.C. |
| TWITTER, | ) |
|       Interested Party. | ) |

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

**<u>SEALED</u>**

**TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BERYL A. HOWELL,
UNITED STATES DISTRICT COURT CHIEF JUDGE**

**<u>APPEARANCES</u>:**

FOR THE UNITED STATES:
               THOMAS WINDOM
               MARY DOHRMANN
               Office of Special Counsel
               950 Pennsylvania Avenue NW
               Washington, DC 20530
               (202) 804-7000

FOR TWITTER:
               ARI HOLTZBLATT
               WHITNEY RUSSELL
               BENJAMIN A. POWELL
               WilmerHale
               2100 Pennsylvania Avenue NW
               Washington, DC 20037 USA
               (202) 663-6964

Court Reporter:    Elizabeth Saint-Loth, RPR, FCRR
               Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

━ **＊ ＊ ＊ ＊ ＊ SEALED ＊ ＊ ＊ ＊ ＊** ━

* * * * * SEALED * * * * *

# P R O C E E D I N G S

1    THE COURTROOM DEPUTY:  Matter before the Court,

2    Case No. 23-SC-31, In the matter of the search of

3    information that is stored at premises controlled by

4    Twitter, Inc.  Interested parties, United States of America

5    and Twitter, Inc.

6           Counsel, please come forward and state your names

7    for the record, starting with the government.

8           MR. WINDOM:  Good morning, Your Honor.

9    Thomas Windom and Mary Dohrmann for the United States.

10          THE COURT:  Yes.  Good morning.

11          MR. HOLTZBLATT:  Your Honor, Ari Holtzblatt for

12   Twitter.

13          THE COURT:  All right.  Who else is with you at

14   counsel table, if you would just introduce them again.

15          MR. HOLTZBLATT:  I'm sorry.  Ben Powell and

16   Whitney Russell.

17          THE COURT:  And Mr. Varghese, as I understand, is

18   on his way.

19          MR. HOLTZBLATT:  Mr. Varghese is in an interview

20   that could not be rescheduled.  So I will be --

21          THE COURT:  Okay.  I thought we were waiting for

22   somebody.

23          MR. HOLTZBLATT:  I'm sorry.  Yes.  Mr. Aaron

24   Zebley entered an appearance this morning and is on his way.

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

 1    He is actually outside the building.  He will be joining

 2    very shortly.

 3            THE COURT:  So we're not waiting for anybody?

 4            MR. HOLTZBLATT:  He is trying to get up here.  But

 5    we don't need to wait for him; I will be presenting.

 6            THE COURT:  I'm sorry.  I had gotten a message

 7    that the person who was supposed to be arguing today was

 8    delayed, but to begin without him.  I just want to make sure

 9    the record is correct.  I presumed it was Mr. Varghese since

10    that was the person who argued the last time we were here

11    earlier this week.  But perhaps I misunderstood.

12            MR. HOLTZBLATT:  I think something may have been

13    lost in communication.  I will be presenting for Twitter

14    today.  My colleague Aaron Zebley is on his way, and will be

15    here shortly.

16            THE COURT:  Okay.  Fine.  Got it.  Fine.  Because

17    we're not waiting.

18            Okay.  So as I look at this and look at the time

19    of the warrant issuance, I look at how far out we are from

20    compliance with the warrant, the representation by Twitter's

21    counsel when we met earlier this week that they could comply

22    by 5 p.m. on the 7th; and there was some compliance, I

23    think, by the deadline.

24            But I understand from the government's email to

25    chambers, with a copy to Twitter's counsel, that there has

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1   not been full compliance with the warrant.  I want to just

2   find out today what happened, and where are we on compliance

3   with the warrant.  Twitter has had quite some time to comply

4   with the warrant and have everything prepared to turn over,

5   so I am a little bit concerned about where we are.

6           Let me find out first from the government, since

7   we're here at the government's request, what is the

8   government expecting to happen today --

9           MR. WINDOM:  Thank you, Your Honor.

10          THE COURT:  -- other than counting up the amount

11  of the penalty?

12          MR. WINDOM:  Yes, ma'am.  A few things.

13          First of all, the government wanted to raise this

14  with Your Honor since it was inconsistent with what was

15  represented in court by Twitter counsel two days ago.

16          Second of all, we want compliance; that's the

17  entire purpose of these repeated proceedings and

18  conversations with counsel, is to get the information that

19  the Court ordered them to produce 13 days ago.

20          Each time we have received an email or had a

21  conversation with counsel over the last 48 hours, we have

22  not been left with any confidence that they have produced

23  everything, that they have a time frame to produce

24  everything, or that they even know the scope of the

25  repositories of information.

* * * * * SEALED * * * * *

1      Even this morning, when we had a phone call with

2    them, it seemed as if they were attempting to cabin one of

3    the requests in the warrant.  The only way to describe the

4    end of the phone call after it concluded, I had felt like I

5    had been getting nickle-and-dimed for the prior 20 minutes

6    of conversation.  We need the material.  We need it now.  We

7    needed it 13 days ago.

8      The purpose of this hearing is to impress upon

9    counsel in a way that apparently the government cannot, that

10   the meter is running.  $50,000 accrued at five o'clock two

11   days ago; $100,000 yesterday; $200,000 so far today.  It

12   will continue to run until Twitter completely complies with

13   the warrant.

14      THE COURT:  All right.  So let's hear from you,

15   Mr. Holtzblatt.

16      MR. HOLTZBLATT:  Thank you, Your Honor.

17      I would like to address three things that counsel

18   for the government just said:  First, what we understood we

19   were producing at five o'clock on Tuesday; second, what we

20   have done since then -- actually, four things -- what

21   remains.  And the final item that counsel for the government

22   mentioned about the single category where we discovered this

23   morning that we had a different understanding about what

24   that category represents, and I think it may be -- I

25   ultimately would like --

* * * * * **SEALED** * * * * *

1          THE COURT:  Well, I am looking at Attachment B,

2     Part 1.  We're just going to go through it line by line,

3     something tediously -- I tried to avoid at the last hearing;

4     but it seems like that kind of supervision of Twitter is

5     necessary here.

6          Do you have that in front of you, Mr. Holtzblatt?

7          MR. HOLTZBLATT:  I do, Your Honor.

8          THE COURT:  Let's start with number 1.

9          All business records and subscriber information in

10    any form kept pertaining to the subject account starting

11    with:  A, identity and contact information, past and

12    current, including full name, email address, physical

13    address, date of birth, phone number, gender, and other

14    personal identifiers.

15         Has that been turned over?

16         MR. HOLTZBLATT:  Your Honor, I was prepared to

17    identify for you the items that we understand are not yet

18    turned over --

19         THE COURT:  Well, it's the same way of doing it.

20    What have you turned over?  What is missing?

21         So everything in "A" turned over?

22         MR. HOLTZBLATT:  The one item that I know that is

23    not yet turned over but is about to be turned over is the

24    information regarding gender.

25         THE COURT:  Which you are still determining

* * * * * **SEALED** * * * * *

* * * * * **SEALED** * * * * *

1   whether you have or not?

2           MR. HOLTZBLATT:  No.  We have determined that we

3   have the gender information.  We spoke to the government

4   about the gender information yesterday.

5           The email communication from the government

6   suggested that the gender field was not necessarily the most

7   pressing of information, but we have gathered it.  And, I

8   think, as we speak are producing the gender field

9   information.

10          THE COURT:  And everything else in "A," I am

11  understanding from what you said, has been turned over.

12          Is that a correct understanding?

13          MR. HOLTZBLATT:  That is my understanding.

14          THE COURT:  All right.  B.  Do I have to read it

15  to you or can you read it yourself?

16          Has everything in B been turned over?

17          MR. HOLTZBLATT:  Your Honor.  Can you bear with me

18  for one second?

19          (Whereupon, Twitter counsel confer.)

20          MR. HOLTZBLATT:  Your Honor, we have turned over

21  information in all categories in B with one exception that

22  we are -- we don't possess in the manner in which it is

23  described in B, and so we're attempting to turn over what we

24  do have.

25          THE COURT:  What is that precisely?

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1           MR. HOLTZBLATT:  All associated accounts,

2     parentheses, including those linked by machine, cookie, IP

3     address, email address, or any other account or device

4     identifier, that's not -- "associated accounts," as I

5     understand it, is not a category of information that exists

6     in that term within our systems.  And so we are attempting

7     to gather a proxy for that, but it's not --

8           THE COURT:  What is the proxy you are gathering

9     for that?

10          (Whereupon, Twitter counsel confer.)

11          MR. HOLTZBLATT:  We are --

12          THE COURT:  Is there a reason why Ms. Russell just

13    has to just sit there as opposed to speaking, since she

14    seems to be the person with the answers?

15          MR. HOLTZBLATT:  No, Your Honor.  We have

16    collectively gathered the information about the answers.  So

17    before I make a representation to you I wanted to confirm

18    that information because I don't want to make an incorrect

19    representation to Your Honor.

20          THE COURT:  Of course not.  We have already been

21    through that.

22          Okay.  So you are still figuring out all of the

23    associated account information in 1B.

24          How long will it take you to figure that out,

25    produce it, collect it, and produce it?

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1      MR. HOLTZBLATT:  Well, Your Honor, we don't -- the

2  issue, Your Honor -- there isn't a category of "associated

3  account information"; that's not information that Twitter

4  stores.

5      What we are doing right now is manually attempting

6  to ascertain links between accounts.  But the ascertainment

7  of links between accounts on the basis of machine, cookie,

8  IP address, email address, or other account or device

9  identifier is not information that Twitter possesses, it

10  would be information that Twitter needs to create.  So

11  that's the reason why we had not previously produced it

12  because it's not a category of information that we actually

13  possess.

14      So what we are trying to do is be -- I would

15  say -- because it's not information --

16      THE COURT:  Okay.  I am going to do this in a way

17  that makes sense on the record as we're talking about

18  things.

19      Mr. Windom, with respect to the "all associated

20  accounts," have you obtained -- has the government obtained

21  information like that before from Twitter, if you know?

22      MR. WINDOM:  I can't make that representation with

23  respect to Twitter.

24      With any number of other electronic communication

25  providers, they keep that information in a consistent form.

* * * * * SEALED * * * * *

\* \* \* \* \* SEALED \* \* \* \* \*

1          To the extent that Twitter does not, it should be

2     a simple process.  You have cookies associated with an

3     account; you have the email for the subscriber information;

4     perhaps you have the phone number; you definitely have the

5     IP addresses.  Control F that through your system to see

6     what other accounts have come from those IP addresses, are

7     linked to that email address, are linked to the phone

8     number, are linked to the same cookies.

9          I don't profess to be a technological wizard, but

10     it does not seem to be a complex issue.

11          THE COURT:  And all associated --

12          MR. HOLTZBLATT:  Your Honor.

13          THE COURT:  Excuse me.  Mr. Windom, you escaped

14     too fast.

15          MR. WINDOM:  Sorry, ma'am.

16          THE COURT:  "All associated accounts" information

17     is helpful and useful for what reason?

18          MR. WINDOM:  It is, as explained more fully in the

19     warrant -- but for these purposes, it is a useful tool in

20     identifying what other accounts are being used by the same

21     user or by the same device that has access to the account.

22          As oftentimes in any number of cases, user

23     attribution is important.  And if there are other accounts

24     that a user is using, that is very important to the

25     government's investigation.

* * * * * **SEALED** * * * * *

1        THE COURT:  All right.

2        MR. HOLTZBLATT:  So, Your Honor, all providers are

3    not the same.  And it is -- I believe it is correct that

4    other providers possess this information in this form.

5        The warrant, in Section 1 of the warrant, is a BSI

6    request for basic subscriber information.  It, therefore, is

7    asking for information that exists, not information that

8    needs to be created.

9        What I understand the government to be asking --

10    and we are -- we were trying to be cooperative, and our

11    communications with the government have aimed at attempting

12    to assist the government -- is for us to create information

13    that does not exist, as opposed to produce information that

14    does exist.  We are trying to work with the government.  But

15    in terms of compliance with the warrant, the creation of BSI

16    that does not exist, I think, is beyond the scope of the

17    warrant.

18        THE COURT:  Well, it's business records and

19    subscriber information in any form kept.  You are saying

20    because of the word "kept" you don't have that information

21    as a business record that you maintain?

22        MR. HOLTZBLATT:  That's right.  If the records --

23    if the linkage between accounts, which is what we understand

24    this category to be referring to, is not itself a piece of

25    information that we keep, then it's not a business record

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1    that we would ordinarily produce.

2             What I understand the government to be asking is

3    for us to analyze our data, as opposed to produce existing

4    data.  And we are trying to work with the government in that

5    respect, but that is the reason that it is not something

6    that -- that is a different category of information.

7             THE COURT:  All right.  1C, length of service, has

8    that been produced?

9             MR. HOLTZBLATT:  We have produced length of

10   service including start date; and I don't know the answer to

11   the rest of 1C.

12            THE COURT:  Ms. Russell, do you know the answer?

13            (Whereupon, Twitter counsel confer.)

14            MR. HOLTZBLATT:  We have produced everything, but

15   there is no credit card or bank account number information

16   associated with the account.

17            THE COURT:  Really?  Then how did somebody pay for

18   that account at all, or --

19            MR. HOLTZBLATT:  The Twitter services --

20            THE COURT:  -- or identify themselves -- that's

21   just one way to identify yourselves as an account user?  You

22   don't have to provider that information to use a Twitter

23   account?

24            MR. HOLTZBLATT:  That's correct, Your Honor.  The

25   Twitter service is free.

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1        THE COURT:  All right.  D?

2        MR. HOLTZBLATT:  Yes.  We have produced that

3    information.

4        THE COURT:  E?

5        MR. HOLTZBLATT:  We have produced that information.

6        THE COURT:  And F?

7        MR. HOLTZBLATT:  We have produced that information.

8        THE COURT:  G?

9        MR. HOLTZBLATT:  We have produced that information.

10        THE COURT:  H?

11        MR. HOLTZBLATT:  This is the source of our

12    divergence of understanding with the government that we

13    discussed with the government this morning.  Until we had

14    this discussion this morning, we did not understand how --

15    we had a different understanding of what 1H refers to.  And

16    if Your Honor will permit, I can explain --

17        THE COURT:  Well, for purposes of the record, H

18    is:  Communications between Twitter and any person regarding

19    the account including contacts with support services and

20    records of actions taken.

21        It seems pretty plain on its face.

22        Have you reached an understanding now with the

23    government as to the scope?

24        MR. HOLTZBLATT:  No.  We have attempted and would

25    like to continue to attempt to reach an understanding with

* * * * * SEALED * * * * *

———— * * * * * SEALED * * * * *————

1   the government as to the scope if Your Honor would permit.

2           THE COURT:  I am going to dictate the scope right

3   now:  All communications that Twitter had with any person

4   regarding this account including any contacts with support

5   services and records of actions taken.  Is that clear?

6           MR. HOLTZBLATT:  Well, Your Honor --

7           THE COURT:  What don't you understand about what I

8   just said?

9           MR. HOLTZBLATT:  We understand 1H to refer to

10  basic subscriber information because it appears in Section 1

11  of the warrant.

12          THE COURT:  I think it speaks for itself, and it

13  is not just "basic subscriber information," it is what it

14  says.

15          So have there been communications between Twitter

16  and any person regarding this account -- and given the fact

17  that it was turned off at one point and then turned back on

18  again -- one would think that there would be a lot of

19  communications; and all of those communications would be

20  included.

21          Where are you puzzled as a company?

22          MR. HOLTZBLATT:  This is where we are puzzled,

23  Your Honor.  1H appears in Section 1 of the warrant which

24  otherwise refers -- every other category in Section 1 refers

25  to basic subscriber information.

————* * * * * SEALED  * * * * *————

1        THE COURT:  Forget -- forget what you think this

2   category is.

3        It's all business records and subscriber

4   information in any form kept pertaining to the subject

5   account.

6        So any communications between Twitter and anybody

7   else regarding the account -- if it's kept, it's

8   communications regarding the account and subject to that

9   paragraph.

10        MR. HOLTZBLATT:  We had understood this category

11   to be defined by the including clause here, which says:

12   Contacts with support services and records of actions taken.

13        We have searched for that information, and are in

14   the process of producing just, I think, two records.  What

15   the government explained --

16        THE COURT:  Well, that's just including contacts.

17   "Including" does not mean only limited to.  "Including"

18   means including that but any other communications as well.

19        MR. HOLTZBLATT:  We understand that is how the

20   government communicated to us their understanding of this

21   clause today because it appears in the basic subscriber

22   information section.

23        THE COURT:  So the government agrees with what I

24   have just read to you, that that is what the scope is?

25        MR. HOLTZBLATT:  So we have done -- we have

* * * * * SEALED * * * * *

1    attempted to conduct searches today, in light of the

2    conversation we had this morning with the government, to

3    understand the scope of this.  What we have found is --

4    based on certain types of searches -- we are talking about

5    millions of emails that include, for example,

6    realDonaldTrump.  That is a dramatically broader scope of

7    information than we had understood would be covered by this

8    category.  And what we said to the government --

9        THE COURT:  Why don't you explain that more.

10       MR. HOLTZBLATT:  Why don't I explain what we

11   understood it to mean or what we --

12       THE COURT:  No.  I understand you thought it was

13   limited to two records with support services; and that's

14   clearly not the full scope of what is covered in H.

15       So based on what the plain text of H means, and

16   you just mentioned -- made reference to millions of emails,

17   what would the response mean to the plain text of this?

18       MR. HOLTZBLATT:  So what -- if what the government

19   believes we need to produce for this category -- and we are

20   prepared to be as cooperative as we can be with the

21   government in doing that.

22       The government this morning communicated to us

23   that they were most interested in communications between

24   government officials and Twitter regarding the subject

25   account as captured by this.

* * * * * SEALED * * * * *

1    If that is what we are to produce, which is not

2    what we had understood was covered by this category until

3    the conversation this morning, then, what we would normally

4    do for that kind of a communication production would be to

5    meet and confer with the government or -- if we were in

6    civil litigation with the opposing party -- identify search

7    terms and, potentially, custodians that would produce a

8    reasonable set of records that we can review and then

9    produce in order to produce a manageable amount of

10   information.  That's what we proposed to the government this

11   morning, is that we meet and confer, try to understand what

12   search terms would be effective at narrowing down the

13   search.

14        As I said, when we did a search for -- simply the

15   keyword search of @realDonaldTrump on emails within the

16   Twitter system, it produced millions of hits.  I think there

17   are other ways of constructing a search that would produce

18   an appropriate scoped search for this category.

19        THE COURT:  And those millions of hits consist of

20   people concerned about Twitter turning off the account, is

21   that why it was millions?  Why would it be millions?

22        MR. HOLTZBLATT:  Well, that's with only the search

23   term @realDonaldTrump, so that's obviously broader than what

24   Your Honor just said.

25        H says:  Communications between Twitter and any

1    person regarding the account.  To give meaning to that in --

2    to be responsive to the government about what they are most

3    interested in with respect to this category, we proposed --

4    and would still propose -- that we meet and confer,

5    understand what a set of search terms would be that would

6    obtain the kind of information that the government is trying

7    to obtain under this category --

8            THE COURT:  Mr. Holtzblatt, why are -- are there a

9    million emails?  Why are there a million emails?  From whom?

10           MR. HOLTZBLATT:  Within the Twitter email system.

11   It's not limited to emails -- between people outside the

12   Twitter set of employees and Twitter itself.

13           So we -- so, for example, one way of addressing

14   this category would be to limit our search to -- that was

15   from 2006 to the present.  So there is no date limitation

16   within Category 1, which is another reason we understood it

17   to be BSI information.

18           So what would help to narrow this down would be to

19   impose a date limitation, which is not currently within

20   Category 1; to, perhaps, add a set of to/from or bcc, or cc

21   recipients.  For example, if the government is interested in

22   specifically communications from government officials, then

23   we can do a:  To/from .gov.

24           THE COURT:  Okay.  Please sit down.

25           Mr. Windom, do you really need that from 2006 to

* * * * * SEALED * * * * *

1    the present on H?

2              MR. WINDOM:  This is the first time I have heard a

3    complaint about a date limitation on 1H.  The answer is no.

4    I don't need it from 2006 forward.

5              If we were to pick a date right now, I would say

6    October 1st of 2020 through January 20th of 2021, which is

7    consistent with 1F.

8              But this information about, you know, what it is

9    that we say that we're most specifically interested in, I

10   did not represent that we were most interested in

11   communications between government officials and Twitter

12   regarding the account.

13             We did point out that -- much as Your Honor did

14   just now -- it seemed beyond comprehension that there

15   weren't communications regarding the account when it was

16   suspended and terminated, but that doesn't mean government

17   officials at least cabined to that.  It can mean campaign

18   officials.  It can be anybody acting on behalf of the user

19   of the account, or the user of the account himself.

20             THE COURT:  So any person regarding the account is

21   broader than what you just said, though, Mr. Windom.

22             "Any person regarding the account" is quite broad.

23   It could be all the complaints of all of the Trump

24   supporters out in the world saying:  What are you doing,

25   Twitter?

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1        So I take it, from what you just said, that you

2   are interested only in -- rather than "any person," a person

3   who was the subscriber or user of the account or on behalf

4   of that person regarding the account?

5        MR. WINDOM:  Yes, ma'am.  An agent thereof.

6        THE COURT:  All right.  How long -- with that

7   clarification, Mr. Holtzblatt, how long will it take Twitter

8   between -- with the date limitation and the limitation on

9   any person, to produce records?

10        MR. HOLTZBLATT:  Your Honor, I just want to make

11   sure I understand the limitation.

12        There are two additional limitations that are

13   being placed on 1H, one is -- is that it be limited by date,

14   from October 1st, 2020, to January 20th, 2021, is that

15   correct, or the end of January --

16        THE COURT:  January 20th, 2021.

17        MR. HOLTZBLATT:  -- January 20th, 2021, and that

18   the individuals covered would be only the owner of the

19   account or an agent of the owner of the account for

20   communications?

21        I will need to talk to my client about how long it

22   will take.  But what I can represent to the Court is that,

23   within an hour of today's hearing, I will be able to provide

24   an estimate.  And my hope would be that I will be able to

25   produce today that information, but I don't feel like I can

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    make a representation without first talking to my client

2    about it.

3            THE COURT:  All right.  Is that sufficient,

4    subscriber or agent of the user of the account?

5            MR. WINDOM:  Yes, ma'am, with the qualification

6    that I can't know the universe of who those agents or

7    putative agents may be.

8            THE COURT:  Well, how is Twitter going to know

9    that?

10           MR. WINDOM:  It would be beyond all comprehension

11   to imagine that, with this account, there is not a file

12   known within the general counsel's office or some other

13   liaison office within Twitter regarding the account with

14   everything that transpired during the relevant time period.

15           THE COURT:  We'll see how that goes because

16   hopefully -- I don't want to see you all here again.  I am

17   sure none of you want to be here again.

18           All right.  So now we're on to 2, which is --

19           MR. HOLTZBLATT:  Just on one -- on the agents,

20   Your Honor, one category that I could propose is the

21   representatives of -- that subject to the account assigned

22   to be responsible for all presidential records with respect

23   to the archivist, so there are a limited -- a defined and

24   limited set of individuals who were assigned to be

25   responsible for presidential records.  And as we have talked

* * * * * SEALED * * * * *

————————— * * * * * SEALED * * * * *—————————

1    about before, at least during the relevant time period, both

2    the archivist and Twitter understood these to be

3    presidential records.  Whether or not -- I know Your Honor

4    has some questions about that.  But in terms of the

5    contemporaneous understanding of the parties, that's how

6    Twitter understood the records --

7         THE COURT:  Well, when this account was set up,

8    was there a communication from the person or persons who set

9    up the account with Twitter as to who could access it and

10   who could communicate regarding the functionality and any

11   other concerns about the account?

12        MR. HOLTZBLATT:  The account was set up in 2006,

13   Your Honor.  A great deal transpired between 2006 and 2020

14   with respect to the individual who is the owner of the

15   account.  So I don't -- there is obviously -- there is

16   sign-in information with the account, but you don't need to

17   provide very much information to open a Twitter account.  So

18   it's -- it may be surprising to the government or to the

19   Court, but there is not a -- we don't keep dossiers on users

20   in that sense.

21        I can represent to Your Honor that the current

22   email -- we have a name of an individual who is the current

23   email contact for the account, and that is a person who is a

24   credible --

25        THE COURT:  What is that name?

————————— * * * * * SEALED  * * * * *—————————

1        MR. HOLTZBLATT:             .  So I think we can

2   certainly look at the NARA -- the individuals who are

3   assigned to be agents for the account --

4        THE COURT:  And expand it beyond             to

5   include those people as well?

6        MR. HOLTZBLATT:  That's correct, Your Honor.

7        THE COURT:  Right.

8        Mr. Windom, I am not sure what else they can do.

9        MR. WINDOM:  Your Honor, that's a starting point.

10  We can add names to the extent we think appropriate.

11       I will say this, the letter that they're talking

12  about was signed on January 19th and includes the sitting

13  Assistant Attorney General for the Office of Legal Counsel.

14  I highly doubt that that person is having communications

15  with Twitter in the relevant time period about this account.

16  I would not cabin it to that --

17       THE COURT:  Well, I know the NARA representatives

18  are -- limiting it to them would be useless, generally

19  useless.

20       MR. WINDOM:  Yes, ma'am.

21       THE COURT:  I am fully aware of that.  But

22         would not be.

23       MR. WINDOM:             is one person I can

24  consult, and add additional names to the extent that their

25  list is not robust.

* * * * * **SEALED** * * * * *

1           THE COURT:  All right.  Well, you can provide the

2      list of names to them.

3           MR. WINDOM:  Thank you, Judge.

4           THE COURT:  All right.  We're on to 2A,

5      Mr. Holtzblatt.

6           MR. HOLTZBLATT:  Thank you, Your Honor.

7           THE COURT:  And for purposes of the record, so

8      we're all clear, 2 states that the warrant demands:  All

9      content, records, and other information relating to

10     communications sent from or received by the subject account

11     from October 2020 to January 2021 including but not limited

12     to:  A, content of all tweets created, drafted, favorited,

13     liked, or re-tweeted by the subject account including all

14     such deleted tweets, and all associated multimedia,

15     metadata, and logs.

16           Has that been produced?

17           MR. HOLTZBLATT:  Yes, Your Honor.  We have --

18           THE COURT:  You can stop at "yes," if it's all

19     been produced.  If there is an exception --

20           MR. HOLTZBLATT:  It's more complicated, so I was

21     going to explain.

22           THE COURT:  Okay.  That's unfortunate.

23           MR. HOLTZBLATT:  At 5 p.m. on February 7th, I

24     think that was our day, we produced all data in this

25     category that was in the standard production tools of

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1    Twitter.

2          We communicated with the government on

3    February 8th that there were prior preservations of the

4    subject account that are not within Twitter's standard

5    production tools and that would, therefore, require

6    engineering to obtain information.  And we asked the

7    government whether it wished us to undertake that effort,

8    and the government confirmed that it did.

9          And we have since then -- when we produced on

10   February 7, we indicated to the government in our production

11   letter that there was potentially deleted data that might

12   exist, which is what would be found in prior preservations,

13   but that it would require additional engineering efforts.

14         At 2 a.m. last night, or this morning, Twitter

15   produced additional information from those prior

16   preservations that falls within category 2A.  There are --

17         THE COURT:  When you say "prior preservations"

18   what are you talking about?

19         Prior litigation holds of some kind or that you

20   had a stash or a cache of preserved data sitting in

21   different places?  What are you talking about?

22         MR. HOLTZBLATT:  I am referring -- with respect to

23   this particular account, I am referring to preservations

24   from two specific dates.

25         There is a preservation that was made that

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    includes the subject account covering January 3rd to 9th,

2    2021.  There is a second preservation of this that includes

3    this account that covers January 11 to 12, 2021.

4         Those are collections of data that -- they are

5    not -- it's not coterminous with the categories that would

6    exist in the active account right now and -- and that's data

7    that does not exist within a production environment.  So

8    it's not data that you can just click -- we have a system to

9    just click a button and produce, which is why we indicated

10   that further engineering efforts might be necessary.

11        We asked the government if they wished us to

12   undertake those efforts.  We had an engineer working through

13   the night, after the government asked us to, to undertake

14   those efforts.  At 2 a.m. in the morning we produced

15   additional information that came from those preservations.

16        There are two categories of information that --

17   actually, I'm sorry, three categories of information that we

18   are still working to produce because of the engineering

19   challenges associated.

20        One of those categories is the list of -- I am not

21   sure this is from 2A.  But I think, for purposes of

22   coherence, it would be helpful for me to describe it now

23   because it connects to this preservation; that is,

24   followers -- a list of followers for this account that were

25   contained within the January 11 through 12th prior

1  preservation.  We have segregated that information.  It is a

2  complicated and large set of information.  And we are unable

3  to deliver it in the manner that we normally deliver

4  information to law enforcement, which is to send a token.

5  We believe right now it would require physical media to put

6  that information on and to hand it over to the government.

7         This morning we indicated to the government:  If

8  there is a mechanism, like an FTP site or something, that

9  you have that you can work with us, we would like to work

10 with you on this.  We have it.  We have segregated it.  We

11 just don't currently have a tool that allows us to produce

12 it to you.  So that --

13        THE COURT:  This is really just a list of

14 followers attached to the preserved account from January 11

15 through 12, 2021?

16        MR. HOLTZBLATT:  That's this particular -- there

17 are two others that I need to address, but that's this

18 particular one that I am addressing.  That's correct, Your

19 Honor.

20        THE COURT:  Okay.  Category two of the three.

21        MR. HOLTZBLATT:  As I mentioned, Your Honor, there

22 were two prior preservations, and then there is the current

23 production tools.  In two of the three of those sets, the

24 January 3 through 9 and the current one, we have produced

25 the tweets and related tweet information for the account.

* * * * * SEALED * * * * *

1           In the January 11 to 12th prior preservation, the

2    way that the tweet and tweet-related information is stored,

3    it goes all the way back to 2006.  We don't have a

4    warrant -- that is contents of user communications.  We

5    don't have a warrant that would permit us to produce the

6    entirety of that information.  So what we have is a tool

7    that -- what we refer to as a redaction [sic] tool or a

8    trimming tool.  Because this is not a production

9    environment, a human being has to go in and manually trim

10   the information to isolate the date range.  That, as I think

11   Your Honor can understand, is a laborious process, including

12   for this particular account, given the time frame; and we

13   need to isolate it, I think, over a three-month, four-month

14   period, I'm sorry, Your Honor.  So we are undertaking it.

15           We are underway on that effort, but the second

16   piece of information that we are working on producing but

17   have not yet produced is the tweets for the January 11 to

18   12th prior preservation for the subject account as we

19   undergo the trimming process.

20           THE COURT:  Okay.  And how long will it take you

21   to produce -- do that trimming process?

22           MR. HOLTZBLATT:  I am hopeful that we will be able

23   to finish it today.  I don't know that we will be able to

24   finish it today.  What I would propose to the government --

25   what we have proposed and what we would propose again is

* * * * * SEALED * * * * *

* * * * * **SEALED** * * * * *

1    that we provide updates this afternoon on where we are with

2    that engineering process.

3              We are working as, I think, evidenced by having an

4    engineer come in overnight and work with this tool through

5    the night.  We are working very diligently to try to produce

6    this information.  We have produced this category of

7    information for two of the three repositories where this

8    type of information is held, and we are working on this last

9    one --

10             THE COURT:  And these tweets in the preserved data

11   set from January 11 through 12, 2021, are different from in

12   the current -- your current status of the account?

13             MR. HOLTZBLATT:  That's a great question, Your

14   Honor.

15             So they are probably not different and they are

16   certainly not, in any large sense, different.  It is

17   possible that between when the account was suspended on

18   January 8th, which is before this preservation occurred, and

19   then it was reinstated recently -- it is conceivable that,

20   after it was reinstated, someone that has access to the

21   account deleted some of the tweets.  If that happened, they

22   would be present in the January 11th and 12th, but not in

23   the current one.  I don't know.  It may be -- I don't know.

24             THE COURT:  Okay.  I understand.

25             The third category of information that you are

* * * * * **SEALED** * * * * *

1    still working on.

2            MR. HOLTZBLATT:  The third category is something

3    called fleets with an "F."  I will be honest with you, Your

4    Honor, until this morning I didn't know that that was a

5    content category that existed.  I am a Twitter user and have

6    worked with Twitter a long time; that was not something that

7    I was aware of.

8            But we are collecting that from the January 11th

9    through 12th production set, and only that set; and it

10   presents, I believe, a similar problem, of having to trim it

11   down.  We're working on that well.

12           THE COURT:  What precisely is fleets?

13           MR. HOLTZBLATT:  It is similar to tweets, and I

14   don't know more than that, Your Honor.

15           THE COURT:  You don't use "fleets."

16           MR. HOLTZBLATT:  I had not heard of fleets until

17   this morning.

18           THE COURT:  And was fleet used on this account?

19           MR. HOLTZBLATT:  It is a vanishing tweet.

20           THE COURT:  A vanishing tweet.

21           MR. HOLTZBLATT:  I guess fleet -- that makes

22   sense, fleeting.

23           THE COURT:  Okay.  So it's a vanishing tweet.  And

24   do you know whether that vanishing tweet or fleet

25   functionality was active on this account?  And are you able

* * * * * SEALED * * * * *

1    to tell that?

2            MR. HOLTZBLATT:  I don't, as I stand here now,

3    know whether it was.  If there is data -- if there is fleet

4    data in the prior preservation from January 11 and 12th,

5    then that would be -- it would have been active, and that

6    would correspond to it, and that's what we're working to

7    obtain.

8            THE COURT:  Okay.  So let me interrupt you for a

9    second.

10           Mr. Windom, of these three categories is the

11   government particularly interested in Category No. 1, this

12   list of followers for the account from January 11

13   through 12, 2021?

14           MR. WINDOM:  Yes, Your Honor.

15           The answer is going to be yes for all three.  I

16   have some additional information that may be of assistance.

17           This is a perfect example of why it was imperative

18   that we come before Your Honor.  Twitter counsel has just

19   mentioned two things that we have never heard of before in

20   our calls.

21           What we were told was that there was one

22   preservation done of the entire history of the account on

23   January 11th.  This is the first time we are hearing about

24   another preservation between January 3rd and January 9.

25           Second, I have never heard of "fleets" in part of

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

 1   any discussion that we have had.  I don't know if that is

 2   information in this account; it may or may not be.  It still

 3   will be relevant, it still will be responsive.

 4            THE COURT:  Well, it seems to me that that's a

 5   functionality that you would probably understand from the --

 6   1C, types of services utilized.

 7            MR. WINDOM:  Yes, ma'am.

 8            THE COURT:  But perhaps people -- representatives

 9   of Twitter can explain why that's just not indicated in 1C,

10   which is:  Functionality uses of the account?

11            MR. WINDOM:  I can't speak to that given our

12   review of the material at this point.  I do want to point

13   out, though, Your Honor, what Twitter counsel told us, in

14   terms of the preservations, they said that according to

15   Twitter's policies, if the user deletes tweets or direct

16   messages Twitter, nonetheless, retains that information for

17   14 days.  These two prior preservations could have deleted

18   tweets, could have deleted direct messages that are not part

19   of the instant production from this year.

20            We know with certainty that there were deleted

21   tweets on January 6th.  Twitter said that the President had

22   to delete those tweets in order to reinstate his account

23   from suspension.  We do not know if those deleted tweets are

24   part of what we got from this year's preservation versus

25   either of those two prior preservations.  That is one of the

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    reasons it is very concerning to us.

2         I will also point out that the introductory

3    paragraph in the warrant for Part 1 specifically says

4    anything in their holdings -- it mentions including any

5    preservations that were made pursuant to 18 U.S.C. -- I

6    think it is 2703.

7         It is not clear to us whether these preservations

8    were made pursuant to a federal order or just for internal

9    reasons.  But, in any event, that opening paragraph of

10   Part 1 clearly covered all of these things.  And all of the

11   problems that they say they're encountering and redacting,

12   and going back and looking at things, we're 23 days from the

13   date that the Court entered an order and they're just

14   starting to learn about things now.

15        THE COURT:  Okay.  So were these -- I mean, I

16   didn't pursue the preservation orders and why they were in

17   place, presuming that they were government orders and you

18   might already know about those.  But were these government

19   preservation requests under the Stored Communications Act?

20        MR. HOLTZBLATT:  So we don't believe they were,

21   but the individuals who would know definitively are no

22   longer employed with Twitter.  But we don't believe that

23   these are 2703; and one of the two is definitely not.

24        That's what I thought, yes.

25        One of the two is certainly not, and the second

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1      one we don't know the answer.

2              THE COURT:  Doesn't Twitter keep track of why

3      they're preserving data?

4              MR. HOLTZBLATT:  Your Honor, this particular time

5      frame --

6              THE COURT:  Like, which order, for how long, and

7      so on?

8              MR. HOLTZBLATT:  So I don't know -- yes.

9              THE COURT:  Does Twitter keep track of why it's

10     preserving data and pursuant to which order?

11             MR. HOLTZBLATT:  So I don't know -- I have two

12     answers, Your Honor.  As a general matter, I don't know the

13     answer to your question.

14             In this particular instance, we do not have a

15     record of a government request that corresponds to either of

16     these two preservations.

17             THE COURT:  Interesting.  Okay.

18             MR. HOLTZBLATT:  So if a negative pregnant is to

19     be followed, then it would suggest that these were done not

20     pursuant to a preservation order.  But I cannot -- I do not

21     wanted to stand up here and make a representation to Your

22     Honor that I don't know to be true.

23             So I can tell you we do not have a record.  I know

24     that one of the two was not; and I don't know the answer as

25     to the other one.

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1          THE COURT:  Okay.  All right.  And for the -- let

2     me just go back for one second just to make sure my notes

3     are complete.

4          For Category 1, the list of followers, did you

5     tell me when you think that is going to be produced?

6          MR. HOLTZBLATT:  We need the government's help

7     with this.  We have it ready to go, it's simply a question

8     of how to do it --

9          THE COURT:  He just needs to know where to do it.

10         MR. HOLTZBLATT:  If the government would like us

11    to deliver a hard drive to the FBI office in San Francisco,

12    we can do it today.  If they would like us to do it to an

13    FTP site and they can provide us an FTP link, we can do it

14    today.  We stand ready to produce that as soon as we have a

15    mechanism to do it.

16         THE COURT:  Okay.  Mr. Windom, on that issue?

17         MR. WINDOM:  I am advised that there is an FTP

18    link in their email in-box now.

19         MR. HOLTZBLATT:  Great.

20         THE COURT:  Okay.  So that can start now.

21         With respect to 2, the time frame is possibly

22    today, possibly tomorrow; no promises on that.  But you are

23    going to keep the government updated on the status of two.

24         And for the fleets, what is your time frame?

25         MR. HOLTZBLATT:  So the fleets is only as to one

* * * * * SEALED   * * * * *

* * * * * SEALED * * * * *

1    of the three repositories we're talking about, January 11

2    through 12.

3              THE COURT:  Right.

4              MR. HOLTZBLATT:  That's in the same category as

5    the tweets for January 11 and 12.  I am hopeful that we will

6    have it today.  I can commit to having -- to providing an

7    update to the government this afternoon about where we stand

8    with that effort; and we are working around the clock.

9              THE COURT:  Okay.  So you are going to give

10   Mr. Windom and Ms. Dohrmann an update on both 2 and 3, let's

11   say, by 4 p.m. today if you haven't delivered everything by

12   then.

13             MR. HOLTZBLATT:  Yes, Your Honor.

14             THE COURT:  Okay.  Let's move on to B, the content

15   of all direct messages, the DMs:  Sent from, received by,

16   stored in draft form, in or otherwise associated with the

17   subject account including attachments, multimedia, header

18   information, metadata, and logs.

19             Am I understanding correctly, Mr. Holtzblatt, that

20   that has been produced, to the extent it's subject to your

21   standard production tool, but to the extent that this data

22   falls in the two preserved caches --

23             MR. HOLTZBLATT:  We have also produced --

24             THE COURT:  You have also produced it?

25             MR. HOLTZBLATT:  That is -- happily, that was one

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    of the things our engineers were able to pull at 2 in the

2    morning; and that included deleted direct messages and not

3    just nondeleted, but also deleted direct messages.

4            THE COURT:  And then 3, content which -- for the

5    record's clarity, 3 asked for:  All content records and

6    other information relating to all other interactions between

7    the subject account and other Twitter users from

8    October 20th to January 20, 2021 including but not limited

9    to -- this is where we get into the, A, users the subject

10   account has followed, unfollowed, muted, unmuted, blocked or

11   unblocked, and all users who have followed, unfollowed,

12   muted, unmuted, blocked or unblocked the subject account.

13           Do you want to give me the status of that?

14           MR. HOLTZBLATT:  So I -- the one category that is

15   not produced from that is this physical media, this

16   production that we need to do, I guess, through an FTP site

17   that's in my email box or George's, Mr. Varghese's --

18           THE COURT:  Which is the Category 1 that you have

19   referred to before; and you are ready to produce that today?

20           MR. HOLTZBLATT:  We are ready to produce that

21   today.

22           THE COURT:  Got it.  Via the FTP site or mechanism.

23           B, all information from the connect or

24   notifications tab for the account including all lists of

25   Twitter users who have favorited or re-tweeted tweets posted

* * * * * SEALED * * * * *

1   by the accounts, as well as all tweets that include the user

2   name associated with the account, i.e., mentions or replies.

3           MR. HOLTZBLATT:  So, Your Honor, this is a

4   category we have not produced, and I want to explain why.

5           The items in 3 are all date limited.  This is not

6   a category of information that was -- is contained within

7   the prior preservation, so it's not saying we can go back to

8   January of 2021 and collect to fit it within the time frame.

9           All we have that could conceivably fall within

10  this category is information that is there today.  This is

11  dynamic information, so it's information that changes.  And

12  so the information that would be contained in this today is

13  a mix of information that might have been responsive to this

14  category and information that is definitely not.  Because it

15  is contents of communications, we don't believe we can

16  produce without a warrant the information that's available

17  in this category on our systems today because it is -- it

18  includes a category of information that goes beyond the

19  scope of the warrant.  So we don't have a way of

20  disaggregating this information --

21          THE COURT:  Meaning, you don't have a way to put a

22  time frame on it?

23          MR. HOLTZBLATT:  That's correct, Your Honor.

24          It is information that -- because it's dynamic --

25  whatever is in the account today is not what was in the

* * * * * SEALED * * * * *

1    account at the time -- at the relevant time frame.

2            THE COURT:  I see.

3            MR. HOLTZBLATT:  And I don't -- so I don't know if

4    this is important to the government or not.  If it is, we

5    have to come up with a different solution.  I don't think we

6    actually can -- I don't think we are permitted to produce

7    what we have today.

8            THE COURT:  Okay.  Well, let me just --

9    Mr. Windom, do you want to think about that or do you want

10   to respond?

11           Do you think Mr. Zebley is standing outside the

12   locked door?

13           MR. HOLTZBLATT:  I think there is a chance.

14           THE COURT:  Could you check?  Poor Mr. Zebley.

15           MR. WINDOM:  Should I wait, Your Honor, or

16   proceed?

17           THE COURT:  Proceed.  In my chambers we wait for

18   no man.

19           MR. WINDOM:  Thank you.

20           Your Honor, I mean, the short answer is of course

21   it's important to us.  Just by PC -- for it to be in the

22   warrant, and Your Honor signed a warrant with this in it, I

23   don't understand -- I just don't understand the explanation

24   that was given as to what exists or does not exist.

25           It sounds like they have more information than is

* * * * * SEALED  * * * * *

* * * * * **SEALED** * * * * *

1    responsive and so there can be an overproduction of

2    material.  Honestly, I am not clear what they're saying; nor

3    do I understand if the two preservations that they have

4    identified today would somehow ameliorate the problem that

5    they have just raised at the podium.

6              I don't understand the technology behind it.  If

7    they would like to explain further or if they would like to

8    talk to me offline, that is fine.  The bottom-line --

9              THE COURT:  I am going to let you-all talk about

10   this offline.

11             MR. WINDOM:  Thank you, Your Honor.

12             THE COURT:  Because I think -- what I am

13   understanding from Twitter is that -- I am not a Twitter

14   user; most judges are not.

15             The connector notifications tab -- I am not

16   exactly sure what that is.  But I do understand lists of

17   Twitter used who have favorited or re-tweeted tweets posted

18   by the account.

19             As I understand what Twitter is saying, that is

20   just a mass of data that is not segregated or segregable by

21   date frame -- by a time frame.  And so I think that they are

22   having trouble figuring out how to do that.

23             And then, the last part of this is:  All tweets

24   that include the user name associated with the account.

25   That could be a lot of data.  So I think you need to talk to

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1     them about how to refine that.  Okay.

2                MR. HOLTZBLATT:  Thank you, Your Honor.

3                THE COURT:  C, all contacts and related sync

4     information, produced?

5                MR. HOLTZBLATT:  Yes.

6                THE COURT:  Okay.  All associated logs and

7     metadata, produced?

8                MR. HOLTZBLATT:  Yes.

9                THE COURT:  4, for the record, reads:  All other

10    content records and other information relating to the use of

11    the subject account including but not limited to:  A, All

12    data and information associated with the profile page

13    including photographs, bios, and profile backgrounds and

14    themes.

15               Has that been produced?

16               MR. HOLTZBLATT:  Yes.

17               THE COURT:  B, multimedia uploaded to or otherwise

18    associated with the subject account.

19               Has that been produced?

20               MR. HOLTZBLATT:  With one exception, yes.

21               The one exception is that there is tweet media

22    which are associated with the tweets.  And so in the

23    January 11th through 12th repository that we are trimming --

24    that requires the trimming -- that one of the things that

25    has to be trimmed down to includes the tweet media.  Other

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    than that, we have produced for this category.

2              THE COURT:  Okay.  C, all records of searches

3    performed by the subject account from October 20th to

4    January 20, 2021.

5              Has that been produced, Mr. Holtzblatt?

6              MR. HOLTZBLATT:  We have produced saved searches;

7    and we are in the process of producing actual search

8    queries, which can be produced today.

9              THE COURT:  Today.

10             MR. HOLTZBLATT:  It may have been included in the

11   earlier production, I don't know the answer to that.  We are

12   producing additional information of actual search queries

13   today.

14             THE COURT:  Okay.  D, all location information

15   including all location data collected by any plug-ins,

16   widgets or the quote-unquote tweet with location service

17   from October 20th to January 20, 2021.

18             MR. HOLTZBLATT:  Yes.  We have produced what we

19   have.  It is not something we normally have, so it may be a

20   small or null set.  But to the extent we have it, we have

21   produced it.

22             THE COURT:  Okay.  E, information about the

23   subject account's use of Twitter's link service including

24   all longer website links that were shortened by the service,

25   all resulting shortened links or information about the

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    number of times that link posted while the subject account

2    was clicked, which is a lot of information in there.

3              MR. HOLTZBLATT:  Yes.  We have not -- we have not

4    produced this information.  We're struggling to understand

5    what would be responsive, and it's one we're continuing to

6    work on and would like to be able to continue to talk with

7    the government to make sure we understand what they

8    understand would fall in this category, so we're working on

9    it.

10             THE COURT:  Can I just ask why is it that when

11   there are questions about the scope, and so on -- to be

12   quite honest, we are J.D.s, we are not IT professionals.  So

13   it's oftentimes the case that, when we lawyers look at

14   language, we have to confer with IT to find out what is

15   feasible, what they have, how much longer it is, does it

16   exist, and so on.

17             So why is it on February 9th you-all are just

18   starting to have that conversation?

19             MR. HOLTZBLATT:  Well, Your Honor --

20             THE COURT:  When I do take, at face value,

21   Twitter's representation in connection with its motion

22   challenging the NDO, that it was perfectly prepared to

23   comply with this warrant?

24             MR. HOLTZBLATT:  So I would like to explain that,

25   Your Honor.

* * * * * SEALED * * * * *

1          THE COURT:  It's a puzzle from where I sit.

2          MR. HOLTZBLATT:  I'm sorry, Your Honor.

3          In ████████ communication with the government

4    prior to any filing in this case, one of the things that █

5    said to the government was:  Once these issues, by which she

6    meant what was the subject of our -- what is still the

7    subject of our pending motion -- what was the subject of the

8    government's motion are resolved, which we understood to be

9    the big question -- there are some technical issues that we

10   will need to discuss with respect to this account.  These

11   are the kinds of things ████████ was referring to, about

12   the need to talk about technical information.

13          That's everything from:  We have a standard

14   production tool, which is how -- for thousands of warrants

15   we produce information --

16          THE COURT:  So █ was putting the cart before the

17   horse.  █ should have been working on getting the warrant

18   production ready to go while she litigated whatever else

19   Twitter wanted to litigate.

20          Okay.  Well, that's been clear from the process

21   here.

22          Okay.  So let's break down E.

23          So information about use of Twitter's link

24   service, which is shortening longer website links.  Does

25   Twitter maintain that information, when a Twitter user

1    accesses and uses the link service?

2            You can tell me you don't know if you don't know.

3            MR. HOLTZBLATT:  I think the safest thing for me

4    to say to Your Honor would be that I don't know the answer.

5    It is something that, I think, we are trying to produce

6    today; but it is also something that there was some

7    confusion about what it is.  To the extent there remains

8    confusion, we will speak with the government and continue

9    speaking with the government until we have eliminated that

10   confusion.

11           And if it is available -- I think I am saying that

12   it is not hard to produce.  We will endeavor to produce it

13   today.  And if not, we will provide an update and explain

14   why we have not at the end of this afternoon, at four

15   o'clock.

16           THE COURT:  This may be why the government keeps

17   insisting at each of these meetings that a personal

18   representative from Twitter be sitting at the table to

19   answer more technical questions.  I am not sure why they

20   keep asking for a personal representative, but perhaps

21   that's one reason.

22           You are going to find that out.  It will be

23   produced today if Twitter maintains it?

24           MR. HOLTZBLATT:  It will be produced today if we

25   maintain it.  And with the only caveat that if, for some

* * * * * SEALED * * * * *

1    reason, there is an engineering challenge that we cannot

2    overcome today, I will give an update to the government at

3    four o'clock and explain that.

4              THE COURT:  Okay.  And then -- so if the account

5    user used the link service.  And then, the second part of

6    this is:  All resulting shortened links.  And then, the

7    third part of it is:  The number of times that a link posted

8    by the subject account was clicked.

9              Do you understand what that means by "clicked"?

10             MR. HOLTZBLATT:  I understand what it would mean

11   to click a link.  I don't know if that is information that

12   Twitter maintains, the information about the clicking of

13   links that have been shortened through any link service.  I

14   don't know the answer to that.

15             THE COURT:  Because, certainly, the source link

16   might maintain the number of clicks on its link.  But does

17   Twitter maintain information about those number of clicks

18   for links accessed via Twitter?

19             MR. HOLTZBLATT:  I don't know.  That is not

20   standard information that Twitter produces.  I have some

21   doubt about whether this is information that Twitter

22   maintains, but I am not going to make a representation to

23   the Court when I don't know.

24             THE COURT:  Mr. Windom.

25             Let's get clarity right now on what is being

* * * * * SEALED * * * * *

47

* * * * * SEALED * * * * *

1    requested in 4E.

2            Just reading the English here, I think it reads --

3    but you can correct me if I'm wrong -- it's requesting three

4    things, the number of times the user of this account

5    accessed and used Twitter's link service which shortens

6    links -- so far so good?

7            MR. WINDOM:  Yes, ma'am.

8            THE COURT:  And then the second thing is what were

9    the shortened links.

10           MR. WINDOM:  Yes, ma'am.

11           THE COURT:  Is that right?

12           MR. WINDOM:  Yes, ma'am.

13           THE COURT:  And then, finally, any information

14   that Twitter has about the number of times that a link

15   posted by the subject account was actually clicked, which

16   is, basically, clicking on the tweet -- clicking on a link

17   embedded in a tweet.

18           Is it the government's information that this is

19   information that can be preserved, maintained, collected by

20   an electronic communications provider like Twitter.

21           MR. WINDOM:  Yes, ma'am.  And there is some

22   reference to this in the affidavit I will read briefly.

23   Twitter tracks --

24           THE COURT:  In the affidavit?

25           MR. WINDOM:  Ma'am?

* * * * * SEALED * * * * *

* * * * * **SEALED** * * * * *

1      THE COURT:  In the affidavit?

2      MR. WINDOM:  Yes, ma'am.

3      THE COURT:  Which is currently sealed, and Twitter

4  hasn't seen it?

5      MR. WINDOM:  This is a line that is a statement of

6  fact responsive to your question.

7      THE COURT:  What a privilege to --

8      MR. WINDOM:  "According to the government's

9  information, Twitter tracks how many times these shortened

10  links are clicked."  Period, full stop.

11      THE COURT:  Well, we'll find out if that

12  representation in the affidavit is correct, but that is

13  certainly information that the government has.

14      The government has been living and working and

15  obtaining information from Twitter since its existence,

16  probably, so they have experience before they put that in

17  their affidavit.  Perhaps that can help counsel in

18  communicating with Twitter.

19      MR. HOLTZBLATT:  Thank you, Your Honor.  I

20  appreciate that.

21      THE COURT:  Okay.  All right.  So E, 4 p.m. update

22  to the government today, Mr. Holtzblatt, about how much of

23  that you can produce, and when.

24      MR. HOLTZBLATT:  Yes, Your Honor.

25      THE COURT:  All right.  I think that's it for what

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1    hasn't been produced, and a time frame for production.

2              It's clear to me that Twitter didn't comport or

3    comply with the deadline by 5 p.m. on February 7th and is

4    working hard to do so now.  So that's good news.

5              When production is complete, I will expect the

6    government to let me know and what the government's

7    calculation is at that point because I am not keeping count

8    of the penalty, but I am sure the government will.  I will

9    enter an order at that time for the amount.  And, hopefully,

10   the government will confer with Twitter that everybody is

11   counting the days the same way and doing the math the same

12   way.  But $50,000 a day is a pretty big -- easy to calculate

13   round number even for us J.D.s.  Hopefully, this production

14   will get wrapped up promptly.

15             Is there anything further today, Mr. Windom?

16             MR. WINDOM:  No, ma'am.  Thank you, Your Honor.

17             THE COURT:  Anything further from Twitter?

18             MR. HOLTZBLATT:  No, Your Honor.

19             THE COURT:  All right.  Hopefully, I won't see you

20   all again.  You will be able to work this out.

21             I will just wait for your submissions on Twitter's

22   motion, and then we'll proceed from there.  As I said, I was

23   hoping that the hearing we had on Tuesday pretty much covers

24   most of the issues that I might be concerned about with both

25   motions that were pending in front of me.  But, as I said,

* * * * * SEALED * * * * *

1    if something comes up in the briefing where I think I

2    need -- another hearing is necessary on Twitter's motion,

3    we'll hold it then.

4            All right.  If there is nothing else, you are

5    excused.

6            MR. HOLTZBLATT:  Thank you, Your Honor.

7            MR. WINDOM:  Thank you, Your Honor.

8            (Whereupon, the proceeding concludes, 12:15 p.m.)

9                         * * * * *

10                        **CERTIFICATE**

11

12            I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

13   certify that the foregoing constitutes a true and accurate

14   transcript of my stenographic notes, and is a full, true,

15   and complete transcript of the proceedings to the best of my

16   ability.

17            This certificate shall be considered null and void

18   if the transcript is disassembled and/or photocopied in any

19   manner by any party without authorization of the signatory

20   below.

21        Dated this 11th day of February, 2023.

22        /s/ Elizabeth Saint-Loth, RPR, FCRR
          Official Court Reporter

23

24

25

# Exhibit A

**Filed Under Seal**

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 23-SC-31
INFORMATION THAT IS STORED AT )
PREMISES CONTROLLED BY TWITTER INC. )
IDENTIFIED IN ATTACHMENT A )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____January 31, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Chief Judge Beryl A. Howell_____.
*(United States Chief Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: ____1/17/2023____ at 1:31 PM

*Berl A. Howell*
*Chief Judge's signature*

City and state: _____Washington, D.C._____

Chief Judge Beryl A. Howell
United States Chief Judge

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SC-31 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with the Twitter account "@realDonaldTrump" ("**SUBJECT ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by Twitter Inc. ("Twitter"), a company headquartered at 1355 Market Street, Suite 900, San Francisco, California.

**ATTACHMENT B**
**Particular Things to be Seized**

**I.      Information to be disclosed by Twitter Inc. ("Twitter" or the "provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Twitter, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Twitter, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the Government for each account or identifier listed in Attachment A:

1.      All business records and subscriber information, in any form kept, pertaining to the **SUBJECT ACCOUNT**, including:

a.      Identity and contact information (past and current), including full name, e-mail address, physical address, date of birth, phone number, gender, and other personal identifiers,

b.      All usernames (past and current) and the date and time each username was active, all associated accounts (including those linked by machine cookie, IP address, email address, or any other account or device identifier), and all records or other information about connections with third-party websites and mobile apps (whether active, expired, or removed),

c.      Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records,

d.      Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers,

       e.      All advertising information, including advertising IDs, ad activity, and ad topic preferences,

       f.      Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from October 2020 to January 2021,

       g.      Privacy and account settings, including change history, and

       h.      Communications between Twitter and any person regarding the account, including contacts with support services and records of actions taken,

       2.      All content, records, and other information relating to communications sent from or received by the **SUBJECT ACCOUNT** from October 2020 to January 2021 including but not limited to:

       a.      The content of all tweets created, drafted, favorited/liked, or retweeted by the **SUBJECT ACCOUNT** (including all such deleted tweets), and all associated multimedia, metadata, and logs,

       b.      The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the **SUBJECT ACCOUNT**, including all attachments, multimedia, header information, metadata, and logs,

       3.      All other content, records, and other information relating to all other interactions between the **SUBJECT ACCOUNT** and other Twitter users from October 2020 to January 2021, including but not limited to:

       a.      All users the **SUBJECT ACCOUNT** has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the **SUBJECT ACCOUNT**,

    b. All information from the "Connect" or "Notifications" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies"),

    c. All contacts and related sync information, and

    d. All associated logs and metadata,

  4. All other content, records, and other information relating to the use of the **SUBJECT ACCOUNT**, including but not limited to:

    a. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes,

    b. All multimedia uploaded to, or otherwise associated with, the **SUBJECT ACCOUNT**,

    c. All records of searches performed by the **SUBJECT ACCOUNT** from October 2020 to January 2021,

    d. All location information, including all location data collected by any plugins, widgets, or the "tweet With Location" service, from October 2020 to January 2021, and

    e. All information about the **SUBJECT ACCOUNT**'s use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the **SUBJECT ACCOUNT** was clicked.

  5. Twitter is ordered to disclose the above information to the government within 10 days of issuance of this warrant to:

* * * * * SEALED * * * * *

\* <u>THIS PAGE LEFT INTENTIONALLY BLANK</u> \*

<u>SEALED MATTER ENCLOSED</u>

<u>FOR AUTHORIZED PERSONS ONLY</u>

* * * * * SEALED * * * * *

─────── * * * * * SEALED * * * * *───────

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
In the Matter of The Search of    ) Case No. 23-SC-31
Information That is Stored         )
at Premises Controlled by          )
Twitter, Inc.                      )
                                   )
UNITED STATES OF AMERICA,          ) February 7, 2023
        Interested Party,          ) 1:32 p.m.
                                   ) Washington, D.C.
TWITTER,                           )
        Interested Party.          )
* * * * * * * * * * * * * * * *

**SEALED**
**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES**:

FOR THE UNITED STATES:
                        GREGORY BERNSTEIN
                        JAMES PEARCE
                        THOMAS WINDOM
                        MARY DOHRMANN
                        Office of Special Counsel
                        950 Pennsylvania Avenue NW
                        Washington, DC 20530
                        (202) 804-7000


FOR TWITTER:            GEORGE P. VARGHESE
                        ARI HOLTZBLATT
                        WHITNEY RUSSELL
                        BENJAMIN A. POWELL
                        WilmerHale
                        2100 Pennsylvania Avenue NW
                        Washington, DC 20037 USA
                        (202) 663-6964


Court Reporter:    Elizabeth Saint-Loth, RPR, FCRR
                   Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.
─────── * * * * * SEALED * * * * *───────

\* \* \* \* \* SEALED \* \* \* \* \*

# P R O C E E D I N G S

1   THE COURTROOM DEPUTY:  Matter before the Court,

2   Case No. 23-SC-31, In the matter of the search of

3   information that is stored at premises controlled by

4   Twitter, Inc.  Interested parties:  United States of America

5   and Twitter, Inc.

6   Counsel, please come forward and state your names

7   for the record, starting with the government.

8   MR. BERNSTEIN:  Good afternoon, Your Honor.

9   Greg Bernstein, Thomas Windom, Mary Dohrmann, and

10  James Pearce for the United States.

11  THE COURT:  All right.  Just so you all know, if

12  you are feeling okay today, and you are fully vaccinated,

13  when you are speaking you can remove your masks so we can

14  all hear you better.

15  During the pandemic, I guess, it was nice that I

16  have so much strong air conditioning in my courtroom, but it

17  does create a lot of white noise.  It's a lot easier to

18  understand you if you are speaking without your mask.

19  For Twitter.

20  MR. VARGHESE:  Good afternoon, Your Honor.

21  My name is George Varghese on behalf of Twitter.  I am

22  joined today by my colleagues, Ari Holtzblatt, Ben Powell --

23  THE COURT:  Okay, wait.  Slow down.

24  So you are Mr. Varghese.  Are you going to be

\* \* \* \* \* SEALED  \* \* \* \* \*

3

**\* \* \* \* \* SEALED \* \* \* \* \***

```
1     mostly speaking today, Mr. Varghese.
2               MR. VARGHESE:  Yes, Your Honor.
3               THE COURT:  Who else is there?
4               MR. VARGHESE:  Ari Holtzblatt.
5               THE COURT:  Ari Holtzblatt.  Which one of you is
6     that?
7               MR. HOLTZBLATT:  I am, Your Honor.
8               MR. VARGHESE:  Ben Powell.
9               THE COURT:  Ben Powell.  P -- Powell with a "P"?
10              MR. POWELL:  Yes, Your Honor.
11              THE COURT:  Got it.
12              MR. VARGHESE:  And Whitney Russell.
13              THE COURT:  All right.  Who is the personal
14    representative from Twitter?
15              MR. VARGHESE:  We don't have a personal
16    representative from Twitter.
17              THE COURT:  I thought my order directed that there
18    be a personal representative from Twitter here.
19              MR. VARGHESE:  I don't believe the minute order
20    did, Your Honor.
21              THE COURT:  Okay.  Maybe the government wanted a
22    personal representative?
23              MR. VARGHESE:  That's correct, Your Honor.  I
24    believe their draft order did.  But, in the minute order,
25    the Court did not --
```

**\* \* \* \* \* SEALED  \* \* \* \* \***

* * * * * SEALED * * * * *

1      THE COURT:  Okay.  So I only have the attorneys --

2   outside counsel attorneys for Twitter sitting at counsel

3   table?

4      MR. VARGHESE:  Yes, Your Honor.

5      THE COURT:  Okay.  Just so I know who is who.

6      All right.  So we're here, first, on the

7   government's motion for issuance of the order to show cause

8   why Twitter should not be held in contempt; although, I know

9   that we have this other pending motion filed by Twitter, and

10   some of the conversation today will probably address both.

11      And even though I gave briefing -- a briefing

12   schedule for the First Amendment challenge to the NDO, that

13   doesn't require briefing to be done until the end of

14   February -- towards the end of February.  So I would like to

15   focus on the order to show cause for contempt first;

16   although, there is not that much difference between a motion

17   for an order to show cause why a party should be held in

18   contempt and a contempt hearing itself.

19      So let me just point out that under our local

20   Criminal Rule 6.1:  All hearings affecting a grand jury

21   proceeding shall be closed, except for contempt proceedings

22   in which the alleged contemnor requests a public hearing.

23      I am confident the government is not requesting a

24   public hearing.

25      Is Twitter requesting a public hearing today?

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1          MR. VARGHESE:  No, Your Honor.

2          THE COURT:  Okay.  Perfect.  Because that would

3     have been denied, but that saves me time.

4          All right.  So let me just put on the table some

5     of the issues that I want to discuss today so you all --

6     we're all lawyers.  None of us like to be surprised.  Let me

7     just tell you the things that I am puzzling over, generally.

8          The precise deadline for the search warrant's

9     compliance given the back and forth between the parties, the

10    formal or informal extensions that the government gave.

11         Second, I need to be clear about what Twitter has

12    seen of the warrant package.  I don't know how many of you

13    at Twitter's table have ever been prosecutors; but you know

14    the warrant is a very thin little part -- important part,

15    critical part, it is a court order -- a thin part of a

16    warrant package.  I am not clear from this record what

17    Twitter has seen and what it hasn't.  It doesn't know very

18    much at all, although it thinks it does, about the

19    government's investigation; but it certainly doesn't know, I

20    don't think, very much about the warrant that I signed and

21    all of its parts.  But I need to be clear about what it does

22    and doesn't know about that.

23         Third, Twitter's thrown up "NARA," and I need to

24    know where there is an overlap or not between what the

25    search warrant is demanding and requiring Twitter to turn

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1  over, and what NARA holds now or potentially in the future.

2  Not that that's all relevant here.  But I actually want to

3  be clear in my own mind in addressing, if not today, with

4  respect to the NDO challenge -- the merits of Twitter's

5  arguments.

6          Fourth, Twitter's standing here to raise any

7  issues as to the NDO or the warrant and the account user's

8  privileges, and whether those concerns -- even if Twitter

9  doesn't have standing -- warrant, on consideration, a

10  rewrite of the Court order, which is what Twitter is

11  actually demanding here, which is a rewrite of the warrant.

12          And then, finally, whether Twitter has acted in

13  good faith, and what is necessary for enforcement and

14  compliance with the Court ordered warrant.

15          Those are, generally, the topics I plan to

16  discuss.

17          Who is arguing on behalf of the government?

18          MR. BERNSTEIN:  Greg Bernstein, Your Honor.

19          THE COURT:  Okay.  Mr. Bernstein, step forward to

20  the podium.

21          Okay.  So the warrant, by its terms, is pretty

22  explicit about saying that the warrant issued on

23  January 17th gave ten days for the warrant returns to be

24  delivered to the government, which brings us to -- if my

25  math is right, and I am a mere J.D., January 27th -- which

* * * * * SEALED * * * * *

—— * * * * * SEALED * * * * *——

1    is -- again, if my math is right -- about ten days ago; ten

2    days --

3              MR. BERNSTEIN:  Yes, Your Honor.

4              THE COURT:  -- in a matter of national importance

5    pending before the special counsel's office.

6              MR. BERNSTEIN:  Yes, Your Honor.

7              THE COURT:  Okay.  But then, when I look at these

8    negotiations going back and forth between Twitter and the

9    government -- I guess it was you on the other end of the

10   communications with the Twitter general counsel or counsel?

11             MR. BERNSTEIN:  Yes, Your Honor.  I was the one

12   speaking with ████████████ who identified ██████ as the

13   most senior counsel for Twitter.

14             THE COURT:  Okay.  By my review back and forth of

15   this, you gave Twitter an extension -- almost until

16   February 1 -- for Twitter to provide authority, I guess, for

17   refusing to comply with the warrant on a timely basis.  But

18   it seemed like the government was giving little extensions

19   back and forth.

20             So when is it that the government expected this

21   warrant, given that back and forth with Twitter's counsel --

22   when did the government expect Twitter to comply?

23             MR. BERNSTEIN:  So, Your Honor, just to be clear,

24   the order itself, which I don't think the government has any

25   authority to modify unilaterally -- just as Twitter

——* * * * * SEALED  * * * * *——

* * * * * SEALED * * * * *

1    doesn't -- ordered the production of these records by

2    January 27th.  The negotiations to which Your Honor

3    refers --

4              THE COURT:  Yes.  But in terms of fairness and

5    equity and bad-faith measurements, I am looking at

6    compliance here, in terms of and assessing what the contempt

7    penalty should be; I look at the amount of the delay.

8              MR. BERNSTEIN:  Yes, Your Honor.

9              THE COURT:  Ten days is a long time.  But I am not

10   sure that ten days is the right assessment of that delay.

11             MR. BERNSTEIN:  I can give Your Honor a timeline

12   of the discussions --

13             THE COURT:  Don't.  Don't.  The back and forth is

14   ridiculous.  What's the government -- I mean, I don't have

15   time for that, and I have read it -- between the declaration

16   and the government's papers, and the back and forth.

17             What is the bottom line?  When did the government

18   expect, as a final drop dead date, for the warrant returns

19   to be put in your hands?

20             MR. BERNSTEIN:  It's January 27th.

21             And the request for authority by February 1 was

22   not to say:  We are extending the deadline of the warrant

23   which, of course, is Your Honor's order.  It was to say:

24   Give us authority for your position by this time or we

25   intend to pursue court intervention.

* * * * * SEALED  * * * * *

———— * * * * * **SEALED** * * * * *————

1            THE COURT:  All right.  Now let's turn to the

2     warrant package.  Okay.

3            So the warrant package consisted of an incredibly

4     lengthy affidavit, the warrant itself.  The warrant itself

5     had Attachment A, property to be searched; it had

6     Attachment B, particular things to be searched; and

7     Attachment B had different parts.

8            Now, certainly, Twitter hasn't seen the

9     application part of the package; it hasn't seen the

10    affidavit part of the package.  Is that right?

11            MR. BERNSTEIN:  Yes, Your Honor.

12            THE COURT:  That's correct?

13            MR. BERNSTEIN:  That's correct, Your Honor.

14            THE COURT:  Certainly, Twitter has seen the

15    warrant and Attachment A; is that correct?

16            MR. BERNSTEIN:  That's correct, Your Honor.

17            THE COURT:  And out of Attachment B, has Twitter

18    seen any part other than Part 1?

19            MR. BERNSTEIN:  No, Your Honor.

20            THE COURT:  Okay.  Well, that's sort of what I

21    thought, but I wanted to make sure.

22            So Twitter, as it sits here, has zero idea and

23    zero affirmation about whatever filter protocol or procedure

24    there is attached to this warrant in terms of processing any

25    warrant returns; is that correct?

————* * * * * **SEALED**  * * * * *————

* * * * * SEALED * * * * *

1        MR. BERNSTEIN:  That's correct, Your Honor.

2        THE COURT:  And if they know, it's not from the

3    government.

4        MR. BERNSTEIN:  I'm sorry.  Can you repeat the

5    question, Your Honor?

6        THE COURT:  They wouldn't know from the

7    government.

8        MR. BERNSTEIN:  They would not know from the

9    government, Your Honor, that's correct.

10        THE COURT:  All right.  So to the extent that

11    Twitter is standing here, as I understand their position,

12    trying to protect any privilege of the account user with

13    this solution of providing prior notice to the account user,

14    they are taking no account because they can't -- because

15    they haven't seen it and they don't know anything about any

16    filter protocol that might be attached to this warrant.

17        MR. BERNSTEIN:  That's correct, Your Honor.  They

18    do not know about any filter protocol that could or could

19    not be attached to the warrant.

20        THE COURT:  Got it.  Okay.

21        I just want to make it clear, when providers step

22    in here and take up my time on what should be a simple

23    processing of a warrant, exactly how much in the dark they

24    are.  Okay.

25        Now let's turn to what came up in your discussions

* * * * * SEALED * * * * *

1    with the Twitter lawyer, in-house lawyer, and was also put

2    in the lawyer's declaration.  I also saw in Twitter's

3    papers, here, that Twitter believes that the government

4    could obtain all of the information it's seeking in the

5    search warrant from NARA, the good old archivist of the

6    United States.

7          So does the government know whether NARA has all

8    of the information sought by this search warrant directly

9    from Twitter?

10          MR. BERNSTEIN:  We have spoken to NARA after we

11   had these communications with Twitter.  And they represented

12   to us that there is not complete overlap between the

13   Attachment B and the records in their possession.

14          THE COURT:  Okay.  Do you know what they have

15   versus what the warrant is seeking?

16          MR. BERNSTEIN:  Could I have one moment to confirm

17   with co-counsel, Your Honor?

18          THE COURT:  Yes.

19          And let me just say, it may be that Twitter has

20   better information on that because Twitter supposedly

21   provided the information to NARA.  But go ahead.

22          (Whereupon, government counsel confer.)

23          MR. BERNSTEIN:  Thank you, Your Honor.

24          So, in the preliminary conversation we had with

25   counsel for NARA, their representation was more, on a

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    general level, that the data that NARA had in its possession

2    was not a complete overlap with what we would have in the

3    Attachment B.  And I believe that Twitter's opposition also

4    makes reference to much of the data being in there as --

5              THE COURT:  I know.  I am going to talk to them

6    about that.  I saw that too.  It was pretty clear.  Not a

7    complete overlap -- not the briefing.  The briefing was a

8    little bit more vague about that but, certainly, the

9    declaration was more precise; that they said much of the

10   information required under the warrant was turned over to

11   NARA without saying a complete overlap.

12             MR. BERNSTEIN:  That's correct, Your Honor.

13             THE COURT:  But do you know what is missing from

14   NARA?

15             MR. BERNSTEIN:  We are not in a position

16   ourselves, at this moment, to make a representation --

17             THE COURT:  So, Twitter, you be ready to answer

18   that.

19             Okay.  So, now, the Presidential Records Act -- I

20   am going to read you part of this -- provides, in relevant

21   part, quote:  When the archivist determines under this

22   chapter to make available to the public any presidential

23   record that has not previously been made available to the

24   public, the Archivist shall promptly provide notice of such

25   determination to the former President during whose term of

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1     office the record was created.  That's at 44 U.S.C. Section

2     2208(a)(1)(A)(i).

3              Is that provision the basis for the government's

4     belief -- and I think you made the representation to the

5     Twitter counsel -- that the government would have to inform

6     the former President before they were able to get this

7     information from NARA?  You couldn't do it covertly.

8              Is that the specific provision that you are

9     relying on?

10             MR. BERNSTEIN:  I am not sure that's the specific

11    provision.  But I do know that -- having spoken to NARA

12    counsel, they have made it clear to us that there will be

13    notice to the President if we attempt to obtain this

14    evidence from them directly.

15             THE COURT:  And you heard that from whom?

16             MR. BERNSTEIN:  That's Gary Stern, the general

17    counsel of NARA, Your Honor.

18             THE COURT:  But you didn't find out from

19    Gary Stern what provision of the Presidential Records Act he

20    was relying on, and whether it was this one in particular?

21             MR. BERNSTEIN:  No, Your Honor.

22             THE COURT:  Well, I mean, Gary Stern is a great

23    lawyer, but I would still ask him for a citation.

24             Because, if it's this provision, I really am

25    puzzled -- when there is a request to NARA on a covert basis

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1     pursuant to a warrant or a subpoena to produce information,

2     that's not producing it to the public.  So I am not sure why

3     that would require notice -- an advance notice to the

4     privilege -- to the former President, whose records they are.

5              MR. BERNSTEIN:  We will go back with Gary Stern

6     and hash that out, Your Honor.

7              As a practical matter, that has been the process

8     thus far; that, when we have made these requests for

9     information in the possession of NARA, that there's been

10    notification, and the President has had -- the former

11    President's had some opportunity to challenge that process.

12             THE COURT:  Okay.  Even when the government is

13    serving a subpoena?  So not for public dissemination?

14             MR. BERNSTEIN:  Yes, Your Honor.

15             THE COURT:  All right.  Well, I am sort of

16    curious.  Maybe, when you are litigating the rest of this,

17    you can talk to Mr. Stern who knows the Presidential Records

18    Act, I know, inside and out.  He can educate all of us

19    because, as I look at the PRA, I am not sure where he is

20    getting that.

21             MR. BERNSTEIN:  We'll find out, Your Honor.

22             THE COURT:  Okay.  But neither here nor there, in

23    some ways.

24             But -- and also, I actually have a question about

25    whether this Twitter account used by the former President

1    and his staff, I guess, is even subject to the Presidential

2    Records Act.

3             I mean, the Presidential Records Act says:  The

4    President may not create or send a presidential record using

5    a nonofficial electronic message account unless the

6    President copies an official electronic messaging account of

7    the President, in the original creation or transmission of

8    the presidential record; or forwards a complete copy of the

9    presidential record to an official electronic messaging

10   account of the President not later than 20 days after the

11   original creation or transmission of the presidential

12   record.  That's under 44 U.S.C. Section 2209(a)(1) through (2).

13            So if that provision of the Presidential Records

14   Act wasn't complied with by the former President with

15   respect to his Twitter account activity, does this mean that

16   this Twitter account activity falls outside the protection

17   of the Presidential Records Act, doesn't even qualify as a

18   presidential record, which, of course, would also have an

19   impact on any assessment of whether any contents of his

20   Twitter account are entitled to any executive privilege.

21            So have you conferred with NARA about whether the

22   Twitter account is even subject to the Presidential Records

23   Act?

24            MR. BERNSTEIN:  I can confirm with co-counsel

25   whether we have had conversations with NARA about that.

* * * * * **SEALED** * * * * *

1          The representation that we received from

2     Twitter -- and they can speak more about this -- is that --

3     I believe is that the White House made some effort to

4     designate part or all of the Twitter account as a

5     presidential record and turn it over to NARA.  But I think

6     that counsel for Twitter might be in a better position to

7     talk about what happened with respect to the President's --

8     the former President's Twitter account and how it ended up

9     going into the possession of NARA.

10          THE COURT:  Let me step back for a minute.

11          What constitutes a presidential record subject to

12     the PRA is pretty defined.  And that's helpful when you're

13     defining what a presidential record is and it's, certainly,

14     helpful when you are making an assessment of a presidential

15     privilege.

16          So do you think this is a rabbit hole or worth

17     inquiring about?

18          MR. BERNSTEIN:  Well, I wouldn't necessarily

19     characterize it as a "rabbit hole."  But I think, for

20     purposes of today's hearing, whether there was an

21     alternative route for the government to obtain these

22     records, yes or no --

23          THE COURT:  Is beside the point, I agree.

24          But as I said, part of this hearing is going to

25     be -- as you saw in my scheduling order, I am only going to

* * * * * SEALED * * * * *

1   have a hearing on the NDO if it's necessary; and I am trying

2   to make it not necessary by doing that hearing now.  And

3   actually, you know, in some ways, it's a constructive way to

4   hold a hearing; have the hearing so you can see what I am

5   puzzling over so you can address it in your briefing.

6          MR. BERNSTEIN:  Then that's fair, Your Honor.

7   I think for the purpose of today -- perhaps beside the

8   point.  For the purpose of the NDO briefing, it's helpful to

9   hear Your Honor's thoughts on this so that we can address

10  them before that hearing actually comes up.

11         THE COURT:  And you are welcome to tell me in your

12  briefing that this is a rabbit hole, not relevant, or

13  whatever.  But, I mean, I am just looking at this and

14  puzzling over how the PRA serves as any kind of valid

15  defense to compliance with a search warrant and trying to

16  figure out what the basis of that is at all when, you know,

17  I am not confident that the PRA -- that whatever was turned

18  over to NARA is what is being called for in the warrant.  I

19  am not confident that the Twitter account is even subject to

20  the PRA, let alone is a presidential record.  So I'd just

21  invite the government to help me figure that out.  Maybe you

22  will do it in your briefing.

23         Okay.  So now let's turn to more specific

24  executive privilege concerns, which is why Twitter wants to

25  rewrite the warrant to turn it from a covert warrant to an

* * * * * SEALED * * * * *

* * * * * **SEALED** * * * * *

1    advance notice warrant and, basically, not disclose any

2    information to the government until, I guess, the former

3    President's had an opportunity -- or the account user's had

4    an opportunity to decide whether he wants to challenge the

5    warrant and then, if so, to challenge the warrant, and then

6    assert whatever privileges he has.

7         Part of the reason Twitter says they're doing that

8    here is because -- they call the issues concerning executive

9    privilege difficult and novel questions.

10        Does the government find these issues difficult

11   and novel or is that just Twitter's take on these questions,

12   because it hasn't been living with them for as long as the

13   government has been?

14        MR. BERNSTEIN:  I have a few responses to that,

15   Your Honor, and I will be succinct here.

16        First -- one factual, one legal.  First, for

17   factual context, Twitter has proffered no evidence -- and I

18   don't think the government is aware of any evidence -- that

19   the former President used his private Twitter account to

20   engage in communications with his senior advisors about

21   matters that were vital to presidential decisionmaking.

22        There is no evidence in the record whatsoever --

23   and I don't think Twitter is going to proffer any

24   evidence -- to show that there is a serious possibility that

25   we are going to find executive privileged communications on

1    his private Twitter account.

2           As a legal matter, the case law -- and I am

3    referring to *GSA versus Nixon* right now -- makes it clear

4    that it's not the same as, say, an attorney-client issue

5    where communications that are protected by the

6    attorney-client privilege don't belong to the government or

7    don't belong to the executive branch.  In this case, the

8    assertion here is that these are communications that are

9    privileged that belong to the executive branch.  Of course,

10   we are the executive branch.  So there can't be any unlawful

11   disclosure of communications that are protected by the

12   executive privilege to the executive branch itself.

13          That aside, Your Honor -- again, I think this is

14   what Your Honor was alluding to at the beginning of the

15   hearing.  The issuing judge, which is Your Honor, the Chief

16   Judge in this district already considered these issues,

17   already hashed these issues out when Your Honor issued a

18   warrant, a clear order to Twitter to produce the

19   Attachment B records within ten days.

20          THE COURT:  A clear order.  They haven't seen the

21   full order.  They haven't seen the full order but --

22          MR. BERNSTEIN:  But they have seen the order to

23   produce the records --

24          THE COURT:  Correct.

25          MR. BERNSTEIN:  -- the unambiguous order to

* * * * * **SEALED** * * * * *

1    produce the records.

2         THE COURT:  They have seen the only part of it for

3    which they're responsible?

4         MR. BERNSTEIN:  That's correct.

5         And the response to that has been, "Thank you, no

6    thank you."  We have decided, on our own timetable, one that

7    we are -- seem to be implementing for what they consider to

8    be a quote-unquote unique client.

9         THE COURT:  Right.  Well, it's my view, just so,

10   Twitter, you are clear:  You may think these are difficult

11   and novel issues.  For the others of us in this room, they

12   are not.

13        All right.  On your last point, that it's hard to

14   imagine -- to paraphrase you -- it's hard to imagine that

15   the President would use a Twitter account to engage in the

16   types of confidential presidential decisionmaking issues

17   that are subject to executive privilege.

18        But Twitter apparently has these communications

19   mechanisms for direct messaging, and so on.  So is it

20   remotely possible that the former President could have

21   communicated with his closest advisors about presidential

22   decisionmaking on Twitter?

23        MR. BERNSTEIN:  Is it theoretically possible that

24   the President sent a direct message to, say, National

25   Security Advisor Robert O'Brien about invading Iran over a

* * * * * **SEALED**  * * * * *

* * * * * **SEALED** * * * * *

1    direct message over Twitter?  It's theoretically possibly.

2    I am aware of no evidence in the record or from the

3    investigation that would even remotely support that

4    assertion.

5           THE COURT:  So it's your view that should -- that

6    the mere fact that these were presidential communications on

7    Twitter, which -- from Twitter's perspective means:  Hey, it

8    could be subject to executive privilege.  From the

9    government's perspective means:  You have got to be kidding;

10   it's most likely nothing there is executive privilege.

11          MR. BERNSTEIN:  That would --

12          THE COURT:  We just have two different

13   perspectives on how important the Twitter activity was to

14   the conduct of presidential decisionmaking.

15          MR. BERNSTEIN:  That there were communications

16   between the President and senior advisors that were vital to

17   presidential decision-making, that was our reaction.

18          And, again, Twitter has this data in its

19   possession, and they haven't made any kind of representation

20   that they have specifically seen a communication that would

21   fit that bill.

22          THE COURT:  Although it would be pretty ironic,

23   isn't it, if Twitter, which is trying to stand up and

24   protect the privacy and executive privilege of a former

25   President, went scouring through it to find that evidence?

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1    But I guess it could, which also is something that one could

2    take into account --

3            MR. BERNSTEIN:  Well, Your Honor --

4            THE COURT:  -- in assessing the viability of an

5    executive privilege defense on Twitter's part to delay in

6    executing a warrant.

7            MR. BERNSTEIN:  Well, that is true.  But, Your

8    Honor, they have inserted themselves in this process in

9    contravention of Your Honor's order.

10           They have decided that they will not comply with

11   the order even though they understand it and they are not

12   challenging the validity of the warrant itself.  And they

13   have come to this argument without any ammunition to suggest

14   that there is any potential for this Twitter account to

15   contain communications that are protected by the executive

16   privilege.  That is the problem here, that this is an order

17   to show cause.  And they are not coming forth with any

18   evidence to show that they are unable to comply, that they

19   have substantially complied, or that the foundation of their

20   argument for why they're not complying has any basis, in

21   fact, whatsoever.

22           THE COURT:  Twitter has also raised what they

23   call -- and I quote:  The issue of executive privilege in

24   this context, including what limitations might need to be

25   imposed on derivative use of private presidential

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    communications.  That's in the Twitter motion, at 12 through

2    13.

3            What does the government make of this term

4    "derivative use" and this whole argument?

5            MR. BERNSTEIN:  I think what they're trying to say

6    is that from their point of view -- and there is no citation

7    to authority for this.  But, from their point of view,

8    communications covered by the executive privilege are the

9    same as communications covered by something like

10   attorney-client privilege, where you could actually have

11   prosecutors being tainted off the prosecution team so that

12   no derivative use could be made of those communications.

13           My understanding of the case law surrounding

14   executive privilege is that is distinctly not the case.

15   There is no executive privilege, for example -- or no case

16   that says that -- one, there is no case that says that the

17   executive branch or another part of the executive branch

18   can't be exposed to these communications.  And there is

19   certainly no case to my knowledge that says that if another

20   part of the executive branch were exposed to the

21   communications then, all of a sudden, the prosecutors and

22   agents would be tainted off because of the mere possibility

23   of derivative use.

24           So, in other words, I think they're saying that

25   communications in the possession of the Department of

* * * * * SEALED * * * * *

1    Justice that potentially could be covered by executive

2    privilege carry with them the same concerns as

3    attorney-client privilege communications; but there is no

4    authority for that proposition, Your Honor, and they have

5    not cited any.

6         THE COURT:  So, interestingly, having lived

7    through Special Counsel Robert Mueller's investigation as

8    chief judge -- it was interesting to me to see that Twitter

9    cites Special Counsel Mueller's report on the investigation

10   into Russian interference in the 2020 election and uses that

11   as -- cites an example where it says:  The White House was

12   given notice in advance of interviews regarding statements

13   made by the President, quote:  To give the White House an

14   opportunity to invoke the executive privilege in advance of

15   the interviews.

16         And it is certainly the practice, often, that a

17   privilege holder is given notice of a motion to compel

18   testimony, as the example from the Mueller report indicates,

19   from another person about potentially privileged

20   communications.  But that same advance notice to a privilege

21   holder is not given before the government obtains covertly

22   potentially privileged records because, obviously, obtaining

23   testimony from a person is not covert.  And if that

24   testimony is obtained from a person before the grand jury,

25   grand jury secrecy rules, under Federal Rule of Criminal

* * * * * SEALED * * * * *

1  Procedure 6(e), expressly do not subject a grand jury

2  witness to grand jury secrecy.

3       So having -- Twitter having pointed out what are,

4  to most of us -- not novel, not difficult -- but obvious

5  differences between the Mueller report example of giving

6  advance notice to a privilege holder before obtaining

7  potentially privileged testimony from a third person before

8  the grand jury because that's not going to be -- it's not

9  going to be covert.  That grand jury witness can go talk

10 about it to the privilege holder; compared to the obvious

11 difference, as I said, of a covert warrant.

12      Does the government have any other reasons for the

13 difference in procedures between giving advance notice to a

14 privilege holder before obtaining potentially privileged

15 testimony from a person, third party, and not giving such

16 advance notice in connection with covertly obtaining a

17 privilege holder's records pursuant to a Stored

18 Communications Act warrant?

19      MR. BERNSTEIN:  Well, it's just that, Your Honor.

20 It's the fact that if we speak to a witness, that's not a

21 covert step.  Again, the witness can go speak with the

22 President himself or herself, and that often can be the

23 case.  In this case, we're asking for Twitter to simply

24 comply with the unambiguous order that this order issued to

25 produce these records; "these records," being communications

* * * * * SEALED * * * * *

1    and materials related to the former President, that there is

2    no legal bar to us possessing it in the first place.

3              THE COURT:  Well, are there other reasons for not

4    giving advance notice in connection with a covert warrant to

5    a potential privilege holder that might be incorporated into

6    a nondisclosure order?

7              MR. BERNSTEIN:  In this case, the specific reasons

8    for why we sought the nondisclosure order -- I think if we

9    get into the granular facts, that will be part of an

10   *ex parte* submission.  But I can say now that we expect to

11   prevail on the litigation related to the NDO.  And the basis

12   for that -- there actually are concrete cognizable reasons

13   to think that:  If the former President had notice of these

14   covert investigative steps, there would be actual harm and

15   concern for the investigation, for the witnesses going

16   forward.

17             THE COURT:  And that's based on your own

18   investigation here, and not Volume II -- Volume II of the

19   Mueller report which lays out, in hundreds of pages, the

20   number of obstructive actions taken by the same person who

21   was the user of the account at issue?

22             MR. BERNSTEIN:  So, Your Honor, yes.

23             In our *ex parte* submission, we intend to lay out a

24   number of validated concrete facts independent of what is in

25   the Mueller report that make out a relatively clear case of

* * * * * SEALED * * * * *

1    the President being someone who will take obstructive action

2    if he is notified of this warrant.

3            THE COURT:  All right.  So Twitter says that

4    producing the warrant returns prior to allowing the company

5    to alert the former President of the warrant would

6    irreparably injure its First Amendment rights, eliminate any

7    potential remedy for the former President.  And the

8    government's response is to turn to *Google* -- the *Google*

9    case from the Southern District of New York from 2020, as

10   standing for the uncontroversial principle that the warrant

11   and NDO do not travel together.

12           So is the government construing Twitter's First

13   Amendment concerns as tied only to the NDO and not to both

14   the NDO and the warrant?

15           MR. BERNSTEIN:  Yes, Your Honor.  And they are

16   construing it the same way, their First Amendment

17   challenge -- the only remedy they are seeking is to an

18   entirely separate order.  They are seeking, under the First

19   Amendment, to modify or vacate the nondisclosure order.

20           Nothing they do under the First Amendment will

21   alter the validity of the warrant itself or negate any

22   element of contempt.

23           If Your Honor can give me 30 seconds to make

24   another point here.  The citation of the First Amendment is,

25   to a certain degree, disingenuous for this reason:  If the

* * * * * SEALED  * * * * *

———— * * * * * SEALED * * * * * ————

1   government -- and Twitter has represented this to the

2   government.  But if the government were to withdraw the NDO

3   today -- which we are not doing, but if we did -- Twitter

4   would have all the speech it wanted.  It would have no more

5   restrictions on speech; the First Amendment issue would be

6   gone, I think everybody agrees with that.

7        Even then they have represented that they will not

8   produce the records to the government.  They will continue

9   to violate the order because they have decided that they

10  will give this special account holder the opportunity to

11  litigate pre-indictment motions related to executive

12  privilege.

13       So, again, Your Honor, has ordered Twitter to

14  produce these records within ten days; they have said, "No,

15  thank you."  We are going to -- whether there is a First

16  Amendment issue or not, we are going to set a different

17  timetable, a special protocol; and we will give this account

18  holder the opportunity to litigate these motions about

19  executive privilege which, again, are frivolous considering

20  that there is no indication in the record that there will be

21  executive privilege communications on this account in the

22  first place.  And even if there were, we are the executive,

23  Your Honor.

24       THE COURT:  Okay.  So Twitter, in its opposition,

25  had, like, I don't know, I counted like 80 pages of an

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1  exhibit of all these press reports about the special counsel

2  investigation; I didn't look at it in detail.

3          But, in sum, Twitter's argument is:  Hey, the

4  government's interest in maintaining the NDO isn't

5  compelling because look at all this press.  Lots of people

6  know about this investigation going on.  The Attorney

7  General has an order on the DOJ website saying:  I have

8  appointed the special counsel to look at the following

9  issues.

10          Twitter goes on to say that the press has been

11  doing its job, thankfully.  And so, as a consequence, we all

12  know that, you know, the government, in aggressively

13  pursuing this investigation, has been looking at the

14  communications of a number of people.

15          So it sums up by saying:  It strains credulity to

16  believe that the incremental disclosures of this warrant

17  could somehow alter the current balance of public knowledge

18  in any meaningful way so as to cause harm to the

19  investigation.

20          So just like Twitter doesn't know much about the

21  warrant here at all, and has only seen a small sliver of the

22  entire warrant package, do you think that it strains

23  credulity to believe the incremental disclosure of this

24  order would somehow alter the current balance of public

25  knowledge in any meaningful way?

* * * * * SEALED  * * * * *

———— * * * * * SEALED * * * * * ————

1          MR. BERNSTEIN:  Absolutely not, Your Honor.

2          There is an incredible difference between the

3     public knowing about the existence of the investigation and

4     the account holder in this case knowing about a concrete,

5     investigative step that the government has taken.

6          And, again, I have to be careful about what I say

7     in this setting because I don't want to disclose information

8     that's covered by 6(e) or that otherwise would compromise

9     the investigation.  With that said, Your Honor, I think when

10    Your Honor gets our *ex parte* filing with respect to the NDO,

11    I think Your Honor will wholeheartedly reject the assertion

12    that it strains credulity to think that there could be

13    serious adverse consequences from the President finding out

14    about this search warrant.

15          THE COURT:  And Twitter goes on -- focusing on the

16    NDO -- that the government's proffered explanations for

17    needing the NDO appear conclusory and that there is no

18    reason to believe that notification of the warrant would

19    suddenly cause former President Trump or potential

20    confederates to destroy evidence, intimidate witnesses, or

21    flee prosecution, particularly since the former President

22    has announced that he is running in 2024.

23          And I did look at the NDO just to see is that

24    language just as specific as that, and it is.  It doesn't

25    have to be.  Under 2705(b), it's not just by the account

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1    holder, it's by any other person who might flee, might

2    obstruct.  And this NDO was written fairly narrowly, to say

3    the least.

4          I think one thing that I hope the government takes

5    away from this interlude with Twitter is that the

6    boilerplate NDOs -- although in the applications are fairly

7    more detailed, and clearly and broadly -- the orders

8    themselves, you probably need to look at the more

9    boilerplate orders in the NDOs to make it as broad as the

10   application is requesting.

11         So do you want to respond to that? -- to Twitter's

12   comment that there is no reason to believe notification

13   would suddenly cause Trump or potential confederates to

14   destroy evidence, intimidate witnesses, or to flee

15   prosecution, or are you waiting on that for an *ex parte*

16   submission?

17         MR. BERNSTEIN:  We are waiting.  But I can give

18   Your Honor two responses in the meantime.

19         First, they don't know anything.  I mean, they

20   know some stuff.  They know what they have read in the

21   newspapers.  But they're making these confident factual

22   assertions without knowing the actual facts of the

23   investigation.

24         Number two, they have cited a number of news

25   articles.  They seem to have a robust understanding of what

* * * * * SEALED  * * * * *

1    is in the public record.  They seem to be ignoring the fact

2    that there is an entirely separate public investigation into

3    the former President for doing just that, for taking

4    obstructive efforts with respect to NARA's request to

5    retrieve classified documents, and then the government --

6    the grand jury's request to subpoena classified documents

7    from the former President, and the steps that he took to

8    obstruct those efforts.  So there will be considerably more

9    detail about the basis for the NDO when we brief this issue.

10          For now, though, the assertion that they're

11   making, one, is not based on any factual foundation that

12   they could possibly be aware of; and then, second, to the

13   extent that they are able to ascertain details from the

14   public record, they seem to be ignoring those details.

15          THE COURT:  Okay.  So let me just let me turn to

16   compliance since it's been ten days of delay.  I think if

17   Twitter can comply with production by 5 p.m. today -- is

18   that what the government is looking for, or are you looking

19   for some other time period?

20          MR. BERNSTEIN:  We are looking for compliance as

21   soon as possible.  And we understand that they're prepared

22   to comply, they are just choosing not to.

23          THE COURT:  And the government -- consistent with

24   past situations like this, the government has been coy about

25   setting out precisely what it's asking for, in terms of an

* * * * * SEALED * * * * *

1    incentive to comply within the time frame of 5 p.m. today of

2    the penalty, given the fact that I am looking at a company

3    that was bought for $44 billion; and the CEO, sole owner of

4    Twitter, is worth -- according to some news reports, I

5    guess -- over 180 billion.

6              What is the government asking for in terms of a

7    fine, for failure to comply by 5 p.m. today?

8              MR. BERNSTEIN:  So the marching orders I have,

9    Your Honor, are to take into account -- once discussed

10   today, we will go back to the special counsel's office,

11   discuss with the special counsel what actual number and

12   schedule we think is appropriate; and then we can file that

13   by 5 p.m. today.

14             THE COURT:  That's not on my time frame.  You need

15   to come prepared for that.  $25,000, $50,000 a day, for

16   failure to comply?  What's the number?

17             MR. BERNSTEIN:  Could I have 30 seconds to speak

18   with co-counsel?

19             THE COURT:  You can have like ten.

20             (Whereupon, government counsel confer.)

21             MR. BERNSTEIN:  Your Honor, we're asking for

22   $50,000, and then to double each day thereafter.

23             THE COURT:  All right.  Okay.  Thank you.

24             Anything further?

25             MR. BERNSTEIN:  No, Your Honor.  Thank you.

* * * * * SEALED  * * * * *

* * * * * **SEALED** * * * * *

1          THE COURT:  All right.

2          MR. VARGHESE:  Good afternoon, Your Honor.

3          THE COURT:  Mr. Varghese.

4          Twitter says in its opposition that -- in its

5    defense, that its ability to communicate with its customers

6    about law enforcement's efforts to access their

7    communications and data is essential to its business model

8    in fostering trust with its user base.

9          But, clearly, Twitter does not run to court, as it

10   is here today, in response to court orders for information

11   about Twitter users.  So even though a lot of Twitter users

12   probably have potential privileges -- marital, priest,

13   clergy, executive, attorney-client -- so what is it -- is it

14   just lucky me, you know, that you are here?

15        What is it about this case?  The government

16   suggests it's because you are giving special attention to

17   this particular user.

18        MR. VARGHESE:  No.  No, Your Honor.

19        THE COURT:  Why are you here?

20        MR. VARGHESE:  Thank you, Your Honor.

21        So Twitter receives thousands of legal requests

22   every year from law enforcement.

23        THE COURT:  I hope you have your website working

24   better than it was working here.

25        MR. VARGHESE:  I don't know.  I think that might

* * * * * **SEALED** * * * * *

* * * * * **SEALED** * * * * *

1   have been on them, Your Honor.  I don't know what the

2   details were about the legal process, but it worked --

3              THE COURT:  I thought legal counsel said:  Oh,

4   yeah, our website for handling this was down for a couple of

5   days, or something.

6              MR. VARGHESE:  I don't know the answer for that,

7   Your Honor.  I don't know.

8              THE COURT:  Well, that should be a focus for

9   Twitter, rather than trying to delay --

10              MR. VARGHESE:  Your Honor, if I may.

11              THE COURT:  -- warrant returns in a case of such

12   national importance as this.

13              MR. VARGHESE:  Your Honor, if I may.

14              Twitter reviews thousands of pieces in the legal

15   process, including the nondisclosure orders that goes with

16   it; that's what this issue is about.  It's about Twitter's

17   First Amendment rights.

18              When this legal process came in with this

19   nondisclosure order, as this Court noted, it is boilerplate.

20              THE COURT:  Come on.  Let's just cut through this.

21              Twitter gets NDOs a lot --

22              MR. VARGHESE:  Yes, Your Honor.

23              THE COURT:  -- so it has to pick and choose:  This

24   is where we're going to stand up for our First Amendment

25   rights and challenge a gag order on these particular cases,

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1      and on these particular cases we're not.

2                  So what is the criteria that Twitter uses?

3                  MR. VARGHESE:  It's whether or not they're

4      facially valid, Your Honor.

5                  THE COURT:  Is it because the CEO wants to cozy up

6      with the former President, and that's why you are here?

7                  MR. VARGHESE:  No, Your Honor.  It's whether or

8      not they are facially valid.

9                  In this case, one of the arguments was flee from

10     prosecution.  As this Court has already noted, the former

11     President of the United States, who has announced that he is

12     rerunning for President, is not at flight from prosecution.

13     Presumably, with his security detail, he is not fleeing.

14                 Second, Your Honor --

15                 THE COURT:  And you didn't accept the other

16     reasons?

17                 MR. VARGHESE:  The other reason is destruction of

18     evidence, Your Honor.  What we know about destruction of

19     evidence in notifying Confederates is that this is the most

20     publicly announced criminal investigation.  The Attorney

21     General of the United States had a press conference to

22     announce Mr. Smith's appointment, as well as his mandate

23     with respect to investigating the former President.  It just

24     doesn't ring true, Your Honor.

25                 THE COURT:  So the -- Twitter's in-house counsel

* * * * * SEALED * * * * *

* * * * * **SEALED** * * * * *

1    states that:  On occasion, we, Twitter, have challenged

2    nondisclosure order orders whether in follow-up

3    conversations with prosecutors or government officials or in

4    court filings.

5              On how many occasions has Twitter challenged NDOs

6    in court?

7              MR. VARGHESE:  I don't know the exact number, Your

8    Honor.

9              THE COURT:  Does somebody at your table know?

10             MR. VARGHESE:  I don't believe we have the exact

11   number, Your Honor.

12             THE COURT:  Okay.  By 5 p.m. today, can you

13   provide that list to me?

14             I want to know how often Twitter has challenged

15   NDOs in court.  I want case cites and docket numbers.  If

16   those orders are under seal, I would like you to tell me

17   that; and I want to know the results.

18             MR. VARGHESE:  Your Honor, if I may, I personally

19   have called on behalf of Twitter two prosecutors and raised

20   concerns about this.

21             THE COURT:  I am not asking about whether you have

22   had informal conversations.  I am asking about court

23   filings.

24             MR. VARGHESE:  Yes, Your Honor.

25             THE COURT:  Okay.  So I just want to know

* * * * * **SEALED** * * * * *

* * * * * SEALED * * * * *

1    because -- based on those court filings -- perhaps I will be

2    able to see what criteria Twitter is using to assert the

3    rights of its users in court.

4          MR. VARGHESE:  If I may, Your Honor.

5          So we have made informal calls where we had

6    concerns about NDOs.  And, oftentimes, prosecutors have

7    agreed either to withdraw the NDO or to modify the NDO.

8    Your Honor, that is the process that we go through.

9          THE COURT:  What modifications did you want here?

10         As I understand it, your modification was to take

11   out of the NDO "potential risk of flight by the President,"

12   although he does have properties overseas that would be

13   probative.

14         What your demand of the government here was, was

15   to provide advance notice of an otherwise covert warrant.

16         MR. VARGHESE:  Your Honor, if I may, either to the

17   user or to the user's representative, a representative of

18   the user who could assert the user's interest in this issue.

19   And Your Honor --

20         THE COURT:  What user representative, when you are

21   dealing with an individual and not a company, doesn't report

22   directly to the user?

23         MR. VARGHESE:  Well, the former --

24         THE COURT:  So what are you talking about

25   Mr. Varghese?

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1       MR. VARGHESE:  The former President has designated

2   certain individuals to act in his capacity with respect to

3   his presidential records.

4       THE COURT:  And they are lawyers who report

5   directly to him, if they're still -- to the extent that he

6   designated any, if they're still working for him.

7       MR. VARGHESE:  And so, for example, Your Honor --

8       THE COURT:  There have been a lot of changes.

9       MR. VARGHESE:  For example, Your Honor, this issue

10  came up with Google and a warrant with respect to *The

11  New York Times*.  In that case, there was an accommodation

12  made that allowed -- that allowed Google to notify *The

13  New York Times* general counsel but not the reporter whose

14  records were being sought.

15      THE COURT:  Because that was a company context

16  here.  We're dealing with an individual.

17      So how is that workable here?

18      MR. VARGHESE:  Well, Your Honor, we would submit

19  that the former President has identified certain individuals

20  in his capacity for the office of the presidency.

21      THE COURT:  Do you know if all of those people who

22  were designated back on January -- January 2021, are still

23  working as his representatives vis-à-vis NARA?

24      MR. VARGHESE:  Your Honor, I believe some of them

25  are.  There was an updated list that was provided to NARA

* * * * * SEALED * * * * *

1    for people who could represent him, Your Honor.  We can

2    check on their exact employment status, but --

3            THE COURT:  And you think that you could

4    communicate with them, unlike company counsel, who could

5    preserve secrecy that these are individuals designated by

6    the former President who could preserve secrecy from the

7    former president?

8            MR. VARGHESE:  Well, if this Court ordered that --

9            THE COURT:  And you have confidence, and you think

10   the government should have confidence in that?

11           MR. VARGHESE:  Well, if this Court ordered that

12   representative -- like what happened in the Google-New York

13   Times case, if this Court ordered that representative not to

14   disclose the existence of the warrant, but simply to assert

15   whether or not any executive privilege would be at issue, I

16   think it is a workable solution, yes, Your Honor.

17           THE COURT:  Okay.  Well, I would like the

18   government to be prepared to respond to that potential

19   alternative.

20           MR. VARGHESE:  And, Your Honor, I have -- I

21   apologize.

22           THE COURT:  So let's go to what Twitter's in-house

23   counsel said, in the ███████ declaration at paragraph 10,

24   that NARA has a copy of the target account and much of the

25   information called for in the warrant.  So, of course, "much

* * * * * SEALED * * * * *

1   of" is not all of the information called for in the warrant.

2           MR. VARGHESE:  Yes, Your Honor.

3           THE COURT:  So what is it that Twitter sent to

4   NARA that -- well, has Twitter sent information to NARA

5   already?

6           MR. VARGHESE:  Yes, Your Honor.  But --

7           THE COURT:  Okay.  And what information is

8   covered -- required to be produced in the warrant that has

9   not been produced to NARA?

10          MR. VARGHESE:  Thank you, Your Honor.

11          The big difference between what is in Attachment B

12   and what NARA has --

13          THE COURT:  Attachment B, Part 1 --

14          MR. VARGHESE:  Part 1.

15          THE COURT:  -- of multiple parts that you have no

16   idea about.

17          MR. VARGHESE:  Yes, Your Honor.

18          -- and what is being held by NARA currently and

19   safely -- the big difference is business records.

20          So Attachment B asked for the communications with

21   Twitter about any service interruptions.  It asked for

22   communications -- logs of service, length of service --

23   these kinds of business records that Twitter has; that's not

24   what is being held at NARA.

25          What is being held at NARA is the user's profile,

1    his tweets, including deleted tweets, images, videos, gifts

2    attached to those tweets, his list of followers, direct

3    messages, moments, mentions, replies; there is extensive

4    information.  And I will point out, Your Honor, what NARA is

5    holding is from January 17th through January 2021 [sic], a

6    far longer time period than what the special counsel is

7    offering.

8         In fact, the volume of information that is being

9    held at NARA is much more significant than what is being

10   requested in Attachment B.  But the distinction, Your Honor,

11   to be clear, are those Twitter business records, such as IP

12   records, length of service records, credit card

13   information -- those kinds of business records.  That's not

14   what NARA was interested in, and that was not what was

15   provided to NARA as part of the records collection, Your

16   Honor.

17        If I may also take a step back and answer a

18   question --

19        THE COURT:  So you have already produced all of

20   the user names, the date and time each user name was active,

21   all associated accounts including those linked by machine,

22   cookie, IP address, email address, or any of their account

23   or device, records or information about connections with

24   third-party websites and mobile app s whether active,

25   expired, or removed?

* * * * * SEALED * * * * *

1              MR. VARGHESE:  No, Your Honor.

2              Actually, Twitter doesn't maintain that

3      information.

4              THE COURT:  And in terms of information about

5      devices used to log in or access the account?

6              MR. VARGHESE:  That would not be at NARA, no, Your

7      Honor.

8              THE COURT:  Okay.  And internet protocol addresses

9      used to create, log in, or use the account, including dates,

10     times, and port numbers?

11             MR. VARGHESE:  No, Your Honor.  That would have

12     been -- those are Twitter business records that would not

13     have been produced to --

14             THE COURT:  And privacy account settings,

15     including change history?

16             MR. VARGHESE:  No, Your Honor.

17             THE COURT:  Communications between Twitter and any

18     person regarding the account, including context with support

19     services and records of actions taken?

20             MR. VARGHESE:  No.  That would be situations where

21     you would report:  My IP is not working, my access is not --

22             THE COURT:  Okay.  So in Attachment B, Part 1,

23     nothing in paragraph 1 has been turned over by Twitter to

24     NARA?

25             MR. VARGHESE:  That's not what NARA requested, no,

* * * * * SEALED * * * * *

1   Your Honor.

2            THE COURT:  Got it.

3            And then paragraph 2 is:  All content, records,

4   and other information relating to communications, including

5   the content of all tweets created, drafted, favorited,

6   liked, or re-tweeted.

7            MR. VARGHESE:  Yes, Your Honor.  I believe most of

8   that information would have been produced to NARA.

9            THE COURT:  Most, or all?

10           MR. VARGHESE:  Well, Your Honor --

11           THE COURT:  If you don't know, you can just let me

12   know, Mr. Varghese.

13           MR. VARGHESE:  I don't know precisely if they're a

14   complete overlap.  But that is the type of information that

15   was produced to NARA, so I just don't know if it's 100

16   percent accurate -- complete, Your Honor.

17           THE COURT:  So you don't know, okay.

18           We have got all of paragraph 1.  We have got

19   paragraph 2A, not necessarily produced to NARA.

20           And then, B:  Content of all direct messages sent

21   from, received by, stored in draft form in, or otherwise

22   associated with the subject account including all

23   attachments, multimedia, header information, metadata, and

24   logs.

25           MR. VARGHESE:  Again, Your Honor, direct messages

* * * * * SEALED * * * * *

1   were provided to NARA.

2             THE COURT:  And that means drafts also?

3             MR. VARGHESE:  I don't know, Your Honor.

4             THE COURT:  Okay.  Well, somebody behind you

5   knows.

6             (Whereupon, Twitter counsel confer.)

7             MR. VARGHESE:  Everything that Twitter had in

8   January of 2021 was provided to NARA with respect to the

9   draft message.

10             THE COURT:  Yes.  But that's not my question.

11             My question was:  Was everything --

12             MR. VARGHESE:  I think to the extent --

13             THE COURT:  -- covered in paragraph 2B produced to

14   NARA?

15             MR. VARGHESE:  To the extent that Twitter had it,

16   it was produced to NARA.

17             THE COURT:  All right.  In your briefing -- I am

18   not going to waste more time going up and down through this

19   whole thing.  But, clearly, I think the point has already

20   been established that everything Twitter produced to NARA is

21   not covered -- it's not a complete overlap with what was

22   demanded in the warrant.

23             Okay.  So even if it's correct, although I am not

24   persuaded that the Presidential Records Act would require

25   notice to the former President if the government did seek

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1  from NARA all of this Twitter account information, why

2  should Twitter be able to dictate to the government where it

3  gets information for its investigation?

4        MR. VARGHESE:  To be clear, Your Honor, Twitter is

5  not trying to dictate to the government where it should get

6  that information.

7        Twitter engaged in good-faith negotiations with

8  the special counsel's office about the nondisclosure order

9  in Twitter's own First Amendment rights.  And as we were

10  having discussions with Mr. Bernstein, we offered an

11  alternative; that was the context in which NARA was raised.

12  It was not saying go somewhere else.

13        THE COURT:  Okay.  So let's go right to that.

14        Twitter concedes it has no standing whatsoever to

15  assert any privilege on behalf of the user of this account,

16  correct?

17        MR. VARGHESE:  That's correct, Your Honor.

18        THE COURT:  All right.  And so -- but you are

19  saying that you do have standing to assert a First Amendment

20  right here under the --

21        MR. VARGHESE:  That's correct.

22        THE COURT:  -- nondisclosure order?

23        MR. VARGHESE:  That's correct, Your Honor.  And

24  it's an important First Amendment right.  It's the right to

25  communicate with our users that's being restrained by the

* * * * * SEALED  * * * * *

1    special counsel's office, and that was the basis for

2    reaching out to them, Your Honor.

3              THE COURT:  But you want to exercise that First

4    Amendment right here, the reason -- what is animating your

5    assertion of the First Amendment right here is because you

6    believe that there are these unique constitutional issues

7    associated with this user and this user account because of

8    what Twitter perceives to be an executive privilege,

9    difficult and challenging issue.

10             So what is it about the executive privilege issues

11   that Twitter sees here that Twitter believes differentiates

12   it from other privileges that any Twitter user might have?

13             I mean, the government has made what I think is a

14   very accurate statement, that this is -- Twitter's

15   intervention here is quite momentous, I think is the word

16   the government used.

17             So why isn't it momentous if Twitter can pop up --

18   take up all of my time, and every district court judge

19   across the country's time -- to intervene, to stop

20   compliance -- not just with warrants in investigations of

21   this significance, but even in a request for subscriber

22   information or any other use of Stored Communications Act

23   authorities to say:  Whoops, there might be a privilege

24   there, we want to alert the user of that account that we're

25   about to turn over information about the account user to the

* * * * * SEALED * * * * *

1    government so that they can have an opportunity to step in?

2           You are not doing that for everybody.

3           MR. VARGHESE:  No, Your Honor.

4           THE COURT:  And you are not doing it for every

5    privilege.

6           MR. VARGHESE:  No, Your Honor.

7           THE COURT:  So what is it about executive

8    privilege or this user or this user account that makes

9    Twitter stand before me today?

10          MR. VARGHESE:  Your Honor, there's two things that

11   make this case unusual, which is what brought us here.

12   First, we had a facially invalid NDO in our view based on

13   the way that we read it and what we know about this

14   investigation.

15          THE COURT:  Which is not much, to be honest.  You

16   don't even know the half about the very warrant you are

17   coming in here to delay execution of.

18          MR. VARGHESE:  Understood, Your Honor.  However,

19   we also know --

20          THE COURT:  I hope you do understand.

21          MR. VARGHESE:  Of course, Your Honor.  But what we

22   also know is saying:  Risk of flight for a former President

23   of the United States doesn't make a lot of sense.

24          Second, Your Honor --

25          THE COURT:  I would agree with that.

* * * * * SEALED * * * * *

———— * * * * * SEALED * * * * *————

1          MR. VARGHESE:  Thank you, Your Honor.  That raises

2     concerns for us.

3          Then, when we looked at the underlying substantive

4     issue, Your Honor, this is the first time in our knowledge

5     that private presidential communications held by a third

6     party were being demanded by the government through a

7     warrant without any notice to that former occupant.  We were

8     not aware of another time ever where that has happened.

9          THE COURT:  Well, you did not read the Mueller

10    report very carefully.

11         MR. VARGHESE:  Yes, Your Honor.

12         THE COURT:  Because the Mueller report talks about

13    the hundreds of Stored Communications Act -- let me quote.

14    Let's see.

15         The Mueller report states that:  As part of its

16    investigation, they issued more than 2800 subpoenas under

17    the auspices of the grand jury in the District of Columbia.

18    They executed nearly 500 search and seizure warrants,

19    obtained more than 230 orders for communications records

20    under 18 U.S.C. Section 2703(d); and then it goes on and on

21    and on for all of the other things they did.

22         And some of those communications included the

23    former President's private and public messages to General

24    Flynn, encouraging him to "Stay strong," and conveying that

25    the President still cared about him, before he began to

————* * * * * SEALED   * * * * *————

1    cooperate with the government.

2          So what makes Twitter think that, before the

3    government obtained and reviewed those Trump-Flynn

4    communications, the government provided prior notice to the

5    former President so that he can assert executive privilege?

6          MR. VARGHESE:  My understanding, Your Honor, is

7    that the Mueller investigators were in contact with the

8    White House counsel's office about executive privilege

9    concerns.

10          THE COURT:  You quoted the one part that said

11    that, and that was for testimony, testimony, where it was

12    not covert.

13          MR. VARGHESE:  Yes, Your Honor.

14          THE COURT:  You need to read the Mueller report a

15    little bit more carefully.

16          MR. VARGHESE:  Yes, Your Honor.  Our --

17          THE COURT:  You think that for 230 orders, 2800

18    subpoenas, and 500 search and seizure warrants the Mueller

19    team gave advance notice to the former President of what

20    they were about?

21          MR. VARGHESE:  I don't know that, Your Honor.

22          THE COURT:  You do not know that.

23          MR. VARGHESE:  But what I believe was that there

24    was consultation with the White House about the scope of

25    executive privilege, that's my understanding.

* * * * * SEALED * * * * *

1        THE COURT:  When it came to testimony for the
2   obvious reason, that that was not covert.
3        MR. VARGHESE:  Yes, Your Honor.
4        THE COURT:  All right.
5        MR. VARGHESE:  So if I may finish your question,
6   though, Your Honor.
7        THE COURT:  Do you understand --
8        MR. VARGHESE:  Yes, Your Honor.
9        THE COURT:  -- that it is only with respect to the
10   speech and debate clause privilege that the D.C. Circuit,
11   alone, of all of the circuits, has said that there is a
12   nondisclosure component to that privilege that requires the
13   privilege holder to have the opportunity to review the
14   materials before it is reviewed by prosecutors?
15        MR. VARGHESE:  Yes, Your Honor.
16        THE COURT:  And no such nondisclosure attribute
17   has ever, as government counsel said, been attached to the
18   exercise of executive privilege.
19        And do you know why it is that the D.C. Circuit in
20   *Rayburn* said that there was a nondisclosure aspect to the
21   speech or debate clause privilege?
22        MR. VARGHESE:  No, Your Honor.
23        THE COURT:  Well, let me advise you.
24        It was because of separation of powers concerns;
25   Congress being investigated by the executive branch.  So

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    that before prosecutors sitting in the executive branch

2    could see potentially privileged under speech or debate

3    clause material, they had to give the privilege holder the

4    opportunity to review it all because of separation of powers

5    concerns.  And here I have the executive branch looking at

6    executive branch materials; it is not the same thing.

7              MR. VARGHESE:  Your Honor --

8              THE COURT:  So I don't know how it is that you

9    think that the same nondisclosure, advance notice to the

10   privilege holder requirement applies here.  It is not

11   looking at the full scope of privilege law as it has

12   developed in this circuit.

13             And I find it very ironic you are relying on *Nixon v*

14   *Administrator of General Services*, this 1977 Supreme Court

15   case.  But in that case, didn't the Supreme Court -- to the

16   point that I was talking about in terms of speech or debate

17   clause and its differences with executive privilege -- hold

18   that the GSA administrator could take custody of and review

19   recordings and documents created by President Nixon?

20             MR. VARGHESE:  It did, Your Honor.  But it did not

21   accept that principle that:  Oh, this is all within the

22   executive branch; that was not the basis for that decision.

23   It was a multifactored fact-intensive inquiry.  What they

24   said was that we feel comfortable that the archivist can

25   review this material.

* * * * * SEALED * * * * *

* * * * * SEALED * * * * *

1    THE COURT:  Yes.  Because GSA is himself an

2    official of the executive branch, and that GSA's career

3    archivists are, likewise, executive branch employees.

4    MR. VARGHESE:  But that was not the end of the

5    inquiry, Your Honor.  That is a 45-year-old opinion that the

6    special counsel's office is holding on to to make a

7    bright-line rule that says that they are allowed to look at

8    everything in the executive branch, and that is simply --

9    THE COURT:  What Twitter's position here is that

10   the same separation of powers concerns that animated the

11   nondisclosure aspect to the speech or debate clause, meaning

12   the privilege holder needed to obtain advance notice, should

13   apply here --

14   MR. VARGHESE:  No, Your Honor.

15   THE COURT:  -- to assertion of executive

16   privilege?  And all Twitter is doing here is it's holding up

17   what it views should be the state of the law for executive

18   privilege?

19   MR. VARGHESE:  No, Your Honor.

20   Twitter does not take a position on what the scope

21   and the contours of executive privilege are.  But note that

22   that is not a well-defined space.  And all we are asking

23   for --

24   THE COURT:  It's much better defined than you

25   think.

* * * * * SEALED * * * * *

─* * * * * **SEALED** * * * * *─

1          MR. VARGHESE:  Your Honor, if I may, one of the

2     things that we don't know about is derivative use.  What if

3     the special counsel's office uses that --

4          THE COURT:  What are you talking about with

5     "derivative use"?

6          MR. VARGHESE:  I can explain, Your Honor.

7          THE COURT:  I read that, and I really wanted to

8     know what you are talking about.

9          MR. VARGHESE:  I can explain, Your Honor.

10          THE COURT:  Sure.

11          MR. VARGHESE:  If, for example -- assuming for a

12     second there is executive privilege materials in the

13     account --

14          THE COURT:  Which, of course, you have zero idea

15     about.

16          MR. VARGHESE:  I can come back to that question,

17     Your Honor.

18          THE COURT:  No.  Deal with it right now.

19          You have zero idea about executive privilege

20     communications in this Twitter account.

21          MR. VARGHESE:  Twitter does not review the

22     contents of its users' accounts.

23          THE COURT:  You have no idea?

24          MR. VARGHESE:  But I can say there are

25     confidential communications associated with the account.

─* * * * * **SEALED**  * * * * *─

* * * * * **SEALED** * * * * *

1        THE COURT:  And how do you know that?

2        MR. VARGHESE:  So, Your Honor, we went back --

3    because this was an important issue for us to compare,

4    whether or not there were potentially confidential

5    communications in the account, and we were able to confirm

6    that.

7        THE COURT:  How?

8        MR. VARGHESE:  So, Your Honor, there was a way

9    that we compared the size of what a storage would be for DMs

10   empty versus the size of storage if there were DMs in the

11   account.  And we were able to determine that there was some

12   volume in that for this account.  So there are confidential

13   communications.  We don't know the context of it, we don't

14   know --

15       THE COURT:  They are direct messages.  What makes

16   you think -- do you think that everything that a President

17   says, which is generically a presidential communication, is

18   subject to the presidential communications privilege?

19       MR. VARGHESE:  No, Your Honor.

20       THE COURT:  Is that the basis of this?  You have a

21   total misunderstanding of what the presidential

22   communications privilege is?

23       MR. VARGHESE:  No, Your Honor.  No, Your Honor,

24   that's not my understanding.

25       THE COURT:  So what -- I don't understand your

* * * * * **SEALED** * * * * *

1    argument, Mr. Varghese.

2         MR. VARGHESE:  My argument simply, Your Honor, is

3    the user may have an interest in these communications, and

4    asserting that privilege.  It's not Twitter's interest.

5         THE COURT:  Having an interest is a very different

6    thing from saying something is privileged --

7         MR. VARGHESE:  It might be.

8         THE COURT:  -- under the executive privilege or

9    the presidential communications privilege.  Would you

10   concede that?

11        MR. VARGHESE:  Yes, Your Honor.  But it's not my

12   privilege to assert.  It's not Twitter's privilege to

13   assert.  All we're simply trying to do is exercise our First

14   Amendment rights to notify the user so the user may assert

15   that privilege if he chooses.

16        But getting back to the derivative point, Your

17   Honor, if I may.

18        THE COURT:  Yes.

19        MR. VARGHESE:  The point of the derivative

20   argument is if -- the special counsel's office is using

21   these materials before the grand jury, which is an organ of

22   this court, or using them in warrant affidavits --

23        THE COURT:  Well, actually, grand jury is a,

24   actually, a totally independent body from any branch of

25   government.

* * * * * **SEALED** * * * * *

 1          MR. VARGHESE:  But certainly not the executive

 2     branch, Your Honor.  Also, we would say --

 3          THE COURT:  The grand jury is independent of --

 4          MR. VARGHESE:  That's right, Your Honor.

 5          THE COURT:  -- of every branch of government,

 6     including the executive branch.

 7          MR. VARGHESE:  Yes, Your Honor.  And that's

 8     precisely why the executive privilege wouldn't be protected

 9     in that case, or if the material is put into an affidavit

10     and shown before a judge to get another warrant, that would

11     also vitiate the privilege it would seem.  Also, if it was

12     being used in interviews with witnesses --

13          THE COURT:  So what is it about -- so this is the

14     confusion here, Mr. Varghese.

15          MR. VARGHESE:  Yes, Your Honor.

16          THE COURT:  That you want to treat the executive

17     privilege like the speech or debate clause without any of

18     the same foundational predicates for that because material

19     obtained covertly by the government that is potentially

20     privileged is, typically, subject to a filter review

21     protocol to identify that and get judicial rulings on that;

22     and that's how it's normally dealt with, use of a filter

23     team.

24          But what you are saying is executive privilege

25     can't be dealt with that way; it has to, instead, use a

* * * * * **SEALED** * * * * *

1    protocol similar to that required by the D.C. Circuit in my

2    reading.  But the D.C. Circuit is going to consider that, I

3    would hope, and say that advance notice has to be given to

4    the privilege holder to debate it.

5              MR. VARGHESE:  No, Your Honor, that is not my

6    position.

7              THE COURT:  That is exactly what you are saying.

8    Why are you fighting that?

9              MR. VARGHESE:  Because, Your Honor, I am not

10   saying what the right way is for executive privilege to be

11   treated.

12             THE COURT:  Aren't you saying that advance notice

13   has to be given to the user of the account here?  I thought

14   that was the whole reason we're here.

15             MR. VARGHESE:  Your Honor, if I may, what I am

16   trying to say is that it is ill defined.  The contours of

17   how executive privilege works is ill defined.  The only case

18   the special counsel's office is looking to is a 45-year-old

19   Supreme Court case.

20             THE COURT:  And, as a consequence, isn't it

21   Twitter's position, yes or no, that advance notice to a

22   privilege holder of the executive privilege must be given

23   before Twitter can turn over the warrant returns?

24             MR. VARGHESE:  Your Honor, our position --

25             THE COURT:  Yes or no?  Is that your position or

* * * * * SEALED * * * * *

1    not?

2             MR. VARGHESE:  We would like to notify the user as

3    per our First Amendment rights.

4             THE COURT:  So, yes, that's your position?

5             MR. VARGHESE:  We would like to notify the user

6    per our First Amendment rights.

7             THE COURT:  I am interpreting that as a "yes."  I

8    don't know why you can't say "yes," it's a puzzle to me.

9             MR. VARGHESE:  Yes, Your Honor.

10            THE COURT:  It's very frustrating.

11            MR. VARGHESE:  I apologize, Your Honor.

12            THE COURT:  I try to be direct, and I don't

13   understand why you are not being direct.  But -- yes.

14            And I am telling you -- why, for the executive

15   privilege, does Twitter believe that such advance notice is

16   required when, for every other privilege except speech or

17   debate clause, it is not?

18            MR. VARGHESE:  It's because it is ill defined.

19   There is no controlling law in this area, and we believe the

20   user has the right to litigate this issue; that's it, Your

21   Honor.

22            We have a First Amendment right to notify --

23            THE COURT:  Even though the entire Mueller report,

24   with hundreds of search warrants, thousands of subpoenas --

25   the only time the two-volume Mueller report ever talks about

* * * * * SEALED * * * * *

——— * * * * * SEALED * * * * * ———

1   ever alerting the White House counsel is where it wasn't

2   covert it was overt, because they were seeking potentially

3   privileged information from a grand jury witness.  But,

4   nonetheless, you think it's never been done before?

5           MR. VARGHESE:  There is no published opinion, Your

6   Honor, that lays out the contours of executive privilege

7   beyond this 45-year-old opinion, which we do not necessarily

8   think is on point.

9           THE COURT:  Okay.  It couldn't be that Twitter is

10  trying to make up for the fact that it kicked Donald Trump

11  off Twitter for some period of time that it now is standing

12  up to protect First Amendment rights here, is it?

13          MR. VARGHESE:  No, Your Honor.

14          THE COURT:  Because it's a little bit of an ironic

15  position, don't you think?

16          MR. VARGHESE:  No, Your Honor.  This is based on

17  the facially invalid NDO.

18          THE COURT:  Is this to make Donald Trump feel like

19  he is a particularly welcomed new renewed user of Twitter

20  here?

21          MR. VARGHESE:  Twitter has no interest other than

22  litigating its constitutional rights, Your Honor.

23          THE COURT:  And how does requiring compliance with

24  the search warrant here actually implicate Twitter's First

25  Amendment rights which are only at issue with the gag order?

——— * * * * * SEALED  * * * * * ———

* * * * * SEALED * * * * *

1          MR. VARGHESE:  Your Honor, the issue is about

2    whether or not that speech is meaningful.

3          We have a right to speak.  There is a

4    difference -- and timing of that speech is critical, and so

5    we would like to provide meaningful notice to the user prior

6    to the review by the government.

7          We still have a First Amendment right, to be

8    clear, to speak to the user afterwards; but we think that

9    that message is stronger and more meaningful if we have an

10   opportunity to convey that message beforehand.

11         THE COURT:  So I didn't see it, but this has been

12   on a fairly quick turnaround given the ten-day delay already

13   in compliance with the warrant.  But has Twitter found any

14   court decision in which a third-party company, like Twitter,

15   has successfully stayed compliance with a search warrant

16   pending a First Amendment challenge to a nondisclosure

17   order?

18         MR. VARGHESE:  No, Your Honor, not an NDO.

19         THE COURT:  And would Twitter acknowledge that

20   there is an ongoing harm to the government and the public by

21   continued failure to comply with the search warrant?  And if

22   Twitter had its way, that would -- there would be no

23   execution of this search warrant until after completion of

24   briefing and resolution of its challenge to the NDO.  Would

25   you acknowledge that that delay would take us, wow, for a

* * * * * SEALED   * * * * *

1    month?

2             MR. VARGHESE:  No, Your Honor.

3             We proposed a briefing schedule that was five

4    days.  We were having a briefing schedule that would be done

5    by the end of this week -- by the end of next -- next week,

6    I believe.  And, therefore, Your Honor, we tried to

7    accommodate the government's concerns.  It has never been

8    Twitter's position that we are seeking to delay the

9    government's investigation.

10            We are trying to vindicate our First Amendment

11   right; that is all.  So we tried to work around the

12   government's expedited schedule.

13            I should also note, Your Honor -- you mentioned

14   the ten-day delay.  Let me just address that for a second.

15            When Mr. Bernstein talked to ████████, counsel,

16   on January 27th, he acknowledged that we were wrestling

17   through these issues.  He said:  Can we please talk about

18   realistic dates for completion, for execution?  He

19   recognized that we were going through these issues.  We

20   thought we were having a good-faith discussion.  And to say

21   that we have just been sitting on this and trying to upset

22   both the court and the special counsel's office is factually

23   inaccurate, Your Honor.

24            We were trying to work through these issues.  We

25   have talked to Mr. Bernstein --

———— * * * * * SEALED * * * * * ————

1          THE COURT:  Let me just be clear.  I really -- I

2    take offense when lawyers try and attribute to me certain

3    feelings --

4          MR. VARGHESE:  I apologize, Your Honor.

5          THE COURT:  -- that are totally -- totally off

6    course.  So I am not upset.

7          I am trying to puzzle over the arguments to make

8    sense of them when there is zero case law and support of

9    Twitter's arguments.

10         MR. VARGHESE:  I apologize, Your Honor.  I didn't

11   mean upsetting in the emotion sense.  I meant upsetting the

12   Court's deadline or the special counsel's investigation;

13   that is not our goal, Your Honor.

14         Our goal was to engage in good-faith negotiations,

15   which we thought we were doing with Mr. Bernstein.

16         THE COURT:  Okay.  Can Twitter produce the warrant

17   returns by 5 p.m. today?

18         MR. VARGHESE:  I believe we are prepared to do

19   that.  Yes, Your Honor.

20         THE COURT:  Good.  Anything further?

21         MR. VARGHESE:  Your Honor, we have a draft -- we

22   have an order that was issued in the Google case, if you

23   want to observe how they did it, allowing *The New York*

24   *Times* --

25         THE COURT:  I don't need to look and see what the

———— * * * * * SEALED  * * * * * ————

* * * * * SEALED * * * * *

1   Southern District of New York judge did.

2           MR. VARGHESE:  Thank you, Your Honor.

3           I have nothing further.

4           THE COURT:  Any reply?

5           MR. BERNSTEIN:  No, Your Honor.

6           THE COURT:  All right.  I am going to grant the

7   government's motion for an order to show cause why Twitter

8   should not be held in contempt.  I am just going to

9   summarize my reasons here.

10          When I deal with the nondisclosure order challenge

11  I may elaborate on these reasons more fulsomely.  But given

12  the fact that Twitter will have until 5:00 p.m. today to

13  produce the warrant returns to the government, I think I am

14  going to keep my remarks fairly brief.

15          As an initial matter, the government has satisfied

16  all three requirements for finding contempt here.  There was

17  a clear and unambiguous court order in place; that order

18  required certain conduct by the respondent, the respondent

19  failed to comply with the order.  See *U.S. v Latney's*

20  *Funeral Home*, 41 F. Supp. 3d 24, jump cite 30, D.D.C. from

21  2014.

22          The search warrant was issued on January 17, 2023.

23  It was an unambiguous court order requiring Twitter to

24  comply with production of the specified records in

25  Attachment B, Part 1, by January 7, 2023.  Twitter did not

* * * * * SEALED * * * * *

1    comply.

2         Twitter doesn't contest those findings in its

3    opposition.  Instead, it asserts that it has promptly and

4    expeditiously sought to comply with the warrant and has

5    acted in good faith and with alacrity.  But Twitter's good

6    faith does not matter for the purpose of finding it in

7    contempt because a finding of bad faith on the part of the

8    contemnor is not required.  See *Food Lion, Inc. v United*

9    *Food and Commercial Workers*, a D.C. Circuit case from 1997.

10        Twitter's defense is that producing the requested

11   information prior to allowing it the opportunity to alert

12   the former President would irreparably injure its First

13   Amendment rights and eliminate any potential remedy for the

14   former President.  If accepted, Twitter's argument would

15   invite intervention by Twitter -- let alone every other

16   electronic communications provider -- to delay execution of

17   any order, let alone warrants, issued under the Stored

18   Communications Act based on the provider's belief, knowing

19   slivers, slivers of what is required for execution of the

20   warrant -- slivers of knowledge of the scope of an

21   investigation.  But they would, nonetheless, step forward to

22   frustrate execution of orders across the country based on

23   their perceived view that their user's potential privilege

24   rights at issue.

25        The government calls the practical consequences of

──── * * * * * SEALED * * * * *────

1   adopted Twitter's amorphous standards "momentous," and I

2   agree.  There is simply no support for Twitter's position.

3        Twitter concedes it doesn't have standing to

4   assert President Trump's claims of executive privilege.  And

5   any merit to the former President's potential executive

6   privilege claims need not be addressed here because Twitter

7   lacks standing to assert them or fully brief them.  Twitter

8   has no defense for its failure to comply with the search

9   warrant.

10        As the Southern District of New York explained in

11   *Google v United States*, any challenge to a NDO is separate

12   from a challenge to a search warrant because any further

13   delay on the production of the materials responsive to the

14   warrant increases the risk that evidence will be lost or

15   destroyed, heightens the chance the targets will learn of

16   the investigation, and jeopardizes the government's ability

17   to bring any prosecution in a timely fashion.  The public

18   interest is served by prompt compliance with the warrant,

19   443 F. Supp. 3d 447, 455, SDNY, 2020.

20        Twitter's insistence that its First Amendment

21   challenge to the NDO must be resolved prior to its

22   compliance with the search warrant are rejected.

23        Twitter is directed to comply with the warrant by

24   5 p.m. today.  Should Twitter fail to comply, I agree with

25   the government that escalating daily fines are appropriate.

────* * * * * SEALED  * * * * *────

* * * * * SEALED * * * * *

1    If Twitter fails to comply, the fines are civil, designed to

2    ensure Twitter complies with the search warrant.  They are

3    not punitive to punish Twitter for its failure thus far to

4    comply.

5           Considering that Twitter was purchased for over

6    $40 billion, and the sole owner is worth over $180 billion,

7    a hefty fine is appropriate here.  If Twitter does not

8    comply with the warrant by 5 p.m. today, it will be fined

9    $50,000, and that fine will double every day thereafter.

10          So accordingly -- and part of my consideration for

11   the size of the fine and the need to get this moving is

12   because Twitter is delaying a special counsel investigation

13   into whether any person or entity violated the law in

14   connection with efforts to interfere with the lawful

15   transfer of power following the 2020 presidential election

16   or the certification of the Electoral College vote held on

17   January 6, 2021, and other matters of vital national

18   importance.  This delay is going to stop now.

19          Upon consideration of the government's motion for

20   an order to show cause, docketed at ECF No. 5 in the record

21   herein, it's hereby ordered that the government's motion is

22   granted.

23          It is further ordered that Twitter comply with the

24   search and seizure warrant, which itself required compliance

25   by January 27, 2023, by today at 5 p.m.

* * * * * SEALED  * * * * *

* * * * * SEALED * * * * *

1        It is further ordered that Twitter shall be held

2    in contempt if it fails to comply with this order by 5 p.m.

3    today.

4        It is further ordered that Twitter shall be fined

5    $50,000 each day; a fine amount that shall double every day

6    for failure to comply with the order, with that fine payable

7    to the Clerk of this court.

8        Is there anything further today since we already

9    have a schedule for further briefing on the NDO?

10        MR. BERNSTEIN:  No, Your Honor.

11        THE COURT:  From Twitter?

12        MR. VARGHESE:  No, Your Honor.  Thank you.

13        THE COURT:  You are all excused.

14        (Whereupon, the proceeding concludes, 3:03 p.m.)

15                    * * * * *

16                    **CERTIFICATE**

17        I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
18    transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
19    ability.

20        This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
21    manner by any party without authorization of the signatory
     below.

22

23        Dated this 11th day of February, 2023.

24    /s/ Elizabeth Saint-Loth, RPR, FCRR
     Official Court Reporter

25

* * * * * SEALED * * * * *

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:        **CASE NO. SC 23-31-BAH**
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER        **UNDER SEAL**
INC. IDENTIFIED IN ATTACHMENT A

<u>**UNITED STATES' OPPOSITION TO MOTION FOR STAY PENDING APPEAL**</u>

On January 17, 2023, this Court issued a search warrant to Twitter requiring disclosure of the responsive data within 10 days. When Twitter purposefully refused to meet that deadline because it disagreed with the separate non-disclosure order ("NDO"), the Government moved to show cause why Twitter should not be held in contempt. At a hearing on February 7, 2023, the Court ordered Twitter to produce all responsive material by 5:00 p.m. that day, in part based on Twitter's representation that it "would and could comply." ECF No. 32-1 ("Mem. Op.") at 12. At the hearing, the Court made clear that if Twitter missed this deadline, it would "be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant." *Id.* When Twitter failed to produce all responsive data until late in the day on February 9, 2023, the Court imposed the sanctions contemplated by its contempt order—$350,000 due no later than March 13, 2023. *Id.* at 29-35; ECF No. 29. Twitter has filed a notice of appeal and moves the Court to stay only one component of the Court's order while it seeks appellate review: the payment deadline. Twitter has not met its burden of demonstrating either likelihood of success on the merits or irreparable injury that is more than hypothetical or speculative. Its stay motion should be denied.

**APPLICABLE LEGAL STANDARD**

A stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right," *Nken v. Holder*, 556 U.S. 418, 427 (2009)

(citation and internal quotation marks omitted), and is judicially regarded as "extraordinary relief," *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) ("*CREW*"). A movant seeking a stay pending appeal bears the burden of demonstrating that the stay is warranted. *Nken*, 556 U.S. at 433-34. A court deciding whether to grant a stay pending appeal considers whether (1) the stay applicant has "made a strong showing that he is likely to succeed on the merits," (2) the applicant will be irreparably injured absent the stay, (3) issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) the stay is in the public interest. *Id.* at 434. The last two factors "merge when the Government is the opposing party." *Id.* at 435.

The first two factors—likelihood of success on the merits and irreparable injury—are "the most critical," *id.* at 434, and likelihood of success is the "most important," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). With respect to the paramount factor, it is "not enough that the chance of success on the merits [is] better than negligible." *Nken*, 556 U.S. at 434 (citation and quotation marks omitted). Rather, the likelihood of success on appeal must be "substantial." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Failure to make this requisite showing is "arguably [a] fatal flaw for a stay application." *CREW*, 904 F.3d at 1019. As for the second factor, it is not enough to show the mere "possibility of irreparable injury." *Nken*, 556 U.S. at 434-35 (internal quotation marks omitted). Irreparable harm must be "both certain and great," and "actual and not theoretical." *CREW*, 904 F.3d at 1019 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

## ARGUMENT

Twitter fails to satisfy the two most important stay factors, and for that reason alone, its request to stay payment of the contempt sanction should be denied. With respect to the contempt

payment, Twitter makes two arguments: (1) contempt was improper because the Court should have delayed compliance with the separate warrant until Twitter could litigate its challenge to the NDO, and (2) the sanction was unduly punitive or otherwise improper because Twitter established substantial compliance and good faith.

As the Court held, the warrant and NDO did "not travel together," Mem. Op. at 24, and Twitter's desire to challenge a separate order could not legally excuse its deliberate choice to violate the warrant. Otherwise, the record shows that Twitter's conduct met the three elements of civil contempt, Twitter failed to demonstrate that it substantially complied or acted in good faith at any point before the fine was exacted, and the Court's sanction was eminently reasonable. Twitter has not met its burden of establishing a likelihood of success on appeal—that the Court abused its discretion when exacting this reasonable fine. Moreover, Twitter has not met its burden of establishing irreparable injury if Twitter pays the sanction. Twitter offers no factual or legal basis for the Court to grant this extraordinary relief.

## I.     Twitter Fails to Demonstrate a Strong Likelihood of Success on Appeal.

On appeal, Twitter will bear the burden of demonstrating that the Court committed reversible error when it imposed the $350,000 sanction. The D.C. Circuit reviews "a district court's contempt finding and the imposed sanctions for abuse of discretion." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 379 (D.C. Cir. 2011). This standard of review is particularly deferential. As courts have explained, the "imposition of coercive sanctions by way of fines is generally an area in which appellate courts must rely heavily on the informed exercise of the district court's discretion." *See In re Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir. 1987); *In re Grand Jury Subpoena Duces Tecum, 91-02922*, 955 F.2d 670, 673 (11th Cir. 1992) (quoting and citing same); *see also Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 673

F.2d 53, 57 (2d Cir. 1982) ("The overriding consideration is whether the coercive fine was reasonably set in relation to the facts and was not arbitrary."). Twitter cannot overcome this deferential standard or prevail in the D.C. Circuit.

> **a.     Twitter cannot show a substantial likelihood that the Court abused its discretion in requiring compliance with the warrant prior to resolving the NDO challenge.**

Twitter first contends (Mot. 6-9) that it is likely to convince the D.C. Circuit that the Court should have delayed Twitter's compliance pending Twitter's First Amendment challenge to the NDO. As an initial matter, Twitter's framing of its argument on appeal is in stark contrast to its admissions in this Court. For purposes of appeal, Twitter intends to argue that it withheld production of responsive data so that it could challenge the NDO and vindicate its own First Amendment interests. But Twitter made clear in its General Counsel's declaration, briefing, and representations to the Court that—despite the deadline prescribed by the Court's order—it would not comply with the warrant until *both* (1) the NDO was lifted *and* (2) the account holder had the opportunity to fully litigate executive privilege motions. *See, e.g.*, Twitter Opp. Mot. Show Cause at 5 (arguing for the Court to permit the account holder to bring "*pre-execution* challenges" based on executive privilege) (emphasis added); Decl. of Twitter Senior Counsel ████████ (███ Decl.) at 4-5, ECF 9-1 (with respect to executive privilege, "Twitter takes no position on these issues, as they are for the former President to assert . . . Twitter's position would be that we should not produce until we resolved our questions as to the NDO"). In other words, Twitter's refusal to comply with the Court's unambiguous order was not merely premised on its desire to pursue its own First Amendment challenge, as Twitter now argues in its stay motion. Rather, Twitter pronounced its decision to hold the responsive documents hostage until its "unique"

account holder could pursue his separate legal claims, doing so at the expense of the Court's authority and the Government's investigation.

Setting aside its attempt to recast its position in a more favorable light, Twitter cannot show a substantial likelihood of success for at least two other reasons. *First*, as explained in the following section, this issue likely is moot—irrespective of whether this Court stays payment of the contempt sanction—and Twitter is thus unlikely to prevail on appeal on that ground alone. *See infra* at 10-11.

*Second*, on the merits, Twitter's desire to litigate a separate NDO was legally irrelevant to whether its behavior in response to the warrant was contemptuous, and cannot have formed the basis for delayed compliance with the otherwise valid warrant. To that end, Twitter cannot demonstrate that it will show abuse of discretion on appeal. Twitter identifies no case standing for the proposition that a third party's obligation to execute a lawfully issued warrant "travels together" with the entirely distinct question of whether that party may properly challenge a non-disclosure order accompanying that warrant. Mem. Op. at 24. As the Court observed, "[a]s a legal matter, the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each." Mem. Op. at 11 (citing *Google v. United States,* 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020)); *id.* at 24 ("As the Court previously explained, the Warrant and the NDO do not travel together."); Tr. (Feb. 7, 2020) at 66 (finding the "public interest is served by prompt compliance with the warrant" because "any challenge to a NDO is separate from a challenge to a search warrant [since] any further delay on the production of the materials responsive to the warrant increases the risk that evidence will be lost or destroyed, heightens the chance the targets will learn of the investigation, and jeopardizes the government's ability to bring any prosecution in a timely fashion").

Having failed to find pertinent cases that support its novel fellow-travelers theory, Twitter instead relies (Mot. 7-8) on several cases underscoring the general importance of protecting privilege. That contention is faulty. For one, none of those cases involved a potential executive privilege claim—a claim that lacks merit. Additionally, none of those cases involved a pre-enforcement challenge brought by a third party that held no cognizable privilege in the materials to be seized under the warrant. *See, e.g. In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, 11 F.4th 1235, 1238-39 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022) (challenge brought by attorneys "assert[ing] attorney-client and work-product privilege over at least some of [the] documents"); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 164-65 (4th Cir. 2019) (challenge brought by law firm invoking attorney-client and work-product privilege over materials); *Klitzman, Klitzman & Gallager v. Krut*, 744 F.2d 955, 956 (11th Cir. 1984) (post-search challenge brought by defendant, an attorney, whose materials were seized); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (pre-enforcement challenge to procedure for review of potentially privileged materials brought by the defendant); *United States v. Ritchey*, No. 21-cr-6, 2022 WL 3023551, at *1-*2 (S.D. Ohio June 3, 2022) (post-search challenge to filter protocol). In each of those cases, moreover, the search warrant was executed, and the parties then litigated whether any right or privilege precluded full government access to them. In short, Twitter can point to no case approving its course of action here: refusing to execute a valid search warrant given the potential for a privilege claim.

- 6 -

**b.   Twitter cannot show a substantial likelihood that the Court abused its discretion in finding that Twitter did not act in substantial compliance and good faith.**

Twitter's assertion that it proved substantial compliance and good faith (in relation to the third contempt element) is contradicted by the record. As described above, Twitter's initial basis for non-compliance was not a legal excuse for contempt. Rather, with virtually no investigatory facts at its disposal, Twitter staked out an "extraordinarily aggressive" position: it willfully violated an unambiguous order so that it could bring an unfounded challenge to a separate NDO and give its account holder the opportunity to litigate pre-indictment motions.[1] *E.g.*, Mem. Op. at 20 ("Twitter is taking the extraordinarily aggressive position as a service provider to demand that a covert step taken in an ongoing grand jury and criminal investigation be made public, at least to the account user, before complying with a court order, notwithstanding the informational void on which it stands.").[2]

Far from illustrating good faith, the record shows that Twitter was dilatory, consciously dismissive of the Court's authority, and at times not forthcoming with all relevant facts. Twitter's conduct prior to the February 7 contempt hearing is a contextual prologue to what transpired thereafter. The Court's opinion well describes Twitter's substantial structural inefficiencies in responding to the warrant. Mem. Op. at 8-9. But it soon became clear that Twitter's non-compliance was not just deficient but willful, based on its desire—unmoored from precedential

---

[1] Regardless of its aggressive nature, Twitter's position was baseless. *See, e.g.*, Mem. Op. at 20 ("Twitter makes this demand for an adversarial assessment of privilege issues as a condition of complying with the Warrant, despite not being privy to the full Warrant . . . .").

[2] Twitter moved to stay only payment of the contempt sanction. For that reason, the Government does not separately address the validity of the NDO other than by pointing to its *ex parte* opposition to Twitter's NDO motion, the attending materials, and the additional evidence on which the Court relied in its memorandum opinion. Together, those facts make out an overwhelming case that the NDO was consistent with the First Amendment.

caselaw—to litigate the NDO prior to production under the warrant. Mem. Op. at 9-10 ("Twitter highlighted that the Target Account's User . . . should have the opportunity to [assert] privilege prior to Twitter turning over the information to the government."); ███ Decl. at 4-5; Twitter Opp. Mot. Show Cause at 5. Twitter made clear that it was not impressed with the Court's 10-day production deadline, and instead would produce the responsive data on its own schedule.

At the first contempt hearing on February 7, 2023 (11 days past the production deadline) the Court rejected Twitter's defense to the show cause order, and posed a simple question to Twitter's counsel: "can Twitter produce the warrant returns by 5 p.m. today?" Tr. (Feb. 7, 2023) at 63. In response to "the Court's direct question, Twitter's counsel represented that the company was prepared to and could comply" with the warrant by the conditional deadline. Mem. Op. at 12. Specifically, counsel's answer was, without qualification, "I believe we are prepared to do that. Yes, Your Honor." Tr. (Feb. 7, 2023) at 63. Thus, counsel for Twitter assured the Court that it would fully comply with the warrant by close of business. Mem. Op. at 12 (finding that Twitter gave the Court "assurance of full compliance by close of business that day").[3]

Twitter's representations to the Court were inaccurate. As the Court found, "[d]espite representing that the company would and could comply with the Warrant by 5:00 p.m. on February 7, 2023—by that point, nearly two weeks late—Twitter failed timely to comply with the Show Cause Order." Mem. Op. at 12. In a call on February 8, Twitter told the Government that it had not produced all responsive data. *Id.* at 12-13. Then, the following day, Twitter made a second

---

[3] Twitter made a similar representation to the Government. Two days earlier, counsel for Twitter sent the Government an email stating that it was prepared to produce the responsive documents to the Court or Government, though again with conditions. *See, e.g.*, Twitter's Opp. Mot. Show Cause at 10 ("On February 5, Twitter offered to the government to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until the Motion to Vacate or Modify is resolved.").

production and "alerted the government that further productions were expected." *Id.* at 13. As Twitter's contemptuous behavior mounted, the Government requested a second hearing.

On February 9, 2023, counsel for the Government and Twitter appeared in Court for the second time. As the Court noted in its memorandum opinion, the Court spent much of the hearing reviewing the warrant with Twitter to "assess the extent of compliance and noncompliance." *Id.* at 13. During that process, "Twitter raised questions for the first time about certain requests, demonstrating that the company had failed to confer effectively with the government." *Id.* (citing hearing transcript). That night, following weeks of noncompliance and contemptuous behavior, Twitter made its final production, well into its third day past the conditional deadline. Mem. Op. at 34 (determining that Twitter accumulated $350,000 in contempt sanctions by 12:00 a.m. on February 9).

Despite being a well-resourced, $40 billion company, Twitter deliberately withheld data responsive to the warrant for 13 days past the mandatory deadline, in violation of the Court's unambiguous order. Twitter's choice to ignore the warrant was premised on its desire to bring a meritless challenge to the NDO, then give this one unique subscriber the opportunity to pursue baseless, pre-indictment litigation that would delay the Government's investigation and undermine the authority the Court exercised when it issued the warrant. Twitter staked out this "extraordinarily aggressive position" with scant knowledge of the investigation or the Attachment B (other than the portions with which it was served), no serious reason to believe that President Trump's Twitter account holds core presidential communications between the President and his Senior Advisors, and no law to suggest that an unauthorized disclosure could be made inside the executive branch. Twitter offered no legally-cognizable defense to the contempt finding, and when questioned on its ability to produce the records by the conditional deadline, Twitter misdirected

the Court, then spent the next two days making fragmented productions and negotiating new issues related to the Attachment B that should have previously been resolved. *Id.* ("Twitter could have resolved all these issues with the government prior to the original return date for the Warrant on January 27, 2023, or even during conversations with Twitter's in-house counsel through February 1, 2023, but Twitter skipped those opportunities."). Twitter has not met its burden of demonstrating likelihood that the D.C. Circuit will reverse this Court, particularly in light of the deferential review standard.

## II.   Twitter Fails to Demonstrate Irreparable Injury.

Twitter contends that without the stay, "the court of appeals could lose appellate jurisdiction over" two of the three issues it intends to raise on appeal (Mot. 1-5).[4] But one of the two arguments it intends to raise—that "contempt was improper" (Mot. 1)—was mooted when Twitter complied with the warrant. With regard to its other argument, that the "contempt sanction was unduly punitive" (Mot. 1), Twitter has failed to show a "certain[ty]," rather than a mere "theoretical" possibility," that the issue would become moot absent a stay. *CREW*, 904 F.3d at 1019. Twitter has therefore failed to carry its burden of showing that it will suffer irreparable injury.

### a.   Twitter's challenge to whether contempt was improper has likely already become moot.

One of the arguments Twitter intends to raise on appeal is that this Court erred when, at the February 7, 2023 show-cause hearing, it "ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant." Mem. Op. at 12 (summarizing Feb. 7, 2023 Minute

---

[4] With respect to its third argument, Twitter rightly acknowledges that the absence of a stay will have no effect on its ability to argue that the NDO should be vacated on First Amendment grounds.

Order). According to Twitter, it was reversible error for the Court to issue that order on February 7 in light of Twitter's separate challenge to the NDO. Twitter therefore intends to argue on appeal that "its obligation to comply with the Warrant [should] be stayed pending resolution of the dispute over the NDO." Mot. 4.

As discussed in the prior section, Twitter's argument regarding the contempt finding is unlikely to succeed on the merits. But the argument also was rendered moot when Twitter produced the responsive documents on February 9, 2023. This is because in "the context of purely coercive civil contempt, a contemnor's compliance with the district court's underlying order moots the contemnor's ability to challenge his contempt adjudication." *In re Grand Jury Subpoena Duces Tecum, 91-02922*, 955 F.2d 670, 672 (11th Cir. 1992) (collecting cases); *see also* 13B FED. PRAC. & PROC. JURIS. § 3533.2.2 (3d ed.) ("Belated compliance accomplished to purge a contempt adjudication likewise moots an appeal if there is no question of undoing the complying acts."). Because the propriety of the contempt order itself is now moot, the denial of the stay motion will not create irreparable injury with respect to that issue.

> **b.** **Twitter has failed to show that timely payment of the contempt fine will render moot the issue of whether the sanction was reasonable.**

By contrast, to the extent Twitter intends to argue on appeal that the contempt fine was unreasonable (Mot. 1), it has not shown that this argument would be rendered moot if the stay motion were denied. Controversies in this context are generally moot where no effective remedy is available (i.e., if a viable remedy persists, the issue is not moot). *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 14 (1992) (noting that the "availability of [a] possible remedy is sufficient to prevent this case from being moot"); 13B FED. PRAC. & PROC. JURIS., *supra*, § 3533.2.2 ("Mootness may result from compliance with an injunction or other specific order" if the court cannot "undo the effects of compliance and a decision is not likely to affect future

events"). Here, if the contempt fine is found on appeal to be unduly punitive (an unlikely result),

Twitter's timely payment of the fine could be remedied by returning some or all of the money,

particularly if the Court holds the funds in escrow. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*,

142 F.3d 1041, 1057 (7th Cir. 1998) ("Payment of the sanction does not moot the appeal because

the appellate court can fashion effective relief to the appellant by ordering that the sum paid in

satisfaction of the sanction be returned."); 13B Fed. Prac. & Proc. Juris. § 3533.2.2 ("An effective

remedy is most clearly possible if the fine remains in the district court, not yet covered into the

Treasury."); *Rhode Island Hosp. Trust Nat'l Bank v. Howard Commc'ns Corp.*, 980 F.2d 823, 829

n.9 (1st Cir. 1992) (rejecting mootness argument where money was held in escrow).

The cases on which Twitter principally relies, including two decisions from this Court, do

not support Twitter's mootness argument. To the contrary, they arise in two contexts that are

materially different from the case before this Court—(1) stays designed to prevent sanctions from

*accruing* during an appeal by a contemnor who has not complied with the underlying order, and

(2) mootness findings resulting from compliance with the underlying order itself, rather than

mootness resulting from the payment of fully accrued contempt sanctions.

For example, in *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956

and 50 U.S.C. § 1705*, 2019 WL 2182436 (D.D.C. Apr. 10, 2019) (Howell, C.J.), this Court issued

a compulsion order similar to the one imposed on Twitter, but unlike here, the contemnors chose

to appeal rather than complying with the underlying order. *Id.* at *5-6. The Court then granted the

contemnors' unopposed request to "stay accrual of the contempt sanctions" during the pendency

of an "expedited appeal," while also denying one contemnor's request "to stay the Compulsion

Order itself."[5] *Id.* This Court's decision in *In re Grand Jury Subpoena No. 7409*, 2018 WL 8334866 (D.D.C. Oct. 5, 2018) (Howell, C.J.), arose under similar circumstances, and merely stayed the accrual of contempt sanctions during the pendency of the appeal. *See id.* at *3-4. Neither decision supports Twitter's request to stay payment of a fully accrued fine where, as here, the contemnor complied with the underlying order.

The circuit decisions Twitter relies on are likewise inapposite, as they address mootness resulting from the contemnor's ultimate compliance with the underlying order, not the accrued sanction. *See United States v. Griffin*, 816 F.2d 1, 7 n.4 (D.C. Cir. 1987) (appeal of a contempt order was moot where the defendant had fully complied with the underlying restitution order); *In re Hunt*, 754 F.2d 1290, 1293-94 (5th Cir. 1985) (appeal of contempt order was moot where the party had fully complied with the underlying injunction); *In re Campbell*, 628 F.2d 1260, 1261-62 (9th Cir. 1980) (per curiam) (reaffirming that a contemnor's testimony in compliance with an underlying subpoena "will normally terminate a case or controversy and render appeal from the order moot," but finding that the "near-certainty" of the witness being recalled to testify in the future defeated mootness).[6] Those cases tend to confirm that Twitter has already lost "its ability

---

[5] Twitter cites this Court's opinion in *In re Grand Jury Investigation* for the proposition that "'staying sanctions during an expedited appeal' is an appropriate measure to ensure that a contemnor has an opportunity to 'press its arguments to a court of review.'" Mot. 1-2. The implication is that this Court endorsed stay orders as a routine measure to allow any contemnor to pursue appellate review. This was decidedly not the Court's holding. In that case, the subpoenaed banks were in contempt and *accruing* per diem sanctions. *In re Grand Jury Investigation*, 2019 WL 2182436, at *5. For that reason, the Court granted a limited order staying the further accrual of sanctions for the duration of an "expedited" appeal, expressly declining to stay accrual while the bank exhausted "all appellate rights." *Id.*

[6] Some out-of-circuit cases suggest that payment of a contempt sanction could moot a challenge to the underlying contempt order. *See, e.g.*, *RES-GA Cobblestone, LLC v. Blake Const. & Dev., LLC*, 718 F.3d 1308, 1315 (11th Cir. 2013). But Twitter's failure to identify binding precedent on this issue confirms that, in this case, "the irreparable injuries asserted fail to rise beyond the speculative level." *CREW*, 904 F.3d at 359.

to appeal its request that its obligation to comply with the Warrant be stayed pending resolution of the dispute over the NDO," Mot. 4, but do not support Twitter's contention that a stay of the payment date is necessary to preserve Twitter's ability to litigate the sanction's reasonableness on appeal.

To that end, Twitter has not identified any cases, similar to its own, where mootness turns on the payment of the fully accrued contempt fine, rather than compliance with the underlying order. Nor has Twitter addressed persuasive authority indicating that such payment would *not* render the case moot—particularly where the Court can hold the payment in escrow during the pendency of the appeal. *See Corley*, 142 F.3d at 1057; *Rhode Island Hosp. Trust*, 980 F.2d at 829 n.9; *see also In re Grand Jury Subpoena Duces Tecum, 91-02922*, 955 F.2d at 672-73 (dismissing as moot the "appeal of the order finding [the appellant] in contempt," but addressing the merits of whether the accrued, unpaid fine was unduly punitive); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir. 1983) ("While the contempt itself has been purged, whether the Shufflers are liable for the $500 daily fine imposed under the May contempt order remains a live controversy"). Twitter has therefore failed to carry its burden of showing that it will suffer irreparable injury in the absence of a stay.

## CONCLUSION

The Court should deny the motion for a stay.

Respectfully submitted,

Jack Smith
Special Counsel
N.Y. Bar No. 2678084

/s/ *Gregory Bernstein*
Gregory Bernstein (C.A. Bar No. 299204)
Cecil VanDevender (Tenn. Bar No. 029700)
James I. Pearce (N.C. Bar No. 44691)
Thomas P. Windom (D.C. Bar No. 502131)

Dated: March 9, 2023

FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 – BAH <br><br> **UNDER SEAL** |

### TWITTER'S OPPOSITION TO
### GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE

Twitter is not refusing to comply with the Warrant in this case. Instead, Twitter sought a

negotiated resolution with the government with respect to the associated Non-Disclosure Order,

and when it reached an impasse, it immediately sought this Court's intervention. There is no

basis to hold Twitter in contempt.

Twitter's interest in notifying its user about the Warrant is well-founded: the issues

presented by the government's demand for private presidential communications without notice

are weighty and entirely without legal precedent. These executive privilege issues are distinct

from issues presented in a typical search warrant, where a Fourth Amendment violation or other

harm can be remedied by post-execution suppression. The executive privilege, and derivative

use concerns related to it, raise unique constitutional issues that cannot be remedied by any ex-

post action of a court. Twitter is not taking a position on the applicability of the privilege or the

validity of the Warrant, and it is certainly not contemptuous of the Warrant's dictates. Rather, it

is pointing out that every court, including the United States Supreme Court, has concluded these

are challenging and substantial issues, and Twitter's user has a significant interest in an

1

FILED UNDER SEAL

opportunity to raise these issues before the records are produced.  Twitter has, through its filing

of its Motion to Vacate or Modify the Non-Disclosure Order ("Motion to Vacate or Modify"),

and its request for a stay of its production obligations until that Motion is resolved, sought this

Court's assistance to permit those issues to be considered deliberately with input from the real

parties in interest.

I.      **The Executive Privilege Issues Here Are Potentially Significant and Deserve
        Consideration of the Former President's Input Prior to Compliance**

The Warrant demands the contents of private personal presidential communications,

without permitting notice or an opportunity for the interested party to raise any privilege

concerns.[1]  Though courts have acknowledged the gravity of executive privilege issues, *see*

*Trump v. Thompson*, 142 S. Ct. 680 (2022) (Order Denying Stay of Mandate and Injunction)

(noting that questions of executive privilege "raise serious and substantial concerns"), the

question of whether the former President whose communications are sought has a pre-execution

right to assert executive privilege interests has never been addressed – let alone resolved – by

any court.  The absence of any law on this issue highlights additional issues that are completely

without precedent:  (1) no President or former President has ever been denied some advance

---

[1] The Supreme Court has recognized that a former President could potentially raise a claim of executive privilege. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448-49 (1977) (holding that "the privilege survives the individual President's tenure"). *See also Trump v. Thompson*, 142 S. Ct. 680 (2022) (Kavanaugh, J., respecting denial of application for stay) (observing "former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his presidency, even if the current President does not support the privilege claim"); *Trump v. Mazars USA, LLP*, 39 F.4th 774, 788 (D.C. Cir. 2022) ("The possibility that President Trump's ability to assert executive privilege may be unaffected by his status as a former President—even in the face of the sitting President's opposition—gives us all the more reason to conclude here that the test governing President Trump's challenge is unaffected by his departure from office during the litigation."); *Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury*, 45 F.4th 324, 342 n.3 (D.C. Cir. 2022) (Henderson, concurring).

FILED UNDER SEAL

notice of his potentially privileged communications being seized and examined; and (2) no potentially privileged presidential communications have been held by or sought from a private, non-governmental entity. These difficult and novel questions ought to be meaningfully addressed by the real party in interest, particularly because there is no countervailing governmental interest in keeping the Warrant secret from that party. The risk of irreparable harm to Twitter's own and its user's interests resulting from Twitter's court-ordered silence provide good faith reasons for it to request the Court to reexamine the Non-Disclosure Order and delay compliance with the Warrant.

Twitter values its ability to safeguard the privacy of its users. Accordingly, Twitter's Privacy Policy makes clear to its users and to law enforcement that it will notify users of any law enforcement requests for their communications or data unless legally prohibited from doing so:

> For purposes of transparency and due process, Twitter's policy is to notify users (e.g., prior to disclosure of account information) of requests for their Twitter or Periscope account information, including a copy of the request, unless we are prohibited from doing so (e.g., an order under 18 U.S.C. § 2705(b)).[2]

Twitter's ability to communicate with its customers about law enforcement's efforts to access their communications and data – rooted in its contractual promises and historical commitment to privacy and transparency – is essential to its business model and fostering trust with its user base. Given its vast and diverse community of users, Twitter is not in a position to identify and assert its users' rights and privileges with respect to every government demand for communications and data. Moreover, Twitter might lack standing to assert the rights and privileges of its users. Such rights and privileges could include communications between attorneys and clients, journalists and sources, medical professionals and patients, clergy and

---

[2] https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support

3

FILED UNDER SEAL

laity, spouses, or politicians communicating in ways that might be covered by the Speech or

Debate Clause, executive privilege, or other official privileges.  By notifying its users of

government demands for communications and data, Twitter serves a critical role in enabling its

users to identify, evaluate, and assert for themselves those rights and privileges that could be

implicated by a government search and seizure.

The government argues that Twitter's interests in notifying its user are irrelevant to the

question of production, because the Warrant and Section 2703 do not provide for intervention by

a third party.[3]  It is entirely unsurprising that the criminal rules and Section 2703 do not address

this unique situation—where potentially privileged presidential communications are sought from

a private non-governmental entity without notice to that President.  But that does not eliminate

the significant and unresolved legal issues at play, nor does it address the former President's

interest in participating in their resolution (as *every* President before him has). Indeed, the

government's own statements underscore why the former President should be heard under these

unique circumstances.  As discussed below, when counsel for Twitter alerted the government

that NARA already had the data it was seeking, counsel for the government responded that the

government did not want to seek these communications from NARA because it would trigger

notice to the former President under the Presidential Records Act.[4]  This highlights two points

strongly in favor of pre-execution notice to Twitter's user and an opportunity for him to weigh

in:  (1) the government is attempting an end-run around the statutory protections that Congress

put in place regarding presidential communications; and (2) the statutory regime in place never

---

[3] Gov't Motion at 1 and 3.

[4] Declaration of ███████████████, Exhibit A, at ⁋ 12.

4

FILED UNDER SEAL

contemplated and does not account for the circumstances at play here: access (without notice to

a former President) to his potentially privileged presidential communications held by private,

non-governmental entities.

This case is emphatically not a run of the mill Fourth Amendment case that can be later

cured by suppression of the evidence.  Executive privilege, even more than other privileges,

differs substantially from routine Fourth Amendment challenges because the privilege is injured

*at the time the communications are viewed by another party.*[5]  *In re Sealed Case*, 121 F.3d 729,

744 (D.C. Cir. 1997) (*citing Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) for the

proposition that intrusion into the confidentiality of presidential communications occurred at the

time of screening of the materials by archivists).  The party "remains injured as long as the

government retains its privileged documents." *Harbor Healthcare Systems, LP v. United States*,

5 F.4th 593, 600 (5th Cir. 2021). "It makes little sense to say that the Fourth Amendment can be

litigated only in a suppression motion when there are other types of harm arising from unlawful

searches and seizures." *Id.* at 601.

Accordingly, in such circumstances involving privileged materials, courts have permitted

pre-execution challenges to protect an individual's privilege because an injury that occurs at the

time of review cannot be wholly or adequately remedied post-execution. *See e.g. In re Search

Warrant Issued June 13, 2019*, 942 F.3d 159, 183 (4th Cir. 2019) (reversing district court's

denial of injunction on federal agents reviewing seized privileged materials obtained through

---

[5] The former special counsel's *Report on The Investigation Into Russian Interference In the 2016
Presidential Election* contains potentially privileged information, but that was not obtained
without notice and agreement. *See, e.g.,* Volume II at p 82 n. 546 (describing notice to White
House Counsel's Office in advance of interviews regarding statements by the President, "to give
the White House an opportunity to invoke executive privilege in advance of the interviews").

5

FILED UNDER SEAL

execution of a search warrant); *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3rd

Cir. 1984) (granting defendant's motion to return privileged material seized during execution of

search warrant); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (noting that

defendant opposed government's use of a filter team and sought return of records).  As the

Eleventh Circuit has explained:

> The whole point of privilege is privacy.  So the Intervenors' interests in preventing
> the government's wrongful review of their privileged materials lie in safeguarding
> their privacy.  Once the government improperly reviews privileged materials, the
> damage to Intervenors' interests is definitive and complete.
>
> Contrary to the government's suggestion, suppression is not an adequate remedy
> for any violations.  We cannot know whether criminal charges will be brought
> against the Intervenors.  Yet suppression protects against only the procedural harm
> arising from the introduction at a criminal trial of unlawfully seized evidence.  If
> the Intervenors are not charged, they will not have suppression available to them as
> a potential remedy.  And even if they are charged and may seek suppression,
> suppression does not redress the government's intrusion into the Intervenors'
> personal and privileged affairs.

*In re Sealed Search Warrant and Application*, 11 F.4th 1235, 1247 (11th Cir. 2021) (internal

citations omitted).  Any concern of delaying criminal proceedings "can be minimized by

expediting review of motions of this type."  *Id.*; *see also In re Search Warrant*, 942 F.3d at 181-

82 (holding that "delay in the government's investigations here does not outweigh the harm" of

examining privileged materials).

Applying these well-founded legal principles to this case, Twitter respectfully submits

that this Court should delay compliance with the Warrant and vacate the Non-Disclosure Order

to allow Twitter to notify its user so that he may assert the privilege if he so chooses.

Investigative speed is not a sufficient justification to irreparably harm a bona fide privilege

claim.

FILED UNDER SEAL

Moreover, if such an executive privilege claim is asserted by the user, the D.C. Circuit

has instructed what should happen next:

> the privilege is qualified, not absolute, and can be overcome by an adequate
> showing of need.  If a court believes that an adequate showing of need has been
> demonstrated, it should proceed to review the documents *in camera* to excise non-
> relevant material.   The remaining relevant material should be released.   The
> President should be given an opportunity to raise more particularized claims of
> privilege if a court rules that the presidential communications privilege alone is not
> a sufficient basis on which to withhold the document.

*In re Sealed Case*, 121 F.3d at 745.  This Court should follow the D.C. Circuit's holding and

resolve the privilege issue prior to permitting "[f]ederal agents and prosecutors rummaging

through" potentially privileged materials.  *In re Search Warrant*, 942 F.3d at 183.

Further, seizure of privileged materials also raises thorny derivative use issues, such as

the use of the privileged materials in furthering the investigation through additional warrant

affidavits or witness questioning.  As noted in Twitter's Motion to Vacate or Modify, no court

has ever addressed the issue of executive privilege in this context — including what limitations

might need to be imposed on derivative use of private presidential communications.  The

government should also have an interest in ensuring that its further investigative techniques are

not undertaken in a manner that taints its ability to bring a successful prosecution at a future date.

As stated in its Motion to Vacate or Modify, Twitter takes no position on the applicability

of executive privilege to these communications in this circumstance.  Twitter does have a strong

First Amendment interest in providing meaningful notice to its users.  And it has an especially

strong First Amendment interest in providing that notice *before* it produces the former

President's account information—while he still has an opportunity to raise a meaningful

privilege objection.  *See Matter of Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990) ("It

is axiomatic that the timing of speech is often crucial to its impact."); *Wood v. Ga.*, 370 U.S. 375,

7

FILED UNDER SEAL

392 (1962) ("Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed." ). The disclosure of private presidential communications clearly affects other parties, including Twitter's user, who was President of the United States at the time the materials sought were created, and who may retain the ability to assert that privilege now.

These are weighty and difficult questions that courts, including the Supreme Court, have wrestled with, and should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing. The government should want this issue resolved as well. "[P]rosecutors have a responsibility to not only see that justice is done, but to also ensure that justice *appears* to be done. Federal agents and prosecutors rummaging through [privileged materials] is at odds with the appearance of justice." *In re Search Warrant*, 942 F.3d at 183 (emphasis in original).

## II.    Twitter Has Acted in Good Faith and Promptly Sought Court Intervention

Twitter has promptly and expeditiously sought to comply with the Warrant in a manner that does not violate its fundamental rights to provide meaningful notice to its user. The government did not serve the Warrant until two days after obtaining it. (Gov't Mot. at 2.) Counsel for the government did not contact counsel for Twitter to alert it of the expedited nature of the Warrant until six days after serving the Warrant, which was only two days before the production deadline.  (Gov't Mot. at 2.)

Upon learning of the Warrant on January 25th, counsel for Twitter immediately directed the preservation of responsive materials in Twitter's production tooling used to respond to law

8

FILED UNDER SEAL

enforcement process and began evaluating the request in good faith and with alacrity.

(Declaration of ██████████ ("█████ Declaration"), attached as Exhibit A, at ▌4.)

Twitter corresponded and spoke with the government on at least 10 occasions over the week

between becoming aware of the Warrant and Non-Disclosure Order and the government's filing

of its Motion for an Order to Show Cause.  (*Id.*)  Throughout these conversations, Twitter made

clear that its concerns centered on the Non-Disclosure Order limiting Twitter's ability to notify

its user, and indicated throughout that Twitter had preserved data and did not intend to challenge

the underlying Warrant.  (*Id.*)

Specifically, as set forth in the ██████ Declaration, counsel for Twitter first learned of the

Warrant and Non-Disclosure Order during a call from the government on Wednesday January

25.  (*Id.*, at ▌2.)  Counsel for Twitter attempted to call the government's counsel on January 26th

but was unable to reach him.  ████ thus sent an email alerting the government that Twitter would

not be able to provide a final answer to the government by the production deadline the following

day, that Twitter was working on the Warrant, and that preservation of responsive data was in

place.  (*Id.*, at ▌5.)  Counsel for Twitter spoke by phone with the government multiple times in

an ongoing attempt to find negotiated resolution.  (*Id.*, at ▌8.)  During these calls, Twitter

suggested an alternative means that it believed might satisfy both the government's interest in

obtaining the data and Twitter's First Amendment interests in notifying its user if it were to

produce the data.  Specifically, Twitter suggested that the government could obtain the data it

sought from the National Archives and Records Administration ("NARA"), which maintains a

copy of the Target Account, including private presidential communications, in accordance with

the Presidential Records Act.  (*Id.*, at ▌10.)

FILED UNDER SEAL

The government declined Twitter's suggestion.  Specifically, counsel for the government

stated in a phone call the evening of January 31 that the government did not want to seek the

communications from NARA, because making such a request would require notification to the

former President under the Presidential Records Act.  (*Id.*, at ¶ 12.)  Despite Twitter's request

and invitation, the government offered no suggestions of its own.

Recognizing that Court intervention would be necessary, Twitter prepared the Motion to

Vacate or Modify.  Outside counsel for Twitter called the government on the morning of

February 2 to attempt to reach a resolution and, in the alternative, notify it that Twitter would be

bringing the matter to the Court for assistance.  During that call, the government rejected any

entreaties and informed undersigned counsel that it was "about to file" a motion for an order to

show cause and that there would be a hearing that afternoon or the following day that Twitter

should attend.

To further demonstrate its good faith compliance with the Warrant while its First

Amendment interests are resolved, on February 5, Twitter offered to the government to produce

the requested data and communications from the Target Account to the Court or the government,

to be held without review until the Motion to Vacate or Modify is resolved.  The government

declined Twitter's offer.[6]

In sum, Twitter alerted the government to its concerns promptly, negotiated in good faith

where it thought a resolution may be possible, sought prompt court intervention as soon as it

---

[6] In its email, the government noted: "We respectfully decline. The Chief Judge has already
issued an order -- via a warrant Twitter does not challenge -- that directed Twitter to produce the
records by January 27. This was a clear order from the District Court that Twitter received and is
not challenging, and Twitter has deliberately chosen non-compliance. So while we appreciate the
email offer, at Tuesday's hearing we intend to ask for a contempt sanction that will quickly bring
Twitter into compliance with the warrant."

10

FILED UNDER SEAL

became clear that the parties were at an impasse, sought a stay of its production obligations from the Court during the resolution of its Motion to Vacate or Modify, and proposed an expedited briefing schedule to resolve its concerns at a speed that would not prejudice the government.

Twitter respectfully submits that its actions fall well below any level of contempt: they are precisely the steps that courts have found any responsible judicial officer ought to take. *See, e.g., In re Search Warrant*, 942 F.3d at 182 ("We do not fault the Law Firm for seeking a negotiated resolution of these important disputes before requesting court intervention. And we will not reward the government for ignoring those efforts."); *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987) (describing a physician's motion for relief from execution of a search warrant that encompassed patient files as a "good faith" and "diligent[]" effort to "press[] the interests of his patients"); *United States v. Ritchey*, __ F. Supp. 3d __, 2022 WL 3023551, at *5 (S.D. Miss. June 3, 2022) (explaining that the government "typically" relies on "adversarial review" of proposed privilege-protection measures or "informal, good faith resolution with the" targeted person to dispel "a certain level of suspicion" that otherwise attaches to the government's review of seized documents that likely contain privileged materials).

### III.   The Government's Reliance on *Google* is Misplaced

The government argues that Twitter's concerns regarding the Non-Disclosure Order cannot be resolved prior to production, relying on a single case in support of its position. Specifically, arguing that it has "an interest in prompt enforcement of the Warrant, regardless of any challenge to the NDO," (Motion, 3) the government cites *Google* for the proposition that the "request to stay warrant deadline pending resolution of challenge to accompanying non-disclosure order" should be denied, "noting any further delay . . . increases the risks that evidence will be lost or destroyed, heightens the chance that targets will learn of the

11

FILED UNDER SEAL

investigation, and jeopardizes the Government's ability to bring any prosecution in a timely

fashion." (*Id.*, citing *Google LLC v. United States*, 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020).)

But the government's reliance on *Google* is misplaced.  Instead, the application of the factors

articulated in *Google* clearly support the relief that Twitter sought from this Court when it filed

its own Motion to Vacate or Modify.

As a threshold matter, the *Google* Court – in accordance with Twitter's position in its

Motion – applied strict scrutiny to the evaluation of the government's non-disclosure order

barring Google from notifying its users in that case.

The factors that the government cites from *Google* to argue that production must

immediately precede without waiting for resolution of Twitter's Motion to Vacate or Modify are

inapposite here.  First, the "further delay" that the *Google* Court found so unappealing and that

the government cites in its brief is not comparable to the timeline here.  In *Google*, the parties

had already fully litigated the validity of the non-disclosure order, delaying the government's

ability to obtain the materials it sought.  Here, the Court has not yet had a chance to rule on the

non-disclosure order.  And Twitter has moved swiftly to minimize any possible delays. Within

*days* of being notified of the Warrant and the Non-Disclosure Order, Twitter began discussions

with the government regarding how it could simultaneously comply with its production

obligations and maintain its First Amendment right to meaningfully notify its user.  As soon as it

determined that the parties were at an impasse, which was within a *week* of being notified of the

existence of the Warrant, Twitter brought the issue before this Court for resolution.  Twitter

proposed an expedited briefing schedule *of five days* to achieve a prompt resolution with no

prejudice to the government, which the government rejected.  For the government to now claim

that Twitter's Motion is seeking "indefiniteness and interference" mischaracterizes the facts.

12

FILED UNDER SEAL

Twitter has not delayed nor acted with any contempt; Twitter has acted with all deliberate speed in promptly seeking Court assistance – including a stay of its production obligations while the Court addressed its concerns.

Second, unlike in the *Google* case, there is little risk that the evidence sought in this case will be "lost or destroyed" during the pendency of Twitter's Motion to Vacate or Modify, as Twitter has preserved the data in its system used for responding to law enforcement process. Moreover, a copy of the Target Account is also available at NARA, which is responsible for securing and maintaining Presidential records. The risk of spoliation of data that was arguably present in the *Google* case is wholly absent here.

Third, unlike the *Google* case, there is simply no credible risk that delaying production pending resolution of Twitter's Motion will "heighten the chance that targets will learn of the investigation" – because they already know. (Gov't. Mot. At 3.) As set forth extensively in Twitter's Motion to Vacate or Modify, unlike in the *Google* case, the publicity surrounding the investigations into former president Trump is widespread and unprecedented. (*See* Exhibit B, containing an appendix of news articles cited in Twitter's Motion to Vacate or Modify.) Additionally, other investigations have already publicly targeted the user's communications through the same Target Account. *See, e.g.,* Congressional Subpoena to President Trump from the Select Committee to Investigate the January 6th Attack on the United States Capital, Oct. 21, 2022 (requesting, among other documents, "communications sent or received . . . relating or referring in any way to any… tweet, or other social media post from November 3, 2020 to January 6, 2021."). This is wholly distinct from any typical covert law enforcement investigation where the targets are unaware of the government's activities, including the investigation at issue in the *Google* case. In this case, the Attorney General of the United States

13

FILED UNDER SEAL

held a nationally televised press conference to announce the appointment of the Special Counsel and his mandate to investigate the former President.

Finally, although the government argues that resolving Twitter's First Amendment concerns would "jeopardize the government's ability to bring any prosecution in a timely fashion," (Gov't. Mot. At 3), Twitter has moved with alacrity and proposed a briefing and hearing schedule that would have concurrently resolved the concerns of both the government and Twitter within days.

Rather than rely on *Google*, which is clearly inapposite, this Court should follow the Supreme Court's mandate that the status quo should be maintained pending a final judicial determination of the government's prior restraint on Twitter's speech. *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) ("any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained"). Applying those principles here, the Court should stay any production obligation until the issues raised in Twitter's Motion to Vacate or Modify are resolved.

As a continued demonstration of its good faith efforts to comply with this Court's orders while its First Amendment interests are resolved, Twitter continues to be willing to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until the Motion to Vacate or Modify is resolved — and in the event the non-disclosure order is quashed or modified and notice is permitted, until 7 days after such notice is given.

14

FILED UNDER SEAL

## CONCLUSION

For the foregoing reasons, Twitter respectfully requests that the government's Motion for

an Order to Show Cause be denied, and the Court stay compliance with the Warrant until Twitter's

Motion to Vacate or Modify is resolved.

Dated: February 6, 2023

                                          Respectfully submitted,

                                          *C. Holtzblatt*

                                          Ari Holtzblatt, D.C. Bar 1009913
                                          Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
                                            *admission pending)*
                                          Whitney Russell, D.C. Bar 987238 *(D.D.C.*
                                            *admission pending)*
                                          WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                          2100 Pennsylvania Ave. NW
                                          Washington, DC 20006
                                          Ari.Holtzblatt@wilmerhale.com
                                          benjamin.powell@wilmerhale.com
                                          Whitney.russell@wilmerhale.com
                                          Tel:  (202) 663-6000
                                          Fax:  (202) 663-6363

                                          George P. Varghese *(pro hac vice pending)*
                                          WILMER CUTLER PICKERING
                                          HALE AND DORR LLP
                                          60 State Street
                                          Boston MA 02109
                                          George.varghese@wilmerhale.com
                                          Tel:  (617) 526-6000
                                          Fax:  (617) 526-6363

                                          *Counsel for Twitter, Inc.*

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February 2023, I caused the foregoing motion to be served by email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

16

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |

# EXHIBIT A
## TO TWITTER'S OPPOSITION TO
## GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE

1

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**<u>UNDER SEAL</u>** |

## DECLARATION OF ███████████

I, ███████████, declare as follows:

1.  I am the Senior Director of Legal for Twitter, Inc. ("Twitter"). Twitter is a global social media platform that fosters public and private conversations amongst its 450 million active monthly users. I make this Declaration based on my own personal knowledge and investigation, and if called as a witness to testify, I could and would testify competently to the following facts.

2.  On Wednesday, January 25, at 4:54pm I received an incoming call from Assistant Special Counsel Greg Bernstein. He informed me that the Special Counsel's Office had previously served a search warrant on Twitter for data associated with the account @realDonaldTrump ("Warrant"). I had not heard anything about this Warrant prior to the call, which I told him. I said that I would need to look into the matter and revert. He responded that they were looking for an on time production, in two days. I said that without knowing more or taking any position that would be a very tight turnaround for us.

2

FILED UNDER SEAL

3. Later that day, at 7:25pm, I received an email from Mr. Bernstein, forwarding an earlier email from 5:06pm from him addressed to his colleagues but intended for me that he had forgotten to copy me on, attaching copies of the Warrant and the Non-Disclosure Order.

4. I directed the preservation of data available in our production environment associated with the @realDonaldTrump account, and have confirmed that the available data was preserved.

5. On Thursday, January 26, I placed an outgoing call to Mr. Bernstein, but was unable to reach him.  I followed up with an email sent at 7:37pm, stating, "We are not going to be able to get back to you by tomorrow.  But, I can confirm that the warrant is working its way through our system, and preservation is in place."

6. At 7:49pm on Thursday, I missed an incoming call from Mr. Bernstein.  He did not leave a message.

7. At 10:06pm on Thursday, I received an email from Mr. Bernstein seeking to schedule a call for the following day.

8. On Friday, January 27, I called Mr. Bernstein and confirmed that the Warrant was being processed through the system but that we were not going to be able to respond by the 27th.  I explained that we needed time to consider the Warrant and Non-Disclosure Order and we would get back to them early next week with an update.  Mr. Bernstein pressed me for more information, and I assured him I was one of the most senior lawyers at the company, and the fact that I was attending to these questions underscored that the company was prioritizing the matter and taking it very seriously.  I reiterated that it was clearly a matter of great

FILED UNDER SEAL

importance and I had only had it for two days.  We agreed to talk again on
Tuesday after 5 pm ET due to Mr. Bernstein's schedule that day.

9.  At 5:02pm ET on Tuesday, January 31, I called Mr. Bernstein as arranged. He did
not answer.

10. At 5:07pm ET, Mr. Bernstein called me back.  I told him that I appreciated his
patience.  We had had a chance to review the warrant and NDO, consult outside
counsel, and also gather internal information potentially responsive to Attachment
B.  I explained that it is essential to Twitter's business model (including our
commitment to privacy, transparency, and neutrality) that we communicate with
users about law enforcement efforts to access their data.  I shared that on
occasion, we have challenged non-disclosure orders, whether in follow-up
conversations with prosecutors or government officials, or in court filings.  I
explained that we had reviewed the Non-Disclosure Order here, but we did not
see how it meets the factors outlined in § 2705(b), given the intense publicity
around the investigation.  I asked, recognizing that he may not be able to answer,
whether the Special Counsel had sought this information from the National
Archives Records Administration ("NARA"), since it maintains a copy of the
Target Account and have much of the information called for in the Warrant.  I
asked that he consider withdrawing the Non-Disclosure Order, given its
restriction on Twitter's First Amendment rights to communicate with its user.  I
told him that we felt that the investigation of the Former President could not be
more publicized.  I explained that respectfully, there did not appear to be a
legitimate compelling government interest that justifies restricting Twitter's First

FILED UNDER SEAL

Amendment rights to meaningfully communicate with its users. I raised specifically the claim in the Non-Disclosure Order that the former President was likely to flee from prosecution if the Non-Disclosure Order or Warrant was disclosed.  I told Mr. Bernstein that it seemed very unlikely that the former President presents a risk of flight because of a warrant for his Twitter data.  I explained that in our view, Twitter's First Amendment interests are particularly important here where the warrant could implicate issues of executive privilege. I told Mr. Bernstein that Twitter takes no position on these issues, as they are for the former President to assert, if at all. I offered to continue discussing the matter. I told him that I understood he had a job to do, and that I had also served as a federal prosecutor, and emphasized that my job was to protect Twitter's interests and our users' data while meeting our legal obligations. He responded that he understood, and appreciated my professionalism.

11.  At 6:58pm ET on January 31, I missed a call from Mr. Bernstein.  He followed up with an email at 7:05pm asking me to call him back, indicating that it was time sensitive.

12. At 9:08pm ET on January 31, I returned Mr. Bernstein's call.  He asked me to clarify our position, specifically on whether we viewed the Warrant and Non-Disclosure Order as linked or separate.  Mr. Bernstein stated that they did not want to obtain data from NARA, as it would require notification pursuant to the Presidential Records Act.  I told him that Twitter's position would be that we should not produce until we resolved our questions as to the NDO.  He asked whether I had any case law support for our position, and I said that I would collect

FILED UNDER SEAL

it and provide to him.  He asked that I provide it by end of the next day.  I told

Mr. Bernstein that I was traveling to San Francisco the next day, but would make

sure to get him support for our position.

13. On February 1, at 10:38am, I sent an email to Mr. Bernstein confirming that I

would send an email with support for Twitter's position later that evening.

14. On February 1, at 10:14pm, I sent the following email to Mr. Bernstein:  "As

discussed last night, I want to be clear that Twitter is not taking a position on the

underlying warrant. That said, we continue to believe that production of

responsive data prior to a resolution of Twitter's questions around the validity of

the non-disclosure order in this case would be inappropriate in light of clear

judicial directives that the status quo should be preserved pending final judicial

resolution of questions around the prior restraint of speech. *See Elrod v. Burns*,

427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury.") (*citing

New York Times Co. v. United States*, 403 U.S. 713 (1971)); *Freedman v. State of

Md*., 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial

determination on the merits must similarly be limited to preservation of the status

quo for the shortest fixed period compatible with sound judicial resolution.");

*Thomas v. Chicago Park Dist*., 534 U.S. 316, 321 (2002) ("any restraint prior to

judicial review can be imposed only for a specified brief period during which the

status quo must be maintained"). Although I understand your position that the

NDO and the warrant could be litigated separately, we remain unclear as to what

FILED UNDER SEAL

remedy DOJ would propose in this unique situation in the event that the NDO is

deemed invalid yet the materials have already been reviewed by your team. We

are open to discussing any suggestions you might have. Separately, we will want

to further discuss with you Attachment B and technical issues we will need to

work through in responding once this issue is resolved. I've also copied George

Varghese and Ben Powell of WilmerHale, who are assisting us in this matter."

In accordance with LCrR49(f)(5), I declare under penalty of perjury that the foregoing is true and correct. Executed on February 5, 2023.

██████████████████████

███████████████

Senior Director, Legal
Twitter, Inc.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY TWITTER
INC. IDENTIFIED IN ATTACHMENT A

Case No. 23-SC-31

**Under Seal and**
**Ex Parte to Government**

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

For what appears to be the first time in their nearly seventeen-year existence as a company,

*see generally* Letter from Counsel for Twitter, Inc. (SEALED), ECF No. 14, Twitter Inc.

("Twitter") seeks to vacate or modify an order, issued under the Stored Communications Act of

1986 ("SCA"), 18 U.S.C. § 2701 *et seq.*, commanding that the company not disclose the existence

of a search warrant for a user's Twitter account, and further seeks to condition any compliance by

the company with that search warrant on the user (or user's representatives) first being notified

about the warrant and given an opportunity to stop or otherwise intervene in execution of the

warrant.  *See* Twitter's Mot. to Vacate or Mod. NDO and Stay Twitter's Compl. with Warrant

("Twitter's Motion") (SEALED), ECF No. 7; *see also* Twitter's Mem. Supp. Twitter Mot.

("Twitter Mem.") (SEALED), ECF No. 7-1.  This is an extraordinary request. Twitter denies that

this action is being taken by the company due to the identity of the targeted Twitter account

("Target Account") or its user, suggesting instead that Twitter regularly engages in challenging

SCA nondisclosure orders ("NDOs")—though concededly never before regarding a covert search

warrant—and assuring the Court that the fact that the user of the Target Account ("the User") is a

high-profile public figure is merely coincidence.  *See* Feb. 7, 2023 Hrg. Tr. at 60:9-22 (SEALED)

(Twitter's counsel declaiming that the company "has no interest other than litigating its constitutional rights").[1]

Twitter justifies initiating this dispute on grounds that the NDO violates the First Amendment as a content-based prior restraint on speech the company wants to have with a customer that fails to satisfy the exacting requirements of strict scrutiny. Twitter Mem. at 2. Specifically, Twitter is not satisfied with the government's proffered reasons for nondisclosure, based upon what the company has read in media reports, *id.*, notwithstanding that both the warrant and the NDO were issued by this Court after being apprised of extensive reasons sufficient to establish probable cause for issuance of the warrant and to meet the statutory requirements for an NDO, to which reasons Twitter is neither privy nor entitled to be privy. The government opposes Twitter's motion, arguing that disclosure of the warrant's existence would result in statutorily cognizable harms, under 18 U.S.C. § 2705(b), *see* Gov't's *Ex Parte* Opp'n to Twitter's Mot. at 1 ("Gov't's *Ex Parte* Opp'n") (SEALED), ECF No. 22, and such harms provide compelling reasons for the NDO, even under the exacting requirements of strict scrutiny review, assuming that standard should apply here, *id.* at 13.[2]

Separately, the parties also dispute whether monetary sanctions are warranted against Twitter because, while focusing on intervening in this criminal investigation and obtaining

---

[1]     The Twitter account at issue is @realDonaldTrump, which is the recently reinstated account of former President Donald J. Trump. *See* Claire Duffy and Paul LeBlanc, "Elon Musk restores Donald Trump's Twitter account," CNN (Nov. 20, 2022), available at https://www.cnn.com/2022/11/19/business/twitter-musk-trump-reinstate/index html (last visited on Mar. 1, 2023) ("The much-anticipated decision from the new owner sets the stage for the former president's return to the social media platform, where he was previously its most influential, if controversial, user. With almost 90 million followers, his tweets often moved the markets, set the news cycle and drove the agenda in Washington.").

[2]     The government's opposition summarizes extensive evidence of the User's conduct, and those of his associates, raising legitimate concerns ██████████████████████████████████████████. *See* Gov't's *Ex Parte* Opp'n at 3–9; *see infra* nn.4, 6.

permission to alert the User about the search warrant, the company failed fully and timely to comply with the Warrant, in violation of two court orders.

As explained below, the government has established that, even if strict scrutiny analysis applies—which the Court assumes without deciding—the compelling interests of avoiding the harms to the criminal investigation, as authorized in § 2705(b), warrant Twitter's continued nondisclosure of the warrant's existence, and the NDO is the narrowest possible way available to protect those compelling government interests. Accordingly, Twitter's motion to vacate or modify the NDO is denied. Moreover, Twitter must pay $350,000 in contempt fines for failing to comply with the warrant in a timely manner, a delay for which Twitter bears full responsibility.

## I.   BACKGROUND

The relevant statutory, factual and procedural background is summarized below.

### A.   Statutory Framework

The SCA governs how providers of "electronic communications service[s] ["ECS"]," as defined in 18 U.S.C. § 2510(15), and "remote computing service ["RCS"]" providers, as defined in 18 U.S.C. § 2711(2), may be compelled to supply records related to that service in response to a subpoena, court order, or search warrant. As relevant here, the SCA's §§ 2703(a), (b)(1)(A), and (c) provide that the government may obtain contents of communications, as well as non-content information and records or other information, about a subscriber or customer of such service, via a search warrant. *See Id.* § 2703(a)-(c). Twitter enables account holders to share and interact with electronic content and to send and receive electronic communications with other users, publicly or privately, and is indisputably an ECS and RCS provider. *See* NDO Appl. ¶ 3.

The SCA is silent as to any obligation of ECS/RCS providers to notify subscribers about the providers' production of records in response to subpoenas, court orders, or search warrants, implicitly allowing such notification on a voluntarily basis. Indeed, Twitter promotes a policy of

3

"notify[ing] its users of any requests from law enforcement for account information, particularly requests for contents of communications, unless prohibited from doing so." Twitter Mem. at 1. The SCA is explicit, however, in authorizing "governmental entit[ies]," which includes federal "department[s] or agenc[ies]" and those of "any State or political subdivision thereof," 18 U.S.C. § 2711(4), to apply for and obtain a judicial order "commanding" a provider of ECS or RCS "to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id*. § 2705(b). Upon receipt of such an application, the SCA requires that "[t]he court *shall* enter such an order if it determines that there is reason to believe that notification of the existence of the warrant, subpoena, or court order will result in" any of five enumerated harms. *Id*. (emphasis added). These enumerated harms broadly cover: "(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial." *Id*. "The explicit terms of section 2705(b) make clear that if a court[] finds that there is reason to believe that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b), the court must enter an order commanding a service provider to delay notice to a customer for a period of time that the court determines is appropriate." *Matter of Application of U.S. of Am.*, 45 F. Supp. 3d 1, 5 (D.D.C. 2014).

A service provider is authorized to move "promptly" to quash or modify an order for disclosure of the contents of communications, such as the warrant at issue here, under two specific circumstances: first, "if the information or records requested are unusually voluminous in nature," 18 U.S.C. § 2703(d), or, second, "compliance with such order otherwise would cause an undue

4

burden on such provider," *id.* Twitter does not contend that either of those circumstances are present here. The SCA is notably silent in providing any statutory authorization for a service provider to challenge an NDO. Instead, in a mechanism designed to encourage compliance with NDOs and minimize litigation, particularly during an ongoing criminal investigation when SCA authorities are employed by law enforcement, the SCA expressly relieves providers from any liability on any claim in any court for disclosing their customer's information in compliance with an SCA order. *See id.* § 2703(e) ("No cause of action shall lie in any court against any provider of wire or [ECS], its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter.").

### B. The Search Warrant and NDO At Issue

On November 18, 2022, Attorney General Merrick Garland announced the appointment of Jack Smith to serve as Special Counsel to oversee two ongoing criminal investigations into (1) unlawful interference with the transfer of power following the 2020 presidential election, including certification of the Electoral College vote held on January 6, 2021, ("the January 6th Investigation"), and (2) unlawful retention of classified documents and possible obstruction ("the Classified Documents Investigation"). *See* "Appointment of a Special Counsel," Department of Justice (Nov. 18, 2022), available at https://www.justice.gov/opa/pr/appointment-special-counsel-0 (last visited on Mar. 2, 2023). As part of the January 6th Investigation, on January 17, 2023, the government applied for, and the Court issued, based on an affidavit establishing probable cause to believe the Target Account contains evidence of criminal activity, a search warrant to search the Target Account and seize responsive records ███████████████████

███████████████████████████

███████████████████████████

████████████████████.  *See* Search and Seizure Warrant ("Warrant") (SEALED), ECF No. 4; *see also* Gov't's Appl. And Aff. in Supp. of Appl. for a Search Warrant ("Warrant Affidavit" and "Warrant Application"), ECF No. 1.  The Warrant itself has two attachments: Attachment A, describing the "Property to Be Searched," and Attachment B, the "Particular Things to Be Seized," and is separate from both the Warrant Application and the Warrant Affidavit.  Warrant at 2.

In addition to the Warrant, the government applied for, and this Court issued, an order sealing the Warrant and related materials, and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days.  *See* Order Granting the Gov't's Appl. for an Ord. Pursuant to 18 U.S.C. § 2705(b) as to Twitter, Inc. ("NDO") (SEALED), ECF No. 3.  The NDO was granted based on the government's proffered facts showing reasonable grounds to believe that notifying the Target Account's User of the existence of the Warrant "would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to this investigation."  NDO Appl. ¶ 10; 18 U.S.C. § 2705(b)(3)-(5).[3]  The government's accompanying lengthy Warrant Affidavit detailed various actions of the User, and the User's associates, ████████████████████████████

████████████████████████████████████.[4]

---

[3]     By contrast to the Application for the NDO, the NDO itself also offered as grounds for nondisclosure the basis that the user of the Target Account would "flee from prosecution."  NDO at 1.  The government has since explained that justification to the NDO was erroneously included.  *See* Gov't's *Ex Parte* Opp'n at 3 n.1.

[4]  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### C.     Procedural History

The Warrant was issued on January 17, 2023, and required Twitter's compliance within ten days of "issuance," Warrant, Att. B. § I, ¶ 5, meaning by January 27, 2023.   Twitter's compliance ended up taking over double the amount of time provided in the Warrant.

### 1.     *Service on Twitter of Relevant Part of Warrant and NDO*

On the same day as issuance of the Warrant, the government attempted to serve the Warrant and the NDO on Twitter through the company's Legal Requests Submissions online site.  Gov't Mot. for Ord. Show Cause at 2 ("Gov't Mot.") (SEALED), ECF No. 5.  Specifically, six pages



of the Warrant were submitted to Twitter, consisting of the Warrant with Attachment A and part of Attachment B. *See* Gov't's *Ex Parte* Opp'n, Ex. A. (SEALED), ECF No. 22-1; *see also* Feb. 7, 2023 Hrg. Tr. at 9:1-19 (same). Twitter has thus never been privy to the remaining parts of Attachment B to the Warrant, the Warrant Affidavit or Application, nor even the Application for the NDO. Twitter Mem. at 1 (conceding "Twitter has not seen" the *ex parte* application for the NDO); Feb. 7, 2023 Hrg. Tr. at 9:1-19 (government counsel agreeing that Twitter has only seen the warrant, Attachment A, and Part 1 of Attachment B).

The government's initial service attempts on Twitter failed twice, with the government's receipt both times of an automated message indicating that Twitter's "page [was] down." Gov't's Mot. at 2 (alteration in original). On January 19, 2023, the government was finally able to serve Twitter through the company's Legal Requests Submissions site. *Id.*

Twitter, however, somehow did not know of the existence of the Warrant until January 25, 2023—two days before the Warrant returns were due. That day, the government contacted Twitter about the status of the company's compliance with the Warrant, and Twitter's Senior Director of Legal, ███████████, "indicated she was not aware of the Warrant but would consider it a priority." *Id.*; *see also* Decl. of ███████████, Senior Director of Legal for Twitter ("███ Decl.") ¶ 2 (SEALED), ECF No. 9-1. The government indicated that "they were looking for an on time production, in two days[,]" to which ███ responded, "without knowing more or taking any position that would be a very tight turnaround for us." ███ Decl. ¶ 2. The government sent the six pages of the Warrant and the NDO directly to ███ later that evening. Meanwhile, ███ directed Twitter's personnel to preserve data available in its production environment associated with the Target Account, and "have confirmed that the available data was preserved." *Id.* ¶ 4.

Twitter notified the government in the evening of January 26, 2023, that the company would not comply with the Warrant by the next day, *id.* ¶ 5, and responded to the government's request for more specific compliance information, by indicating that "the company was prioritizing the matter and taking it very seriously" but that ███ had the Warrant and NDO only "for two days," *id.* ¶ 8, even though the government had tried to submit the Warrant and NDO through Twitter's Legal Requests Submissions site nine days earlier. The Warrant's deadline for compliance makes no exception for the provider's failure to have a fully operational and functioning system for the timely processing of court orders.

On January 31, 2023, Twitter indicated for the first time that the company would not comply with the Warrant without changes to the NDO, stressing as "essential to Twitter's business model (including [its] commitment to privacy, transparency, and neutrality) that [Twitter] communicate with users about law enforcement efforts to access their data." *Id*. ¶ 10. Referencing that "on occasion, [Twitter has] challenged nondisclosure orders," ███ asserted that the NDO "did not . . . meet[] the factors outlined in § 2705(b), given the intense publicity around the investigation." *Id.* In a subsequent conversation with government counsel, ███ made clear that "Twitter's position would be that we should not produce until we resolved our questions as to the NDO." *Id.* ¶ 12.

### 2. *Government and Twitter's Cross Motions*

Given Twitter's refusal to comply with the Warrant unless and until its condition was met allowing disclosure of the Warrant to the Target Account user (or user's representatives), on February 2, 2023, the government moved for an Order to Show Cause "why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant." Gov't's Mot. at 1. The government explained Twitter had no basis for refusing to comply with the Warrant, pointing out that the Warrant and NDO were different court orders, so Twitter could "not delay, to an unknown

future date, compliance with the Warrant by challenging the NDO," *id*. at 3, and arguing that neither "the Warrant itself nor Section 2703 provide for intervention by a third party before compliance with the Warrant is required," *id*.

The same day, Twitter filed its motion to vacate or modify the NDO and stay compliance with the Warrant, arguing that the requested stay was required to "(1) prevent irreparable injury to Twitter's interests that would occur if production under the Warrant were required prior to resolution, and (2) to preserve the status quo as to the user's interest in potentially seeking to assert privilege or otherwise curtail derivative use of potentially privileged communications."  Twitter Mem. at 3.  Twitter highlighted that the Target Account's User could, in theory, exert a privilege over his private communications on Twitter (through direct messages with other users), and should have the opportunity to exert privilege prior to Twitter turning over the information to the government.  *Id.* at 12–14.

The parties were directed to confer and propose a briefing schedule for the pending motions, Min. Order (Feb. 2, 2023) (SEALED), and the schedule proposed by the government was ultimately adopted, *see* Min. Order (Feb. 3, 2023) (SEALED).

### 3. *Hearing on and Resolution of Government's Motion For Order To Show Cause*

At a hearing held on February 7, 2023 on the government's motion, *see* Minute Entry (Feb. 7, 2023) (SEALED), Twitter conceded that: (1) the company had no standing to assert any privilege by any of its users, including the Target Account's User, Feb. 7, 2023 Hrg. Tr. at 66:3-4; *accord* Twitter Opp'n Mot. Ord. Show Cause at 3 ("Twitter Opp'n") (SEALED) (same), ECF No. 9 (SEALED); (2) the company had no confirmation that the Target Account's User wanted or would seize on any opportunity to assert any privilege if such opportunity were provided, *see* Feb. 7, 2023 Hrg. Tr. at 54:11-25; and (3) the company was operating on a mere sliver of the

10

information presented to the Court in support of issuance of the Warrant and the NDO, *see id.* at 48:15-19.

Nevertheless, Twitter argued that "producing the requested information prior to allowing it the opportunity to alert the [Target Account's User] would irreparably injure its First Amendment rights." *Id.* at 65:10-14. This argument was rejected for both practical and logistical reasons as well as legal grounds.  If accepted, Twitter's argument would invite repeated litigation by Twitter and other ECS providers to challenge NDOs in order to alert users to SCA orders, particularly for high profile, highly placed users, such as current or former government officials, with whom the providers might want to curry favor, with concomitant and inevitable delays in execution of SCA orders and resultant frustration in expeditiously conducting criminal investigations.  *See id.* at 65:14-20.  As a legal matter, the NDO was a wholly separate order from the Warrant, with different standards applicable to issuance of each.

These concerns had been well articulated by another court in a similar situation of being confronted with a government motion to compel compliance with an SCA warrant and an ECS provider simultaneously seeking to challenge an NDO, and capsulized this Court's decision to grant the government's motion because the "public interest is served by prompt compliance with the [W]arrant" because "any challenge to a NDO is separate from a challenge to a search warrant [since] any further delay on the production of the materials responsive to the Warrant increases the risk that evidence will be lost or destroyed, heightens the chance the targets will learn of the investigation, and jeopardizes the government's ability to bring any prosecution in a timely fashion."  *Id.* at 66:11-17 (paraphrasing *Google v. United States,* 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020)).

In response to the Court's direct question, Twitter's counsel represented that the company was prepared to and could comply with the Warrant by 5:00 PM that day. *See* Feb. 7, 2023 Hrg. Tr. at 63:16-19 (THE COURT: Okay. Can Twitter produce the [W]arrant returns by 5 p.m. today? MR. VARGHESE: I believe we are prepared to do that. Yes, Your Honor."). The government requested that if Twitter failed to comply with the Warrant by 5:00 PM that day, an escalating sanction should be imposed, starting at a sanction of $50,000, an amount that should "double each day thereafter." *Id.* at 33:6-22; *see also id.* at 33:2-5 (the Court noting that the company "was bought for $40 billion, and the CEO, sole owner is worth . . . over $180 billion"); Gov't's Reply Supp. Mot. Order Show Cause ("Gov't's Reply") at 10 (SEALED), ECF No. 11 (requesting "escalating daily fines" for continued noncompliance by Twitter with the Warrant, at an amount "commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay"). With Twitter's assurance of full compliance by close of business that day, and given Twitter's already tardy compliance with the Warrant, the Court ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant. *See* Min. Order (Feb. 7, 2023) ("Show Cause Order") (SEALED).

### 4.      *Twitter Fails To Comply Timely With Court's Show Cause Order*

Despite representing that the company would and could comply with the Warrant by 5:00 p.m. on February 7, 2023—by that point, nearly two weeks late—Twitter failed timely to comply with the Show Cause Order. Gov't's Notice Re. Twitter's Non-Compliance with the Warrant (SEALED), ECF No. 25. The government explained that prior to 5:00 PM on February 7, "Twitter made a production to the [g]overnment," but "[i]n a follow up call on February 8, counsel for Twitter identified certain information that may (or may not) exist in their holdings and that had not been produced to the [g]overnment." *Id.* Twitter made another production on February 9, and

in a subsequent call, alerted the government that further productions were expected, though the company could not provide a timeframe when "all materials responsive to the Warrant would be produced." *Id.* The government accordingly requested a prompt in-person hearing that day regarding Twitter's continued failure to fully comply with the Warrant. *Id.*

At a hearing held later on February 9, 2023, *see* Minute Entry (Feb. 9, 2023); Feb. 9, 2023 Hrg. Tr. 4:1-5 (SEALED), the Court reviewed with Twitter each part of Part I of Attachment B to the Warrant to assess the extent of compliance and noncompliance by identifying the responsive records Twitter had yet to produce. *See* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20. During this process, Twitter raised questions for the first time about certain requests, demonstrating that the company had failed to confer effectively with the government. *See, e.g.,* Feb. 9, 2023 Hrg. Tr. at 5:1-7 (government counsel commenting about Twitter "attempting to cabin one of the requests in the warrant," during a call earlier on February 9); *id.* at 18:25–19:4 (government counsel explaining that "[t]his is the first time I have heard a complaint about a date limitation on 1H"); *id.* at 31:21-24 (government counsel, stating, "What [the government was] told was that there was one preservation done of the entire history of the account on January 11th. This is the first time we are hearing about another preservation between January 3rd and January 9."); *id.* at 30:2-22, 31:25–32:3 (after Twitter counsel explained that they were collecting data on potentially responsive "fleets," *i.e.* "vanishing tweets," government counsel responded, "I have never heard of 'fleets' in part of any discussion that we have had. I don't know if that is information in this account; it may or may not be. It still will be relevant, it still will be responsive.").

After a line-by-line review of Twitter's responsive and not yet completed productions to the Warrant, Twitter promised to provide an update to the government, by 4:00 PM that day, explaining what responsive records were left to produce and when production would be completed.

*Id.* at 48:21-24.  At the end of the hearing, the Court instructed the government to calculate the total penalty for Twitter's failure to comply with the Show Cause Order by the 5:00 p.m. deadline on February 7, and submit notice of the same to the Court.  *Id.* at 49:5-14.

The government supplied notice, on February 13, 2023, *see* Gov't's Not. Re. Accrued Sanction ("Government Notice") (SEALED), ECF No. 19, that Twitter advised the government, at 8:28 p.m. on February 9, 2023, that "it believed 'Twitter's obligations under the Warrant and the Court's order were complete.'"  *Id.* at 1–2.  With respect to the fine amount, the government calculated that Twitter owed "$350,000, payable to the Clerk of the Court."  *Id.* at 2 ("By the terms of the Court's order, Twitter was in contempt as of 5:00 p.m. on February 7, 2023, at which point a $50,000 sanction came into effect.  An additional amount of $100,000 accrued at 5:00 p.m. on February 8, 2023, since Twitter still had not fully complied with the Warrant as of that time. And at 5:00 p.m. on February 9, 2023, an additional amount of $200,000 accrued.").

Twitter disputes that any sanction is appropriate, *see* Twitter Not. Re. Appl. Of Sanctions at 1 ("Twitter Notice") (SEALED), ECF No. 18, because the company acted in good faith to comply speedily after the February 7 hearing, and the government bears the fault for production delays due to the government's nonstandard requests combined with the government delaying clarifying the scope of the Warrant's requirements.  *See generally id.*

## II.   DISCUSSION

Twitter's motion asserts that the NDO violates its First Amendment right to inform the Target Account's User of the existence of the Warrant, and accordingly requests the NDO be modified to allow notification to that User (or his authorized representatives).  *See* Twitter Mem. at 2–3.  The government opposes Twitter's motion, with both a sealed opposition shared with Twitter and in an *ex parte* filing.  *See* Gov't's *Ex Parte* Opp'n; Gov't's Sealed Opp'n Twitter's

14

Mot. to Vacate or Modify NDO (SEALED), ECF No. 22.  As discussed below, Twitter's motion

is denied and sanctions are appropriately levied here.

### A.    Twitter's Challenge to the NDO Is Without Merit

Twitter asserts that the NDO "constitutes a content-based prior restraint on [its] speech,"

and the government's interests in keeping the Warrant secret cannot "satisfy strict scrutiny in light

of the significant publicity surrounding the Department of Justice's criminal investigation into the"

January 6th Investigation and the Classified Documents Investigation.  Twitter Mem. at 2.  Claims

under the Free Speech Clause of the First Amendment, U.S. CONST. AMEND. I, are analyzed in

three steps: (1) "whether the activity at issue is protected by the First Amendment[;]" (2) "whether

the regulation at issue is content based or content neutral, *i.e.*, if it applies to particular speech

because of the topic discussed or the idea or message expressed[;]" and (3) whether the

government's justifications for restricting the plaintiff's speech satisfy the relevant standard, *i.e.*,

strict or intermediate scrutiny.  *Green v. United States Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir.

2022) (cleaned up).  Strict scrutiny requires that the government show its restriction on speech is

"narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155,

163 (2015).  "If a less restrictive alternative would serve the Government's purpose, the legislature

must use that alternative."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

As to the first step, Twitter correctly points out that "the government does not seriously

contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that

the Non-Disclosure Order operates as a prior restraint on such speech[.]"  Twitter Reply Supp.

Mot. to Vacate or Modify NDO ("Twitter Reply") at 1 (SEALED), ECF No. 27.  Other courts have

concluded, and this Court so finds here, that a nondisclosure orders issued under the authority of

the SCA's § 2705(b) "implicate First Amendment rights because they restrict a service provider's

speech" and "also constitute[] prior restraint, a characterization typically used to describe 'judicial

orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155 (3d Cir. 2020) *("Matter of Subpoena")* (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)); *see also Google*, 443 F. Supp. 3d at 452; *In re Info. Associated with E-Mail Accts.*, 468 F. Supp. 3d 556, 560 (E.D.N.Y. 2020) ("*In re E-Mail Accounts*"); *Matter of Search Warrant for [redacted].com*, 248 F. Supp. 3d 970, 980 (C.D. Cal. 2017) (collecting cases).

With respect to the second step, no decision from this Court, the D.C. Circuit, or the Supreme Court has established whether strict scrutiny or intermediate scrutiny applies when an ECS provider challenges a nondisclosure order issued pursuant to the SCA's § 2705(b). On the one hand, a nondisclosure order is a content-based restriction on speech, and content-based restrictions are normally evaluated under strict scrutiny. *Green*, 54 F.4th at 745 ("[W]e apply . . . strict scrutiny for content-based statutes[.]"); *see also In re Nat'l Sec. Letter*, 33 F.4th 1058, 1072 (9th Cir. 2022) (applying strict scrutiny to a nondisclosure requirement because it "is content based on its face" since "the nondisclosure requirement prohibits speech about one specific issue"). At the same time, in this context, a "nondisclosure requirement" is "not a typical example of such a restriction for it is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 876 (2d Cir. 2008). Indeed, considering that nondisclosure orders tend to be narrow in scope, limited to their accompanying orders or warrants and the facts surrounding them, good reasons exist to subject such orders only to intermediate scrutiny instead of the exacting requirements of strict scrutiny. *See id.* at 876 ("[T]he nondisclosure requirement is triggered by the content of a category of information . . . is far more

16

limited than the broad categories of information that have been at issue with respect to typical content-based restrictions.").

The strict-scrutiny debate need not be resolved here. Assuming, without deciding, that strict scrutiny applies to nondisclosure orders, the NDO at issue here survives strict scrutiny review as a narrowly tailored restriction for which no less restrictive alternative is available that would be at least as effective in serving the government's compelling interests.

### 1.    *The NDO serves a compelling government interest*

The government says that the NDO safeguards "the integrity and secrecy of an ongoing [criminal] investigation" ███████████████████████████████. Gov't's *Ex Parte* Opp'n at 14–15. According to the government, these secrecy interests are particularly salient here because ████████████████████████████████████████████████████ ██████████████ based on the evidence outlined in its *ex parte* opposition. *Id.* at 15; *see also supra* at n. 4, *infra* n.6, and associated text

The government is correct. For starters, "[m]aintaining the integrity of an ongoing criminal investigation is a compelling governmental interest." *In re E-Mail Accounts*, 468 F. Supp. 3d at 560; *see also United States v. Smith*, 985 F. Supp. 2d 506, 545 (S.D.N.Y. 2013) ("[T]he [g]overnment has demonstrated that there is good cause for a protective order because of its compelling interest in ongoing investigations into potentially serious criminal conduct that could be jeopardized by dissemination of the discovery."); *Matter of Subpoena 2018R00776*, 947 F.3d at 156 ("The government's interest is particularly acute where, as here, the investigation is ongoing."). That compelling interest here is magnified by the national import of the January 6th investigation into conduct that culminated in a violent riot at the U.S. Capitol on January 6, 2021, and the disruption of the Joint Session of Congress to certify the results of the 2020 presidential election. Ferreting out activity intended to alter the outcome of a valid national election for the

leadership of the Executive Branch of the federal government, which activity undermines foundational principles of our democracy, and assessing whether that activity crossed lines into criminal culpability, presents as compelling a governmental interest as our very national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) (quotation marks omitted) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation."); *see also* Gov't's Opp'n at 14 ("And that interest is all the more compelling where the investigation concerns an effort to overturn the results of an election and thwart the transfer of presidential power—an effort that culminated in a mob attack on the United States Capitol as lawmakers sought to carry out their constitutional and statutory obligation to certify the Electoral College results.").

Additionally, the government has a strong interest in maintaining the "confidentiality of [its] investigative techniques and [not] cause the subjects of other investigations to change their conduct to evade detection and otherwise thwart future investigations of similar allegations." *Cf. In re Los Angeles Times Commc'ns LLC*, No. MC 21-16 (BAH), 2022 WL 3714289, at *8 (D.D.C. Aug. 29, 2022) (quotation marks omitted) (holding that these weighty law enforcement interests, in the context of an application to unseal court records under the common-law right of public access to judicial records, weighed in favor of continued sealing of certain search-warrant materials). Thus, the SCA deems certain factors to be sufficiently compelling to justify issuance of a nondisclosure order based on reason to believe that disclosure otherwise would pose a risk of destruction or tampering with evidence, intimidation of witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5). In short, maintaining the confidentiality of the government's criminal investigation into any efforts ███ ████████████████████████████ to overturn the 2020 election to ensure that all those responsible and criminally liable, or not, are identified and that relevant documentary and

testimonial evidence is both preserved and collected, without spoliation, alteration or tampering, plainly serves compelling government interests.

Twitter disagrees.  In Twitter's view, "the government cannot credibly show that the [NDO] . . . serves a compelling governmental interest," citing "the voluminous publicly available information about the investigation," Twitter Mem. at 8; *id.* at 9-10 (describing, *inter alia*, media reports about witnesses "subpoenaed to testify before a federal grand jury" and the appointment of Special Counsel Jack Smith); *see also* Twitter Opp'n at 13 (arguing that public revelation of the search and seizure Warrant at issue here would pose "no credible risk" because "the publicity surrounding the investigations" being conducted by Special Counsel Jack Smith "is widespread and unprecedented," making this investigation "wholly distinct from any typical covert law enforcement investigation where the targets are unaware of the government's activities").  With this perception of "no credible investigative reasons to bar disclosure [] of the existence of the Warrant," Twitter urges that the Target Account's User be alerted to the Warrant so he "may raise whatever concerns he has, if any, for determination by this Court in a full adversarial proceeding." Twitter Mem. at 14.  While Twitter denies taking any position "on the applicability of [any] privilege or the validity of the Warrant," Twitter Opp'n at 1 ("Twitter is not taking a position . . . ."); *id.* at 7 ("Twitter takes no position on the applicability of [] privilege as to these communications in this circumstance."), Twitter's real objection then is that the government is proceeding covertly with a criminal investigation when, in the company's view, any privilege issue "should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing."  *Id.* at 8; Twitter Mem. at 2 ("Allowing Twitter . . . to notify the account holder would afford the user . . . an opportunity to address the legal issues surrounding a

demand for [ ] communications in this unique context, and give this Court a full adversarial process in which to evaluate them.").

Twitter makes this demand for an adversarial assessment of privilege issues as a condition of complying with the Warrant, despite not being privy to the full Warrant, ██████████████ ██████████████████████████████████████████, let alone the other proffered evidence presented to the Court in issuing the Warrant and the NDO.  *See* Feb. 7, 2023 Hrg. Tr. at 9:20–10:19.  Put another way, Twitter is taking the extraordinarily aggressive position as a service provider to demand that a covert step taken in an ongoing grand jury and criminal investigation be made public, at least to the account user, before complying with a court order, notwithstanding the informational void on which it stands.

Despite the fact that Twitter has been privy to only a sliver of the government documentation underlying the Warrant and NDO, and thus is quite ignorant of details about and the scope of the government's current investigation into unlawful interference with the transfer of power following the 2020 presidential election and ██████████████████████ in such illegal activity, the company nonetheless boldly contests any compelling interest the government may have in continuing to conduct its investigation covertly, bolstered by the NDO, for three reasons, each of which is meritless.  First, Twitter challenges each of the government's articulated justifications for the NDO under Section 2705(b), arguing that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the Target Account's User will "alter the current balance of public knowledge in any meaningful way" since that disclosure would at most be "incremental."  Twitter Mem. at 11.[5]  For instance, the

---

[5]     In support, Twitter cites news articles discussing the existence of the government's investigations and certain public steps the government has taken as part of its investigations or courthouse citing of witnesses.  Twitter Mem. at 9–11; *see also* Twitter Opp'n, Ex. B (SEALED), ECF No. 9-2 (culling eighty pages of similar articles discussing the investigations); Twitter Reply at 5–6 (identifying several members of former president's administration that have been

company argues that disclosure of the Warrant is not likely to prompt "the destruction of *other* evidence," Twitter Reply at 4 (emphasis in original), because the public and the User know that the User is under investigation for any involvement in interfering "with Congress's certification of the presidential election on January 6," *id.* Nor would it be reasonable, Twitter asserts, "to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications," or that the investigation would be seriously jeopardized because the Attorney General "confirmed the investigation, its scope, and the identity of the target" to the country. *Id.* at 7–8.

Twitter misapprehends the risks of disclosure here. For one thing, without being privy to any non-public information about the investigation, including the full Warrant, Warrant Application and Affidavit, and NDO Application submitted to the Court, Twitter is simply in *no position* to assess how much of the media reports and general public information about the investigation are accurate and how limited that information may be compared to what is known to investigators. Put bluntly, Twitter does not know what it does not know.

More importantly, Twitter's argument is unmoored from the realities of what disclosure would mean here. As the government observes, Gov't *Ex Parte* Opp'n at 16, Attachment B to the Warrant provides significant insight into the type and nature of information that the government requested and targets a key social media account. No public reporting has, thus far, indicated execution of search warrants for the contents of the User's personal electronic communications and records, even if the User is aware of the general contours of the government's

---

subpoenaed or compelled to testify, including former vice president Pence, the former president's daughter and advisor Ivanka Trump and her husband Jared Kushner, his former chief of staff Mark Meadows, and others). Twitter also observes that government has itself "confirmed it has seized and is reviewing the email accounts of [the former president's] associates as part of the investigation." Twitter Reply at 9 (citing *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826 (D.D.C. Feb. 23, 2023) ("*In re N.Y. Times*")).

investigation.  Specific identification of the Warrant could prompt witnesses, subjects, or targets

of the investigation to destroy their communications or records, including on Twitter or other social

media platforms, and could lead the User to ratchet up public and private pressure on others to

refuse to be cooperative with the government, or even to engage in retaliatory attacks on law

enforcement and other government officials that have real world and violent consequences.  This

is not a "conclusory" harm Twitter dismisses out of hand based on its limited information, but

rather could "endanger the life or physical safety of" government officers or "otherwise seriously

jeopardiz[e]" the government's investigation.  *See* 18 U.S.C. §§ 2705(b).  Permitting Twitter to

alert the Target Account's User of the Warrant may prompt a response to this new investigative

scrutiny of the User's conduct that could very well result in one of the enumerated harms set out

in Section 2705(b).

Twitter points to "'the partial unsealing of two judicial decisions resolving filter team

motions'" in relation to one of Special Counsel Smith's investigations, Twitter Reply at 9 (quoting

*In re N.Y. Times*, 2023 WL 2185826 *15), but this is both unpersuasive and supports maintaining

the NDO.  The two unsealed judicial decisions addressed review of the contents of email accounts

that are not those of the Target Account's User, so the unsealing of those decisions raise entirely

different risk assessment contexts than here.  Furthermore, this Court's decision in *In re N.Y. Times*

makes clear that "reliance on and deference to the government is necessary" when considering

whether the release of grand jury materials might harm the government's investigation because

"courts are not made aware of the full scope of materials presented to the grand jury and therefore

are not best positioned to execute redactions[.]"  *Id.* at *9.  As Twitter correctly notes, the Warrant

exists outside the grand jury context—though Warrant returns may be presented to the grand jury

and to that extent become "a matter occurring before the grand jury," subject to secrecy, under

FEDERAL RULE OF CRIMINAL PROCEDURE 6(e). Yet, the exact same point made in *In re N.Y. Times* supports maintaining the NDO because the government remains, both in the grand jury and covert SCA warrant contexts, in the best position to understand how, when, and whether alerting the user of certain information might impair an ongoing criminal investigation. The government's *ex parte* filing, as well as the Warrant and NDO Application, provide ample good reason to support the NDO here to avoid any enumerated harm under the SCO's § 2705(b). *See John Doe*, 549 F.3d at 881 (explaining that "the court will normally defer to the Government's considered assessment of why disclosure in a particular case may result in an enumerated harm" if the government has "at least indicate[d] the nature of the apprehended harm and provide[d] a court with some basis to assure itself (based on *in camera* presentations where appropriate) that the link between disclosure and risk of harm is substantial").[6] That justification for the NDO supplies sufficient compelling

---

[6]

reason for preventing Twitter from disclosing the Warrant to anyone, including the Target Account's User (or the User's representatives).

Second, Twitter believes that "[u]nique and [i]mportant" privilege issues support the relief it seeks, Twitter Mem. at 12, but that argument is irrelevant to whether the government has a compelling interest in maintaining the NDO.[7] Twitter's interests here are purely about its right to speak to the Target Account's User, not what privileges that User may assert. Indeed, Twitter concededly has no standing to raise any issue as to any privilege the User may hold. *See* Twitter Mem. at 4. As the Court previously explained, the Warrant and the NDO do not travel together "because any further delay on the production of the materials" creates an ongoing harm to the government's investigation, Feb. 7, 2023 Hrg. Tr. at 66:11-17; *see also Google*, 443 F. Supp. at

_____

Even though Twitter is not privy to the information contained in the government's *ex parte* filings, Twitter is plainly aware of, and even cites to, former Special Counsel Robert Mueller's investigation into then-President Trump. *See* Twitter Opp'n at 5 n.5 (citing Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election* ("Mueller Report"), Vol. II at pg. 82 n. 546, Dept. of Justice (March 2019), available at https://www.justice.gov/storage/report_volume2.pdf (last visited on Mar. 2, 2023)). The Mueller Report details extensively how former President Trump engaged in obstructive conduct to thwart the former Special Counsel's investigation into Russian Interference in the 2016 presidential election. *See, e.g.*, Mueller Report, Vol. II at pg. 85–90 (discussing how, in June 2017, the former president directed White House Counsel Don McGahn to order the firing of the Special Counsel after press reports that Mueller was investigating the former for obstruction of justice); *id*. at 109-13 (observing that, in 2017 and 2018, the former president pressed Attorney General Sessions to "un-recuse" himself from the Special Counsel Mueller's inquiry, and a "reasonable inference" could be made that, from those actions, the former president "believed that an unrecused Attorney General would play a protective role and could shield the President from the ongoing Russia Investigation"). Given that Twitter is aware of the former president's prior efforts to obstruct investigative efforts into his and his associates' conduct, it should be no surprise that the government can demonstrate that revealing the existence of the Warrant poses the reasonable risk of resulting in several of the deleterious consequences under the SCA's § 2705(b).

[7]     Twitter cites to the Mueller Report as an example of then-President Trump being given advance notice of interviews with witnesses that might implicate the executive privilege to give the former president the opportunity to invoke the privilege in advance of the interviews. Twitter Opp'n at 5 n.5 (citing Mueller Report, Vol. II at pg. 82 n. 546). This example, however, elides the fact that while the former president was given advanced notice to invoke executive privilege for witness interviews, no such representation is made about him being given advance notice to assert privilege as to evidence collected through the issuance of "more than 2,800 subpoenas under the auspices of a grand jury sitting in the District of Columbia; [] nearly 500 search-and-seizure warrants; [] more than 230 orders for communications records under 18 U.S.C. § 2703(d)," and other covert orders. Mueller Report, Vol. I at pg. 13.

24

455, and that harm plainly outweighs a temporary denial of Twitter's ability to speak to its user about the existence of the Warrant.  In any event, no matter the privileges the Target Account's User may hold, what matters for purposes of the First Amendment is whether the government has established that the NDO is narrowly tailored to serve a compelling government interest to keep the Warrant confidential.  The government's interests here are plainly compelling.  *See supra* at nn. 4, 6, and associated text.

Third, as a last-ditch argument, Twitter says that the government "was required to make the requisite showing prior to the [NDO] being signed[,]" and any new, "secret rationale" should be rejected as a "*post hoc* rationalization[.]"  Twitter Reply at 13.  Twitter's argument is both factually and legally flawed.  The government's argument is not a *post hoc* rationalization because the Warrant Affidavit, which was considered simultaneously with the NDO Application, provides ample reason justifying the NDO.  Furthermore, Twitter cites no decision in which an NDO has been vacated because the government offered *additional* evidence to support that order when challenged.  *See, e.g., John Doe*, 549 F.3d at 881 n. 15 (noting that the court permitted the government "to amplify its grounds for nondisclosure in a classified declaration submitted *ex parte* . . . and made available for [the court's] *in camera* review").

The case Twitter relies on to assert that the government cannot provide new support for the NDO "that [was] not offered at the time the government first sought the" order, Twitter Reply at 13 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("*Lakewood*")), is entirely inapposite.  *Lakewood* addressed a facial challenge to a city ordinance that gave unbridled discretion to the mayor to issue permits for placement of news racks on public property.  *Id.* at 753–54. The Court struck down the ordinance, because, without objective standards for determining whether a permit should issue, impermissible, content-based rejections could be

disguised by "*post hoc* rationalizations, . . . making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* at 758.  Unlike in *Lakewood*, the government here does not possess unbridled discretion to silence ECS/RCS providers when applying for an NDO.  Rather, an NDO may issue when, as here, the government has adduced evidence to demonstrate to the Court that notifying the customer or subscriber of the court order or subpoena may lead to one of the deleterious outcomes listed under § 2705(b).

### 2. The NDO is narrowly tailored

In the strict-scrutiny context, which is assumed to apply here, the narrow-tailoring requirement is a least restrictive–means test.  This test requires that "[i]f a less restrictive alternative for achieving that interest exists, the government 'must use that alternative.'" *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 510 (D.C. Cir. 2016) (quoting *Playboy Entm't Grp.*, 529 U.S. at 804).  The less restrictive alternative must "be at least as effective in achieving the legitimate purpose that the [government action] was [taken] to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997); *see also McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (same).  The government explains, correctly, that the NDO is narrowly tailored because: (1) "The scope of speech regulated by the NDO is extremely narrow" since the NDO only "prohibits Twitter from disclosing the existence or contents of the Warrant" and "is limited to 180 days[,]" Gov't's Opp'n at 17–18; and (2) notifying the user or his representatives is untenable because it would be ineffective in maintaining the confidentiality of its investigation, leading to the harms described above, *see id.* at 18–19.

Courts have routinely found that non-disclosure orders satisfy the narrow-tailoring requirement under strict scrutiny so long as the orders are limited in scope and time, and notifying the subject of the investigation, or any other authorized person, would not satisfy the government's

26

compelling interest in maintaining the confidentiality of its investigation. For example, in *Google v. United States*, the court held the nondisclosure order in that case was narrowly tailored because "it prohibit[ed] only the disclosure of the existence of the Warrant and of the investigation[,] . . . [and it was] also limited to a one-year time period." 443 F. Supp. 3d at 453. The government satisfied the least-restrictive-means requirement by demonstrating that notifying "the person or entity to whom the warrant is directed . . . would result in at least one of [§ 2705(b)'s] five enumerated harms" based on the government's lengthy *ex parte* "affidavit setting out . . .why premature disclosure of the warrant and the existence of the investigation could reasonably lead to the destruction of or tampering with evidence and intimidation of potential witnesses, thus making information inaccessible to investigators, and how the disclosure could seriously jeopardize the ongoing investigation." *Id.*; *see also in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62 (rejecting a similar First Amendment challenge to a one-year NDO as to a warrant and existence of the investigation because the government's *ex parte* affidavit showed "there was a risk that other employees, including higher-ups, were involved in the conspiracy[,]" such that notifying the company of the existence of the warrant could lead to one of the numerated harms under Section 2705(b) and "jeopardize [the government's] investigation").

The NDO is narrowly tailored for the same reasons articulated in *Google* and *In re E-mail Accounts*. First, the NDO here is even more narrow in scope and time duration than those at issue in *Google* and *In re E-mail Accounts*: the subject matter Twitter is barred from speaking about is limited to the Warrant's contents and existence, and does not impinge at all on the company speaking to the public about the general subject of the January 6th Investigation. Plus, the NDO applies for 180 days, which is half the duration of the year-long NDOs at issue in *Google* and *In re E-Mail Accounts*. Second, the NDO presents the least-restrictive means for the government to

satisfy its compelling interests here because notifying the User or his representatives of the Warrant's existence would, for the reasons explained above, likely result in the enumerated harms outlined in 2705(b).  *See supra* at nn. 4, 6, and associated text; *see also Google*, 443 F. Supp. 3d at 453; *in re E-Mail Accounts*, 468 F. Supp. 3d at 561–62.

Twitter does not dispute that the NDO is narrow in scope and in time.  Instead, Twitter posits that purportedly narrower alternatives could be adopted to preserve the company's "[e]ssential First Amendment [r]ights."  Twitter Mem. at 14.  Twitter's suggestions are untenable, however, and do not come close to satisfying the government's interests in maintaining confidentiality about this covert investigative Warrant.  First, Twitter's suggestion that notifying "just its user" plainly fails because this would likely result in the statutory harms outlined in § 2705(b) for the reasons outlined above.  *See supra* at nn. 4, 6, and associated text.  Second, Twitter suggests notifying certain of the User's representatives, Twitter Mem. at 14–15; Twitter Reply at 16, but that proposal is preposterous since such the suggested representatives not only may themselves be witnesses, subjects, or targets of either the January 6th or Classified Documents Investigation, but also would be under no bar from immediately alerting the User.[8]

The Third Circuit's decision in *Matter of Subpoena* is instructive here.  In challenging an order preventing disclosure of a grand jury subpoena for the data of a customer's employees, the SCA provider that received the grand jury proposed two alternatives, both of which involved notifying the customer's bankruptcy trustee.  *Matter of Subpoena*, 947 F.3d at 158.  The Third Circuit categorically rejected the proposals as "untenable" and "impractical" because notifying the trustee "would be ineffective in maintaining grand jury secrecy" and would "undermine[] the

---

[8]     Twitter's suggestion that the government obtain the responsive data from NARA, Twitter Mem. at 15, is a nonstarter, both because the Warrant demands more information from Twitter than Twitter provided to NARA about the Target Account, Feb. 7 Hrg. Tr. at 11:7-13, and because this proposal is moot in light of Twitter's representation that it has now fully complied with the Warrant.

government's interest in maintaining the confidentiality of an ongoing investigation." *Id.* at 158–59. Similar to Twitter's naïve suggestion here that, if not the User, the User's associates should be trusted with the existence of the Warrant, the Third Circuit was invited to "assess the trustworthiness of a would-be confidante chosen by a service provider" for disclosure, but expressly rejected that invitation since neither "courts nor the government can be expected to vet individuals selected by service providers and determine their risk of subverting an ongoing investigation." *Id.* at 159.

For the same reasons articulated in *Matter of Subpoena*, evaluating the viability of Twitter's proposed alternative disclosure tactics is unnecessary since revealing the Warrant to either the User or one of his representatives fall far short of meeting the government's compelling interests in maintaining the confidentiality of its investigation for all of the ample reasons presented in support of the NDO. *See supra* at nn. 4, 6, and associated text. In short, "[s]trict scrutiny does not demand that sort of prognostication," *Matter of Subpoena*, 947 F.3d at 159, so Twitter's proposed alternatives lack merit.

For the above reasons, the government has satisfied that the NDO meets the exacting requirements of strict scrutiny review under the First Amendment.

### B.    Sanctions

The last dispute between the parties is whether Twitter should be sanctioned for failing to comply on a timely basis, first with the Warrant and then with the Show Cause Order, the latter of which required full compliance by February 7 at 5:00 PM. Twitter does not contest—nor could it—that the company was in violation of the Warrant and the Show Cause Order as of February 7 at 5:01 PM. Instead, the company claims a full defense to any sanctions, contending that Twitter substantially, if not fully, complied by the Show Cause Order deadline and acted diligently to finish production in response to the government's nonstandard requests, while accusing the

29

government of being dilatory in responding to Twitter's requests for clarification. *See generally* Twitter Notice.

The D.C. Circuit has described three stages in a civil contempt proceeding: "(1) issuance of an order; (2) following disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled." *N.L.R.B. v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981). "At the second stage[,] the recalcitrant party is put on notice that unless it obeys the court's decree and purges itself of contempt it will be fined or face other sanctions." *Id.* at 1185. "At the third stage the court determines whether the party has fulfilled the purgation conditions. If it has, it escapes the threatened penalty; if it has not, the penalty is imposed." *Id.*

Given that both parties agree that Twitter failed timely and fully to comply with the Warrant and Show Cause Order, which imposed monetary sanctions for failure to do so, stage three of the proceedings must be considered: whether monetary sanctions should be imposed. "Once the [movant has] establish[ed] that the [contemnor] has not complied with the order, the burden shifts to the [contemnor] to justify its noncompliance." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 39 (D.D.C. 2010). "The contemnor is required to show that it has 'done all within its power' to comply with the court's order." *Id.* at 40. (quoting *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004)).

Twitter asserts a good faith and substantial compliance defense to being assessed civil sanctions. The D.C. Circuit has left open the ability of a contemnor to assert a defense of good faith and substantial compliance to avoid a civil sanction. *See Food Lion, Inc. v. United Food and*

*Commercial Workers*, 103 F.3d 1007, 1017 (D.C. Cir. 1997); *see also id.* at n.16 (collecting three district court decisions leaving open the availability of a good faith and substantial compliance defense to avoid civil contempt sanctions); *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014) (quotation marks omitted) ("Once the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance by, for example, demonstrating its financial inability to pay the judgment or its good faith attempts to comply."). "Assuming that the defense survives in this circuit, however, the burden of proving good faith and substantial compliance is on the party asserting the defense[.]" *Food Lion*, 103 F.3d at 1017 (footnote omitted). "In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Id.* (quotation marks omitted); *see also Latney's Funeral Home*, 41 F. Supp at 30 (quoting *Int'l Painters*, 736 F.Supp.2d at 40) ("At this stage, conclusory statements about the financial inability to comply or good faith substantial compliance are insufficient; instead, [the contemnor] must demonstrate any offered justification 'categorically and in detail.'").

Ultimately, the decision to hold a party in contempt and assess civil sanctions against a party is left up to the discretion of the district court, based on the record evidence concerning that party's efforts to comply with the court order. *See In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 822–23 (D.C. Cir. 2009) ("District judges must have authority to manage their dockets . . . and we owe deference to their decisions whether and how to enforce the deadlines they impose. Though we recognize [the contemnor's] strenuous efforts to comply, the district court found them to be 'too little too late[.]' . . . Were we on this record to overturn the district court's fact-bound

31

conclusion that [the contemnor] dragged its feet until the eleventh hour, we would risk undermining the authority of district courts to enforce the deadlines they impose.")

Based on the record above, Twitter's good faith and substantial compliance defense is insufficient to avoid the sanction imposed because the company's substantial compliance with the Show Cause Order deadline (February 7 at 5:00 PM) occurred only *after* it had already delayed production since January 27, the original deadline for compliance with the Warrant in an important ongoing criminal investigation. Twitter repeatedly represented that the company stood ready to comply promptly with the Warrant soon after in-house counsel was made aware of the Warrant's existence on January 25, 2023. *See* ▮▮▮▮ Decl. ¶ 4 (noting that ▮▮▮▮ directed Twitter's personnel to preserve data available in its production environment associated with the Target Account on January 25, and "have confirmed that the available data was preserved"); Twitter Opp'n at 14 (promising "[a]s a continued demonstration of its good faith efforts to comply with this Court's orders while its First Amendment interests are resolved, . . . to be willing to produce the requested data and communications from the Target Account to the Court or the government, to be held without review until [its Motion] is resolved"); Feb. 7, 2023 Hrg. Tr. at 63:16-19 (Twitter counsel responding to Court's query whether Twitter could comply with the Warrant by February 7 at 5:00 PM, that Twitter is "prepared to do that."). Yet, Twitter waited until after the Show Cause Order deadline passed on February 7 to raise, *for the first time*, multiple questions about the Warrant's document demands, *see* Feb. 9, 2023 Hrg. Tr. at 6:1–48:20, including the company's inability to produce records responsive to data concerning "associated accounts," *id.* at 7:20-8:7 (discussing Warrant, Att. B, ¶ I.B), and cabining date and scope limitations in another request, *id.* at 20:12-20 (discussing Warrant, Att. B, ¶ I.H).

If Twitter had been diligent and serious in its good faith intention to comply with the Warrant, those questions should have been identified, raised, and resolved with the government upon receipt of the Warrant on January 19, 2023, or subsequently upon review by in-house counsel on January 25 and 26, 2023, or even during ongoing conversations with the government through February 1, 2023. That did not happen. To be sure, Twitter advised the government on February 1, 2023, about "want[ing] to further discuss . . . Attachment B and technical issues [it would] need to work through in responding once the issue is resolved." ███ Decl. ¶ 14. Yet, those issues were not pursued by Twitter and appeared to be dropped in favor of litigating, until raised at the February 9, 2023, hearing under the Court's supervision, with sanctions mounting. That context for raising these issues for the first time does not demonstrate "adequate detailed proof" of good faith and substantial compliance. *See Int'l Painters*, 736 F. Supp. 2d at 38; *cf. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d at 34-35 (citation omitted) (alteration in original) ("Although Defendants maintain that they are 'aggressively working to find monies to pay [their] past due taxes,' their good faith alone does not absolve them of the fact that they remain in substantial violation of the Injunction.").

Moreover, Twitter represented in its opposition to the government's Motion, and at the February 7, 2023 Hearing, that it stood ready promptly to produce responsive records in full, when required, but plainly this was not so. Twitter's good faith and substantial defense fails because it did not attempt to resolve specific questions concerning the Warrant's document demands with the government prior to either the February 7 or February 9, 2023, hearings. *Cf. Food Lion*, 103 F.3d at 1018 (holding that the contemnor "failed to prove that it complied substantially and in good faith with the order" because the order "clearly directed [the contemnor] to search all of its

records[,]" and the contemnor "did not seek a clarification of this order"). In short, Twitter was "too little too late." *In re Fannie Mae Sec. Litig.*, 552 F.3d at 822 (quotation marks omitted).

As a fallback position, Twitter seeks to excuse the incremental $200,000 penalty assessed on February 9, citing the fact that the government did not clarify its position regarding the scope of the Warrant on February 9 until 3:52 PM that day—giving Twitter just 68 minutes to comply before the final $200,000 penalty was purportedly triggered. Twitter Notice at 4. Twitter's argument is rejected for two reasons. For one thing, Twitter incorrectly assumes that the $200,000 fine was triggered at 5:00 PM on February 9. The Show Cause Order did not specify that the subsequent fine would trigger at 5:00 PM the next day, but merely provided that Twitter "shall be fined $50,000, a fine amount that shall double *every day*, for failing to comply with this Order[.]" Minute Order (Feb. 7, 2023) (emphasis added). That means that Twitter's additional fine of $200,000 accrued as soon as 12:00 AM on February 9, not at 5:00 PM. Even if Twitter's last fine were to have accrued at 5:00 PM on February 9, however, the government cannot be blamed for the timeliness of its response on February 9, when Twitter could have resolved all these issues with the government prior to the original return date for the Warrant on January 27, 2023, or even during conversations with Twitter's in-house counsel through February 1, 2023, but Twitter skipped those opportunities. *See Pigford*, 307 F. Supp. 2d at 58 (quoting *Twelve John Does v. District of Columbia*, 855 F.2d 874, 877 (D.C. Cir. 1988)) ("When a district court determines . . . that a contemnor has 'not done all within its power' to comply with the court's orders, contempt may be appropriate even where compliance is difficult.").

Accordingly, Twitter's civil sanction for failing to comply with the Warrant and the Show Cause Order stands at $350,000.

## III.    CONCLUSION

For the foregoing reasons, Twitter's Motion is denied, and the NDO shall remain in effect for 180 days from issuance, until, at least, July 16, 2023.  Additionally, Twitter is assessed a $350,000 sanction for failing timely and fully to comply with the Show Cause Order, which sanction is promptly payable to the Clerk of this Court within ten days.  Twitter shall file a notice for filing in the docket of this matter upon payment in full of the sanction.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 3, 2023

BERYL A. HOWELL
Chief Judge

35

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 – BAH <br><br> **UNDER SEAL** |

## TWITTER'S NOTICE REGARDING APPLICABILITY OF SANCTIONS

Twitter, Inc. writes to set forth its position on the extent of any penalty that should be imposed on Twitter pursuant to the Court's February 7 order compelling Twitter to comply with the government's warrant.

Twitter does not believe any accrued penalty is appropriate.  "[S]ubstantial compliance … is a complete defense in a civil contempt proceeding."  *Brotherton v. Lehman*, 1984 WL 66 (D.D.C. 1984); *see also Cobell v. Babbitt*, 37 F. Supp. 2d 6, 9-10 (D.D.C. 1999) ("To rebut a prima facie showing of civil contempt, the contemnor may assert the defense of 'good faith substantial compliance."").  Here, Twitter at all times acted in good faith and had substantially complied with the warrant by 5:00 pm on February 7, 2023 by using its standard tools for responding to law enforcement requests.  Twitter's February 7 production included 39 data sets containing over 100 data fields, folders, or JSON files.

Twitter produced supplemental data after 5:00 pm on February 7, 2023 but Twitter submits that this supplemental production does not warrant imposition of any penalty, and in all events, it does not warrant imposition of the $350,000 penalty that the government seeks.

1

FILED UNDER SEAL

Twitter's supplemental production resulted from two issues that Twitter had sought to raise with the government prior to the Court's February 7 hearing and that were ultimately resolved only after subsequent conferrals with the government and the Court's hearing on February 9.[1]  Twitter swiftly completed production once it had received necessary guidance from the government and the Court.

**The Government's Non-Standard Requests**

The first issue on which Twitter needed guidance concerned the technical and operational challenges of responding to certain non-standard requests in the warrant.  These requests fell outside the ordinary categories of information captured by the tools that Twitter uses to respond to the thousands of warrants, 2703(d) orders, and subpoenas it receives each year.  Given the challenges and technical issues of responding to such non-standard requests, Twitter sought to raise this issue with the government prior to the February 7th hearing without success.  *See supra* n.1.  Following the hearing, Twitter contacted the government on February 8 at 11:56 am to determine whether the government wished Twitter to take the extraordinary efforts that would be required to collect and produce this non-standard data, which in several instances would be challenging even to locate within the company's systems.

Counsel for Twitter and the government met and conferred at February 8 at 5:30 pm.  At 8:51 pm on February 8, the government confirmed that it did indeed wish Twitter to collect and

---

[1] Prior to any hearing before the Court, on February 1, 2023, Twitter conveyed to the government that "we will want to further discuss with you Attachment B and technical issues we will need to work through in responding," separate and apart from Twitter's position that compliance with the warrant should be delayed until the resolution of its motion to quash the non-disclosure order. ▮▮▮▮ Decl. ¶ 14.  The government declined Twitter's request to discuss these issues with Twitter at that time and instead moved the Court for an order to show cause why Twitter should not be held in contempt.

2

FILED UNDER SEAL

produce non-standard data.  Twitter accordingly worked through the night and the next day to

overcome the technical challenges presented by the government's request.  Twitter produced

certain supplemental data at around 2:00 am ET in the morning of February 9 (approximately

five hours after the government confirmed it wanted Twitter to go outside its standard law

enforcement tools) and completed its supplemental production of non-standard data by 8:06 pm

ET on February 9,[2]  less than 24 hours after the government had confirmed that it wished Twitter

to undertake these efforts.

**Guidance Regarding Certain Requests**

The second issue on which Twitter needed guidance from the government and the Court

concerned the scope of certain requests in the warrant.  Request 1(h) seeks "communications

between Twitter and any person regarding the account, including contacts with support services

and records of actions taken."  This request could potentially have been read to encompass all

communications with any party and an employee at Twitter regarding the subject account from

2006 until the present, a potentially vast scope of data.  During the February 9 call, the

government would not provide any further guidance on this request.

At the hearing on February 9, however, the Court recognized the need for guidance given

the breadth of Request 1(h) and consequently defined the scope of the Request to

communications between October 1, 2020 and January 20, 2021 with 8 identified individuals

regarding the subject account, and permitted the government to meet and confer with Twitter to

---

[2] We believe the government incorrectly labeled this production as occurring at 5:03pm Eastern
(Gov't Notice at 1) because its FTP site may have date/time stamped the upload using Pacific
time.  For the reasons stated below, the government's claim that a purported three-minute
delinquency requires a $200,000 penalty is equally unreasonable even with the correct time.

3

FILED UNDER SEAL

potentially identify additional agents who the government believed might have communicated

with Twitter about the subject account on behalf of the accountholder during that time period.

(Transcript of Hearing, February 9, 2023, 13:10-24:3.)   The government provided Twitter a list

of additional email addresses that it wished Twitter to search at 3:52 pm ET on February 9, 2023.

Although Twitter believed that the government's list was overbroad, Twitter nonetheless

completed a search using the government's list and included the identified communications in its

final production at 8:06 pm ET on February 9.

**The Government's Calculation Is Unreasonable**

Prior to the first hearing before the Court on February 7, Twitter attempted to confer with

the government about the technical and operational challenges of responding to its requests.  In

addition, Twitter had a good faith, legal disagreement about whether production should have

been stayed pending resolution of its challenge to the non-disclosure order.  Once the Court

rejected Twitter's position, Twitter moved swiftly that same day to comply—not only by

substantially completing production using its standard production tools before 5:00 pm on

February 7, but also by working around the clock and overcoming significant technical issues to

produce supplemental data shortly thereafter.  In light of Twitter's diligence, substantial

compliance, and good faith, Twitter believes that no penalty is warranted here.

In all events, however, Twitter objects to the incremental $200,000 that the government

seeks to impose for the period after 5:00 pm on February 9, 2023.  As set forth above, Twitter

was still receiving clarification on the government's position regarding the scope of the warrant

up until 3:52 pm on February 9—just 68 minutes before the government believes this final

$200,000 penalty was triggered.  Twitter then completed its production—including with respect

4

FILED UNDER SEAL

to the new search terms provided by the government at 3:52 pm—within a matter of hours. And

the final production came just hours after a hearing in which the court had provided direction on

how Twitter was to comply.  Twitter does not believe that such a short period of delay justifies

imposition of such an extraordinary sanction.

Dated: February 13, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.*
    *admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.*
    *admission pending)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel:  (617) 526-6000
Fax:  (617) 526-6363

*Counsel for Twitter, Inc.*

5

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of February 2023, I caused the foregoing motion to be served by email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

6