# Attachment B:

# Documents to be unsealed without redactions

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 Filed Under Seal |
|---|---|

**GOVERNMENT'S MOTION TO SEAL AND TO AUTHORIZE LIMITED DISCLOSURE**

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully moves for an order to place and maintain under seal, until further notice of the Court, the Government's Ex Parte Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant, the Government's Sealed Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant, this Motion to Seal, and the Court's Order to Seal, except that these materials, other than the Government's Ex Parte Opposition, may be served upon counsel for Twitter.

"A motion or application filed in connection with a grand jury subpoena or other matter occurring before a grand jury, all other papers filed in support of or in opposition to such a motion or application, and all orders entered by the Court in connection therewith, shall be filed under seal." D.D.C. LCrR 6.1. These requirements advance the important public and private interests served by the grand jury secrecy requirement contained in Federal Rule of Criminal Procedure 6(e). Here, the Government's Ex Parte Opposition discusses matters occurring before a grand jury. Although the Sealed Opposition does not directly discuss grand jury matters, it nonetheless

refers to an ongoing grand jury investigation.   Accordingly, the Government requests an Order placing the above-listed materials under seal and authorizing disclosure to Twitter, with the protections described in the Proposed Order.

Respectfully submitted,

JACK SMITH
Special Counsel

By:  */s/ Mary L. Dohrmann*
    Mary L. Dohrmann (N.Y. Bar No. 5443874)
    James I. Pearce (N.C. Bar No. 44691)
    Assistant Special Counsels
    950 Pennsylvania Avenue, N.W.
    Washington, D.C.   20530

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 Filed Under Seal |
|---|---|

**ORDER AUTHORIZING LIMITED DISCLOSURE AND IMPOSING PROTECTION**

The United States has responded in opposition to Twitter Inc's motion to vacate or modify an order that it not disclose the existence of a search warrant. ECF No. 7. The Government requests that certain protections be imposed to ensure the secrecy of the sealed proceeding.

By Local Rule of this Court, because the proceeding on this motion is "in connection with a grand jury subpoena or other matter occurring before a grand jury, all other papers filed in support of or in opposition to [the] motion . . . shall be filed under seal," and all hearings "shall be closed." D.D.C. LCrR 6.1. Here, the Government's Ex Parte Opposition directly discusses matters occurring before the grand jury, and the Government's Sealed Opposition refers to an ongoing grand jury investigation. Accordingly, the proceeding on the motion must not be made public except by order of the Court. *See id.* ("Papers, orders and transcripts of hearings subject to this Rule, or portions thereof, may be made public by the Court on its own motion or on motion of any person upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury."). These requirements advance the important public and private interests served by the grand jury secrecy requirement contained in Federal Rule of Criminal Procedure 6(e). *See, e.g.*, *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983) ("[I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that

testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." (quoting *Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979)); *see also McKeever v. Barr*, 920 F.3d 842, 844–45 (D.C. Cir. 2019) (articulating the "vital interests" safeguarded by Federal Rule of Criminal Procedure 6(e)).

To ensure adherence to Local Criminal Rule 6.1, Federal Rule of Criminal Procedure 6(e), and the interests underlying those rules, it is:

1. **ORDERED** that the Government is authorized to provide Twitter with a copy of the Government's Sealed Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant; it is further

2. **ORDERED** that the Government is authorized to file an *ex parte* Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant; it is further

3. **ORDERED** that the Government and Twitter shall not disclose to the public the existence of this proceeding, any papers or orders filed in this proceeding, or the substance of anything occurring in this proceeding; and it is further

4. **ORDERED** that the attorneys of record shall restrict disclosure of this proceeding, including disclosure of any papers and orders filed in this proceeding, to their clients and to those

individuals adjudged by the attorney as necessary to litigate the issues presented.

**IT IS SO ORDERED.**

DATE: FEBRUARY ___, 2023.

______________________________
BERYL A. HOWELL
CHIEF JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |

**MOTION FOR LEAVE TO LATE-FILE THE GOVERNMENT'S OPPOSITION TO TWITTER'S MOTION TO VACATE OR MODIFY THE NDO**

The United States of America respectfully moves for leave to late-file the Government's Ex Parte Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant, the Government's Sealed Opposition to Twitter Inc's Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant, the Motion to Seal, and the Court's order to seal. For the reasons given in the Government's Motion to Seal, the Government also requests this Motion be placed under seal except that it may be served upon Counsel for Twitter.

On February 3, 2023, the Court issued a briefing schedule for Twitter's Motion to Vacate or Modify Non-Disclosure Order under which the Government's opposition was due on February 16 and Twitter's reply was due on February 23. The briefing schedule further specified that the filings on those dates were due by 4:00 p.m. The Government filed its Opposition (as well as the other related filings identified in the prior paragraph) by e-mail to Chambers on February 16, but regrettably it did so at 5:43 p.m., thus missing the deadline by one hour and forty-three minutes. The Government now seeks the Court's leave to late-file its Opposition and other related filings and would not object to a similar extension of time for Twitter to file any reply.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    */s/ James I. Pearce*
        James I. Pearce (N.C. Bar No. 44691)
        Mary L. Dohrmann (N.Y. Bar No. 5443874
        Assistant Special Counsels
        950 Pennsylvania Avenue, N.W.
        Washington, D.C.  20530

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |
|---|---|

**GOVERNMENT'S REPLY IN FURTHER SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE WHY TWITTER INC. SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH A SEARCH WARRANT**

Twitter Inc. ("Twitter") declined to comply with a clear order issued by this Court: a search warrant requiring Twitter to provide information associated with the Twitter account "@realDonaldTrump." ECF No. 4 (the "Warrant"). Twitter acknowledges the Warrant's validity but nonetheless refuses to comply unless it is first permitted to disclose the Warrant to former President Donald J. Trump and the former President is provided with an opportunity to challenge it. Indeed, Twitter claims that it will refuse to execute the Warrant *even were* the government to retract the Non-Disclosure Order ("NDO")—which the government will not do. The Court should require Twitter to comply with this Warrant just like any other. Twitter should not be permitted to dictate a special protocol.

## I. Legal Standard

"A civil contempt action is characterized as remedial in nature, used to obtain compliance with a court order or to compensate for damages sustained as a result from noncompliance." *United States v. Shelton*, 539 F. Supp. 2d 259, 262 (D.D.C. 2008) (citing *Evans v. Williams*, 206 F.3d 1292, 1294-95 (D.C. Cir. 2000)). The party seeking the finding of contempt has the burden of establishing by clear and convincing evidence that "(1) there was a clear and unambiguous court order in place; (2) that order required certain conduct" by Respondent; and (3) Respondent "failed

to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 30 (D.D.C. 2014); *see also Food Lion, Inc. v. United Food and Commercial Workers*, 103 F.3d 1007, 1016 (D.C. Cir. 1997) (rejecting argument that movant must demonstrate bad faith by contemnor); *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993). "[A litigant's] intent in failing to comply . . . is irrelevant." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 22, 26 (D.D.C. 2015).

If the party seeking contempt sanctions makes the above *prima facie* showing, the burden shifts to the putative contemnor to produce evidence justifying noncompliance either because of an inability to comply or good faith and substantial compliance. *MasTec Advanced Technologies v. National Labor Relations Board*, No. 1:20-mc-0022, 2021 WL 4935618, at *3 (D.D.C. June 3, 2021). Both good faith and substantial compliance "must be accompanied by adequate detailed proof." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010). "To prove good faith substantial compliance, the contemnor must show that it 'took all reasonable steps within [its] power to comply.'" *SEIU Nat'l Indus. Pension Fund v. Artharee*, 48 F. Supp. 3d 25, 30 (D.D.C. 2014) (alteration in original) (quoting *Int'l Painters*, 736 F. Supp. 2d at 40). A party's good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, but good faith alone is not sufficient to excuse contempt. *Food Lion, Inc.*, 103 F.3d at 1017-18.

## II.     The Requirements for Holding Twitter in Civil Contempt Are Satisfied Here

### A.     Twitter Has Failed to Comply with a Clear and Unambiguous Order

The Warrant issued by this Court unambiguously requires Twitter to produce the records delineated in Attachment B. Twitter knows full well what it must do to comply with the Warrant. Indeed, on February 5, 2023, Twitter informed the government that it is fully prepared and able to

"produce data responsive to the Warrant." Email from George Varghese, Feb. 5, 2023; *see* Opp. 10. But Twitter states it will comply with the Warrant and provide the data only if the government agrees not to review that data until this Court decides Twitter's motion to vacate or modify the separate NDO. In short, Twitter refuses to comply because it has purportedly decided to "safeguard the privacy" of a particular user. Opp. 3.

### B. Twitter Does Not and Cannot Demonstrate an Inability to Comply or Good Faith Substantial Compliance

Twitter offers no technical obstacle to complying with the Warrant. Indeed, as noted above, it appears Twitter has already gathered the responsive information. Instead, Twitter claims that legal obstacles prevent it from complying with this Court's order. But Twitter can avail and has availed itself of an independent legal avenue to challenge the NDO. It has entirely failed to comply with the Warrant, let alone substantially comply. And even if it had substantially complied, its invocation of an unfounded executive privilege claim belies its purported good faith.

#### 1. Twitter Cannot Refuse to Comply Based on Potential Privileges Possessed by Third Parties

Twitter does not dispute that no legal authority permits a third party served with a search warrant to contest that warrant before it is executed. *See* Opp. 4; Gov. Mot. at 1, 3. Twitter instead contends (Opp. 4) that the absence of any legal mechanism to press such a challenge is "entirely unsurprising" given the "unique situation" implicating "significant and unresolved legal issues" that the Warrant presents. But the potential for a legal challenge to information obtained through a search warrant, whether "unique" or not, provides no basis for the recipient of a search warrant to refuse, on behalf of a third party, to execute it.

The practical consequences of adopting Twitter's amorphous standard are momentous. As Twitter observes (Opp. 3-4), Twitter users on whose accounts a search warrant has been executed

could potentially advance any number of legal arguments, including privilege claims (such as attorney-client, clergy-penitent, Speech or Debate) and suppression claims under the Fourth Amendment. Twitter correctly acknowledges (Opp.3) that it lacks standing to assert its users' "rights and privileges" but nonetheless proceeds to advocate an approach that would permit Twitter not to comply with a court order directing it to execute a search warrant any time Twitter deems the situation "unique" (Opp. 4) or determines that the warrant presents "challenging and substantial issues" (Opp.1).   Neither legal authority nor an overarching interest in protecting the privacy of its users permits Twitter to arrogate such power to itself. *See Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 56 (2d Cir. 2017) (Carney, J, concurring in the order denying rehearing en banc) (noting that a warrant "issued by a neutral magistrate judge upon a showing of probable cause . . . satisfied the most stringent privacy protections our legal system affords"). Here, Twitter seeks to deploy that power to characterize the Warrant as "unique" and, in contravention of the court's order, unilaterally impose heightened requirements for execution of a search warrant where a high-profile client is involved. The government merely seeks evenhanded application of established legal principles.

 Furthermore, the potential for collateral litigation around search warrants under Twitter's approach is significant.  Every time Twitter deems a case—or a user—"unique," it could intervene in a case to delay a criminal investigation.  But even Twitter recognizes that that is not how the law works because it is not permitted to notify users of law enforcement requests where "legally prohibited from doing so."  Opp. 3.  Here, such a prohibition exists, yet Twitter nonetheless seeks special treatment for this user.

None of the cases that Twitter cites supports its novel approach. *See* Opp. 5-6. For one, none of those cases involved a potential executive privilege claim—a claim that lacks merit. *See*

*infra* at 6-9. Additionally, none of those cases involved a pre-enforcement challenge brought by a third party that held no cognizable privilege in the materials to be seized under the warrant. *See, e.g. In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*, 11 F.4th 1235, 1238-39 (11th Cir. 2021), *cert. denied sub nom. Korf v. United States*, 214 L. Ed. 2d 15, 143 S. Ct. 88 (2022) (challenge brought by attorneys "assert[ing] attorney-client and work-product privilege over at least some of [the] documents"); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 164-65 (4th Cir. 2019) (challenge brought by law firm invoking attorney-client and work-product privilege over materials); *Klitzman, Klitzman & Gallager v. Krut*, 744 F.2d 955, 956 (11th Cir. 1984) (post-search challenge brought by defendant, an attorney, whose materials were seized); *United States v. Vepuri*, 585 F. Supp. 3d 760, 762 (E.D. Pa. 2021) (pre-enforcement challenge to procedure for review of potentially privileged materials brought by the defendant); *United States v. Ritchey*, No. 21-cr-6, 2022 WL 3023551, at *1-*2 (S.D. Ohio June 3, 2022) (post-search challenge to filter protocol).[1] In each of those cases, moreover, the search warrant was executed, and the parties then litigated whether any right or privilege precluded full government access to them. In short, Twitter can point to no case approving its course of action here: refusing to execute a valid search warrant given the potential for a privilege claim.

Nor does Twitter's attack (Opp. 11-14) on *Google LLC v. United States*, 443 F. Supp. 3d 447 (S.D.N.Y. 2020), aid its argument. As relevant here, *Google* stands for the uncontroversial principle—borne out by the briefing schedule this Court has now adopted—that the Warrant and

[1] The Third Circuit's decision in *In re Search Warrant (Sealed)*, 810 F.2d 67, 70-71 (3d Cir. 1987), which involved a physician seeking to protect the privacy rights of his patients, is nothing like Twitter's relationship to its users—as Twitter itself recognizes. *See* Opp. 3 (recognizing the "medical professional and patients" privilege); *see also United States v. Westinghouse Elec. Corp.*, 638 F.3d 570, 572 (3d Cir. 1980) (similar approach involving "privacy interests of employees in their medical records").

the NDO do not travel together. *Id.* at 455. Twitter criticizes *Google*'s reasoning with respect to the decision to deny the movant's efforts—similar to Twitter's here—to vacate or modify the NDO. Whatever the merits of that reasoning, Twitter's obligation to comply with a clear court order does not turn on it. To be sure, the court in *Google* relied largely on its analysis rejecting the motion to vacate the NDO, which in turn mooted Google's motion to stay execution of the warrant. But even if Twitter succeeded on its NDO challenge, Twitter identifies no case for the proposition that enjoining execution of the Warrant would also be appropriate.[2]

**2. In Any Event, Executive Privilege Provides No Basis for Twitter to Refuse Compliance**

Even if Twitter could rely on a third party's potential privilege claims as a basis to refuse compliance with a search warrant, it fails to demonstrate a colorable claim of executive privilege here that could justify such non-compliance. The executive-privilege claims that Twitter speculates might be available to the former President are entirely without merit.

The former President would have no basis to challenge the government's access to his Twitter account based on executive privilege because the warrant requires access to the materials by the Executive Branch itself. Executive privilege is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. at 708, and it "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. Gen. Servs. Admin.*, 433 U.S. 424, 447 (1977). The privilege exists "not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449. Consistent with the privilege's function of protecting the Executive Branch as an institution, it may be invoked in

[2] Twitter's reliance on two First Amendment prior restraint cases (Opp. 14) is inapposite. Among other things, neither case involved an ongoing criminal investigation where, as here, the government had obtained a search warrant.

appropriate cases to prevent the sharing of materials outside the Executive Branch—*i.e.*, with Congress, the courts, or the public. *Cf. Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (per curiam) (noting unresolved questions about whether and under what circumstances a former President can invoke the privilege to prevent such "disclosure"—there, to Congress). But the separation-of-powers principles that form the basis for executive privilege provide no justification to prevent the Executive Branch itself from accessing the materials.

Twitter cites no case in which executive privilege has been successfully invoked to prohibit the sharing of documents within the Executive Branch, and the government is aware of none. To the contrary, in what appears to be the only case in which such an assertion has ever been made, *Nixon v. GSA*, the Supreme Court rejected former President Nixon's assertion that a statute requiring the General Services Administration to take custody of and review recordings and documents created during his presidency violated either the separation of powers or executive privilege. 433 U.S. at 433-36. Addressing the separation of powers, the Court emphasized that the Administrator of the GSA "is himself an official of the Executive Branch," and that the GSA's "career archivists" are likewise "Executive Branch employees." *Id.* at 441. The Court rejected the former President's invocation of privilege against the statutorily required review by the GSA, describing it as an "assertion of a privilege against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. The Court explained that the relevant question was whether review by Executive Branch officials within the GSA would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451. And it held that the question was "readily resolved" because the review in question was "a very limited intrusion by personnel in the Executive Branch sensitive to executive branch concerns." *Id.*

Indeed, when the former President previously sought to prevent the Department of Justice

from accessing documents from his presidency on the basis of executive privilege, the United States National Archives and Records Administration ("NARA") flatly rejected that attempt.[3] After NARA found documents with classified markings within 15 boxes of presidential documents that the former President provided to NARA and notified the Department of Justice, the former President sought to prevent the Department of Justice from accessing the materials on the basis of executive privilege. *See* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran (May 10, 2022) at 1, *available at* https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf. NARA rejected those efforts, noting that with respect to the former President's attempt to assert executive privilege to prevent others within the Executive Branch from reviewing the documents, its decision was "not a close one." *Id.* at 3.

The issue here is similarly not close, and Twitter's speculation is even further afield given the extreme unlikelihood that the former President's Twitter account will contain confidential communications subject to executive privilege. The presidential-communications privilege, which appears to be the only form of executive privilege to which Twitter refers in its brief, applies to communications involving the President and his immediate White House advisers (and their staff) that "reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege applies only to "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *GSA*, 433 U.S. at 449 (internal citation and quotation omitted). Twitter provides no basis to conclude that the former President used his Twitter account—rather than face-to-face conversations, written memoranda, or even electronic

---

[3] At the time *Nixon v. GSA* was litigated, the National Archives was a part of the General Services Administration. In 1985, Congress created the National Archives and Records Administration as a separate agency.

communications through government accounts—to communicate confidentially with his advisors about presidential matters. Indeed, as the former President has acknowledged, he used the account during his presidency "as a channel for communicating and interacting with the *public* about his administration." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *cert. granted, judgment vacated sub nom*. *Biden v. Knight First Amend. Inst. At Columbia Univ*., 141 S. Ct. 1220 (2021) (emphasis added). Twitter's supposed concern about potential executive-privilege issues provides no basis to refuse compliance with the valid warrant here.

### III. The Court Should Enter an Order Imposing Monetary Sanctions Until Twitter Complies with the Warrant

Twitter's failure to comply with a clear and unambiguous order warrants a finding of contempt and coercive sanctions.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947) (citation omitted). A "per diem, coercive fine . . . is the epitome of a civil sanction" for contempt. *Pigford v. Veneman*, 307 F. Supp. 2d 51, 57 (D.D.C. 2004). "[F]ines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994). Contempt sanctions "must be sufficiently hefty such that the contemnors are induced to comply and the Court 'must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, Misc. Nos. 18-175, 18-176, 18-177 (D.D.C.

Apr. 10, 2019) (BAH), 2019 WL 2182436, at *4 (quoting *United Mine Workers of Am.*, 330 U.S. at 304).

To maximize the likelihood of obtaining Twitter's rapid compliance with this Court's decision, the government respectfully requests that the Court impose escalating daily fines. *See Pigford*, 307 F. Supp. 2d at 54 (adopting fine of $1,000 per day for first month of contempt, increasing by $1,000 for each subsequent month the contempt continued unpurged). The amount of any fine should be commensurate with the gravity of Twitter's non-compliance and Twitter's ability to pay.[4] *See, e.g.*, *NLRB v. Local 3, International Brotherhood of Elec. Workers*, 471 F.3d 399, 405 (2d Cir. 2006) (affirming a per-violation prospective compliance fine plus an additional $5,000 per day for each day that a violation continues); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 2019 WL 2182436, at *5 (explaining that a "[d]aily imposition of a $50,000 fine is fitting" for "multi-billion-dollar banks disregarding an order to produce records or a witness essential to an investigation into a state-sponsor of terrorism's proliferation of nuclear weapons"); *id.* ("Courts previously have approved the amount of $50,000 per day as an appropriate sanction for other well-resourced corporations and international banks.") (citing multiple cases in support); *see also Pigford*, 307 F. Supp. 2d at 54.

---

[4] As of October 2022, Twitter was valued at over $40 billion. *See* Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, New York Times (Oct. 27, 2022); *available at* https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/ *Mary L. Dohrmann*
       Mary L. Dohrmann (N.Y. Bar No. 5443874)
       Gregory Bernstein (California Bar 299204)
       Assistant Special Counsels
       950 Pennsylvania Avenue, N.W.
       Washington, D.C. 20530
       (202) 714-9376

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 **Under Seal** |
|---|---|

**ORDER**

This matter having come before the Court pursuant to the government's Motion to Modify and Extend Nondisclosure Order ("Motion") related to the above-captioned warrant (the "Warrant") that was issued to Twitter Inc. ("PROVIDER"), an electronic communication service provider and/or a remote computing service provider located in San Francisco, California, not to disclose the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b), and to authorize the government to delay disclosure of the Warrant to the user of the account identified in Attachment A:

For reasons given in the Motion, the Court finds reasonable grounds to believe that disclosure of certain information—namely, the personal identifying information of the case agent—will result in intimidation of potential witnesses and serious jeopardy to the investigation, as defined in 18 U.S.C. § 2705(b).

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 2705(b), that the non-disclosure order entered on January 17, 2023, ("NDO") is hereby extended for a period of 180 days (commencing on the date of this Order), unless the period of nondisclosure is later modified by the Court; and

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the NDO is modified such that the PROVIDER is prohibited only from disclosing the personal identifying information

of the case agent to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice). Twitter no longer is prohibited from disclosing the Warrant, or its existence or contents; and

IT IS FURTHER ORDERED that the Clerk's office shall not make an entry on the public docket of the Warrant until further order of the Court.

Date: June 20, 2023

HON. JAMES E. BOASBERG
CHIEF U.S. DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |
|---|---|

**GOVERNMENT'S SEALED OPPOSITION TO TWITTER INC.'S MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT**

For what appears to be the first time in its history, Twitter Inc. ("Twitter") has filed a motion to vacate or modify an order that it not disclose the existence of a search warrant. ECF No. 7. Twitter takes this extraordinary action only for the account subject to the warrant: @realDonaldTrump ("Account"), used by former president Donald J. Trump. For the reasons stated in the application in support of the non-disclosure order ("NDO") and expanded upon here, there is reason to believe notification to the former president, a sophisticated actor with an expansive platform, would result in a statutorily cognizable harm. Yet Twitter, using the First Amendment as pretense, apparently wants the Court to place Twitter's economic interests over the Court's findings in the NDO—and the integrity of the Government's ongoing investigation. The Court should deny Twitter's Motion.

## BACKGROUND

Twitter is an electronic service provider that enables account holders to share and interact with content and to send and receive communications with other users, publicly or privately. The former president, from the Account, used Twitter in ways described in the Government's *ex parte* submission.

## I. The Warrant

On January 17, 2023, based on an affidavit establishing probable cause, this Court authorized a warrant (the "Warrant") to search the Account. ECF No. 4, Affidavit in Support of Application for a Search Warrant (the "Affidavit"), at ¶ 8. The Warrant incorporates by reference two attachments—describing the "Property to Be Searched" (Attachment A) and the "Particular Things to Be Seized" (Attachment B)—but not the warrant application or the probable cause Affidavit. ECF No. 4, at 2. In other words, of the extensive application, the Warrant itself (as served on Twitter) comprises only six pages. *See* Exhibit A. Nevertheless, those six pages reflect (1) the existence of the Warrant; (2) the Court and Judge from which the Warrant was obtained; (3) the date and time of the Warrant's issuance; (4) the specific account subject to the Warrant; (5) the specific categories of information sought by the Government, including certain content, subject areas, and persons of interest; and (6) the name, title, and official address of the agent with the Federal Bureau of Investigation ("FBI") to whom responsive information should be disclosed. *Id.*

## II. The Non-Disclosure Order

When it authorized the Warrant, the Court also issued an order sealing the Warrant and related materials and requiring, under 18 U.S.C. § 2705(b), that Twitter not disclose the contents or existence of the Warrant for a period of 180 days. ECF No. 3.[1] The NDO was granted based on facts showing that notifying the former president would result in destruction of or tampering with evidence, intimidation of potential witnesses, or other serious jeopardy to an investigation or

[1] The Government's NDO application was based on § 2705(b)(3)-(5), ECF No. 3, ¶ 10, but its proposed non-disclosure order erroneously included language from § 3103a(b), which applies to delayed-notice Rule 41 warrants (not ECPA warrants) and which errantly included flight from prosecution as a predicate. The Government now seeks to strike from the NDO this language, which can be found at the bottom of page two of the NDO.

delaying of trial. *See* 18 U.S.C. § 2705(b)(3)-(5); NDO at 1. Facts supporting the NDO are detailed in the Government's *ex parte* submission.

**III. Procedural History**

The Warrant commanded that Twitter disclose responsive information to the Government within ten days of its issuance, that is, by January 27, 2023. ECF No. 4, Attachment B.I, ¶ 5. Twitter was served with the Warrant, including Attachment A and Attachment B.I, *see* Exhibit A, and the accompanying NDO, but refused to comply with the Warrant's deadline. Consequently, on February 2, 2023, the Government filed a Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant. ECF No. 5. Later that same day, asserting in part that its "ability to communicate with its customers about law enforcement's efforts to access their communications and data . . . is essential to its business model," Twitter filed a motion to vacate or modify the NDO now pending before the Court. ECF No. 7; ECF No. 7-1, Twitter Inc.'s Memorandum of Points and Authorities in Support of Motion to Vacate or Modify Non-Disclosure Order Issued Pursuant to 18 U.S.C. § 2705(b) and Stay Twitter's Compliance with Search Warrant ("Twitter's Mem."), at 4.

After a hearing on February 7, 2023, the Court granted the Government's Motion and ordered Twitter to comply with the Warrant by 5:00 p.m. that day or be held in contempt and subject to a fine of $50,000, to double every day of continued non-compliance with the Warrant. *See* Min. Order, dated Feb. 7, 2023. While Twitter made a production before 5:00 p.m. on February 7, it was not complete. Following multiple further conferences between the Government and Twitter, as well as a hearing before the Court on February 9, 2023, Twitter finally asserted compliance with the search warrant on February 9, 2023, at 8:28 p.m. Accordingly, Twitter was in contempt until at least February 9, 2023, at 8:28 p.m. and should be subject to a $350,000 fine

as a result.  *See* ECF No. 19.

At the February 7 hearing, Twitter acknowledged that it had not "found any court decision in which a third-party company, like Twitter, has successfully stayed compliance with a search warrant pending a First Amendment challenge to a non-disclosure order."  Sealed Hr'g Tr. (Feb. 7, 2023) at 61.  The Court ordered Twitter to "submit a list of each case in which Twitter, Inc. has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the court's resolution of that challenge."  Min. Order, dated Feb. 7, 2023.  Twitter included in its response cases not involving § 2705(b), and even cases where Twitter simply "asserted," in Twitter's parlance, an informal—*i.e.*, not "filed"—challenge to the NDO.  ECF No. 14.  Twitter's list reveals that Twitter has *never before*, in its sixteen years of operating, filed a challenge to an NDO issued pursuant to § 2705(b) for a warrant.

The Government now opposes Twitter's Motion.

## ARGUMENT

### I.  The Non-Disclosure Order is constitutional under the First Amendment.

#### A.  Statutory background

Congress enacted the Stored Communications Act (the "SCA") in 1986, as part of the Electronic Communications Privacy Act, Pub. L. No. 99-508, 100 Stat. 1848 (1986).  In pertinent part, the SCA regulates the Government's access to electronic communications and information stored by electronic communications service providers and remote computing providers, like Twitter.  Within the SCA, Section 2703 defines how the Government obtains records and information pertaining to the users of electronic services.  *See generally* 18 U.S.C. § 2703(a)-(c).  Section 2703 provides for different means of obtaining the evidence—including grand jury subpoenas, court orders under Section 2703(d), and search warrants—and different levels of privacy protection depending on the type of evidence sought.  *See* § 2703(c)(2).

Section 2705(b) complements Section 2703 by authorizing the Government to seek a court order to prevent an electronic communications service provider from disclosing the fact that it has received Section 2703 process regarding a user. *See* 18 U.S.C. § 2705(b); *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d 201, 208 (D.D.C. 2018). At the Government's request, a court may issue a non-disclosure order "for such period as the court deems appropriate," based upon an independent judicial determination that "there is reason to believe that notification of the existence of the [legal process pursuant to Section 2703] will result" in (1) endangerment of a person's life or physical safety; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) seriously jeopardizing an investigation or unduly delaying a trial. 18 U.S.C. § 2705(b). The SCA's statutory scheme thus requires that, once a court has found that the Government has demonstrated a "reason to believe" that disclosure would result in one or more of the listed harms, the court must issue an order prohibiting the service provider to whom the Section 2703 process is directed from notifying "any other person" of the legal process for a period of time that the court deems appropriate. *Id.*[2]

Section 2703 process, and related Section 2705(b) orders, are employed in a wide array of contexts, often involving grand jury investigations that are not yet public or where only some aspects of the investigation are publicly known. The Government may seek basic subscriber

[2] Section 2705(b) is far from the only statute limiting disclosure of information related to government investigations. *See, e.g.*, 18 U.S.C. § 3420 (providing that "[n]o officer, director, partner, employee, or shareholder of, or agent or attorney for, a financial institutional shall, directly or indirectly, notify any person named in a grand jury subpoena served on such an institution in connection with an investigation . . ."); 18 U.S.C. § 2511 (governing disclosures of wiretap surveillance; 18 U.S.C. § 3123 (governing disclosures of pen registers and trap-and-trace devices); *see also Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (observing that "even in a suit for damages based on disclosures allegedly made in a [suspicious activity report ("SAR")], a financial institution cannot reveal what disclosures it made in a SAR, or even whether it filed a SAR at all").

information at an early stage of an investigation, when investigators know nothing more than an IP or email address used in connection with a potential crime, and the identity of the individual is unknown.  And the Government may seek a court order under Section 2703(d) to gather further information, such as identifying information about individuals with whom a suspect is communicating as an investigation progresses.  Where, as here, probable cause exists to believe that the contents of an electronic account include evidence of a crime, warrants are sought to obtain such evidence.

In all of these situations, absent the limited secrecy provided for under the SCA, the ability of grand juries and government investigators to accumulate evidence and identify wrongdoers would be seriously undermined by an electronic communications service provider's decision to inform the target of legal process, or other potentially involved third parties, about the existence of, or steps taken in, a grand jury investigation.   In recognition of the evolving nature of investigations, the U.S. Department of Justice policy regarding applications for orders pursuant to Section 2705(b) notes that "[w]hen applying for a § 2705(b) order to accompany a subpoena seeking basic subscriber information in an ongoing investigation that is not public or known to the subject(s) of the investigation, stating the reasons for the protection from disclosure under § 2705(b) . . . usually will suffice."  U.S. Dep't of Justice, *Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 n.2 (Oct. 19, 2017).  "At a later stage of the investigation," the policy notes, such as "when a search warrant is being sought, the prosecutors should include more specific facts, as available, in support of the protective order."  *Id.*; *see also* U.S. Dep't of Justice, *Supplemental Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b)*, at 2 (May 27, 2022) (noting the prosecutors "must provide a court with

sufficient facts to permit the court to conduct" a "case- and fact-specific analysis," including by "identify[ing] which of the pertinent factors apply").

**B. The Non-Disclosure Order survives strict scrutiny.**

Twitter contends that the NDO cannot withstand strict scrutiny.[3] Twitter's Mem. 7–15. Under strict scrutiny, the challenged NDO is valid if it is "narrowly tailored to serve compelling state interests," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and there are no "less restrictive alternatives [that] would be at least as effective in achieving the [NDO's] legitimate purpose," *Reno v. ACLU*, 521 U.S. 844, 874 (1997). The NDO at issue here satisfies strict scrutiny. *See Matter of Subpoena 2018R00776*, 947 F.3d 148, 159 (3d Cir. 2020) (*Matter of Subpoena*) (applying strict scrutiny and affirming district court order denying challenge to a non-disclosure order under Section 2705(b)); *Matter of the Search of Information Associated with E-mail Accounts*, 468 F. Supp. 3d 556, 560–63 (E.D.N.Y. 2020) (*E-mail Accounts*) (applying strict scrutiny and denying Microsoft Corporation's challenge to a non-disclosure order under Section 2705); *Google LLC v. United States*, 443 F. Supp. 3d 447, 452–55 (S.D.N.Y. 2020) (same for challenge brought by Google); *cf. In re National Security Letter*, 33 F.4th 1058, 1063 (9th Cir. 2022) (applying strict scrutiny and affirming a non-disclosure order obtained in connection with a national security letter issued under 18 U.S.C. § 2709(c)).

---

[3] No precedent from this Court or the D.C. Circuit has concluded that strict scrutiny applies when an electronic service provider challenges a non-disclosure order, and there are good reasons *not* to apply such "exacting" review to a non-disclosure order that "is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 877–78 (2d Cir. 2008). Because the NDO here nonetheless survives strict scrutiny, the Court can assume without deciding that it applies. *See Google LLC v. United States*, 443 F. Supp. 3d 447, 452 (S.D.N.Y. 2020) (adopting that approach).

**i. The Non-Disclosure Order serves a compelling interest.**

The compelling government interests at stake include preserving the integrity and secrecy of an ongoing investigation. "Maintaining the integrity of an ongoing criminal investigation is a compelling government interest." *E-mail Accounts*, 468 F. Supp. at 560 (citation omitted). The interest is particularly "acute" where, as here, the investigation remains ongoing. *Matter of Subpoena*, 947 F.3d at 156. And that interest is all the more compelling for the reasons described in the *ex parte* submission. *Cf. Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and inarguable that no governmental interest is more compelling than the security of the Nation.") (quotation omitted).

Closely linked to the compelling interest in maintaining the integrity of an investigation is protecting its secrecy, which in turns facilitates its "proper functioning." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). Relatedly, erosion of grand jury secrecy "substantially increase[s] the ability of persons who have something to hide to impede legitimate investigations." *SEC v. Jerry T. O'Brien*, 467 U.S. 735, 750 (1984). Such secrecy also furthers several additional governmental interests, including (1) "prevent[ing] the escape" of individuals who may be indicted; (2) ensuring free deliberations by the grand jury, while "prevent[ing] persons subject to indictment or their friends from importuning the grand jurors"; (3) forestalling efforts to suborn perjury or tamper with witnesses; and (4) "encourag[ing] free and untrammeled disclosures by persons who have information with respect to the commission of crimes." *Matter of Subpoena*, 947 F.3d at 157 (citing *Douglas Oil Co.*, 441 U.S. at 291 n.10). Although articulated in the context of grand jury investigations, those factors parallel similar considerations described in Section 2705(b), including destroying or tampering with evidence, intimidating witnesses, or "otherwise seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(b)(3)-(5).

For the reasons explained in the Government's *ex parte* submission, the NDO serves a compelling governmental interest.

Twitter offers (Twitter's Mem. 8–14) two unpersuasive arguments to the contrary.  First, Twitter contends (*id.* at 8–12) that because some aspects of the investigation are publicly known, it "strains credulity to believe" that providing the Warrant to the former president will "alter the current balance of public knowledge in any meaningful way" because such a disclosure would be merely "incremental."  *Id.* at 11.  That contention is flawed in several respects.  Although the investigation's existence is no longer secret, it does not follow that the specific ongoing investigative steps the Government is pursuing are therefore publicly known.  Many of the media accounts that Twitter cites (*id.* at 8–10) attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses.[4]  Whatever the effect of those accounts on the "current balance of public knowledge," *id.* at 11, they provide nowhere close to the detail supplied in the Warrant.  Providing the Warrant to the former president at this point in the investigation would thus far exceed some mere "incremental" step in informing the former president, as described in the *ex parte* submission.

Second, Twitter argues (Twitter's Mem. 12–14) that "[u]nique and [i]mportant" (*id.* at 12) executive privilege issues support the relief it seeks.  That argument is also wanting.  For one, Twitter does not explain the relevance of a putatively "unique" or "important" issue to strict scrutiny analysis, which asks whether the NDO sought under Section 2705(b) is narrowly tailored to serve a compelling governmental interest.  *See In re National Security Letter*, 33 F.4th at 1072.  A Twitter user's potential ability to challenge the legal process at issue—here, the Warrant—is

---

[4] The same is true of the 80 pages of articles and other documents that Twitter submitted as an exhibit to its opposition to the Government's Motion to Show Cause.  *See* Twitter's Opposition to Government's Motion for an Order to Show Cause, Exhibit B (filed Feb. 6, 2023).

entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO. *See, e.g.*, Twitter's Mem. 3 n.1 (Twitter not challenging the Warrant's validity); *id.* at 4 (Twitter acknowledging it "might lack standing to assert the rights and privileges of its users," and acknowledging many potentially privileged communications in which its users could engage). But even if the executive privilege claim that Twitter postulates bore some relevance to the NDO, that claim lacks merit for the reasons given in the Government's briefing in the show cause litigation. *See* Government's Reply in Further Support of Motion for an Order to Show Cause Why Twitter Inc. Should Not be Held in Contempt for Failure to Comply with a Search Warrant, at 6–9 (filed Feb. 6, 2023).

**ii. The Non-Disclosure Order is narrowly tailored.**

The NDO is narrowly tailored to serve the Government's compelling interest because any restriction on Twitter is the least restrictive means of advancing governmental interests. *See Matter of Subpoena*, 947 F.3d at 157–58. The NDO restricts Twitter from disclosing only discrete investigation-related information—information that is in Twitter's hands only because it received legal process in connection with the investigation. And the NDO is limited in duration.

The scope of speech regulated by the NDO is extremely narrow. The NDO prohibits Twitter from disclosing the existence or contents of the Warrant. The NDO does not purport to regulate Twitter's ability to speak about any other topic, such as the issue of non-disclosure orders generally or any information Twitter has obtained independent of its interactions with the Government (or the grand jury) in this case. *See Matter of Subpoena*, 947 F.3d at 158 (finding a non-disclosure order narrowly tailored where it permitted the service provider to "discuss[] the government's requests abstractly, as service providers have done by disclosing the number of data requests and NDOs they receive in public docket civil complaints"). Thus, "[b]y any measure,

[the NDO] restricts a narrow slice of speech." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 452 (2015). That approach is entirely consistent with cases permitting a protective order in civil litigation that prohibited disclosure of information obtained in discovery because "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times v. Rhinehart*, 467 U.S. 20, 33 (1984); *see Butterworth v. Smith*, 494 U.S. 624, 632 (1990) (extending *Rhinehart* to government investigations by striking down a provision that limited a witness from disclosing his own testimony but not addressing "information which he may have obtained as a result of his participation in the proceedings").

The NDO is further narrowly tailored because it does not apply indefinitely but rather is limited to 180 days. The presence of a "temporal limitation" in a non-disclosure requirement is an "important" consideration in assessing "the balance of government versus free speech interests." *John Doe, Inc.*, 549 F.3d at 877. Courts have upheld as narrowly tailored non-disclosure orders that lasted up to a year. *See Matter of Subpoena*, 947 F.3d at 159; *E-mail Accounts*, 468 F. Supp. 3d at 563. Here, the 180-day order appropriately balances the need for investigative secrecy and any speech interests.

Rather than dispute these straightforward factors, Twitter posits (Twitter's Mem. 14–16) three less restrictive means that it claims would preserve its "[e]ssential First Amendment [r]ights." *Id.* at 14. First, it suggests (*id.* at 14) notifying "just its user"—that is, the former president. That suggestion is a fallacy and a non-starter for all the reasons discussed above and in the Government's *ex parte* submission. Second, Twitter speculates (*id.* at 14–15) that one of the former president's "representative[s]" might fit the bill, perhaps even a representative under the Presidential Records Act ("PRA"), 22 U.S.C. § 2201 *et seq.* These "alternatives are untenable"

because they are "impractical," "would be ineffective in maintaining . . . secrecy," risk "undermin[ing] the government's interest in maintaining the confidentiality of an ongoing investigation," and require a court to "assess the trustworthiness of a would-be confidante chosen by a service provider." *Matter of Subpoena*, 947 F.3d at 158–59. In short, this Court should "'decline to wade into this swamp' of unworkable line drawing." *Id.* at 159 (quoting *Williams-Yulee*, 575 U.S. at 454).[5]

Twitter's final proposal (Twitter's Mem. 15) that the Government obtain the data in question from NARA fares no better. As an initial matter, this proposal is moot in light of Twitter's representation that it has fully complied with the warrant. But more so, even Twitter acknowledges that NARA *does not possess* the full universe of responsive documents required under the Warrant. *See id.* at 6 (suggesting that "much"—though not all—"of the information sought in the Warrant has been produced to NARA"); Sealed Hr'g Tr. (Feb. 7, 2023) at 41–46 (discussing entire categories of information required by the Warrant that are not in NARA's possession). Moreover, Twitter's purported inability to comply with the Court's order and fully execute the Warrant calls into question the credibility of Twitter's representations concerning what it has produced to NARA, since it took days after the Court held Twitter in contempt for Twitter to work through various "challenges and technical issues" and "take the extraordinary efforts" to meet the Warrant's requirements. ECF No. 18, Notice of Twitter's Position on Sanctions, at 2 (filed Feb.

---

[5] Twitter does not expand on why it thinks this approach would be workable. Presumably, Twitter would want to notify the PRA representative in an effort to permit the former president to litigate any executive privilege concerns. But the PRA representative would not have standing or authority to pursue such litigation, absent telling the former president of the Warrant and gaining the former president's consent to file suit.

13, 2023).[6] Finally, Twitter identifies no authority for the proposition that a narrow-tailoring analysis under Section 2705(b) constrains the Government's choice of investigative tools.

**II. Twitter's meritless stay motion is moot.**

Twitter's motion to vacate or modify the NDO includes a request to stay execution of the Warrant, Twitter's Mem. 15–16—relief that Twitter acknowledges no court has ever granted, *see supra* 4. The Court's granting of the Government's separately filed Motion to Show Cause and ordering Twitter to comply by executing the Warrant necessarily mooted that stay request. In any event, the request lacked merit. The first two steps for obtaining a stay under *Nken v. Holder*, 556 U.S. 418 (2009), require that Twitter make "a strong showing" that it is "likely to succeed on the merits" and demonstrate that it "will be irreparably injured absent a stay." *Id.* at 434. Twitter makes no showing, let alone a "strong showing," that it is likely to succeed on its claim that the NDO cannot withstand strict scrutiny. Consistent with the weight of recent case law and for the reasons described above and in the Government's *ex parte* submission, Twitter's challenge to the NDO fails, which in turns demonstrates that it cannot satisfy the first stay showing of a strong likelihood of success on the merits. *See Google LLC*, 443 F. Supp. 3d at 455 (denying service provider's motion to stay execution of a search warrant after concluding that the non-disclosure order satisfied strict scrutiny). Twitter suggests that its loss of First Amendment "freedoms" necessarily amounts to irreparable injury, but this case is a far cry from the case that Twitter cites

[6] The Government does not take a position on whether the Account information held at NARA would necessarily qualify as "presidential records" as that term is defined in 44 U.S.C. § 2201(2), in part because it is unknown the extent to which the former president may have used any private settings in his Twitter account to create "personal records," *see* § 2201(3), which, while outside the ambit of the PRA, may nonetheless be relevant and probative evidence in an investigation. It is unclear whether the Government could obtain any previously undisclosed presidential records without triggering the PRA regulation and related executive order that requires notification to the former president. *See* 36 C.F.R. § 1270.44(a)(1) and (c); Executive Order 13489.

for that proposition—*Elrod v. Burns*, 427 U.S. 347 (1976), which involved claims by civil servants that they were discharged or threatened with discharge on account of their political affiliation or nonaffiliation, *see id.* at 349—or other similar situations where more than a "narrow slice of speech" is at issue. *See Williams-Yulee*, 575 U.S. at 452.[7]

**CONCLUSION**

For the foregoing reasons, the Court should deny Twitter's motion to vacate or modify the non-disclosure order.

Respectfully submitted,

JACK SMITH
Special Counsel

By: /s/ *Mary L. Dohrmann*
Mary L. Dohrmann (N.Y. Bar No. 5443874)
James I. Pearce (N.C. Bar No. 44691)
Assistant Special Counsels
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

---

[7] Twitter's invocation (Twitter's Mem. 16) of *Freedman v. State of Md.*, 380 U.S. 51 (1965), is misplaced. The "procedural safeguards" that *Freedman* requires, 380 U.S. at 58, and on which Twitter relies (Twitter's Mem. 7, 16), apply to cases involving "government censorship and licensing schemes," not to a law that prohibits disclosure of government-requested information sought "to assist in an investigation." *In re National Security Letter*, 33 F.4th at 1077.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Filed Under Seal** |

**GOVERNMENT NOTICE REGARDING ACCRUED SANCTION**

At the conclusion of a hearing on February 7, 2023, the Court ordered that "Twitter, Inc. shall be held in contempt if it fails to comply with the Search and Seizure Warrant by February 7, 2023 at 5:00 PM, and that Twitter, Inc. shall be fined $50,000, a fine amount that shall double every day, for failing to comply with this Order, payable to the Clerk of this Court." Twitter thereafter failed to timely comply with the warrant, which necessitated an additional hearing on February 9, 2023, in which the Court ascertained more specifically what remained to be produced. During that hearing, the Court indicated that the Government should advise the Court when Twitter completed its production and, regarding the sanction, "confer with Twitter [so] that everybody is counting the days the same way and doing the math the same way."

On February 9, 2023, at 4:00 p.m., the Government and Twitter held a call to discuss the status of Twitter's production. On that call, Twitter advised (among other things) that it still was working on production regarding a number of categories described in the warrant—namely, Attachment B, Part I, paragraph 1.b and (if any data existed) paragraph 4.e. The parties also discussed additional names that the Government believed Twitter should search in response to Attachment B, Part I, paragraph 1.h.

Twitter uploaded material to the relevant FTP site at 5:03 p.m. on February 9, 2023. At 8:28 p.m. that day, counsel for Twitter advised the Government by email that it believed "Twitter's

obligations under the warrant and the Court's order are complete."

As with any search warrant return, the Government is unable to confirm the completeness of Twitter's production until it more closely reviews the return.  If the Government ever discovers that the production is incomplete, the Government will promptly notify Twitter and the Court. Assuming Twitter's representations are correct, though, the Government now writes to advise the Court regarding its position on the accrued sanction:  Twitter owes $350,000, payable to the Clerk of the Court.  By the terms of the Court's order, Twitter was in contempt as of 5:00 p.m. on February 7, 2023, at which point a $50,000 sanction came into effect.  An additional amount of $100,000 accrued at 5:00 p.m. on February 8, 2023, since Twitter still had not fully complied with the warrant as of that time.  And at 5:00 p.m. on February 9, 2023, an additional amount of $200,000 accrued.  Twitter uploaded its last material after 5:00 p.m., and then advised the Government hours later that production was complete.

The Government asked for Twitter's math on the accrued sanction.  By email on February 13, 2023, counsel for Twitter advised, in sum and substance, that Twitter did not believe any sanction was appropriate.  In a follow-up call on February 13, 2023, counsel for Twitter again advised, in sum and substance, that Twitter did not believe any sanction was appropriate and indicated that it would separately file its position with the Court.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/ *Thomas P. Windom*
        Thomas P. Windom (D.C. Bar No. 502131)
        Senior Assistant Special Counsel
        950 Pennsylvania Avenue, N.W.
        Washington, D.C.  20530

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31 Filed Under Seal |
|---|---|

**GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE WHY TWITTER INC. SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO COMPLY WITH A SEARCH WARRANT**

Twitter Inc. ("Twitter") refuses to comply with the search warrant issued by this Court pursuant to 18 U.S.C. § 2703 for information associated with the Twitter account "@realDonaldTrump." ECF No. 4 (the "Warrant"). Twitter asserts two grounds for its non-compliance. First, Twitter asserts that the non-disclosure order accompanying the warrant, ECF No. 3 (the "NDO"), issued by this Court pursuant to 18 U.S.C. § 2705(b), is unconstitutional. But the constitutionality of the non-disclosure order is unrelated to the validity of the Warrant, and Twitter's apparent desire to contest it does not excuse its non-compliance. Second, Twitter refuses to produce records in response to the Warrant until the account holder has an opportunity to litigate its validity. But neither the Warrant nor Section 2703 provide for such a procedure or excuse Twitter's non-compliance. Accordingly, the Government moves this Court to issue an order scheduling a hearing forthwith for Twitter to show cause why it should not be held in contempt for failing to comply with the Warrant's commands. Consistent with the Order sealing the Warrant and related materials, ECF No. 3, the Government also requests that the Court place this Motion, the accompanying Order, and any related materials under seal.

On January 17, 2023, the Government applied for the Warrant, as well as the accompanying NDO, which requires that Twitter not disclose the contents or existence of the Warrant for a period

of 180 days. ECF Nos. 1, 2. The Court issued the Warrant and the NDO the same day. ECF Nos. 3, 4. The Warrant required that Twitter disclose to the Government information responsive to the Warrant within 10 days of the Warrant's issuance. ECF No. 4, Attachment B, ¶ 5.

Twice on January 17, 2023, the Government attempted to serve the Warrant and NDO on Twitter through its Legal Requests Submissions site but received an automated message indicating that the "page [was] down." On January 19, 2023, the Government successfully served the Warrant and NDO through the site.

On January 25, 2023, the Government contacted counsel for Twitter to inquire as to the status of the Warrant. Counsel for Twitter indicated she was not aware of the Warrant but would consider it a priority. The same day, the Government separately provided Twitter's counsel with the signed warrant and NDO (previously served through Twitter's Legal Requests Submissions site). On January 27, 2023, Twitter's counsel informed the Government that Twitter would not be able to comply with the Warrant by its deadline, but would provide an update on January 31, 2023. On January 31, 2023, counsel for Twitter informed the Government that Twitter believes the NDO violates the First Amendment. Going further, Twitter indicated that it would not comply with the Warrant promptly, even in the absence of an NDO, because it wishes to give the account holder an opportunity to challenge or otherwise object to the Warrant before the Government has the opportunity to review any responsive materials. The Government requested that Twitter provide, by close of business on February 1, 2023, authority for its assertion that it can refuse to comply with the Warrant pending a challenge to the NDO. Twitter provided no such authority, instead citing inapposite First Amendment case law while reiterating that Twitter "remain[s] unclear as to what remedy DOJ would propose in this unique situation in the event that the NDO is deemed invalid yet the materials have already been reviewed" by the Government.

The Government now moves for an Order to Show Cause why Twitter should not be held in contempt for its failure to timely comply with the Warrant's commands. The Warrant ordered Twitter to produce responsive information by January 27, 2023. More than five days have passed since the deadline, and Twitter has disclosed nothing to the Government, nor apparently taken the necessary steps to do so. Instead, Twitter proffers the possibility of litigation as to the NDO and the collateral aim of preventing the Government from reviewing responsive materials until such time as the account holder can challenge the Warrant. The Warrant does not countenance the indefiniteness and interference Twitter seeks.

First, the Warrant and NDO are different court orders, imposing different obligations. Twitter may not delay, to an unknown future date, compliance with the Warrant by challenging the NDO. The Government has an interest in prompt enforcement of the Warrant, regardless of any challenge to the NDO. *See, e.g., Google LLC v. United States*, 443 F. Supp. 3d 447, 455 (S.D.N.Y. 2020) (denying request to stay warrant deadline pending resolution of challenge to accompanying non-disclosure order, noting "any further delay . . . increases the risk that evidence will be lost or destroyed, heightens the chance that targets will learn of the investigation, and jeopardizes the Government's ability to bring any prosecution in a timely fashion"). Second, neither the Warrant itself nor Section 2703 provide for intervention by a third party before compliance with the Warrant is required. Twitter can point to no authority suggesting otherwise.

Under 18 U.S.C. § 401(3), this Court has the "power to punish by fine or imprisonment, or both, . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." Given Twitter's failure to comply with the Warrant's commands, the Court should order Twitter to show cause, at a hearing forthwith, why it should not be held in contempt under Section 401(3). The Government further requests that the hearing be held forthwith, with personal appearance by

a company representative.

For the foregoing reasons, the Government asks this Court to issue an order to show cause why Twitter should not be held in contempt for its failure to comply with the Warrant.  A proposed Order is attached.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/ *Mary L. Dohrmann*
         Mary L. Dohrmann (N.Y. Bar No. 5443874)
         Assistant Special Counsel
         950 Pennsylvania Avenue, N.W.
         Washington, D.C.  20530
         (202) 714-9376

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **Case No. 23-SC-31**<br><br>**Under Seal** |
|---|---|

**[PROPOSED] ORDER**

Upon consideration of the Government's Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant, and the entire record herein, it is hereby

**ORDERED**, this ____ day of February, 2023, that the Government's Motion is GRANTED and a hearing shall be held forthwith; and it is further

**ORDERED** that, on February ____, 2023, a company representative (in addition to any outside counsel) of Twitter Inc. shall personally appear before the Court, and show cause why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant, ECF No. 4; and it is further

**ORDERED** that a copy of this Order shall be served on Twitter Inc. and the Government; and it is further

**ORDERED** that the Government's Motion, this Order, and any related materials are sealed until otherwise ordered by the Court.

**SO ORDERED.**

Date:

___________________________________
CHIEF JUDGE BERYL A. HOWELL
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

cc:    Mary L. Dohrmann
       Assistant Special Counsel
       950 Pennsylvania Avenue, N.W.
       Washington, DC 20530
       (202) 714-9376

FILED UNDER SEAL

RECEIVED

FEB - 2 2023

Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31-BAH<br><br>**UNDER SEAL** |
|---|---|

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER ISSUED PURSUANT TO 18 U.S.C. § 2705(b) AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT**

Twitter is the leading global platform dedicated to fostering and safeguarding conversations among its users. To that end, Twitter's policy is to notify its users of any requests from law enforcement for account information, particularly requests for contents of communications, unless prohibited from doing so. On January 19, 2023, the government served a search warrant (the "Warrant") on Twitter for data associated with the account @realDonaldTrump (the "Target Account") accompanied with a non-disclosure order under 18 U.S.C. § 2705(b) (the "Non-Disclosure Order"), prohibiting Twitter from notifying the account owner, or anyone else, other than counsel. The Warrant requests public and non-public data, including private communications sent to or from the Target Account during the time period when Donald J. Trump, the user of the Target Account, was serving as President of the United States. The Non-Disclosure Order was issued by this Court based on an *ex parte* application, which Twitter has not seen.

Because the Non-Disclosure Order constitutes a content-based prior restraint on Twitter's speech, the government was required to submit facts demonstrating that the Non-Disclosure Order was narrowly tailored to serve a compelling government interest. The Non-Disclosure Order lists several potential governmental interests in keeping the Warrant secret, including destruction or tampering of evidence, intimidation of potential witnesses, notifying confederates, and fleeing from prosecution. But none of these interests can satisfy strict scrutiny in light of the significant publicity surrounding the Department of Justice's criminal investigation of the former President, including detailed news accounts of presidential aides and allies testifying before the grand jury, seizures of aides' electronic devices, a search warrant executed at the former President's home, and the televised press conference by Attorney General Merrick Garland announcing the Special Counsel's appointment and mandate to investigate former President Trump.

The Non-Disclosure Order in this case is particularly significant given that the Warrant seeks the contents of private communications sent to or from the then-President of the United States that raise unique and complex issues of executive privilege. Allowing Twitter the opportunity to notify the account holder would afford the user—the principal party in interest for executive privilege—an opportunity to address the legal issues surrounding a demand for presidential communications in this unique context, and give this Court a full adversarial process in which to evaluate them.

In sum, because the Non-Disclosure Order violates Twitter's First Amendment rights to communicate with its user, cannot be justified by a compelling governmental interest, and is not narrowly tailored, Twitter respectfully requests that this Court vacate or modify the Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) and permit Twitter to notify the user of

the account, or, in the alternative, his authorized representatives.[1] Twitter also respectfully requests this Court stay Twitter's compliance with the Warrant, pending the resolution of this challenge to the Non-disclosure Order, to (1) prevent irreparable injury to Twitter's interests that would occur if production under the Warrant were required prior to resolution, and (2) to preserve the status quo as to the user's interest in potentially seeking to assert privilege or otherwise curtail derivative use of potentially privileged communications. Finally, Twitter requests a hearing on this motion.

## BACKGROUND ON TWITTER

Twitter operates a global social media platform that fosters public and private conversations amongst its more than 450 million active monthly users. Twitter users may communicate with one another through "tweets" which may be accessible to the general public or visible only to the user's followers. Twitter also allows users to send private direct messages, known as "DMs", to other Twitter users. *See e.g.*, *United States v. Sporn*, 2022 WL 656165, at *1 (D. Kan. Mar. 4, 2022). Twitter values its ability to safeguard the privacy of its users. Accordingly, Twitter's Privacy Policy makes clear to its users and to law enforcement that it will notify users of any law enforcement requests for their communications or data unless legally prohibited from doing so:

> For purposes of transparency and due process, Twitter's policy is to notify users (e.g., prior to disclosure of account information) of requests for their Twitter or Periscope account information, including a copy of the request, unless we are prohibited from doing so (e.g., an order under 18 U.S.C. § 2705(b)).[2]

---

[1] Twitter does not challenge the validity of the Warrant. Instead, Twitter brings this motion to enable the user of the Target Account to assert his own rights and privileges if applicable, and provide this Court with a full presentation on these issues.

[2] https://help.twitter.com/en/rules-and-policies/twitter-law-enforcement-support

Twitter's ability to communicate with its customers about law enforcement's efforts to access their communications and data – rooted in its contractual promises and historical commitment to privacy and transparency – is essential to its business model and fostering trust with its user base. Given its vast and diverse community of users, Twitter is not in a position to identify and assert its users' rights and privileges with respect to every government demand for communications and data. Moreover, Twitter might lack standing to assert the rights and privileges of its users. Such rights and privileges could include communications between attorneys and clients, journalists and sources, medical professionals and patients, clergy and laity, spouses, or politicians communicating in ways that might be covered by Speech and Debate Clause, executive privilege, or other official privileges. By notifying its users of government demands for communications and data, Twitter serves a critical role in enabling its users to identify, evaluate, and assert for themselves those rights and privileges that could prohibit government search and seizure.

## PROCEDURAL HISTORY

On January 17, 2023, the Special Counsel's Office obtained a warrant, compelling Twitter to disclose communications and data related to the Target Account. The Target Account is the primary Twitter account of former President Donald J. Trump. Former President Trump routinely used the Target Account for presidential communications during this period. *See Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1222 (2021) (Thomas, J. concurring) ("Mr. Trump often used the account to speak in his official capacity."). Twitter has provided communications and data from the Target Account for the period of Mr.

Trump's presidency to the National Archives and Records Administration ("NARA").[3] The Warrant seeks information from a period at the end of Mr. Trump's presidency, specifically from October 2020 to January 2021.

The Warrant broadly seeks information, both public and private, content and non-content. Significantly, the Warrant seeks "[a]ll content, records, and other information relating to communications sent from or received by the SUBJECT ACCOUNT from October 2020 to January 2021, including . . . The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the SUBJECT ACCOUNT," as well as "All other content, records, and other information relating to all other interactions between the SUBJECT ACCOUNT and other Twitter users from October 2020 to January 2021." (Warrant, at 5.) The Warrant requires production within 10 days of issuance of the Warrant. (Warrant, at 6.)

The Warrant was accompanied by a Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b), prohibiting Twitter from disclosing the "existence or content of the Warrant to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice)," for a period of 180 days. (Order, at 2.) The Non-Disclosure Order states that there were "reasonable grounds to believe that such disclosure will result in destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation," and that

---

[3] Data associated with the account during the timeframe that Mr. Trump was president was produced to and is maintained by the NARA in accordance with the Presidential Records Act. 44 U.S.C. §§ 2201 *et seq*., *See, e.g.,* NARA website, "The National Archives received records from the Trump Administration, which ended on January 20, 2021. We are in the process of preserving and providing access to these records, including all official Trump Administration social media content and deleted posts from @realDonaldTrump and @POTUS." available at https://www.archives.gov/foia/pra-trump-admin; *see also* Letter from NARA Archivist David S. Ferriero to Hon. Carolyn B. Maloney, Chair of House Committee on Oversight and Reform (Feb. 18, 2022), noting that "Twitter provided us with a copy of the available account data [from @realDonaldTrump]," available at: https://www.archives.gov/files/foia/ferriero-letter-to-maloney-on-trump-presidential-records-on-social-media-platforms.02.18.2022.pdf.

"immediate notification to the customer or subscriber of the TARGET ACCOUNT(S) would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution." (Order, at 1.)

Twitter has preserved communications and data from the Target Account available in its standard production tooling used to handle law enforcement process. Twitter has also alerted the Special Counsel's Office of its concerns related to the Non-Disclosure Order and the restriction on its First Amendment rights in this case and the fact that much of the information sought in the Warrant has been produced to NARA and is likely covered by the Presidential Records Act. The Special Counsel's Office has declined to modify or withdraw the Non-Disclosure Order.

**APPLICABLE LAW**

A non-disclosure order is a content-based prior restraint on speech – the "most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), which "comes to [a court] with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971); *Matter of Subpoena 2018R00776*, 947 F.3d 148, 156 (3d Cir. 2020) (non-disclosure orders to service providers are content-based prior restraints subject to strict scrutiny under the First Amendment); *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876, 881-82 (S.D. Tex. 2008) (holding that § 2705(b) nondisclosure orders are content-based prior restraints on speech); *Microsoft Corp. v. U.S. Dep't of Justice*, 233 F. Supp. 3d 887, 905 (W.D. Wash. 2017) (same). A non-disclosure order is therefore invalid unless the government "can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchs. Ass'n*,

564 U.S. 786, 799 (2011); *Taucher v. Rainer*, 237 F. Supp. 2d 7, 13 (D.D.C. 2002) ("[T]he Supreme Court has specifically and unequivocally demanded that the government show the most compelling reason for *any* prior restraint on speech.") (emphasis in original).

Because a § 2705(b) non-disclosure order is a content-based prior restraint, two consequences follow. First, because the order operates as a prior restraint, it can be issued only pursuant to the "procedural safeguards" that the Supreme Court described in *Freedman v. Maryland*, 380 U.S. 51 (1965)—safeguards "that reduce the danger of suppressing constitutionally protected speech," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). Specifically, "the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002). Second, because the order is both content-based and a prior restraint, the highest level of judicial scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (content-based laws must "satisfy strict scrutiny"); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (prior restraint comes to court "bearing a heavy presumption against its constitutional validity"). Accordingly, a non-disclosure order must be "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163, and there must be no "less restrictive alternatives [that] would be at least as effective" as the non-disclosure order, *Reno v. ACLU*, 521 U.S. 844, 874 (1997).

## ARGUMENT

### I. This Non-Disclosure Order Cannot Withstand Strict Scrutiny

The government cannot overcome strict scrutiny here: there is no compelling governmental interest in maintaining the secrecy of this Warrant from everyone. Moreover, even if the government were able to make such a showing, the Non-Disclosure Order is not narrowly tailored to the least restrictive means available to accommodate Twitter's First Amendment

interests in notifying its user and providing him an opportunity to raise the weighty and unique questions of law surrounding the privilege attached to private presidential communications.

### A. Government Cannot Demonstrate a Compelling Interest in Secrecy

In this case, the government cannot credibly show that the Non-Disclosure Order prohibiting Twitter from disclosing information about the Warrant serves a compelling governmental interest. Given the voluminous publicly available information about the investigation of the former President (including, importantly, his statements and communications), the government lacks a compelling interest in maintaining the Non-disclosure Order here.

First, the Department of Justice's criminal investigation into former President Trump and his potential role in the efforts to overturn the 2020 presidential election and the January 6, 2021 attack on the United States Capitol, has been public for several months prior to the issuance of this Warrant. Specifically, the news media has reported extensively that presidential advisors, including White House counsel and senior staff, have been subpoenaed to testify before a federal grand jury investigating those events. *See e.g.*, Casey Gannon et al., *Former Trump White House Counsel and His Deputy Testify to Jan. 6 Criminal Grand Jury*, CNN (Dec. 2, 2022), *available at* https://www.cnn.com/2022/12/02/politics/pat-cipollone-district-courthouse/index.html; Katelyn Polantz & Hannah Rabinowitz, *First on CNN: Top Trump Advisor Stephen Miller Testifies to January 6 Federal Grand Jury*, CNN (Nov. 29, 2022), *available at* https://www.cnn.com/2022/11/29/politics/stephen-miller-testifies-january-6-federal-grand-jury-trump/index.html; Olivia Olander, *DOJ Sends Some 40 Subpoenas to Trump Aides*, POLITICO (Sept. 12, 2022) *available at* https://www.politico.com/news/2022/09/12/justice-subpoena-trump-aides-00056274; Bart Jansen, *Justice Department Subpoenas Dozens of Trump Aides in Apparent Escalation of Investigation, According to Reports*, USA Today (Sept. 12, 2022),

*available at* https://www.usatoday.com/story/news/politics/2022/09/12/trump-aides-subpoenaed-justice-department-jan-6-capitol-attack/10361875002/; Kyle Cheney, *Two Top Pence Aides Appear Before Jan. 6 Grand Jury*, POLITICO (Jul. 25, 2022), *available at* https://www.politico.com/news/2022/07/25/pence-chief-of-staff-january-6-00047772.

On November 18, 2022, the Department of Justice confirmed the criminal investigation into former President Trump in a televised press conference by Attorney General Merrick Garland. *See*, https://www.justice.gov/opa/pr/appointment-special-counsel-0. In the press conference, Attorney General Garland announced the appointment of a special counsel in "two ongoing criminal investigations that had received significant public attention" – the January 6th Capitol riot investigation and the former President's retention of classified documents. *Id.* Attorney General Garland noted that the appointment of a special counsel was necessary because of "the former President's announcement that he is a candidate for President in the next election." The Attorney General's statement made clear that the former President was a potential target of both criminal investigations.

It is also well known that, as part of its investigation, the Department of Justice is closely examining the private communications of people within the scope of its investigation, including the former president's aides and allies. Indeed, the Department of Justice has obtained search warrants for electronic devices of numerous close associates of former President Trump. *See e.g.*, Steve Benen, *DOJ Seizes Team Trump Phones as Part of Intensifying Jan. 6 Probe*, MSNBC (Sept. 13, 2022), *available at* https://www.msnbc.com/rachel-maddow-show/maddowblog/doj-seizes-team-trump-phones-part-intensifying-jan-6-probe-rcna47448; Ella Lee, *Pennsylvania Rep. Scott Perry, a Trump Ally, Says FBI Agents Seized His Cellphone*, USA TODAY (Aug. 10, 2022), *available at*

https://www.usatoday.com/story/news/politics/2022/08/10/scott-perry-fbi-seized-cellphone/10284599002/; Scott Gleeson, *MyPillow CEO, Trump Ally Mike Lindell Says FBI Issued Subpoena, Seized Phone at a Hardee's*, USA TODAY (Sept. 14, 2022), *available at https://www.usatoday.com/story/news/nation/2022/09/14/my-pillow-ceo-trump-ally-fbi-seized-phone/10375227002/*; Alan Feuer & Adam Goldman, *Federal Agents Seized Phone of John Eastman, Key Figure in Jan. 6 Plan*, N.Y. Times (Jun. 27, 2022), *available at* https://www.nytimes.com/2022/06/27/us/politics/john-eastman-jan-6.html. The Federal Bureau of Investigation ("FBI") has also executed a search warrant at the home of a Trump ally to seize electronic devices. *See e.g.* Alan Feuer at al., *Federal Authorities Search Home of Trump Justice Dept. Official*, N.Y. Times (Jun 23, 2022), *available at* https://www.nytimes.com/2022/06/23/us/politics/jeffrey-clark-trump-justice-dept.html.

Former President Trump is well aware of the existence of the Special Counsel's investigation. Indeed, the former President specifically addressed the appointment of a Special Counsel on the same day the Justice Department announced the appointment. *See, e.g.*, Former President Trump Statement on Special Counsel Appointment, available at https://www.c-span.org/video/?524379-1/president-trump-statement-special-counsel-appointment. Former President Trump is also keenly aware of the two investigations that were delegated to the Special Counsel – and the fact that those investigations included the execution of search warrants seeking evidence against him. On several occasions, he has publicly addressed his role in the January 6th Capitol riot and the August 2022 search warrant executed at his residence seeking classified documents.

In sum, public knowledge of the Department of Justice's criminal investigations of former President Trump and his allies in connection with the events of January 6, 2021 and the

retention of classified documents has been ubiquitous. Furthermore, it is well known that the FBI has been seizing and examining the communications of those involved. These federal investigations have been repeatedly acknowledged and addressed by the former President. The government cannot credibly claim that secrecy of this Warrant is required to maintain the integrity of the investigation when more than forty former presidential aides and allies have already been served with grand jury subpoenas, senior advisors are known to have testified before the grand jury, multiple search warrants have been executed for electronic devices, two physical search warrants have been executed, including at the former President's home, and the Attorney General has held a press conference publicly confirming the criminal investigations are directed at the former President. It strains credulity to believe that the incremental disclosure of this Warrant could somehow alter the current balance of public knowledge in any meaningful way so as to cause some harm to the investigation.[4]

The government's proffered explanations for needing the Non-Disclosure Order appear to be conclusory at best. There is no reason to believe that notification of this latest search warrant in this investigation would suddenly cause former President Trump or any potential confederates

---

[4] Other investigations focusing on the former President and his associates are also publicly known and widely reported in the media, including by the Select Committee to Investigate the January 6th Attack on the United States Capitol, the Fulton County District Attorney's Office, and the Manhattan District Attorney's Office. *See* Mary Clare Jalonick et al., *Jan. 6 Panel Urges Trump Prosecution with Criminal Referral,* ASSOCIATED PRESS (Dec. 19, 2022), *available at* https://apnews.com/article/january-6-final-hearing-investigation-wraps-0bceb95826c1c836023d2810ccbeccca; Kyle Cheney, *'Decisions are Imminent': Georgia Prosecutor Nears Charging Decisions in Trump Probe*, POLITICO (Jan. 24, 2023), *available at* *https://www.politico.com/news/2023/01/24/decisions-are-imminent-georgia-prosecutor-nears-charging-decisions-in-trump-probe-00079283*; William Rashburn et al., *Manhattan Prosecutors Begin Presenting Trump Case to Grand Jury*, N.Y. TIMES (Jan. 30, 2023), *available at* https://www.nytimes.com/2023/01/30/nyregion/trump-stormy-daniels-grand-jury.html. The government cannot plausibly assert that these investigations in which the former President's liberty is implicated pose less of an incentive to flee, tamper, or destroy evidence than notification of the Warrant.

to destroy evidence, intimidate witnesses, or to flee prosecution. First and foremost, the Warrant does not provide any new information about the progress of criminal investigation and how the government is seeking evidence; if they were so inclined, former President Trump and potential confederates have had many months during which the government's investigation has been widely known to try and interfere with it. Second, the former President has announced that he is running for re-election in 2024, which renders it highly implausible that he will attempt to flee the country, and even more unlikely that such flight would be precipitated by this specific Warrant. Finally, with respect to this Warrant, Twitter has preserved communications and data from the Target Account available in its standard production tooling used to handle law enforcement process. Therefore, disclosure of the existence of the Warrant to the former President would not risk deletion of relevant communications or data preserved in its production tooling.

In sum, the government cannot meet its burden of establishing a compelling governmental interest necessary to restrain Twitter's First Amendment rights. The government's conclusory statements of investigative harm are insufficient to withstand strict scrutiny. *See John Doe, Inc. v. Mukasey*, 549 F.3d 861, 881 (2d Cir. 2008) (reviewing court cannot "uphold a nondisclosure requirement on a conclusory assurance" that a statutory standard is satisfied). Accordingly, the Non-Disclosure Order should be vacated.

### B. Unique and Important Executive Privilege Considerations Underlie Twitter's First Amendment Interest in Notifying its User

Twitter's First Amendment interests in being able to notify its user in this case is particularly important, where the Warrant calls for the production of, among other things, private communications sent or received personally by the then-President of the United States. No court has ever addressed the issue of executive privilege in this context —including what limitations

might need to be imposed on derivative use of private presidential communications.[5] Twitter itself may not have standing to raise these issues, and takes no position on the applicability of executive privilege to these communications in this circumstance. Nonetheless, the disclosure of these private presidential communications clearly affects other parties, including Twitter's user, who was President of the United States at the time the materials sought were created, and may retain the ability to assert that privilege now. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448-49 (1977). As, the United States Supreme Court stated in *Nixon*:

> [u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.

*Id.* (*quoting* Appellee's Br. at 33). Recently, the Supreme Court declined to answer the open question of whether a former President can assert the privilege over his successor's objection, stating that "[t]he questions whether an in what circumstances a former President may obtain a court order preventing disclosure of privileged records from his tenure in office, in the face of a determination by the incumbent President to waive the privilege, are unprecedented and raise serious and substantial concerns. *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Order Denying Stay of Mandate and Injunction).

These are weighty and difficult questions that courts, including the Supreme Court, have wrestled with, and should be resolved through a full adversarial process involving the real parties in interest, not through an *ex parte* secret filing. Twitter has a significant interest in being

[5] No court has addressed the core privilege issue in this context, and there is a separate and critical issue of derivative use of those communications. As noted in the introduction, it is in part for these reasons that execution of the Warrant should be stayed to preserve the status quo.

permitted to notify its user—for whom there are no credible investigative reasons to bar disclosure—of the existence of the Warrant, so that he may raise whatever concerns he has, if any, for determination by this Court in a full adversarial proceeding.

### C. The Order is Not Narrowly Tailored, as There are Less Restrictive Means Available that Would Preserve Twitter's Essential First Amendment Rights

Separately, even assuming *arguendo* that the government could make a showing of a compelling governmental interest, strict scrutiny also requires the government to prove that a non-disclosure order is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 164. Given the availability of less restrictive means however, the government cannot meet its burden.

Here, the government cannot meet this burden because the Non-Disclosure Order is a blanket prohibition preventing Twitter from notifying anyone about the Warrant and Non-Disclosure Order. Instead, this Court could modify the Non-Disclosure Order to permit Twitter to notify just its user of the Warrant. Such a modification to the Non-Disclosure Order would permit Twitter to exercise its First Amendment interest in complying with its contractual promise to its users about a law enforcement demand for communications and data.

Alternatively, if the government were concerned that even limited disclosure to the user would jeopardize its widely publicized investigations, this Court could modify the Non-Disclosure Order to authorize Twitter to notify a representative of the former President, perhaps from among the list of representatives that former President Trump officially designated as "my representatives in all respects that pertain to the records of my Presidency, and . . . each representative may exercise all authority granted to me under Chapter 22 of title 44, United

States Code, or any other provision of law related to the records of my Presidency."[6] The Court could even appoint a Special Master, who could consider, raise, and assert any rights or privileges, if any, on behalf of the former President.

Finally, the government has another, even less restrictive option that would not impede Twitter's First Amendment interests at all. The government could seek the data instead from the Archivist at the NARA, who, consistent with the Presidential Records Act, maintains a copy of the Target Account from the requested time period. Such action would be in compliance with the law governing presidential records passed by Congress and implemented by the Executive Branch compared to this *ex parte* process sought by the Special Counsel that is proceeding without regard to the procedures governing the Presidential Records Act.

In sum, because there are more narrowly tailored ways to craft the Non-Disclosure Order that lessen the burden on Twitter's First Amendment rights, the Non-Disclosure Order cannot stand.

**D. Failure to Stay Twitter's Production Obligation Pending Resolution of this Motion Would Cause Irreparable Injury to Twitter's First Amendment Rights and Effectively Eliminate Any Potential Remedy for the User**

Finally, although the Warrant requires production of requested information within 10 days of issuance, this Court should stay Twitter's obligation to comply until the Non-Disclosure issue has been resolved. Were Twitter obligated to produce the requested information, it would vastly impede its ability to effect its First Amendment rights to provide meaningful notice to its

---

[6] Letter of Donald J. Trump to NARA Archivist David S. Ferriero (Jan. 19, 2021), designating "Mark R. Meadows, Pasquale A. Cipollone, John A. Eisenberg, Patrick F. Philbin, Scott F. Gast, Michael M. Purpura, and Steven A. Engel as my representatives in all respects that pertain to the records of my Presidency, and . . . each representative may exercise all authority granted to me under Chapter 22 of title 44, United States Code, or any other provision of law related to the records of my Presidency." Available at https://www.archives.gov/files/foia/wh-ltr-to-u.s.-archivist-trump-pra-rep-1.19.2021.pdf.

user. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) *citing New York Times Co. v. United States*, 403 U.S. 713 (1971). Twitter's First Amendment interests are myriad: it wishes to engage in the speech prohibited by the Non-Disclosure Order for a variety of reasons, including both its commitment to informing its customers about legal process related to their accounts but also because in this unique instance, the user may have a strong interest in challenging the Warrant or further use of the requested data – a challenge the user cannot bring unless he is informed of the Warrant before its execution. This concern is even more heightened when the Special Counsel apparently seeks to obtain communications and data that is already at NARA and access to which is subject to the procedures set forth in the Presidential Records Act.

Acknowledging the importance of First Amendment interests and the high judicial scrutiny that attends to prior restraint on speech, the Supreme Court has been clear that the status quo should be maintained pending a final judicial determination. *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965) ("Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."); *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) ("any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained"). Applying those principles here, the Court should stay any production obligation until the issues raised in this motion are resolved —and in the event the Non-Disclosure Order is quashed or modified and notice is permitted, for a 7 day period after such notice is given.

FILED UNDER SEAL

## CONCLUSION

The Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) is a blanket prohibition prohibiting Twitter from notifying anyone about the Warrant or Non-Disclosure Order, and cannot be justified by a compelling governmental interest. Accordingly, the Non-Disclosure Order impermissibly burdens Twitter's First Amendment rights, and must be vacated or modified to allow Twitter to notify its user of the government's demand. In addition, this Court should stay Twitter's compliance with the Warrant until resolution of these constitutional issues.

Dated: February 2, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C. admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C. admission pending)*
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

George Varghese *(pro hac vice forthcoming)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

*Counsel for Twitter, Inc.*

FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of February 2023, I caused the foregoing motion to be served by first class mail and email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED
FEB - 2 2023
Clerk, U.S District & Bankruptcy
Courts for the District of Columbia

IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A

Case No. 1:23-SC-31-BAH

**UNDER SEAL**

**MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER**
**AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT**

Twitter, by and through the undersigned counsel, respectfully moves to vacate or modify this Court's Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) and stay Twitter's obligation to comply with the warrant until the Court has resolved the issues raised in this motion—and in the event the Non-Disclosure Order is quashed or modified—for a 7 day period after Twitter has provided notice. Pursuant to Local Criminal Rule 47(f), Twitter also respectfully requests an oral hearing on this motion.

A memorandum of points and authorities and proposed order are attached.

Dated: February 2, 2023

Respectfully submitted,

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(admission pending)*
Whitney Russell, D.C. Bar 987238 *(admission pending)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Benjamin.Powell@wilmerhale.com
Whitney.Russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

George Varghese *(pro hac vice forthcoming)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston MA 02109
George.Varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

*Counsel for Twitter, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of February 2023, I caused the foregoing motion to
be served by first class mail and email upon:

Gregory Bernstein, Assistant Special Counsel

Ari Holtzblatt, D.C. Bar 1009913
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |
|---|---|

**TWITTER'S REPLY IN SUPPORT OF ITS
MOTION TO VACATE OR MODIFY NON-DISCLOSURE ORDER
ISSUED PURSUANT TO 18 U.S.C. § 2705(b)
AND STAY TWITTER'S COMPLIANCE WITH SEARCH WARRANT**

In its opposition, the government does not seriously contest that Twitter has a First Amendment interest in informing its user of the Warrant, nor that the Non-Disclosure Order operates as a prior restraint on such speech and is therefore subject to strict scrutiny. Instead, it asserts that disclosure of the Warrant in this case would undermine "the integrity and secrecy of an ongoing investigation." Opp. 8. But those vague and generalized interests are insufficient to justify the prior restraint in this case. Both the statute and the First Amendment require the government to establish that silencing Twitter is necessary to address the narrower and more concrete objectives that the government identified when it first obtained the order: preventing "destruction of or tampering with evidence," "intimidation of potential witnesses," and "serious jeopardy to the investigation."[1]

[1] In its opposition brief, the government abandons the first rationale (flight from prosecution) on which it relied, conceding it was included in error. Opp. 2 n.1. The government states that the errant language "can be found at the bottom of page two of the NDO," but it appears that the government instead means to refer to language found at the bottom of page one.

The government has not met and cannot meet that burden. The government's opposition does not even attempt to account for the unique and unparalleled level of publicity surrounding this investigation. It is undisputed that the public knows the government is seizing electronic communications in this (publicly-announced) criminal investigation, including from people who communicated directly with the Twitter user at issue in the Warrant. When an investigation's existence and details about the specific investigative technique at issue in a warrant are widely known, as here, secrecy alone cannot justify a gag order covering a warrant that any reasonable observer would expect the Special Counsel to obtain. Nor can the government claim to be concerned that the Twitter user might destroy the evidence sought, given that the government has now obtained that evidence from Twitter pursuant to the Warrant. And it cannot be credibly said that disclosing the Warrant would provide a particular reason for witness intimidation in view of all the prior reporting that this type of warrant has already been used to seize this type of communications.

Even if the government could establish that the Non-Disclosure Order furthered a compelling (and statutorily identified) interest, it still could not demonstrate that it is the least restrictive means of advancing that interest. The government cursorily dismisses Twitter's proposed alternatives as "untenable" or "impractical," but the Constitution demands more than that. The government may not just assert that proposed alternatives "do not work," or that its "chosen route is easier"—it "must demonstrate that alternative measures … would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 494-495 (2014) (applying intermediate scrutiny). The government has not done so here. It could prevent whatever investigative danger it fears by, for instance, permitting Twitter to disclose only the warrant form and Attachment A (and the relevant date range) to a representative of Mr. Trump who has

already been authorized to act on his behalf "in all respects that pertain to the records of [his] Presidency."[2] Or it could disclose just the fact of the Warrant, but not its contents or attachments.

As a result, the government has failed to carry its burden of justifying the Non-Disclosure Order in this case. The court should accordingly vacate or at least modify that order.

## I. The Government's Asserted Interests Cannot Justify the Non-Disclosure Order

Both the SCA and the Constitution require the government to make specific showings to justify a non-disclosure order. But the highly public nature of the government's investigation and use of this investigative tool means that it cannot make the required showing. Indeed, the government's opposition brief makes little effort to do so—instead, it appears to apply a different—and lesser—legal standard than the one mandated by the statute and the Constitution.

1. The Government Cannot Satisfy the Proper Standard for Obtaining a Section 2705(b) Order

Strict scrutiny requires the government to "specifically identify an 'actual problem' in need of solving," and explain why the Non-Disclosure Order is "actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). The government cannot satisfy that burden here for the three statutorily-authorized rationales that remain in the Non-Disclosure Order.

**Destruction or Tampering With Evidence.** The government cannot demonstrate a meaningful risk that the evidence at issue will be destroyed or tampered with, because Twitter has now produced the evidence from the Target Account that the government requested. If

[2] Letter of Donald J. Trump to NARA Archivist David S. Ferriero (Jan. 19, 2021), available at https://www.archives.gov/files/foia/wh-ltr-to-u.s.-archivist-trump-pra-rep-1.19.2021.pdf (hereinafter "NARA Designation").

disclosure of the Warrant ever risked the destruction of the evidence it sought, it cannot do so now that the evidence is within the government's control.

Nor is it reasonable to conclude that disclosure of the Warrant could prompt the destruction of *other* evidence. As explained in Twitter's opening brief, the Special Counsel has made its investigations into Mr. Trump public. Mot. 8-12. These investigations are likely the most widely known and widely reported on criminal investigations in the Nation. The Department of Justice has itself confirmed the investigations' existence and scope, and has issued scores of subpoenas (now public) encompassing subjects' telephones, personal communications, and sensitive testimony (including that of aides who worked directly for the former President). Mot. at 9-11. As a result, everyone—including Mr. Trump—knows the following:

- The investigations target Mr. Trump and his associates;
- The investigations focus on, among other things, Mr. Trump's involvement in and responsibility for interference with Congress's certification of the presidential election on January 6;
- The government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and
- The investigations encompass Mr. Trump's personal communications, including communications stored electronically.

In short, Mr. Trump is at least constructively aware that the government has done or is doing what the Warrant does.

Adding the limited information reflected in the Warrant—that the government seeks information from the Target Account—to that vast body of public knowledge cannot constitute a reason to believe that anyone will destroy evidence (or, if notice were limited to Mr. Trump, that he will destroy evidence). If Mr. Trump or a witness were inclined to destroy evidence, they

FILED UNDER SEAL

already have ample reason to do so in view of the numerous public reports that the government

has taken the specific investigative step at issue here in this very case—seizing electronic

communications.  The statute and the Constitution require the government to draw a specific link

between disclosure of this Warrant and that act of destroying evidence—and the government

cannot do so.[3]

  Indeed, since this court initially issued the Non-Disclosure Order, the rationale for it has

grown weaker, not stronger.  In just the past few weeks, the government has taken several highly

publicized investigatory steps[4]: the Special Counsel has subpoenaed the former President's

daughter and advisor Ivanka Trump and her husband and former presidential advisor Jared

Kushner[5]; subpoenaed former Vice President Mike Pence[6]; subpoenaed Mark Meadows, Mr.

Trump's last Chief of Staff[7]; required two of Mr. Trump's lawyers to appear before a grand

---

[3] Mr. Trump may be unique in this regard for this investigative step.  Because he was announced as a principal subject of investigation and because the public reporting has focused on investigative actions directed at him, he may have a unique level of knowledge about investigative actions regarding him—even relative to other investigations of him that were conducted with far less public awareness.

[4] The news articles Twitter cited its initial motion are attached here as Exhibit A.  The articles cited in this Reply are attached as Exhibit B.

[5] Maggie Haberman & Michael S. Schmidt, *Jared Kushner and Ivanka Trump Subpoenaed in Jan. 6 Investigation*, N.Y. TIMES (Feb. 22, 2023), available at https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html.

[6] Maggie Haberman & Glenn Thrush, *Pence Gets Subpoena From Special Counsel in Jan. 6 Investigation*, N.Y. TIMES (Feb. 9, 2023), available at https://www.nytimes.com/2023/02/09/us/politics/pence-subpoena-trump.html.

[7] C. Ryan Barber & Sadie Gurman, *Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by Grand Jury*, WALL STREET JOURNAL (Feb. 15, 2023), available at https://www.wsj.com/articles/mark-meadows-trumps-last-chief-of-staff-subpoenaed-by-grand-jury-8c7ad44e?mod=Searchresults_pos2&page=1.

jury[8]; attempted to force one of those lawyers to provide "answers about direct conversations" he had with Mr. Trump[9]; "moved aggressively with subpoenas to associates of Mr. Trump and requests for prompt productions of documents"[10]; and subpoenaed state legislative leaders to acquire their communications with Mr. Trump and other Trump campaign officials.[11] If there was any public uncertainty before (and there was not), there is now no hiding that the Special Counsel is investigating Mr. Trump and his associates, and that his investigative steps include obtaining the contents of direct communications between Mr. Trump and his associates. The disclosure of the Warrant does not meaningfully add anything to that public knowledge.[12]

---

[8] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023), available at https://www.wsj.com/articles/trump-lawyers-appeared-before-grand-jury-as-part-of-classified-documents-probe-3d1c8040?mod=Searchresults_pos5&page=1.

[9] Katelyn Polantz et al., *Special counsel is locked in at least 8 secret court battles in Trump investigations*, CNN (Feb. 16, 2023), available at https://www.cnn.com/2023/02/16/politics/secret-grand-jury-special-counsel-trump/index.html.

[10] C. Ryan Barber & Alex Leary, *Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe*, WALL STREET JOURNAL (Feb. 11, 2023).

[11] Jim Small, *GOP Arizona legislators, including leaders of the house and senate, subpoenaed to testify in special counsel probe of Trump*, Arizona Mirror (Feb. 17, 2023), available at https://www.azmirror.com/blog/gop-arizona-legislators-including-leaders-of-the-house-and-senate-subpoenaed-to-testify-in-special-counsel-probe-of-trump/.

[12] Significant media coverage of an investigation may have different legal consequences in the context of grand jury sealing than in the context of Section 2705(b) non-disclosure orders. *See In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *10 (D.D.C. Feb. 23, 2023) ("[M]aterials from grand jury matters of intense public interest … may have to remain entirely sealed in the name of grand jury secrecy."). Rule 6(e) asks only whether sealing is required "to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e). Section 2705(b), by contrast, requires the government to make a showing that specific adverse consequences may flow from disclosure. Even if media publicity arguably lowers the bar for establishing a potential breach of grand jury secrecy (as relevant for Rule 6(e)), it can sometimes raise the bar for proving that a particular breach of secrecy will lead to specific adverse consequences for an investigation—as Twitter's motion and this reply have explained.

**Intimidation of Potential Witnesses.** Nor is it reasonable to conclude that disclosure of this Warrant in particular would spur witness intimidation in view of that which is already well known about this investigation's seizure of electronic communications. Just as with the destruction of evidence factor, any would-be intimidators, including Mr. Trump himself, have already had more than sufficient reason and opportunity to try to intimidate witnesses in this investigation. Learning of this Warrant would add nothing meaningful to the mix of information already available. And unlike the dozens of subpoenas that are already public, the Warrant here does not involve a witness at all—only data stored on Twitter's servers. The types of revelations that would be logically tied to potential witness intimidation—the disclosure of an investigation's existence or the name of a potential witness—are not implicated by the limited disclosure of this Warrant. And indeed, those categories of information have already been revealed, dozens of times over.

**Serious Jeopardy to an Investigation.** For similar reasons, the government cannot show that disclosure would "seriously jeopardiz[e]" its already highly public investigation. 18 U.S.C. § 2705(b)(5). Importantly, this factor cannot be satisfied merely by showing some vague impact on the "integrity" of the government's investigation. *Contra* Opp. 8. Only "serious[] jeopard[y]" to the investigation can justify restricting Twitter's First Amendment rights.

In a typical case, the government might demonstrate a risk of "serious[] jeopardiz[ation]" by observing that disclosure would "alert the targets to [an] ongoing investigation" of which they would otherwise be unaware. *In re Grand Jury Subpoena Subpoena to Facebook*, 2016 WL 9274455, at *2 (E.D.N.Y. May 12, 2016); *see also, e.g.*, *In the Matter of the Application of the U.S. for a Warrant Authorizing, [Redacted]*, 2015 WL 667923 (D. Kan. Feb. 13, 2015), at *1 ("[T]he government contends such [serious] jeopardy 'would result from notifying a major target

of these investigations that he is under current scrutiny by law enforcement personnel.'"). But that cannot justify the government's approach here—where the Attorney General of the United States held a nationally televised press conference and confirmed the investigation, its scope, and the identity of the target. Once again, this Warrant adds nothing to the public knowledge of the investigation's existence or targets. *See In re Grand Jury Subpoena Issued to Twitter, Inc.*, 2017 WL 9287146, at *6 (N.D. Tex. Sept. 22, 2017) (vacating a non-disclosure order after indictment was unsealed, because the resulting public knowledge meant that "ongoing restriction on Twitter's communication with its subscriber[]" did "little to conceal that [its subscriber]—and, thus, his associates—are under investigation … ."), report and recommendation adopted, No. 3:17-MC-40-M-BN, 2017 WL 9287147 (N.D. Tex. Oct. 19, 2017).

**Past Conduct.** That Mr. Trump may have previously engaged in obstructive behavior towards known cooperating witnesses (or potentially cooperating witnesses) with respect to other investigations or inquiries does not suffice. Twitter does not question that such past behavior would justify concern that Mr. Trump might attempt to obstruct this investigation. But that alone cannot justify restricting Twitter from speaking because the Warrant reveals little that is not already public and provides no new reason for Mr. Trump to engage in obstructive activity. To silence Twitter the government must show that "there is reason to believe that notification of the existence of the" Warrant *here*—as opposed to all of the government's other public efforts—would prompt obstruction. 18 U.S.C. § 2705(b). And for the reasons already described, the particular sorts of obstruction that could actually endanger the government's investigation—like the destruction of evidence or intimidation of witnesses—are not realistically likely to follow from the Warrant's disclosure.

2. The Government's Counter-Arguments Cannot Justify The Non-Disclosure Order

In its opposition, the government offers two counter-arguments for why disclosure of the Warrant is nonetheless likely to damage its investigations. First, it argues that much of the public knowledge of its investigations stems from media accounts that "attempt to fill in gaps based on discrete pieces of information or courthouse sightings of witnesses." Opp. 9. But a significant portion of the public information about the investigations has, in fact, come from the government itself. As explained in Twitter's opening brief, the Department of Justice confirmed the criminal investigations into Mr. Trump in a televised press conference. Mot. 9. It has issued scores of subpoenas to extremely high-profile witnesses who are close to the target of its investigations. And the government "has supported the partial unsealing of two judicial decisions resolving filter team motions" that confirmed it has seized and is reviewing the email accounts of Mr. Trump's associates as part of the investigations. *In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *15 (D.D.C. Feb. 23, 2023) (citing *In re Search of Info. Associated with Two Accounts Stored at Premises Controlled by Google LLC*, 2022 U.S. Dist. LEXIS 237972 (D.D.C. Dec. 15, 2022)). In any event, it is largely irrelevant whether the public's existing knowledge of the investigations arises from deliberate disclosures by the Special Counsel, or instead from investigative reporting. Either way, the public—including Mr. Trump—has become aware of the investigation's existence, scope, and methods (including the Warrant's method and the Warrant's target type of material). Regardless of how that came about, it means that disclosure of the Warrant is unlikely to substantially alter the balance of public knowledge about the investigations.

The government's second argument, that the public's knowledge is more general than what the Warrant reveals, fares no better. In particular, the government argues that while "the

investigation's existence is no longer secret," the "specific ongoing investigative steps the Government is pursuing" are. Opp. 9. But as explained above, the public knows of far more than just "the investigations' existence." The public knows that the investigations target Mr. Trump and a wide range of his associates; that the investigations focus on, among other things, Mr. Trump's involvement in the events of January 6; that the government has seized electronic communications of Mr. Trump's associates, including those who communicated directly with Mr. Trump; and that the investigations encompass Mr. Trump's personal communications, including those stored electronically. The government cannot point to any piece of information in the Warrant that would meaningfully reveal something beyond that broad set of already-public facts.

3. The Government Misstates the Legal Standard for Obtaining a Section 2705(b) Order

The SCA provides that a court may issue a non-disclosure order under 18 U.S.C. § 2705(b) only if "there is reason to believe that notification of the existence of the warrant … will result in" one of several specific adverse outcomes. Those include the grounds on which the non-disclosure order in this case now relies: "destruction of or tampering with evidence," "intimidation of potential witnesses," and "otherwise seriously jeopardizing an investigation." 18 U.S.C. § 2705(b)(3)-(5). The government's opposition, however, largely ignores these statutory requirements. Instead, the government suggests an entirely separate rationale for non-disclosure: "preserving the integrity and secrecy of an ongoing investigation." Opp. 8.

Contrary to what the government suggests, it cannot justify the non-disclosure order simply because there is a related grand jury proceeding. *See* Opp. 8. Grand jury secrecy rules do not speak to disclosure of a warrant, Fed. R. Crim. P. 6(e)(2)(B), and the fact of a search warrant

does not in and of itself reveal "a matter occurring before the grand jury."[13] *See In re Application of the N.Y. Times Co. & Charlie Savage*, 2023 WL 2185826, at *4 n.6 ("Search warrants … are not subject to Rule 6(e), even when the warrant is issued to obtain evidence as part of an ongoing grand jury investigation[.]"). Indeed, a warrant, unlike a grand jury subpoena, can be issued in the absence of a grand jury, such as post-indictment. And given the level of public knowledge concerning the Special Counsel's investigations (discussed above), the Warrant in this case has far more in common with a post-indictment warrant, where maintaining secrecy is not an issue, than a pre-indictment grand jury subpoena issued in total secrecy. Moreover, the existence of a grand jury investigation does not cloak every related government action in grand jury secrecy. *See Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 73 (D.C. Cir. 2018) ("Rule 6(e) does not … draw a veil of secrecy over all matters occurring in the world that happen to be investigated by a grand jury." (quotation marks and alteration omitted)). Even the governing federal rule in the grand jury context begins with a presumption against secrecy, *see* Fed. R. Crim. P. 6(e)(2)(A) ("No obligation of secrecy may be imposed on any person except in accordance with [this rule]."), and courts that have upheld non-disclosure orders in the grand jury context have limited those orders to "exceptional cases," *see, e.g.*, *In re Grand Jury Proceedings*, 814 F.2d 61, 69 (1st Cir. 1987).

Moreover, the secrecy of a criminal investigation alone does not, "without more, provide a statutory basis for a nondisclosure order under Section 2705(b)." *In re Grand Jury Subpoena Issued to Twitter*, Inc., 2017 WL 9287146, at *6. Neither "secrecy" nor "integrity," as an end unto itself, appear in the statute. Rather, the law spells out that a desire for secrecy justifies non-

[13] Were it otherwise, a non-disclosure order would be required for every search warrant to protect grand jury secrecy.

disclosure only where the government establishes a specific, factual link to the particular harms Congress has identified. "[S]ecrecy" and "integrity" could be invoked to justify any speech restriction about any investigative step. But both the First Amendment and the statute preclude the government from asserting an interest that is "too broad … to serve as an effective constraint on law enforcement decisions that may infringe First Amendment rights." *Doe v. Harris*, 772 F.3d 563, 580 (9th Cir. 2014).

As explained above (and in Twitter's opening motion), the government cannot satisfy the specific and concrete interests enumerated in Section 2705(b)(3)-(5). To the extent that the government's *ex parte* filing relies on some other interest, it should be required to disclose that interest to Twitter. That is particularly so in this case, where the government has already conceded that it committed a substantive error in its initial *ex parte* filing to obtain the Non-Disclosure Order. Revealing the nature of the government's interest—as opposed to the facts establishing a risk to that interest—is unlikely to disclose anything that could endanger the government's investigation. And keeping it secret (if that is what the government has done) deprives Twitter of a meaningful opportunity to contest the Non-Disclosure Order by explaining why that interest would not be endangered by limited disclosure. "*Ex parte* communications generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quotation marks omitted). For that reason, particularly where an *in camera*, *ex parte* filing is "dispositive," the government should at least make "available to both sides … the general purport of the [*ex parte*] argument and evidence such that the other side will have an opportunity to respond to the general tenor of the proposed submission," and "explain[] why more detail

should not be made available." *Ibrahim v. Dep't of Homeland Sec.*, 2012 WL 6652362, at *6 (N.D. Cal. Dec. 20, 2012); *see also United States v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007) ("If *ex parte* communications are to be allowed at all, they must continue no further than the extent to which they are absolutely necessary to protect the state's compelling interest.").

If the government is relying on a secret rationale for the Non-Disclosure Order, that also raises the possibility that it has shifted its rationale since it first sought the order. But because prior restraints are constitutionally suspect, such a restraint cannot be defended based on "*post hoc* rationalizations" or the use of "shifting … criteria," which too easily enable censors to "permit[] favorable, and suppress[] unfavorable, expression." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988). The government was required to make the requisite showing *prior to* the Non-Disclosure Order being signed. The Court should not countenance any post-hoc rationalizations that were not offered at the time the government first sought the Non-Disclosure Order.

## II. The Government Has Not Demonstrated That the NDO is Narrowly Tailored; Nor Has It Meaningfully Addressed Twitter's Proposed Less Restrictive Alternatives

A speech restriction is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Boardley v. U.S. Dep't. of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010) (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). As Twitter explained in its Motion, there are several ways that the Court could more narrowly tailor the Non-Disclosure Order to achieve the government's asserted interests and minimize infringement on Twitter's First Amendment rights. Rather than seriously consider these less restrictive measures, the government dismisses them with two paragraphs of cursory analysis. But the government may not just assert, as it does here, that the proposed alternatives simply "do not work." *McCullen*, 573 U.S. at 494 (applying intermediate scrutiny). It must instead "show[] that

it seriously undertook to address the problem with less intrusive tools readily available to it," "that it considered different methods that other jurisdictions have found effective," and, ultimately, "that alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id.* at 494-495*; see also Billups v. City of Charleston, S.C.*, 961 F.3d 673, 688 (4th Cir. 2020) ("testimony from [government] officials regarding the predicted ineffectiveness of … suggested alternatives[,] … without more, is not sufficient to satisfy" even intermediate scrutiny). Because the government fails to meaningfully respond to Twitter's proposals for a less restrictive alternative or itself demonstrate that alternative measures are insufficient, it has not shown that its Non-Disclosure Order is narrowly tailored to achieve its stated interests.

1. The Government has not Demonstrated an Absence of Less Restrictive Means

First, the Court could partially modify the Non-Disclosure Order to permit Twitter to notify the user of the Target Account to the existence of the Warrant without disclosing the contents of Attachment B. The government's articulation of its interest presupposes that Twitter would be "[p]roviding the Warrant to the former president" or otherwise providing to him "the detail supplied in the Warrant." (Opp. 9.) But the government makes no attempt to tailor its interest to mere disclosure of the Warrant's existence, and in fact makes several concessions suggesting that such a disclosure would not significantly impact its interest: For example, the government acknowledges that its "investigation's existence is no longer secret." (Opp. 9.) Nor does it contest that the public is aware of the investigation's scope—in particular, that the investigation encompasses the sensitive personal communications of Mr. Trump and his associates. *See supra* 4-6. Instead, the government warns that "[p]roviding the Warrant to the former president at this point in the investigation" would "exceed some mere 'incremental' step,"

but instead impair its investigation. Opp. 9. Even accepting the government's argument, no such impairment would take place absent provision of the Warrant and attachments. Similarly, to the extent that the risks to the government's interest arise from the user's confederates, and not from the user himself, then disclosure of the Warrant to the user alone would be sufficient.

Alternatively, the Court could permit Twitter to alert one of the former President's representatives authorized to assert his privileges in this case—for example, the former President's attorney, or the several designated "representatives in all respects that pertain to the records of my Presidency" on file with the National Archives and Records Administration (NARA). NARA Designation. As other courts in this District have done in similar cases, the Court could then order those individuals not to disclose the existence of the Warrant. *See, e.g.*, Order, ECF No. 4 at 1, *In re Application of USA for 2703(d) Order for Six Email Accounts Serviced by Google LLC for Investigation of Violation of 18 U.S.C. §§ 641 and 793* [hereinafter "*In re Application re: Six Email Accounts*"], SC No. 20-sc-3361 (D.D.C. Mar. 3, 2021) (modifying gag order to permit disclosure to target's counsel but to no other entities); Order, ECF No. 6 at 1, *In re Application re: Six Email Accounts* (Mar. 8, 2021) (similar); Order, ECF No. 8 at 1, *In re Application re: Six Email Accounts* (Mar. 22, 2021) (similar); *see also In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174, 180 (D.D.C. 2004) (permitting attorney review of sensitive evidence through issuance of a protective order and prohibiting counsel from "disclos[ing] classified information not provided by [their client] to [their client]").

The government does not dispute this latter alternative would minimize the infringement on Twitter's speech while avoiding the harms set forth in their *ex parte* submission. (Opp. 12.) Instead, the government asserts that it would be "untenable" or "impractical" to assess a representative's trustworthiness, and that such a representative would lack the ability to vindicate

Mr. Trump's interests without informing him of the Warrant. (Opp. 11-12.) But the government nowhere explains why extending the Non-Disclosure Order to cover the representatives—as other courts in this District have done—would not address any concerns about a representative's trustworthiness. *See* ECF Nos. 4, 6, 8, *In re Application re: Six Email Accounts*. And courts frequently assess the trustworthiness and discretion of representatives in many contexts, including protective orders and conservatorships. *See, e.g., In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174. In any event, that disclosing to a representative would be less expedient for the government than the blanket Non-Disclosure Order imposed on Twitter is not a permissible reason to dismiss it: "[T]he prime objective of the First Amendment is not efficiency." *McCullen*, 573 U.S. at 495.

Nor is there merit to the government's unsupported assertion that a designated representative would not have standing or authority to vindicate the former President's legal interests in this case. The NARA grant of authority is sweeping and unconditional, designating seven identified individuals as "representatives in *all* respects that pertain to the records of my presidency." NARA Designation (emphasis added). The letter essentially grants power of attorney to the named individuals within the specified domain. Litigation of privileges related to those records fall within that broad ambit, and a lawfully designated representative asserting a pertinent privilege is a circumstance in which "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287-288 (2008) (noting also that "[t]rustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth").

FILED UNDER SEAL

2. The Non-Disclosure Order is not Narrowly Tailored in Light of Twitter's Significant First Amendment Rights at Stake

Instead of meaningfully addressing these less restrictive alternatives, the government asserts that "any restriction on Twitter is the least restrictive means of advancing governmental interests." (Opp. 10.) It then offers two reasons why its non-disclosure order is narrowly tailored: it is limited in duration to 180 days, and it restricts Twitter from disclosing only the existence or contents of the Warrant itself. (Opp. 10-11.)

As to the former, the government asserts that the mere presence of a "temporal limitation … balances the need for investigative secrecy and any speech interests." (Opp. 11.) But even the case it cites acknowledges that "a temporal limitation alone may not be enough to satisfy strict scrutiny." *Matter of Subpoena 2018R00776*, 947 F.3d 148, 157 (3d Cir. 2020); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (noting that "the burden on the Government" of justifying a prior restraint "is not reduced by [its] temporary nature[.]"). Twitter's First Amendment interest is in notifying its user of the Warrant at a time when that information would be meaningful to the user—here, when the user could assert his potential privilege before it has been invaded. Though Twitter is not privy to the government's investigative timeline, 180 days is likely too late for the user to assert the privilege in a timely manner. As courts routinely recognize, "[i]t is axiomatic that the timing of speech is often crucial to its impact." *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1371 (10th Cir. 1990) (emphasis added); *see also White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (protest restriction upheld because it left "unaffected a multitude of possibilities for meaningful" speech) (emphasis added); *Wood v. Ga.*, 370 U.S. 375, 392 (1962) ("Consistent suppression of discussion likely to affect pending investigations would mean that some continuing public grievances could never be discussed at all, or at least not at the moment when public discussion is most needed.").

The government also argues that the Non-Disclosure Order is narrowly tailored because it impedes only a narrow swath of Twitter's speech. But that swath goes to the heart of Twitter's First Amendment interest in this case: consistent with its terms of service and express commitment to its users, Twitter has a vital interest in notifying users, who have entrusted Twitter with their private data, when the government compels Twitter to produce that data.

To this end, contrary to the government's representation that Twitter has uniquely brought this challenge to protect the former President, Twitter reviews non-disclosure orders issued to it and frequently challenges those appearing to contain procedural or substantive deficiencies.[14] In its February 8, 2023 letter to this Court, Twitter identified 32 such instances dating back to 2011. While Twitter does not challenge each and every one of the thousands of non-disclosure orders it receives on a yearly basis, where the statutory factors do not appear to be met, or where a non-disclosure order appears to be otherwise invalid, Twitter has pursued its First Amendment interests and challenged non-disclosure orders accompanying legal process requests for user data in cases like this one.[15]

Here, the Non-Disclosure Order appeared to be plainly invalid for two reasons: certain of the justifications in the order appeared facially to not apply, and (as outlined above) the

---

[14] Twitter's non-disclosure order challenges are often successful, and the Court should not discount—as the government does—situations where Twitter meets and confers with law enforcement and they withdraw or modify an order without court action. These pre-filing conferences are appropriate actions to conserve judicial resources, and, as noted in its filing, Twitter's outreach to law enforcement challenging non-disclosure orders frequently results in law enforcement withdrawing or modifying the non-disclosure order.

[15] Twitter challenges facially invalid non-disclosure orders regardless of the legal process to which they are attached. It is of no matter that, as the government points out, the invalid orders have typically attached to subpoenas or national security letters, rather than warrants. The point is that Twitter has exercised its First Amendment right to contest non-disclosure orders where they have appeared to be improper on their face.

underlying investigative action all but matched other actions widely known to the public in a very public criminal case. It was also clear that Twitter's exercise of its First Amendment rights was particularly important in this case because the targeted account contained communications written by the President himself that were potentially privileged.

As submitted to Twitter, the Non-Disclosure Order stated that the former President was likely to flee from prosecution if the Warrant were disclosed. (Doc. 3 at 1.) The Court acknowledged that this justification did not apply. (Sealed Hr'g Tr. (Feb. 7, 2023) at 48.) And indeed, the Government now admits that this finding—one of the facial deficiencies identified by Twitter in its Motion—was, in fact, an error. Opp. 2 n.1 (acknowledging that the templated language about flight applied to another statute and was "erroneously included" in the Non-Disclosure Order).

Additionally, there is reason to believe that Twitter's user, the former President, may have a claim of privilege that presents unique issues not previously addressed by any court in a public decision. As an initial matter, public reports indicate that during his presidency, Mr. Trump did not use email, text, or any other form of electronic communication besides Twitter.[16] The former President's private Twitter communications appear to be the only such electronic communications written by the former President himself, and the government seized those

---

[16] Jonathan Swan & Maggie Haberman, *OMG. Trump Has Started Texting.*, N.Y. TIMES (Jan. 25, 2023), available at https://www.nytimes.com/2023/01/25/us/politics/trump-texting.html; Alex Leary, *Trump Copes With Facebook, Twitter Ban By Relying On Email, Media Interviews*, THE WALL STREET JOURNAL (May 5, 2021), available at https://www.wsj.com/articles/trump-copes-with-facebook-twitter-ban-by-relying-on-email-media-interviews-11620226189.

For instance, the "message" from former President Trump to General Michael Flynn that he "stay strong" (cited by the court in the hearing on February 7, 2023) was passed in person by KT McFarland—not by an electronic communication written by former President Trump to Gen. Flynn. Sealed Hr'g Tr. (Feb. 7, 2023) at 49 (referencing Mueller Report, Vol. II, p44, n.267).

private written communications from a third-party provider without some notice to him. No court has ever addressed the application of executive privilege in that set of circumstances, and the plain text of Section 2703, Federal Rule of Criminal Procedure 41, and the Presidential Records Act did not contemplate this scenario. Further, if the government has not yet reviewed the communications it seized, there remains for the real parties in interest the issue of whether the privilege may still be asserted at the outset.[17]

Finally, there remains the separate issue of how the government might make derivative use of those communications outside the Executive Branch, which raises a distinct and significant basis for the former President to claim privilege. The Court and government both suggest that there is no executive-privilege issue here because the materials have been seized by the Executive Branch. Gov. MTSC Reply 6-7 (citing *Nixon*, 418 U.S. at 708); Sealed Hr'g Tr. (Feb. 7, 2023) at 51-52. But that does not account for possible derivative uses outside of the Executive Branch, such as the incorporation of privileged information into warrant affidavits, witness questioning, and—as the government suggests throughout its brief—disclosure to a grand jury. Disclosure of the privileged materials in these contexts would raise precisely the

[17] As Twitter previously explained, the executive privilege at issue here is likely injured at the time communications are viewed by another party. *See In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997) (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977). In other privilege contexts, courts have permitted the return of potentially privileged matter even after the materials were seized. *Klitzman Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (granting defendant's motion to return attorney-client privileged materials seized during execution of search warrant); *see also In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 183-184 (4th Cir. 2019) (reversing district court's denial of injunction on federal agents reviewing seized attorney-client privileged materials obtained through execution of search warrant).

Separation-of-Powers issues that the government claims are not triggered when the material stays within the Executive Branch.[18]

In short, while Twitter may not be able to assert the former President's potential privilege—and takes no position here on whether it applies—the issues in play make Twitter's exercise of its First Amendment rights particularly important in this case.[19]

**III. Twitter's Stay Motion is Not Moot**

Twitter's Motion included a request that the Court stay execution of the Warrant until litigation on the Non-Disclosure Order was resolved. Mot. 16. The government argues that the Court's order that Twitter comply with the Warrant "necessarily mooted that stay request." Opp. 13.

This is incorrect for two reasons. First, the Court's compliance order ruled on, and rejected, Twitter's stay request. The request has thus been denied, not mooted. Second, even if the Court had not done so, the request would not be moot because it is "'capable of repetition, yet evading review.'" *People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv., et al*, 59 F. Supp. 3d 91, 97 (D.D.C. 2014). A challenged action is not moot when it is "'typically … in its duration too short to be fully litigated prior to its cessation or expiration,'" and there is "'a reasonable expectation that the same complaining party would be

[18] Even if the government's possible use of a filter team might temporarily isolate privileged materials, the former President retains an interest in actually asserting privilege such that his private Presidential communications are not being protected by the mere exercise of a prosecutor's discretion.

[19] The government states that "[a] Twitter user's potential ability to challenge the legal process at issue—here, the Warrant—is entirely distinct from the First Amendment concerns that Twitter claims it seeks to further through its own challenge to the NDO." Opp. 9-10. This concession—that Twitter's First Amendment rights do not rise or fall with the success or failure of the user's claims—underscores the point that Twitter's constitutional interest is in disclosing the privacy breach to its user, not in litigating the user's claims.

subjected to the same action again.'" *Id.*. That is the case here, where litigation over this Non-Disclosure Order spanned less than one month, and Twitter expects to be subject to non-disclosure orders that it will challenge in the future.

On the merits of Twitter's stay request, Twitter has made a "a strong showing" that it is "likely to succeed on the merits" and "will be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Twitter has demonstrated that the government's Non-Disclosure Order cannot withstand strict scrutiny. *See supra* 3-21. And it has demonstrated "unquestionabl[e]" irreparable injury through "[t]he loss of First Amendment freedoms, for even minimal periods of time." *Elrod v. Burns*, 427 U.S. 347, 373-374 (1976).

**IV. CONCLUSION**

The Non-Disclosure Order issued pursuant to 18 U.S.C. § 2705(b) is a blanket prohibition prohibiting Twitter from notifying anyone about the Warrant or Non-Disclosure Order, and cannot be justified by a compelling governmental interest. Accordingly, the Non-Disclosure Order impermissibly burdens Twitter's First Amendment rights and should be vacated or modified to allow Twitter to notify its user of the government's demand. In addition, this Court should stay Twitter's compliance with the Warrant until resolution of these constitutional issues.

Dated: February 24, 2023

Respectfully submitted,

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823 *(D.D.C.
   admission pending)*
Whitney Russell, D.C. Bar 987238 *(D.D.C.
   admission pending)*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006
Ari.Holtzblatt@wilmerhale.com
benjamin.powell@wilmerhale.com
Whitney.russell@wilmerhale.com
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Twitter, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February 2023, I caused the foregoing to be served by email upon:

James Pearce, Assistant Special Counsel

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
George.varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |
|---|---|

**EXHIBIT A**





CONGRESS

# 2 top Pence aides appear before Jan. 6 grand jury

Marc Short and Greg Jacob have both testified recently, according to two people familiar with the matter.

Marc Short, who served as chief of staff to former Vice President Mike Pence, is one of the most significant witnesses known to face grand jury questions related to Jan. 6. | Patrick Semansky/AP Photo

By **KYLE CHENEY**
07/25/2022 04:26 PM EDT

   

Two of former Vice President Mike Pence's top White House aides have testified recently to a federal grand jury investigating matters connected to the Jan. 6, 2021, attack on the Capitol, according to two people familiar with the matter.

Marc Short, Pence's former chief of staff, testified last week under subpoena, while Pence's former chief counsel Greg Jacob, also testified recently, though the timing and circumstances of his appearance were not immediately clear. Short was spotted by ABC cameras exiting the federal courthouse Friday, on the same day Donald Trump's ally Steve Bannon was convicted of contempt of Congress for defying a Jan. 6 select committee subpoena.

AD

Both Short and Jacob cooperated with the Jan. 6 select committee, testifying in January and February this year, respectively. Jacob was also a star witness for the panel, testifying at a public hearing in June about helping Pence fend off Donald Trump's effort to deputize the vice president to disrupt the transfer of power to Joe Biden.

Short and Jacob are two of the most significant witnesses known to face grand jury questions related to Jan. 6. Both were in key meetings on Jan. 4 and 5, 2021, as Trump attorney John Eastman worked to persuade Pence to adopt a fringe legal theory that would permit the then-vice president to single-handedly overturn the election certification on Jan. 6.

Trump was present for the Jan. 4 meeting, when Pence rejected his and Eastman's entreaties. Short and Jacob were also both with Pence on Jan. 6 as a

mob stormed the Capitol, sending them all fleeing for safety. Jacob's email exchanges with Eastman amid the chaos have become crucial pieces of evidence for Jan. 6 investigators, showing Eastman continuing to lean on Pence and Jacob even as violence raged.

Jacob's memos and notes, explaining why he viewed Eastman's effort as illegal, have proven significant documents for investigators. Among his conclusions: State legislatures had refused, as of Jan. 6, to certify alternate slates of electors, leaving the false slates assembled by pro-Trump activists in multiple states without any claim of authority.

Eastman had previously embraced that notion as well, according to emails and correspondence obtained by the Jan. 6 committee, but pushed ahead with Trump's plan anyway.

Short testified to the Jan. 6 select committee in January about Pence's efforts to convince Trump that he lacked the power to overturn the election, a message Pence relayed numerous times in the weeks before Jan. 6. But Trump, relying on a cadre of fringe attorneys, pushed a theory that Pence — who was charged by the Constitution with presiding over the count of electoral votes on Jan. 6 — could unilaterally refuse to count dozens of electors for Joe Biden, or postpone the count altogether.

Short's testimony was featured in the public hearings the House's Jan. 6 select committee has held over the last several weeks. Jacob testified publicly alongside former federal judge Michael Luttig, who helped Pence develop a

FILED UNDER: CONGRESS, MIKE PENCE, DONALD TRUMP, DONALD TRUMP 2020,

The select committee has publicly expressed uncertainty about whether it will

**Huddle**

A play-by-play preview of the day's congressional news

EMAIL

Your Email

INDUSTRY

Select Industry

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT of JUSTICE

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE

Friday, November 18, 2022

# Appointment of a Special Counsel

Attorney General Merrick B. Garland announced today the appointment of former career Justice Department prosecutor and former chief prosecutor for the special court in The Hague, Jack Smith, to serve as Special Counsel to oversee two ongoing criminal investigations. The first is the investigation, as described in court filings in the District of Columbia, into whether any person or entity unlawfully interfered with the transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021. The second is the ongoing investigation involving classified documents and other presidential records, as well as the possible obstruction of that investigation, referenced and described in court filings submitted in a pending matter in the Southern District of Florida.

"Based on recent developments, including the former President's announcement that he is a candidate for President in the next election, and the sitting President's stated intention to be a candidate as well, I have concluded that it is in the public interest to appoint a special counsel," said Attorney General Garland. "Such an appointment underscores the Department's commitment to both independence and accountability in particularly sensitive matters. It also allows prosecutors and agents to continue their work expeditiously, and to make decisions indisputably guided only by the facts and the law."

The Attorney General also stated, "Although the Special Counsel will not be subject to the day-to-day supervision of any official of the Department, he must comply with the regulations, procedures, and policies of the Department. I will ensure that the Special Counsel receives the resources to conduct this work quickly and completely. Given the work done to date and Mr. Smith's prosecutorial experience, I am confident that this appointment will not slow the completion of these investigations. The men and women who are pursuing these investigations are conducting themselves in accordance with the highest standards of professionalism. I could not be prouder of them. I strongly believe that the normal processes of this Department can handle all investigations with integrity. And I also believe that appointing a Special Counsel at this time is the right thing to do. The extraordinary circumstances presented here demand it. Mr. Smith is the right choice to complete these matters in an even-handed and urgent manner."

Special Counsel Smith has resigned as the chief prosecutor for the special court in The Hague charged with investigating and adjudicating war crimes in Kosovo.

---

**Attachment(s):**
Download 2022.11.18_order_5559-2022.pdf

**Component(s):**
Office of the Attorney General

**Press Release Number:**
22-1237

*Updated November 18, 2022*

Case 1:23-sc-00031-BAH *SEALED* Document 50-2 ... Page 96 of 304





LEGAL

# 'Decisions are imminent': Georgia prosecutor nears charging decisions in Trump probe

Fulton County District Attorney Willis' remark came as she urged a judge to oppose calls to publicly release the findings of her yearlong investigation.

Fani Willis has spent the last year investigating Donald Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. | Drew Angerer/Getty Images

By **KYLE CHENEY**
01/24/2023 03:55 PM EST

   

The Atlanta-area district attorney investigating Donald Trump's effort to subvert the 2020 election indicated on Tuesday that decisions on whether to seek the indictment of the former president or his associates were "imminent."

"Decisions are imminent," Fulton County District Attorney Fani Willis said during a Tuesday court hearing called by the Georgia trial court judge overseeing the "special purpose grand jury" that Willis has used to gather evidence over the last year.

AD

Willis' remark came as she urged the judge, Robert McBurney, to oppose calls to publicly release the findings of her yearlong probe, which she conducted alongside the special grand jury to examine Trump and his inner circle.

Willis has spent the last year investigating Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. The special grand jury probed Trump's Jan. 2 phone call to Georgia Secretary of State Brad Raffensperger, asking him to "find" just enough votes to put him ahead of Joe Biden in the state. And it pursued evidence about Trump's broader national effort to subvert the election, calling top allies like his White House chief of staff Mark Meadows, former national security adviser Michael Flynn, attorney John Eastman and Sen. Lindsey Graham (R-S.C.).

The special grand jury concluded its investigation earlier this month, dissolving in early January, and recommended that its findings be released publicly. McBurney then called for a hearing to discuss whether to follow the panel's recommendation or maintain the secrecy of the report. Willis told the judge that making the report public could jeopardize impending prosecutions.

"In this case, the state understands the media's inquiry and the world's interest. But we have to be mindful of protecting future defendants' rights," Willis said, emphasizing that multiple people could face charges.

Tuesday's discussion was the result of Georgia's unusual grand jury law, which permits prosecutors to impanel a "special purpose grand jury" that has no power to make formal indictments but can help prosecutors gather evidence about a specific topic. If Willis opts to pursue charges against Trump or others, she needs to present her evidence to a traditional grand jury, which could then issue indictments.

Thomas Clyde, an attorney representing several media outlets supporting the release of the report, urged McBurney to side with the grand jurors rather than Willis.

"We believe the report should be released now and in its entirety," Clyde said.

He noted that findings in criminal investigations are often released publicly even while investigations and grand jury proceedings continue.

McBurney noted that Willis' probe has been accompanied by an extraordinary release of information and evidence by the House Jan. 6 select committee and from witnesses being called before a federal grand jury probing the same matters, none of which had derailed Willis' probe. He also noted that there was little to stop individual grand jurors from simply telling others about the findings in their report.

But McBurney said he wanted more time to consider the arguments and said any ruling he made would provide significant advance notice before the potential release of the report.

**FILED UNDER:** DONALD TRUMP, DONALD TRUMP 2020, GEORGIA, ATLANTA, VOTING ISSUES,

Huddle
A play-by-play preview of the day's congressional news
EMAIL
Your Email
INDUSTRY
Select Industry
SIGN UP
By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

From The Rachel Maddow Show

ALL MADDOWBLOG POSTS THE RACHEL MADDOW SHOW FULL EPISODES PODCASTS

< PREVIOUS POST NEXT POST >

# DOJ seizes Team Trump phones as part of intensifying Jan. 6 probe

*If the Mar-a-Lago scandal weren't enough, the Justice Department's investigation into Jan. 6 is intensifying in ways that should make Team Trump nervous.*

Sept. 13, 2022, 8:00 AM EDT

By Steve Benen

When it comes to the many ongoing scandals surrounding Trump World, it's tempting to think the Mar-a-Lago controversy is the most serious. After all, the former president stands accused of

stealing classified materials, refusing to give them back, and obstructing the retrieval process. There's an ongoing criminal investigation, and indictments are a distinct possibility.

But by some measures, the most dramatic scrutiny of Donald Trump and his team remains the Justice Department's criminal probe of the Jan. 6 attack and the Republicans' efforts to overturn the election results.

For months, there was ample speculation about whether investigators were moving forward with any vigor at all. As the latest New York Times reporting suggests, those questions continue to get answers.

> *Justice Department officials have seized the phones of two top advisers to former President Donald J. Trump and blanketed his aides with about 40 subpoenas in a substantial escalation of the investigation into his efforts to subvert the 2020 election, people familiar with the inquiry said on Monday. The seizure of the phones, coupled with a widening effort to obtain information from those around Mr. Trump after the 2020 election, represent some of the most aggressive steps the department has taken thus far in its criminal investigation into the actions that led to the Jan. 6, 2021, assault on the Capitol by a pro-Trump mob.*

According to the Times' reporting, much of which has been confirmed by NBC News, federal agents executed court-approved search warrants, taking the phones of at least two people – Trump lawyer Boris Epshteyn and campaign strategist Mike Roman – while also issuing subpoenas to a variety of figures, including Dan Scavino, Trump's former social media director, and Bernie Kerik.

The subpoenas, according to the Times, were related to the investigation into the fake electors scheme.

To quickly recap for those who might benefit from a refresher, let's revisit our earlier coverage and review how we arrived at this point. It was in March when the Times first reported that federal prosecutors "have substantially widened their Jan. 6 investigation to examine the possible culpability of a broad range of figures involved in former President Donald J. Trump's efforts to overturn the results of the 2020 election."

It raised a few eyebrows for a reason: The Justice Department hasn't made a lot of noise about its Jan. 6 probe, but the reporting suggested it was eyeing Team Trump, and not just rank-and-file

rioters who launched their assault in his name.

Around the same time, The Washington Post also reported that the federal grand jury had "issued subpoena requests to some officials in former president Donald Trump's orbit who assisted in planning, funding and executing the Jan. 6 rally."

**Recommended**

MADDOWBLOG

**'Peaceful transition': Pompeo has a flawed memory of Jan. 6**

MADDOWBLOG

**McCarthy denounces 'turmoil' while imposing debt ceiling turmoil**

In the months that followed, the grand jury heard from top members of former Vice President Mike Pence's team. As part of the same probe, federal investigators descended on Jeffrey Clark's home; FBI agents executed a search warrant against Trump lawyer John Eastman; and Ali Alexander, the founder of the "Stop the Steal" group that organized a Jan. 6 rally, also testified.

We also learned a month ago that a grand jury subpoena made a sweeping demand for "all materials, in whatever form" that the National Archives had given to Congress' Jan. 6 committee, including "records from the files of Mr. Trump's top aides, his daily schedule and phone logs and a draft text of the president's speech that preceded the riot."

It's against this backdrop that federal law enforcement has seized some Trump advisers' phones and blanketed his aides with about 40 subpoenas.

It's unlikely that anyone would characterize the Justice Department's probe as swift or rushed, but let there be no doubt: This investigation exists and it's obviously intensifying.

For the former president and his political operation, this is not at all good news.

 Steve Benen

Steve Benen is a producer for "The Rachel Maddow Show," the editor of MaddowBlog and an MSNBC political contributor. He's also the bestselling author of "The Impostors: How Republicans Quit Governing and Seized American Politics."

**PREVIOUS POST**

Monday's Mini-Report, 9.12.22

**NEXT POST**

Trump lawyers: Mar-a-Lago scandal is a 'document storage dispute'

**LATEST POST**

'Peaceful transition': Pompeo has a flawed memory of Jan. 6

**Sponsored Stories** by Taboola

FINITION

**hotos] Hilarious Signs Employees Have Had To Deal With.**

GHTY SCOOPS

**ıe Oldest Stars Who Are Still Living in 2023.**

SPONSORED / DICK'S SPORTING GOODS

**Nike Zoom Freak 4 Basketball Shoes, Women's**

SPONDERED / MACY'S

## CeCe Sakura Delight Puff-Sleeve Dress

SPONSORED / DEFINITION

**[Photos] Hilarious Signs Employees Have Had To Deal With.**

SPONSORED / MIGHTY SCOOPS

**The Oldest Stars Who Are Still Living in 2023.**

SPONSORED / HOMEBUDDY

**Here's What New Walk-in Shower Should Cost You In 2023**

SPONSORED / HEALTHY BLOOD

**Diabetes Might Not Be From Sweets! Meet The Number One Enemy**

SPONSORED / DEFINITION

## M*A*S*H: 15 Hidden Details You Never Noticed

SPONSORED / HEALTH BENEFITS

## Dentists Are Surprised: BOSTON Man Relieves Tooth Decay With This Natural Ingredient

SPONSORED / THE MOTLEY FOOL

**A Slam Dunk if you Need a Balance Transfer (21 months)**

SPONSORED / TURBOTAX

**Claiming the Home Office Tax Deduction**

SPONSORED / RENUITY BATH EXPERTS

**Your Bathroom Will Never Look The Same Thanks To This 1-Day Transformation**

SPONSORED / BUZZDAILY WINNERS

2/3/23, 4:59 PM Case 1:23-sc-00031-JEB *SEALED* Document 50-2 Filed 03/14/23 Page 107 of 304

**The Most Realistic PC Game of 2022**

SPONSORED / HEALTHY GURU

## New Weight Loss Delicacy Has Americans Dropping Pounds

SPONSORED / SUNVALUE

## Massachusetts: Gov Will Cover The Cost To Install Solar if You Live In These Zip Codes

ABOUT

DO NOT SELL MY PERSONAL INFORMATION

CONTACT

CA NOTICE

HELP

TERMS OF SERVICE

CAREERS

MSNBC SITEMAP

MSNBC STORE

CLOSED CAPTIONING

AD CHOICES

ADVERTISE

PRIVACY POLICY

© 2023 NBC UNIVERSAL

NEWS MSNBC TODAY

https://www.msnbc.com/rachel-maddow-show/maddowblog/doj-seizes-team-trump-phones-part-intensifying-jan-6-probe-rcna47448 6/6





LEGAL

# DOJ sends some 40 subpoenas to Trump aides

The subpoenas are a step forward in the investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol.

Violent insurrectionists loyal to former President Donald Trump climb the west wall of the U.S. Capitol in Washington, D.C., on Jan. 6, 2021. | Jose Luis Magana/AP Photo

By **OLIVIA OLANDER**
09/12/2022 10:26 PM EDT

   

The Justice Department has issued some 40 subpoenas to aides of former President Donald Trump regarding Trump's efforts to overturn the 2020 presidential election, POLITICO confirmed Monday.

The subpoenas, first reported by The New York Times, are a major step forward in the ongoing investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol. They also come as Trump is dealing with a separate inquiry into his handling of presidential records and classified material that he took with him to his home in Florida after the end of his presidency. Trump's lawyers and the Justice Department are currently in a protracted legal battle over the custody of those records.

AD

Former Trump adviser Stephen Bannon was the first to discuss the recent batch of subpoenas, saying on his podcast last week that 35 had been issued. That number appears to have been a slight lowballing of the actual figure.

Among matters that investigators are reportedly looking into is Trump's post-election fundraising and his efforts to overturn the election by appointing false electors. As POLITICO previously reported, a grand jury issued subpoenas last week seeking information about Trump's Save America PAC.

On his show Monday night, Fox News host Tucker Carlson said he had obtained a copy of a subpoena that was issued and that it pertained to "any claim that the vice president and/or the president of the Senate had the

authority to reject or to choose not to count presidential electors." POLITICO

**FILED UNDER:** FOX NEWS, TUCKER CARLSON, DEPARTMENT OF JUSTICE, DONALD TRUMP, 

Huddle
A play-by-play preview of the day's congressional news
EMAIL
Your Email
INDUSTRY
Select Industry
SIGN UP
By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC



**POLITICS** Subpoenas Add Topic

# Justice Department subpoenas dozens of Trump aides in apparent escalation of investigation, according to reports

*The investigation of Trump's effort to overturn the 2020 election and the Capitol attack on Jan. 6, 2021, is separate from the seizure of documents from Mar-a-Lago.*

**Bart Jansen**
USA TODAY

Published 7:43 p.m. ET Sept. 12, 2022 | **Updated 8:52 p.m. ET Sept. 12, 2022**

**Key Points**

- The Justice Department subpoenaed dozens of Trump aides and seized at least two phones.
- Some subpoenas sought information from people who challenged the 2020 election results.
- Some subpoenas focused on Trump fundraisers and organizers of his rally before the Capitol riot.

WASHINGTON – The Justice Department issued dozens of subpoenas to Donald Trump's aides and associates for information about the 2020 election and the Capitol attack on Jan. 6, 2021, according to The New York Times and CNN.

The flurry of subpoenas suggested the investigation, which is separate from the seizure of Trump administration documents from Mar-a-Lago, is picking up pace.

At least two Trump aides, Boris Epshteyn and Mark Roman, had their phones seized as evidence, according to the Times. Epshteyn declined comment.

The subpoenas seek information about the Trump campaign's plan to organize alternate slates of electors in states President Joe Biden won. Epshteyn had copied on emails in late 2020 from Trump lawyer John Eastman, who developed the plan.

Eastman has already been subpoenaed and had his phone seized. Eastman earlier refused to answer questions from the House panel investigating the Capitol attack or a grand jury in

Georgia based on his Fifth Amendment right against self-incrimination.

Another subpoena recipient was Bernard Kerik, the former New York City police commissioner, who coordinated the investigation of claims of voter fraud with Trump lawyer Rudy Giuliani.

Kerik's lawyer, Timothy Parlatore, told USA TODAY that Kerik was willing to testify to federal investigators as he had already before the House committee. Kerik had already turned over examples of probable case of election fraud to the Justice Department for further investigation in late 2020, Parlatore said.

Former Attorney General Bill Barr has testified to the House panel that the department found no evidence to support the Trump campaign's claims of widespread fraud.

Parlatore said the department's latest subpoena read as if the current investigation had no focus and asked Kerik about names he didn't recognize.

"The normal DOJ subpoena looks like rifle shots," Parlatore said. "This looks like a whole bunch of scatter-shot shotgun blasts, almost like a spray-and-pray mindset."

The latest subpoenas included one to Dan Scavino, Trump's former social-media director, according to the Times. Trump promoted his fundraising to fight the results of the 2020 election and his rally the morning of Jan. 6 through social media. Scavino's lawyer, Stanley Woodward Jr., declined comment.

Others who were subpoenaed include former Trump campaign manager Bill Stepien and Sean Dollman, the campaign's chief financial officer, according to CNN.

The Justice Department declined comment on the subpoenas.

The investigation is separate from the seizure of Trump administration documents, which included dozens of classified records, from Mar-a-Lago. In that probe, federal investigators said they were looking for evidence of violations of the Espionage Act for mishandling national defense documents or of obstruction of justice.

**More:** Will Trump or his allies face charges over Jan. 6? Legal experts explain hurdles DOJ faces

The investigation is also separate, but overlaps with a local investigation in Fulton County, Georgia. District Attorney Fani Willis has convened a special grand jury to investigate fake

electors and other potential election fraud by Trump and his campaign. The grand jury has subpoenaed Eastman and Giuliani, among others.

The Justice Department earlier declined without explanation to press charges against Scavino or former White House chief of staff Mark Meadows over defying subpoenas from the House committee investigating the attack. But the department charged Trump political strategist Steve Bannon, who was convicted of contempt, and former trade adviser Peter Navarro, who awaits trial.

The New York Times https://www.nytimes.com/2022/06/27/us/politics/john-eastman-jan-6.html

# Federal Agents Seized Phone of John Eastman, Key Figure in Jan. 6 Plan

The action suggests that the criminal inquiry is accelerating into the efforts to help overturn the results of the 2020 election.

**By Alan Feuer and Adam Goldman**

June 27, 2022

Federal agents armed with a search warrant have seized the phone of John Eastman, a lawyer who advised former President Donald J. Trump on key elements of the effort to overturn the results of the 2020 election, according to a court filing by Mr. Eastman on Monday.

The seizure of Mr. Eastman's phone is the latest evidence that the Justice Department is intensifying its sprawling criminal investigation into the various strands of Mr. Trump's efforts to remain in power after he was defeated for re-election.

In the past week alone, the department has delivered grand jury subpoenas to a variety of figures with roles in backing Mr. Trump's efforts and it carried out at least one other search of a key figure.

The filing by Mr. Eastman, a motion to recover property from the government, said that F.B.I. agents in New Mexico, acting on behalf of the Justice Department's Office of the Inspector General, stopped Mr. Eastman as he was leaving a restaurant last Wednesday and seized his iPhone.

A copy of the warrant included as an exhibit in Mr. Eastman's filing said that the phone would be taken to either the Justice Department or the inspector general's forensic lab in Northern Virginia.

According to the filing, the seizure of Mr. Eastman's phone came on the same day that federal agents raided the home and seized the electronic devices of Jeffrey Clark, a former Justice Department official who was central to Mr. Trump's attempts to coerce the department's leaders into backing his false claims of fraud in the election.

The inspector general's office, which has jurisdiction over investigations of Justice Department employees, also issued the warrant in the search of Mr. Clark's home, a person familiar with the investigation said. The warrant indicated that prosecutors are investigating Mr. Clark for charges that include conspiracy to obstruct the certification of the presidential election, the person familiar with the investigation said.

A spokesman for the U.S. attorney's office in Washington, which is overseeing the inquiry, declined to comment on Mr. Eastman's court filing.

With Mr. Eastman and Mr. Clark, the department is gathering information about two lawyers who were in close contact with Mr. Trump in the critical weeks before the Jan. 6, 2021, attack on the Capitol by a pro-Trump mob.

The advice they were giving Mr. Trump involved separate but apparently intersecting proposals to provide him with a means of averting his defeat, with Mr. Clark focused on using the power of the Justice Department on Mr. Trump's behalf and Mr. Eastman focused on disrupting the congressional certification of the election's outcome.

Jeffrey Clark at a news conference in October 2020. Yuri Gripas/Reuters

The search warrant executed on Mr. Eastman by the inspector general's office may have been issued because of his connections to Mr. Clark, which were briefly touched on at a hearing by the House select committee on Jan. 6 last week, a day after the raids on the two men.

At the hearing, Representative Liz Cheney, Republican of Wyoming and the panel's vice chairwoman, said that Ken Klukowski, a Justice Department lawyer who was in contact with Mr. Eastman, also helped Mr. Clark draft a letter to Gov. Brian Kemp of Georgia stating falsely that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

Did you find this information helpful? Yes No

The letter further recommended that Mr. Kemp call a special session of the state legislature to create "a separate slate of electors supporting Donald J. Trump."

Mr. Klukowski, who briefly served under Mr. Clark at the Justice Department and had earlier worked at the White House budget office, also "worked with John Eastman," Ms. Cheney said during the hearing. She went on to describe Mr. Eastman as "one of the primary architects of President Trump's scheme to overturn the election."

Ken Klukowski, center, a Justice Department lawyer who was in contact with Mr. Eastman, arrived for a meeting with the Jan. 6 House select committee late last year. Al Drago for The New York Times

The inspector general's office has the authority to look into any public corruption crimes committed by Justice Department personnel, said Michael R. Bromwich, a former department inspector general during the Clinton administration.

"Those investigations can lead to people and places outside the Justice Department," Mr. Bromwich said. "There must be a connection between Eastman and someone who worked at the department."

A former law professor in California, Mr. Eastman helped develop and promote a brazen plan to justify having Vice President Mike Pence single-handedly block or delay certification of the Electoral College results showing Joseph R. Biden Jr.'s victory in the 2020 election. In a series of meetings and phone calls, Mr. Trump and Mr. Eastman pressured Mr. Pence to put the plan into action when Mr. Pence presided over a joint session of Congress on Jan. 6, 2021.

Mr. Pence's refusal to go along helped fuel the violence that overwhelmed the Capitol that day and became a bloody symbol of Mr. Trump's efforts to subvert the outcome of the election. Earlier this a year, a federal judge in California considering a civil suit concerning the release of Mr. Eastman's emails to the House select committee concluded that Mr. Eastman and Mr. Trump most likely committed two felonies — obstruction of a proceeding before Congress and a conspiracy to defraud the United States — for their joint role in the pressure campaign against Mr. Pence.

Mr. Eastman was also instrumental in advising Mr. Trump to create purported slates of electors backing Mr. Trump in key swing states won by Mr. Biden. These false pro-Trump electors were intended to give Mr. Pence a quasi-legal rationale for delaying or blocking the Electoral College certification on Jan. 6, or even trying to throw the election to the House of Representatives.

Last week, a federal grand jury in Washington issued subpoenas to several people who prosecutors believe may have information about the so-called fake elector plan. Among those who received subpoenas were top Republicans in key swing states who served as purported pro-Trump electors, including Kelli Ward, the chairwoman of the Arizona Republican Party, and David Shafer, the chairman of the Georgia Republican Party.

The subpoenas, some of which have been obtained by The New York Times, show that prosecutors are seeking information about lawyers like Mr. Eastman who were close to Mr. Trump during the chaotic postelection period. The subpoenas also seek information on other lawyers like Rudolph W. Giuliani, who oversaw Mr. Trump's election challenges in general, and Kenneth Chesebro, who wrote legal memos laying out the viability of the fake elector plan.

In Mr. Eastman's court papers, filed in Federal District Court in New Mexico, he says that the search warrant did not mention what underlying crime prosecutors were looking into by seizing his phone.

On Monday night, Mr. Eastman appeared on Tucker Carlson's Fox News show and discussed the seizure of his phone, repeating his complaint that the warrant never specified what violation of the law prosecutors were investigating.

"There was no indication of any crime this is connected to," he said.

The New York Times https://www.nytimes.com/2022/06/23/us/politics/jeffrey-clark-trump-justice-dept.html

# Federal Authorities Search Home of Trump Justice Dept. Official

Investigators went to the suburban Washington home of Jeffrey Clark in connection with the sprawling inquiry into the Jan. 6 attack and the effort to overturn the 2020 election.

**By Alan Feuer, Adam Goldman and Maggie Haberman**
June 23, 2022

Federal investigators carried out an early-morning search on Wednesday at the home of Jeffrey Clark, a former Justice Department official, in connection with the department's sprawling criminal inquiry into efforts to overturn the 2020 election, people familiar with the matter and an associate of Mr. Clark said.

It remained unclear exactly what the investigators may have been looking for. But Mr. Clark was central to President Donald J. Trump's unsuccessful effort in late 2020 to strong-arm the nation's top prosecutors into supporting his claims of election fraud, and the search suggested that the criminal investigation could be moving closer to Mr. Trump.

The law enforcement action at Mr. Clark's home in suburban Virginia came just one day before the House committee investigating the Jan. 6, 2021, attack on the Capitol held a hearing setting out in vivid and powerful detail Mr. Trump's efforts to pressure the Justice Department to help him reverse his election defeat.

The committee explored Mr. Clark's role in particular in helping Mr. Trump try — ultimately unsuccessfully — to pressure the department into lending credence to his baseless assertions of election fraud and pressure officials in Georgia, a key swing state, into reconsidering their certification of Joseph R. Biden Jr.'s victory.

One of Mr. Clark's associates described the striking scene early Wednesday morning when a dozen federal law-enforcement officials raided the house, seized Mr. Clark's electronic devices and put him out on the street in his pajamas.

"All because Jeff saw fit to investigate voter fraud," said the associate, Russ Vought, who runs the Center for Renewing America, where Mr. Clark is a senior fellow. "This is not America, folks. The weaponization of government must end."

Mr. Clark told Tucker Carlson of Fox News on Thursday that he had been woken by agents banging on his door shortly before 7 a.m. on Wednesday. He said that "12 agents and two Fairfax County police officers went into my house, searched it for three and a half hours." The agents, he said, "took all of the electronics from my house."

Mr. Clark criticized the investigation as "highly politicized" and suggested that it was no coincidence that the raid took place just before the House committee's hearing. "We're living in an era I don't recognize," he said.

The search at Mr. Clark's home was a significant step in the Justice Department's many-tentacled inquiry into the efforts to subvert the democratic process after the 2020 election.

In the early spring, a separate strand of the investigation was revealed as grand jury subpoenas were issued seeking information on a wide cast of political organizers, White House aides and members of Congress connected in various ways to Mr. Trump's incendiary speech near the White House that directly preceded the storming of the Capitol.

Mr. Clark's involvement in the inquiry was also the latest sign that the department's investigation had nudged ever closer to Mr. Trump himself — and to some of his allies in Congress. Mr. Clark worked closely with Mr. Trump in the weeks leading up to the Jan. 6 attack on the Capitol, as Mr. Trump's options closed off, to use the Justice Department as a tool for achieving his political ends.

Encouraged by members of the far-right House Freedom Caucus, Mr. Trump considered and then abandoned a plan in the days just before the Jan. 6 attack to put Mr. Clark in charge of the Justice Department as acting attorney general.

At the time, Mr. Clark was proposing to send a letter to state officials in Georgia falsely stating that the department had evidence that could lead Georgia to rescind its certification of Mr. Biden's victory in that key swing state. The effort was cut short by his superiors in the department.

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

Did you find this information helpful?          Yes     No

Attorney General Merrick B. Garland has said little publicly about the criminal investigation other than that the Justice Department would follow the facts. But he has been under pressure from some Democrats, including members of the House select committee, to hold Mr. Trump and his allies to account for the effort to disrupt the peaceful transfer of power.

The developments regarding Mr. Clark came to light as a federal grand jury sitting in Washington continued to issue subpoenas to people involved in a related plan by Mr. Trump and his allies to overturn the election: an effort to subvert the normal workings of the electoral process by creating fake slates of pro-Trump electors in states that were actually won by Mr. Biden.

In the past two days, according to several people familiar with the matter, at least nine people in four different states have received subpoenas in connection with the fake-elector investigation. They were largely those who agreed to be electors for Mr. Trump themselves or were aides to Mr. Trump's campaign in states where the plan was carried out.

Among those who received subpoenas were Kelli Ward, the chairwoman of the Arizona Republican Party, and her husband, Michael, both of whom served as electors on Mr. Trump's purported slate in the state, according to a person familiar with the matter. Along with the Wards, subpoenas were issued to two other pro-Trump electors in Arizona, Nancy Cottle and Loraine B. Pellegrino, the person said.

Their lawyer, Alexander Kolodin, attacked the Justice Department's fake elector inquiry.

"This is an investigation based on allegations that our clients engaged in core First Amendment activity — petitioning Congress about grievances," Mr. Kolodin said.

On Wednesday evening, a local news outlet in Nevada reported yet another development in the fake-elector investigation: Federal agents armed with a search warrant had seized the phone of Michael McDonald, the chairman of the Nevada Republican Party who had served as pro-Trump elector in the state. A search warrant was also issued for the party's secretary, James DeGraffenreid, who had taken part in the scheme as an elector as well, the news outlet reported.

Lawyers for Mr. McDonald and Mr. DeGraffenreid did not return phone calls on Thursday seeking comment.

While several state officials and Trump campaign aides have received subpoenas in the fake-elector investigation, the inquiry is primarily focused on a group of lawyers who worked closely with Mr. Trump in devising the scheme. Those lawyers include Rudolph W. Giuliani, who oversaw Mr. Trump's challenges to the election in general, and John Eastman, who advised the former president on creating the fake electors, among other things.

Mr. Giuliani and Mr. Eastman have figured prominently in earlier hearings this month by the House select committee. The two men, the committee showed, were intimately involved in efforts to cajole state officials to throw the election to Mr. Trump and in pressuring Vice President Mike Pence to single-handedly grant Mr. Trump a victory in the Electoral College.

At the committee's last hearing, on Tuesday, investigators for the first time directly linked Mr. Trump to the fake elector plan. The committee introduced a recorded deposition from Ronna McDaniel, the chairwoman of the Republican National Committee, in which she recounted how Mr. Trump called her and put Mr. Eastman on the phone "to talk about the importance of the R.N.C. helping the campaign gather these contingent electors."

Mr. Clark's role in the efforts to subvert the election are arguably most closely related to the pressure campaign against state officials to create pro-Trump electors.

In late December 2020, Mr. Clark, while serving as the acting head of the Justice Department's civil division, helped to draft a letter to Gov. Brian Kemp of Georgia stating — without evidence — that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

The letter advised Mr. Kemp, a Republican, to call a special session of his state's General Assembly to create "a separate slate of electors supporting Donald J. Trump."

Mr. Clark pressured the acting attorney general at the time, Jeffrey A. Rosen, to sign and send the letter to Mr. Kemp, but Mr. Rosen refused.

Mr. Rosen was among the former Justice Department officials who testified about Mr. Clark before the House committee at its hearing on Thursday.

Katie Benner contributed reporting.



Archivist *of the*
United States

February 18, 2022

The Honorable Carolyn B. Maloney
Chairwoman
Committee on Oversight and Reform
U.S. House of Representatives
2157 Rayburn House Office Building
Washington, DC 20515

Dear Madam Chairwoman:

I write to you pursuant to my authority under section 2203(e) of the Presidential
Records Act (PRA), as amended (44 U.S.C. §§ 2201-2209), which establishes that I may
"request the advice" of the appropriate committees of the House and the Senate when I
consider that a proposed disposal of Presidential records by the incumbent President
"may be of special interest to the Congress" or that "consultation with the Congress
regarding the disposal of these particular records is in the public interest." While this
provision specifically applies to disposals proposed by the incumbent President, the
National Archives and Records Administration (NARA) has always interpreted it to apply
to disposals of Presidential records of which I was not informed.

Under the PRA, all Presidential records automatically transfer to NARA's legal custody
when the President leaves office. With respect to the Trump Presidential records, the
legal transfer took place on January 20, 2021. However, it is not uncommon for there
to be a delay before NARA takes physical custody of all of the records. The complex
technical work needed to transfer hundreds of terabytes of electronic records, coupled
with a one-term transition, meant that the physical transfer could not be completed
between the Presidential election and Inauguration Day. It took until November 2021
for NARA to receive all of the electronic Trump Presidential records.

Included among the Trump Presidential electronic records are those created on social
media platforms. NARA recognizes that social media records are a relatively recent
phenomenon, that capturing records on social media platforms is an evolving process,
and that different platforms pose different issues with respect to how records are
defined and managed.

By this letter, I am advising you that the Trump Administration did not fully capture, and
therefore NARA did not receive, all of the Presidential records created by President
Trump and White House staff that were posted on social media platforms, as
summarized in more detail below:

DAVID S. FERRIERO  ·  T: 202.357.5900  ·  F: 202.357.5901  ·  *david.ferriero@nara.gov*

National Archives *and* Records Administration  ·  700 Pennsylvania Avenue, NW  ·  Washington, DC 20408  ·  *www.archives.gov*

- Early in the Trump Administration, questions were raised about President Trump's use of his personal Twitter account to conduct official government business and whether deleted tweets were being captured and preserved as Presidential records. In March 2017, NARA advised the Trump Administration that it should capture and preserve as Presidential records all tweets that the President posts in the course of his official duties, whether on his personal @realDonaldTrump account or on the official @POTUS account, including those tweets that were subsequently deleted. As I reported in a March 30, 2017, letter to Senators Claire McCaskill and Tom Carper, NARA was "informed by White House officials that they [were], in fact, doing so."

Since the end of the administration, we have learned that the White House initially used a manual process to capture tweets that were deleted from @realDonaldTrump and @POTUS by copying them from non-governmental organizations that were capturing them, such as Propublica and Factba.se. The White House did not begin using the vendor ArchiveSocial to automate the capture of tweets and other social media records in real-time until January 2018. Moreover, @realDonaldTrump was not enrolled until August 2018 and the tool stopped capturing @realDonaldTrump in April 2020. The official @POTUS was enrolled in February 2018 and remained connected throughout the rest of the administration.

When properly implemented, ArchiveSocial captures all versions of content as it appears on the platforms, along with any changes, such as deleted or edited content, changes to an account profile, and direct or private messages. However, it cannot capture such changes retroactively. If a social media account is not enrolled or subsequently becomes disconnected from ArchiveSocial, any changes, including deleted or modified posts, cannot be captured.

The Twitter account @realDonaldTrump was disconnected from ArchiveSocial in April 2020. A key feature of ArchiveSocial is that it sends automated alerts to the account owners/system administrators every three to five days to remind them to reconnect any disconnected accounts. The tool also displays information about the account status in the dashboard. This account was not re-enrolled.

When White House officials brought this problem to our attention near the end of the administration, Twitter had permanently suspended @realDonaldTrump. NARA contacted Twitter directly to ask if it retained the account data between April 20th and the account's suspension. Twitter provided us with a copy of the available account data. However, it did not include previously deleted tweets, which are not retained by the company. Accordingly, we were unable to obtain a complete set of these Presidential records from the Trump Administration or Twitter. While we do have access to copies of deleted tweets collected by other non-governmental sources, we do not consider them as official Presidential records and cannot ensure the completeness of their captured account data.

- The Trump White House did not take any steps to capture deleted content from any Trump Administration social media account other than @realDonaldTrump or @POTUS prior to enrolling them with ArchiveSocial. As with @realDonaldTrump, many other Trump Administration social media accounts were not enrolled until the summer or fall of 2018, even though these accounts were active for over a year prior to enrollment, during which time deleted or modified Presidential record content was not captured. Other accounts were not enrolled until just prior to the end of the administration.

- The ArchiveSocial tool included the ability to capture direct messages that may have been used on the platforms, but the Trump Administration opted not to enable capture of direct messages, and was unable to report whether direct messaging was actually used on any of the platforms by the account holders.

- NARA identified seven Twitter accounts that we think contain presidential record information, but were not captured by the Trump Administration. These accounts belonged to Andrew Giuliani, Chad Gilmartin, Ivanka Trump, Kayleigh McEnany, Kellyanne Conway, Mark Meadows, and Peter Navarro. After the end of the administration, NARA obtained the publicly available tweets from these accounts in order to supplement its archival collection.

- In January 2021, administration officials advised NARA that two social media accounts they thought contained Presidential record content were not enrolled in ArchiveSocial and could not be retroactively enrolled as they had been suspended by the platforms. These accounts were Donald J. Trump on Facebook and @realDonaldTrump on Instagram. NARA endeavored to work with Facebook, which operates Instagram, to obtain access to the accounts, but Facebook was not able to provide access.

- SnapChat was used by the Trump Administration (@realdonaldtrump and @whitehouse), which advised NARA that it was capturing content posted to the platform. NARA has not yet been able to locate any SnapChat content in the records transferred to us. SnapChat ultimately banned President Trump from the platform, and it is not possible to see any previous content. SnapChat advised NARA that the Trump Administration used the @whitehouse account approximately five times during four years. However, the administration regularly used the @realdonaldtrump account. News reports indicate that the account had 1.5 million followers on the platform. We do not know whether direct messaging was enabled on the account. We are not able to determine to what extent @realdonaldtrump SnapChat contained unique Presidential records as compared to content duplicative from other platforms, or purely campaign related information, which would not have been a Presidential record.

Please let me or my staff know if you have questions or would like to discuss this issue further.

Sincerely,

DAVID S. FERRIERO
Archivist of the United States

cc:  The Honorable James Comer, Ranking Member

CNN politics AudioLive TV

# First on CNN: Top Trump adviser Stephen Miller testifies to January 6 federal grand jury

By Katelyn Polantz and Hannah Rabinowitz, CNN

Updated 8:09 PM EST, Tue November 29, 2022

Video Ad Feedback

What Stephen Miller's testimony tells legal analyst about Trump probe

01:18 - Source: CNN

**Washington (CNN) —** Former Trump adviser Stephen Miller testified on Tuesday to a federal grand jury in Washington, DC, as part of the January 6, 2021, investigation, CNN has learned, making him the first known witness to testify since the Justice Department appointed a special counsel to oversee the criminal investigations around the former president.

Miller was at the federal courthouse in downtown Washington for several hours throughout Tuesday, according to a person familiar with the investigation. January 6 lead prosecutor Thomas Windom was spotted at the same federal courthouse on Tuesday.

Windom is expected to join the newly created Special Counsel's Office led by longtime public corruption prosecutor Jack Smith and will continue leading the investigation into former President Donald Trump's role in efforts to impede the transfer of power following the 2020 election.

Federal investigators have for months sought information from Trump's inner circle in the White House, attempting to gather insight into Trump's state of mind before his supporters rioted on January 6.

Miller, a former White House speechwriter and senior adviser to Trump, could provide a firsthand account of the former president's preparations for his speech at the Ellipse in Washington on January 6, including how he wanted to inspire his supporters, many of whom went on to attack the Capitol and disrupt Congress.

Miller was first subpoenaed in the federal criminal investigation months ago.

In April, Miller testified virtually for roughly eight hours before the House select committee investigating January 6 – a completely separate probe from the criminal investigation being run by the Justice Department.

According to findings the committee presented at a public hearing in July, Miller spoke to Trump for several minutes on the morning of January 6 about his planned speech at the Ellipse. After talking with Miller, Trump added a line to his speech about then-Vice President Mike Pence, according to the committee's findings.

The committee said that Miller removed the lines about Pence after having a conversation with a White House lawyer, Eric Herschmann, who objected to the president's edits, according to testimony from Miller. Yet when Trump gave the speech, it included several references to Pence.

At the time, Trump and others were pressuring Pence to block certification of the election. Pence ultimately refused and told Trump and others he had no authority to do so. During the Capitol riot, Trump supporters chanted, "Hang Mike Pence" and broke into restricted areas of the complex, prompting Pence to be evacuated from the Senate chamber.

In recent months, the January 6 investigation team led by Windom has secured decisions ordering top Pence aides to testify to the grand jury about some of the most guarded conversations around Trump after the election. And a parade of top advisers to Trump have had their cell phones seized or received grand jury subpoenas for testimony and documents related to the effort to overturn Trump's electoral loss.

CNN's Kristen Holmes contributed to this report.

Paid Links

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

FOLLOW CNN POLITICS

   

Terms of Use Privacy Policy Cookie Settings Ad Choices Accessibility & CC About Newsletters Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.


QUICK GUIDE
Search the Video Library
SCHEDULE
TV NETWORKS
RADIO
PODCASTS
APP
CREATED BY CABLE IN 1979
All Series
American History TV
Book TV
Washington Journal
Congress
Executive
Supreme Court
LOGIN

NOVEMBER 18, 2022

Report Video Issue

## Former President Trump Statement on Special Counsel Appointment

Former President Trump made a statement Attorney General Merrick Garland's appointment of a special counsel to investigate him for the possible retention of classified documents at his Mar-a-Lago home and his involvement in the January 6, 2021, attack on the U.S. Capitol during the transfer of power for the presidency.

close

16:38

Clip Bookmark To MyC-SPAN Clipping Guide Share This Video

Text type
Text
Filter by Speaker
All Speakers
Search this text

| | |
|---|---|
| 00:00:00 | THE AMAZING PART WAS THAT RICARDO -- |
| 00:00:00 | LIVE NOW, A LOOK INTO INVESTIGATION SURROUNDING THE FORMER PRESIDENT. [APPLAUSE] |
| 00:00:03 | THANK YOU, VERY MUCH. THANK YOU. WHAT A JOB SHE DOES. [APPLAUSE] |
| 00:00:44 | THANK YOU, VERY MUCH. WE APPRECIATE YOU BEING THAT THIS INCREDIBLE EVENING. WE LOVE YOU AND WE LOVE THIS PLACE. IT HAS DONE SO MUCH GOOD AND RAY SO MUCH... Show Full Text |
| 00:16:27 | FORMER PRESIDENT TRUMP HAS MOVED ONTO OTHER TOPICS. WE WILL TAKE THIS OPPORTUNITY TO MOVE ON WITH OUR PROGRAM SCHEDULE. |

*This text was compiled from uncorrected Closed Captioning.

## PEOPLE IN THIS VIDEO

**Donald J. Trump**
U.S. President (Former)
United States

## HOSTING ORGANIZATION

**Save America PAC**



More information about *Former President Trump Statement on Special Counsel Appointment*

Purchase a Download *Former President Trump Statement on Special Counsel Appointment*

## FEATURED CLIPS FROM THIS VIDEO

**8:34 PM**

### Former President Trump Responds to the Appointment of a Special Counsel

Former President Trump responds to the Department of Justice's appointment of a special counsel to investigate him for...

**2 MINUTES | 6,289 VIEWS**

## RELATED VIDEO

*See all on* **TRUMP, DONALD J.** **JANUARY 6, 2021**

**NOVEMBER 18, 2022**

### Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations

Attorney General Merrick Garland announced that his was appointing Jack Smith as special counsel to oversee investigations involving former President...

**OCTOBER 22, 2022**

### Bart Jansen on Subpoena of Former President Trump

Bart Jansen, *USA Today* Justice Department correspondent, talked about the January 6 Committee's subpoena of former...

**JUNE 23, 2022**

### Rep. Schiff Speaks to Reporters After Fifth January 6 Hearing

Rep. Adam Schiff (D-CA) spoke with reporters following the fifth hearing of the Select Committee to investigate the...

**JUNE 23, 2022**

### Rep. Thompson Speaks to Reporters After Fifth January 6 Hearing

Rep. Bennie Thompson (D-MS) spoke with reporters following the fifth hearing of the Select Committee to investigate the...

## USER CREATED CLIPS FROM THIS VIDEO

**NOVEMBER 18, 2022**

### Former President Trump Responds to the Appointment of a Special Counsel

**2 MINUTES | 6,289 VIEWS**

**NOVEMBER 18, 2022**

### User Clip: Election Manipulation?

**27 SECONDS | 154 VIEWS**

**NOVEMBER 18, 2022**

### User Clip: Trump DOJ Special Counsel

**9 MINUTES | 122 VIEWS**

**NOVEMBER 18, 2022**

### User Clip: Trump Gives Statement on Special Counsel Appointment

**-1 SECONDS | 54 VIEWS**

ABOUT C-SPAN

Our Mission
Our History
Cameras In The Court
Milestones
Leadership
Jobs 
In The Community
Video Library
Viewer Guide

RESOURCES

C-SPAN Classroom
Blog
Series A-Z
Press Center
FAQs
Contact Us
Shop
C-SPAN's Book Collection
World Legislatures

MyC-SPAN Login

**C-SPAN Now App**
 Download 
 Download 

 C-SPAN Podcasts

FOLLOW C-SPAN

© 2023 National Cable Satellite Corporation    |    Copyrights and Licensing    |    Terms and Conditions    |    Privacy

# Former Trump White House counsel and his deputy testify to Jan. 6 criminal grand jury

By Casey Gannon, Katelyn Polantz and Kristen Holmes, CNN
Updated 5:42 PM EST, Fri December 2, 2022

Sarah Silbiger/Getty Images

**(CNN) —** Former Trump White House counsel Pat Cipollone and deputy counsel Patrick Philbin testified to a federal grand jury for several hours in Washington, DC, on Friday, indicating the Justice Department had compelled the men to answer more questions in the January 6, 2021, criminal investigation despite challenges from Donald Trump's legal team.

The January 6 grand jury activity is the latest indication the investigation – now led by special counsel Jack Smith – has pushed in recent months to unearth new details about direct conversations with the former president and advice given to him after the election.

Cipollone was first seen entering the grand jury area with his attorney, Michael Purpura, before 9 a.m., and he was there for more than five hours. Purpura has not responded to

before 9 a.m., and he was there for more than five hours. Purpura has not responded to requests for comment. The grand jury proceedings themselves are confidential.

Philbin, whom Purpura also represents, headed into the grand jury area just before the lunch hour on Friday, staying until about 4 p.m.

Thomas Windom and Mary Dohrmann, prosecutors in the January 6 investigation who are now to be led by Smith, were also seen walking in with Cipollone.

The investigators are looking at efforts to obstruct the transfer of power at the end of Trump's presidency and have obtained testimony from several administration advisers closest to the former president after the election and as the Capitol was attacked by his supporters.



**RELATED ARTICLE**
Trump's classic delay and divert legal strategy is running out of road

CNN previously reported that Chief Judge Beryl Howell of the DC District Court, who oversees the federal grand juries in Washington, ordered Cipollone and Philbin to provide additional grand jury testimony this month, following up on their testimony in the fall. The judge has repeatedly rejected Trump's privilege claims in the Justice Department's criminal investigation of efforts to overturn the 2020 election, according to people briefed on the matter.

Philbin and Cipollone were both key witnesses to Trump's actions in the last days of his presidency. Cipollone repeatedly pushed back on efforts to overturn the 2020 election, and according to a Senate Judiciary Committee report, he and Philbin opposed a proposal to replace the attorney general with someone willing to look into false claims of election fraud.

Previously, the Justice Department compelled top advisers from Vice President Mike Pence's office to testify to the grand jury. They had sought to protect Pence in January 2021 from Trump's pressure campaign to overturn the election.

Earlier this week, Trump White House official Stephen Miller, who worked with Trump on his speech at the Ellipse, had his own day before the grand jury.

On Thursday, another leg of Smith's special counsel investigation – into the handling of documents at Mar-a-Lago after the presidency – was active in the courthouse. At least one Mar-a-Lago prosecutor was working in the secret grand jury proceedings, as three aides

to Trump, Dan Scavino, William Russell and Beau Harrison, each appeared, according to sources familiar with them. Their attorney declined to comment.

*This story has been updated with additional details.*

**Paid Links**

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

2/3/23, 4:57 PM Case 1:23-sc-00031-JEB *SEALED* Document 50-2 Filed 03/24/23 Page 136 of 304

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

FOLLOW CNN POLITICS

Terms of Use Privacy Policy Cookie Settings Ad Choices Accessibility & CC About Newsletters Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

https://www.cnn.com/2022/12/02/politics/pat-cipollone-district-courthouse/index.html 4/5



CaseCase 1:23-cr-00310-BAH-JSE ADocument 50-2 Filed 08/15/23/24/23 Page 138 of 304 of 80

AP NEWS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

ADVERTISEMENT

**Farnoush Amiri**
Farnoush is a congressional reporter.
FarnoushAmiri
famiri@ap.org

Click to copy

**RELATED TOPICS**

Capitol siege
Politics
AP Top News
Donald Trump

# Jan. 6 panel urges Trump prosecution with criminal referral

By MARY CLARE JALONICK, ERIC TUCKER and FARNOUSH AMIRI December 19, 2022

ADVERTISEMENT

**You May Like** Promoted

Amazon Hates When You Do This, But They Can't Stop You
Promoted: Online Shopping Tools

Massachusetts Gov Will Cover The Cost To Install Solar If You Own A Home In These Zip Codes
Promoted: EnergyBillCruncher

Electric Companies Will Hate You for Doing This, but They Can't Stop You

Case 1:23-sc-00031-BAH *SEALED* Document 27-1 Filed 02/24/23 Page 30 of 80

AP NEWS

For By Medicare? (See How)

Promoted: StuffAnswered

Learn More

U.S. News World New

Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

40 Years Old

Promoted: BuzzDaily Winners

Finally Legal in Massachusetts, "You Gotta Try These THC Gummies!"

Promoted: Tommy Chong's CBD

by Taboola

ADVERTISEMENT

WASHINGTON (AP) — The House Jan. 6 committee urged the Justice Department on Monday to bring criminal charges against Donald Trump for the violent 2021 Capitol insurrection, calling for accountability for the former president and "a time of reflection and reckoning."

AP NEWS

congressional

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

panel's seven Democrats and two Republicans are recommending criminal charges against Trump and associates who helped him launch a wide-ranging pressure campaign to try to overturn his 2020 election loss. The panel also released a lengthy summary of its final report, with findings that Trump engaged in a "multi-part conspiracy" to thwart the will of voters.

At a final meeting Monday, the committee alleged violations of four criminal statutes by Trump, in both the run-up to the riot and during the insurrection itself, as it recommended the former

Case 1:23-cr-00310-BAH Document 27-1 Filed 12/24/23 Page 34 of 80

AP NEWS

Department.
Among the

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

prosecution is aiding an insurrection — an effort to hold him directly accountable for his supporters who stormed the Capitol that day.

The committee also voted to refer conservative lawyer John Eastman, who devised dubious legal maneuvers aimed at keeping Trump in power, for prosecution on two of the same statutes as Trump: conspiracy to defraud the United States and obstructing an official proceeding.

While a criminal referral is mostly symbolic, with the Justice Department ultimately deciding whether to prosecute Trump or others,

AP NEWS

almost singular

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

start.

Chairman Bennie Thompson, D-Miss., said Trump "broke the faith" that people have when they cast ballots in a democracy and that the criminal referrals could provide a "roadmap to justice" by using the committee's work.

"I believe nearly two years later, this is still a time of reflection and reckoning," Thompson said. "If we are to survive as a nation of laws and democracy, this can never happen again."

ADVERTISEMENT

Wyoming Rep. Liz Cheney, the panel's

AP NEWS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

opening remarks that every

has defended the orderly transfer of power, "except one."

The committee also voted 9-0 to approve its final report, which will include findings, interview transcripts and legislative recommendations. The full report is expected to be released on Wednesday.

The report's 154-page summary, made public as the hearing ended, found that Trump engaged in a "multi-part conspiracy" to overturn the election. While the majority of the report's main findings are not new, it altogether represents one of the most damning portraits of an American

AP NEWS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

great detail

overturn his own defeat and what the lawmakers say is his direct responsibility for the insurrection of his supporters.

The panel, which will dissolve on Jan. 3 with the new Republican-led House, has conducted more than 1,000 interviews, held 10 well-watched public hearings and collected more than a million documents since it launched in July 2021. As it has gathered the massive trove of evidence, the members have become emboldened in declaring that Trump, a Republican, is to blame for the violent attack on the Capitol by his supporters almost two years ago.

AP NEWS

After beating

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

many of them, the Jan. 6 rioters stormed the Capitol and interrupted the certification of Biden's presidential election win, echoing Trump's lies about widespread election fraud and sending lawmakers and others running for their lives.

The attack came after weeks of Trump's efforts to overturn his defeat — a campaign that was extensively detailed by the committee in its multiple public hearings, and laid out again by lawmakers on the panel at Monday's meeting. Many of Trump's former aides testified about his unprecedented pressure on

AP NEWS

to Biden's win. The committee

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

great detail how Trump riled up the crowd at a rally that morning and then did little to stop his supporters for several hours as he watched the violence unfold on television.

ADVERTISEMENT

The panel aired some new evidence at the meeting, including a recent interview with longtime Trump aide Hope Hicks. Describing a conversation she had with Trump around that time, she said he told her that no one would care about his legacy if he lost the election.

Hicks told the committee that Trump told her,

Trump's

respond to a
request for
comment, but
the former
president
slammed
members of the
committee
Sunday as "thugs
and scoundrels"
as he has
continued to
falsely dispute
his 2020 loss.

While a so-called
criminal referral
has no real legal
standing, it is a
forceful
statement by the
committee and
adds to political
pressure already
on Attorney
General Merrick
Garland and
special counsel
Jack Smith, who
is conducting an
investigation
into Jan. 6 and
Trump's actions.

ADVERTISEMENT

On the
recommendation

Case 1:23-cr-00310-BAH-JSE ADEDDocument 50-2 Filed 08/15/23 Page 148 of 304 of 80

AP NEWS

committee said

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

the former president "was directly responsible for summoning what became a violent mob" and refused repeated entreaties from his aides to condemn the rioters or to encourage them to leave.

For obstructing an official proceeding, the committee cites Trump's relentless badgering of Vice President Mike Pence and others to prevent the certification of the election results on Jan. 6. And his repeated lies about the election and efforts to undo the results open him up to a charge of conspiracy to defraud the United States,

AP NEWS

by the panel is

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

statement, citing the scheme by Trump and his allies to put forward slates of fake electors in battleground states won by President Joe Biden.

Among the other charges contemplated, but not approved, by the committee was seditious conspiracy, the same allegation Justice Department prosecutors have used to target a subset of rioters belonging to far-right groups like the Oath Keepers and Proud Boys.

Thompson said after the hearing that the seditious conspiracy charge is "something that the committee didn't come to agreement on."

Case 1:23-cv-03010-BAH-JSE *SEALED* Document 27-1 Filed 11/22/24 Page 30 of 80

**AP NEWS**

after Senate

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

formation of what would have been a bipartisan, independent commission to investigate the insurrection. When that effort failed, the Democratic-controlled House formed an investigative committee of its own.

ADVERTISEMENT

House Republican leader Kevin McCarthy of California, a Trump ally, decided not to participate after House Speaker Nancy Pelosi rejected some of his appointments. That left an opening for two anti-Trump Republicans in the House —

AP NEWS

of Illinois — to join seven

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

unusually unified panel in the divided Congress.

Rep. Liz (

Rep. Liz Chene

McCarthy was one of four House Republicans who ignored congressional subpoenas from the panel and were referred to the House Ethics Committee on Monday for their non-compliance.

The Republican leader, who is hoping to become speaker of the House when his party takes the majority in January, has acknowledged he spoke with Trump on Jan. 6. The committee also referred Reps. Jim Jordan of Ohio, Scott Perry of Pennsylvania and Andy Biggs

AP NEWS

Trump or the

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

leading up to the attack.

While the committee's mission was to take a comprehensive accounting of the insurrection and educate the public about what happened, they've also aimed their work at an audience of one: the attorney general. Lawmakers on the panel have openly pressured Garland to investigate Trump's actions, and last month he appointed a special counsel, Smith, to oversee two probes related to Trump, including those related to the insurrection and the presence of classified documents at Trump's Florida estate.

The committee

Case 1:23-cv-00310-BAH-JSE-ADEDocument 50-2 Filed 08/15/23 Page 153 of 304

AP NEWS

can only be

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

system.

"No one should get a pass," said Rep. Adam Schiff, D-Calif.

—

Associated Press writers Lisa Mascaro, Jill Colvin and Kevin Freking contributed to this report.

—

For full coverage of the Jan. 6 hearings, go to https://www.apnews.cc siege.

You May Like by Taboola

s

AP NEWS

U.S. News    World New

Trending News    U.S. winter storms    Grammy Awards    Super Bowl    Russia-Ukraine war

Amazon Left Scrambling As...

Online Shopping Tools

Massachusetts: Say Bye To Your Power Bill If Yo...

EnergyBillCruncher

Gronk's Favorite "Dressy" Shoes...

Wolf & Shepherd

If You Have Toenail Fungus...

Healthy Guru

This New Sleep Patch...

Zleep                          Learn More

Seniors Under 85 Yrs Old Get $50K In Life Insuranc...

Finance Daily

Ad Content

Experts Surprised: If You Have Mol...

Promoted: Healthy Living24

This New CPA...

Promoted: The Easy Blog by EasyBreathe.com

5.5% High Interest Savings Accounts. Fin...

Promoted: StuffAnswered

AP NEWS

WAS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

today

## Ad Content

Protect Your Brain: The...

Ageless Mind Learn More

Volkswagen has done it again....

Volkswagen Deals | Top Search Now

Unsold Never-Used Laptops...

Tech Savings Learn More

Empty Alaska Cruise Cabins...

Alaska Cruise Deals | sponsored searches

Your Bathroom Will Never Look The Same Than...

Renuity Bath Experts

These travel vans have done it...

Camper Van Deals | Search Now

## Ad Content

Military Jobs For Seniors...

Promoted: Military Jobs | Search Ads

Look for any high school...

Promoted: Classmates.com

Your Memory Is Excellent If You

Case 1:23-cr-00310-BAH-JSE ADDocument 50-2 Filed 08/15/23 Page 156 of 304 of 80

AP NEWS

US

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

HIN...

yesterda
y

AP NEWS
Top Stories
Video
Contact Us
Accessibility Statement
Cookie Settings
DOWNLOAD AP NEWS
Connect with the definitive source for global and local news
MORE FROM AP
ap.org
AP Insights
AP Definitive Source Blog
AP Images Spotlight
AP Explore
AP Books
AP Stylebook
FOLLOW AP

THE ASSOCIATED PRESS
About Contact Customer Support Careers Terms & Conditions Privacy
All contents © copyright 2023 The Associated Press. All rights reserved.

The New York Times | https://www.nytimes.com/2023/01/30/nyregion/trump-stormy-daniels-grand-jury.html

# *Manhattan Prosecutors Begin Presenting Trump Case to Grand Jury*

The Manhattan district attorney's decision represents a dramatic escalation of the inquiry, and potentially sets the case on a path toward criminal charges against the former president.

**By William K. Rashbaum, Ben Protess, Jonah E. Bromwich and Hurubie Meko**

Jan. 30, 2023

7 MIN READ

The Manhattan district attorney's office on Monday began presenting evidence to a grand jury about Donald J. Trump's role in paying hush money to a porn star during his 2016 presidential campaign, laying the groundwork for potential criminal charges against the former president in the coming months, according to people with knowledge of the matter.

The grand jury was recently impaneled, and the beginning of witness testimony represents a clear signal that the district attorney, Alvin L. Bragg, is nearing a decision about whether to charge Mr. Trump.

On Monday, one of the witnesses was seen with his lawyer entering the building in Lower Manhattan where the grand jury is sitting. The witness, David Pecker, is the former publisher of The National Enquirer, the tabloid that helped broker the deal with the porn star, Stormy Daniels.

As prosecutors prepare to reconstruct the events surrounding the payment for grand jurors, they have sought to interview several witnesses, including the tabloid's former editor, Dylan Howard, and two employees at Mr. Trump's company, the people said. Mr. Howard and the Trump Organization employees, Jeffrey McConney and Deborah Tarasoff, have not yet testified before the grand jury.

The prosecutors have also begun contacting officials from Mr. Trump's 2016 campaign, one of the people said. And in a sign that they want to corroborate these witness accounts, the prosecutors recently subpoenaed phone records and other documents that might shed light on the episode.

A conviction is not a sure thing, in part because a case could hinge on showing that Mr. Trump and his company falsified records to hide the payout from voters days before the 2016 election, a low-level felony charge that would be based on a largely untested legal theory. The case would also rely on the testimony of Michael D. Cohen, Mr. Trump's former fixer who made the payment and who himself pleaded guilty to federal charges related to the hush money in 2018.

Still, the developments compound Mr. Trump's legal woes as he mounts a third presidential campaign. A district attorney in Georgia could seek to indict him for his efforts to overturn his 2020 election loss in the state, and he faces a special counsel investigation into his removal of sensitive documents from the White House as well as his actions during the attack on the Capitol on Jan. 6, 2021.

Mr. Bragg's decision to impanel a grand jury focused on the hush money — supercharging the longest-running criminal investigation into Mr. Trump — represents a dramatic escalation in an inquiry that once appeared to have reached a dead end.

Under Mr. Bragg's predecessor, Cyrus R. Vance Jr., the district attorney's office had begun presenting evidence to an earlier grand jury about a case focused on Mr. Trump's business practices, including whether he fraudulently inflated the value of his assets to secure favorable loans and other benefits. Yet in the early weeks of his tenure last year, Mr. Bragg developed concerns about the strength of that case and decided to abandon the grand jury presentation, prompting the resignations of the two senior prosecutors leading the investigation.

One of them, Mark F. Pomerantz, was highly critical of Mr. Bragg's decision and has written a book that is scheduled to be published next week, "People vs. Donald Trump," detailing his account of the inquiry. Mr. Bragg's office recently wrote to Mr. Pomerantz's publisher, Simon & Schuster, expressing concern that the book might disclose grand jury information or interfere with the investigation.

District Attorney Alvin L. Bragg, center right, jump-started the inquiry last summer into Mr. Trump's role in the hush money paid to the porn star Stormy Daniels. Karsten Moran for The New York Times

Although he balked at charging Mr. Trump over the asset valuations, this is a different case, and Mr. Bragg is now a bolder prosecutor. He has ramped up the hush money inquiry in the weeks since his prosecutors convicted Mr. Trump's company in an unrelated tax case, a far cry from his unsteady early days in office, when Mr. Bragg was under fire from all quarters for unveiling a host of policies designed to put fewer people behind bars.

For his part, Mr. Trump has denied all wrongdoing and chalked up the scrutiny to a partisan witch hunt against him. He has also denied having an affair with Ms. Daniels. If Mr. Trump were ultimately convicted, he would face a maximum sentence of four years, though prison time would not be mandatory.

"This is just the latest act by the Manhattan D.A. in their never-ending, politically motivated witch hunt," the Trump Organization said in a statement, adding that reviving the case under what it called a "dubious legal theory" was "simply reprehensible and vindictive."

A spokeswoman for Mr. Bragg's office declined to comment. Mr. Pecker's lawyer, Elkan Abramowitz, did not immediately respond to a request for comment. A lawyer for Mr. McConney and Ms. Tarasoff declined to comment.

The panel hearing evidence is likely what's known as a special grand jury. Like regular grand juries, it is made up of 23 Manhattan residents chosen at random. But its members are sworn in to serve for six months to hear complex cases, rather than for 30 days, as is the case with panels that review evidence and vote on whether to bring charges in more routine matters.

The investigation, which has unfolded in fits and starts for more than four years, began with an examination of the hush money deal before expanding to include Mr. Trump's property valuations. Last summer, Mr. Bragg's prosecutors returned to the hush money anew, seeking to jump-start the inquiry after the departures of Mr. Pomerantz and Carey R. Dunne, the other senior prosecutor in the investigation.

**Sign up for the New York Today Newsletter** Each morning, get the latest on New York businesses, arts, sports, dining, style and more. Get it sent to your inbox.

The district attorney's office, working with the New York attorney general, Letitia James, is also continuing to scrutinize the way that the former president valued his assets, the people with knowledge of the matter said.

Over the course of the investigation into Mr. Trump, the hush money payment was discussed within the district attorney's office with such regularity that prosecutors came to refer to it as the "zombie theory" — an idea that just won't die.

The first visible sign of progress for Mr. Bragg came this month when Mr. Cohen appeared at the district attorney's office to meet with prosecutors for the first time in more than a year. He is expected to return for at least one additional interview in February, one of the people said.

The lawyer who represented Ms. Daniels in the hush money deal, Keith Davidson, is also expected to meet with prosecutors.

Mr. Trump's company was instrumental in the deal, court records from Mr. Cohen's federal case show.

Although Mr. McConney and Ms. Tarasoff were not central players, they helped arrange for Mr. Cohen to be reimbursed for the $130,000 he paid Ms. Daniels, whose real name is Stephanie Clifford.

Allen H. Weisselberg, the company's former chief financial officer, was also involved in reimbursing Mr. Cohen. And, according to Mr. Cohen, Mr. Weisselberg was involved in a discussion with Mr. Trump about whether to pay Ms. Daniels.

Mr. Weisselberg is serving jail time after pleading guilty to a tax fraud scheme unrelated to the hush money deal, a case that also led to the conviction of the Trump Organization in December. Although he was the star witness for the district attorney's office in that case, Mr. Weisselberg has never implicated Mr. Trump in any wrongdoing.

Without his cooperation, prosecutors could struggle to link Mr. Trump directly to the misconduct.

In 2018, when Mr. Cohen pleaded guilty to federal campaign finance charges stemming from his role in the hush money payments, he pointed the finger at Mr. Trump, saying the payout was done "in coordination with, and at the direction of" the president. Federal prosecutors agreed that Mr. Trump was behind the deal but never charged him or his company with a crime.

The cooperation of Allen H. Weisselberg, the Trump Organization's former chief financial officer, will be key to the prosecution's case against Mr. Trump.   Jefferson Siegel for The New York Times

There is some circumstantial evidence suggesting that Mr. Trump was involved: He and Mr. Cohen spoke by phone twice the day before Mr. Cohen wired the payment to Ms. Daniels's lawyer, according to records in the federal case.

For prosecutors, the core of any possible case is the way in which Mr. Trump reimbursed Mr. Cohen for the $130,000 he paid Ms. Daniels and how the company recorded that payment. According to court papers in Mr. Cohen's federal case, Mr. Trump's company falsely identified the reimbursements as legal expenses.

The district attorney's office now appears to be focusing on whether erroneously classifying the payments to Mr. Cohen as a legal expense ran afoul of a New York law that prohibits the falsifying of business records.

Violations of that law can be charged as a misdemeanor. To make it a felony, prosecutors would need to show that Mr. Trump falsified the records to help commit or conceal a second crime — in this case, violating a New York State election law, according to a person with knowledge of the matter. That second aspect has largely gone untested, and would therefore make for a risky legal case against any defendant, let alone the former president.

Defense lawyers might also argue that Mr. Trump, who was a first-time presidential candidate, did not know that the payments violated election law. And they could take aim at Mr. Cohen, arguing that he is a convicted criminal who has an ax to grind against Mr. Trump.

In its statement, the Trump Organization noted that "the narrow issue of whether payments to Michael Cohen were properly recorded in a personal accounting ledger back in 2017 was thoroughly examined" by the federal prosecutors who charged Mr. Cohen and concluded he had engaged in a "pattern of deception."

Mr. Pecker's testimony, however, could bolster the prosecution's contention that Mr. Trump was involved in planning the hush money payment. A longtime ally of Mr. Trump, the publisher agreed to look out for potentially damaging stories about Mr. Trump during the 2016 campaign. He agreed to this at a meeting in Mr. Trump's office.

In October 2016, Ms. Daniels's agent and lawyer discussed the possibility of selling exclusive rights to her story to The National Enquirer, which would then never publish it, a practice known as "catch and kill."

But Mr. Pecker balked at the deal. He and the tabloid's editor, Mr. Howard, agreed that Mr. Cohen would have to deal with Ms. Daniels's team directly.

When Mr. Cohen was slow to pay, Mr. Howard pressed him to get the deal done, lest Ms. Daniels reveal their discussions about suppressing her story. "We have to coordinate something," Mr. Howard texted Mr. Cohen in late October 2016, "or it could look awfully bad for everyone."

Two days later, Mr. Cohen transferred the $130,000 to an account held by Ms. Daniels's attorney.

Michael Rothfeld contributed reporting.



**NATION** Hardee's Add Topic

# MyPillow CEO, Trump ally Mike Lindell says FBI issued subpoena, seized phone at a Hardee's

**Scott Gleeson**
USA TODAY

Published 9:00 a.m. ET Sept. 14, 2022 | **Updated 2:36 p.m. ET Sept. 14, 2022**

MyPillow CEO Mike Lindell, a prominent Donald Trump supporter, said the FBI seized his cellphone and he was handed a subpoena from a Colorado grand jury Tuesday while he was in a Hardee's parking lot in Minnesota.

Lindell, who founded MyPillow in 2004, has been a key ally for Trump and has continued to protest the 2020 election by pushing baseless claims and conspiracy theories. In May, he was been banned from Twitter for a second time after trying to use a new account. Lindell's original account was permanently banned earlier in the year after he continued to perpetuate claims that Trump won.

On his podcast, "Frank Speech: The Lindell Report," Lindell detailed how he was issued the subpoena while waiting for his food and was questioned about a Colorado clerk, Tina Peters, who is being charged in what prosecutors say was a "deceptive scheme" to breach voting system technology used across the country. Lindell said the papers he was served labeled it an "official criminal investigation of a suspected felony" with the use of a federal grand jury.

**Anti-vaxxer, election denier:** And, in Michigan, perhaps secretary of state

**Critics call it intimidation:** Virginia's GOP attorney general sets up 'election integrity unit.'

Lindell said he also was questioned about his connection to Doug Frank, an Ohio educator who claims voting machines have been manipulated.

Lindell said on the podcast: "Cars pulled up in front of us, to the side of us and behind us, and I said, ‘These are either bad guys or the FBI.’ Well, it turns out they were the FBI. ... I want to say this for the record: They were pretty nice guys. None of them had an attitude."

In a separate interview with ABC News, Lindell said three cars with federal agents pulled in front of his vehicle while he was parked at the fast-food restaurant and handed him the search warrant for his cellphone. "I've been to many jails," Lindell told the outlet. "I'm not scared to go to jail. I'm trying to save my country."

"Without commenting on this specific matter, I can confirm that the FBI was at that location executing a search warrant authorized by a federal judge," FBI spokeswoman Vikki Migoya told The Associated Press.

*Contributing: The Associated Press*


NATIONAL ARCHIVES

# Records Released In Response to Presidential Records Act (PRA) questions under the Trump Administration

NARA officials are often consulted about the management of presidential and federal records. The Presidential Records Act governs access to records after the end of an administration.

The National Archives received records from the Trump Administration, which ended on January 20, 2021. We are in the process of preserving and providing access to these records, including all official Trump Administration social media content and deleted posts from @realDonaldTrump and @POTUS. As records are made available online, they may be accessed through the trumplibrary.gov website, which is part of NARA. The Trump Library will begin accepting FOIA requests on January 20, 2026, in accordance with the PRA.

Below are documents concerning records management-related inquiries about the Trump Administration's presidential records.

| **Document Title** | **Document Date** |
|---|---|
| White House letter to the Archivist of the United States : Trump PRA Designation | February 16, 2017 |
| White House memo to all personnel re PRA obligations (attached to Oct. 2 Compliance Reminder email) | February 22, 2017 |
| Letter from Sens. McCaskill and Carper to Archivist David S. Ferriero | March 7, 2017 |
| Archivist's response to Sens. McCaskill and Carper | March 30, 2017 |

| Document Title | Document Date |
|---|---|
| Attachments to March 30, 2017 letter:<br>• Briefing on the PRA<br>• Background on the PRA<br>• Guidance on Presidential Records (publication)<br>• Presidential Records, 44 U.S.C. Chapter 22<br>• Proposed rule on Presidential Records (note: now a final rule)<br>• Notification Procedures<br>• Approved Requests for Waiver of Incumbent President Privilege Review<br>• Approved Requests for Disposal of Incumbent Presidential Records<br>• NSC memo , Feb. 6, 2009 on procedure for access to PRA records of previous administration<br>• Archivist's memo to Senior Agency Officials for Records Management on Records Management Priorities for 2017<br>• Records Express Blog on Records Management of Social Media and Electronic Records | |
| White House email: Compliance Reminder PRA | October 2, 2017 |
| White House email: Monthly Legal Compliance and Ethics Training reminder | October 2, 2017 |
| American Oversight letter : Presidential Advisory Commission on Election Integrity and potential alienation of records | January 18, 2018 |
| NARA response letter to American Oversight: Presidential Advisory Commission on Election Integrity and potential alienation of records | January 25, 2018 |
| White House letter to the Archivist of the United States: Updated Trump Designation of PRA Representatives | January 19, 2021 |
| Letter from House Committee on Oversight and Reform regarding recovery of Trump PRA records | February 9, 2022 |
| Archivist's response to House Committee on Oversight and Reform regarding recovery of Trump PRA records<br>• NARA letter to Stefan Passantino, Deputy Counsel to the President regarding destruction of records, June 14, 2018 | February 18, 2022 |

| **Document Title** | **Document Date** |
|---|---|
| Archivist's letter to House Committee on Oversight and Reform regarding Trump social media records | February 18, 2022 |
| Archivist's letter to Senate Committee on Homeland Security and Governmental Affairs regarding Trump social media records | February 18, 2022 |
| Acting Archivist's Letter to Evan Corcoran regarding Trump boxes | May 10,2022 |
| Former President Trump's Letter to the Acting Archivist of the United States, Designating PRA Representatives | June 19 2022 |
| U.S. House of Representatives Permanent Select Committee on Intelligence (HPSCI) Ranking Member Michael R. Turner Letter to Acting Archivist | August 9, 2022 |
| Acting Archivist's Response Letter to August 9, 2022, Letter from HPSCI Ranking Member Michael Turner | August 16, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight and Reform, James Comer Letter to Acting Archivist | August 10, 2022 |
| Acting Archivist's Response Letter to August 10, 2022, Letter from House Committee on Oversight and Reform Ranking Member James Comer | August 16, 2022 |
| NARA Notice from Acting Archivist to All NARA Employees Update on Trump Administration Presidential Records | August 24, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight Reform, James Comer Letter to Acting Archivist | August 30, 2022 |
| Acting Archivist's Response Letter to August 30, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | September 22, 2022 |
| U.S. Committee on Oversight and Reform Chairwoman, Carolyn B. Maloney Letter to Acting Archivist | September 13, 2022 |
| Acting Archivist's Response Letter to September 13, 2022, Letter from U.S. Committee on Oversight and Reform Chairwoman Carolyn B. Maloney | September 30, 2022 |
| U.S. House of Representatives Committee on Oversight Reform, Ranking Member James Comer Letter to Acting Archivist | October 4, 2022 |
| Acting Archivist's Response Letter to October 4, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | October 7, 2022 |

| Document Title | Document Date |
|---|---|
| U.S. House of Representatives Committee on Oversight Reform, Ranking Member James Comer and Committee on the Judiciary Ranking Member Jim Jordan Letter    to Acting Archivist | October 14, 2022 |
| Acting Archivist's Response Letter    to October 14, 2022, Letter from House Committee on Oversight Reform Ranking Member and Committee on the Judiciary Ranking Member | October 25, 2022 |

**The U.S. National Archives and Records Administration**

1-86-NARA-NARA or 1-866-272-6272



**POLITICS** Scott Perry (politician) Add Topic

# Pennsylvania Rep. Scott Perry, a Trump ally, says FBI agents seized his cellphone

**Ella Lee**
USA TODAY

Published 9:08 a.m. ET Aug. 10, 2022

WASHINGTON — U.S. Rep. Scott Perry, R-Pa., said in a statement that while traveling Thursday morning with his family, his cellphone was confiscated by three FBI agents carrying a search warrant.

He compared the action to the Monday search of former President Donald Trump's Mar-a-Lago home, describing it as "banana republic tactics."

"They made no attempt to contact my lawyer, who would have made arrangements for them to have my phone if that was their wish," Perry said. "I'm outraged — though not surprised — that the FBI under the direction of Merrick Garland's DOJ, would seize the phone of a sitting Member of Congress."

The circumstances surrounding the seizure were not immediately known. The FBI declined to comment on the matter. USA TODAY requested comment from Perry's office.

Perry is one of a handful of House Republicans who allegedly helped the former president in his efforts to overturn the 2020 election.

**Jan. 6 committee:** Scott Perry, GOP congressman, refuses to cooperate with Jan. 6 investigation committee

**Presidential pardons:** At least 5 House Republicans sought pardons after Jan. 6, including Brooks, Gaetz, testimony reveals

The Pennsylvania lawmaker said in January 2021 that he introduced Trump and Department of Justice lawyer Jeffrey Clark, a top Justice official who was pushing Trump's baseless claims of election fraud. Clark drafted a letter urging officials in six states won by Biden to

submit a different group of electors who supported Trump, according to evidence shown by the Jan. 6 committee.

Former senior Justice Department officials have testified that Perry had "an important role" in Trump's effort to try to install Clark as the acting attorney general. Other administration lawyers rejected the idea as "asinine" and potentially criminal, and Trump relented only after top Justice Department and White House lawyers threatened to resign in protest.

Perry was one of five Congress members to request a pardon from the former president after the Jan. 6 Capitol attack, according to testimony from former White House officials during the Jan. 6 hearings.

Fox News first reported the seizure of Scott's cellphone.

*Contributing: Associated Press*

**THE WHITE HOUSE**

WASHINGTON

January 19, 2021

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Avenue, N.W.
Washington, D.C. 20408

Dear Mr. Ferriero:

In a letter dated February 16, 2017, I designated pursuant to 44 U.S.C. § 2204(d) three persons to act as my representatives with respect to exercising discretion or authority granted to me for the protection and disposition of the Presidential Records of my Presidency. I hereby revoke those designations.

With this letter, I hereby designate Mark R. Meadows, Pasquale A. Cipollone, John A. Eisenberg, Patrick F. Philbin, Scott F. Gast, Michael M. Purpura, and Steven A. Engel as my representatives in all respects that pertain to the records of my Presidency and, upon my death or disability, each representative may exercise all authority granted to me under chapter 22 of title 44, United States Code, or any other provision of law related to the records of my Presidency.

Sincerely,



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |

**EXHIBIT B**



A TO Z

# GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump

BY: **JIM SMALL** - FEBRUARY 17, 2023 7:15 AM

   

House Speaker Ben Toma, Senate President Warren Petersen and Sen. Sonny Borrelli all received federal grand jury subpoenas from the U.S. Department of Justice's special counsel investigation of Donald Trump's efforts to overturn his 2020 election loss. Photos by Gage Skidmore | Flickr/CC BY-SA 2.0

At least three Arizona Republican state legislators have been subpoenaed by the U.S. Justice Department's special counsel, Jack Smith, as part of the criminal investigation into former President Donald Trump and his efforts to reverse his 2020 election loss.

The federal grand jury subpoenas were issued to Senate President Warren Petersen, Sen. Sonny Borrelli and House Speaker Ben Toma. And at least one

former state senator, Michelle Ugenti-Rita, who led the Senate's Election Committee in 2021, received a subpoena. All four have been ordered to produce records and travel to Washington, D.C., to testify.

GET THE MORNING HEADLINES DELIVERED TO YOUR INBOX

SUBSCRIBE

The Arizona Mirror obtained a copy of one of the subpoenas on the condition that it would not be published. In addition to the command to testify before the grand jury, the office of the special counsel is demanding any documents already provided to the congressional panel that investigated the Jan. 6 U.S. Capitol riot and any documents given to any other state or federal inquiry related to the 2020 presidential election.

The subpoena also seeks all communications with Trump or his campaign. It also specifies 18 different campaign employees, attorneys and surrogates: Kenneth Chesebro, Justin Clark, Joe DiGenova, John Eastman, Jenna Ellis, Boris Epshteyn, Rudy Giuliani, Bernard Kerik, Bruce Marks, Cleta Mitchell, Matthew Morgan, Kurt Olsen, William Olson, Sidney Powell, Bill Stepien, Victoria Toensing, James Troupis and L. Lin Wood.

The state Senate and House of Representatives both confirmed the existence of the subpoenas for the three sitting lawmakers, but refused to release them under the state's public records law or to discuss if other lawmakers were also subpoenaed. Spokespeople and legislative attorneys also refused to answer questions about the subpoenas.

"The Special Counsel's Office has informed us that public release of its subpoenas could impede its investigation and interfere with federal law enforcement," Pete Galvan, an associate rules attorney in the Senate, wrote in an email. "In light of the position of the Special Counsel's office, the Senate won't release the materials at this time but may revisit the issue in the future as circumstances change."

A House attorney also initially cited a request from the Special Counsel's Office to keep the records secret as justification. Upon further questioning, both Justin Riches, the House's public records counsel, and Galvan said the legislative bodies were under no obligation to release the subpoenas because of case law and administrative rules allowing records to be shielded if doing so is "in the best interests of the state."

Ugenti-Rita did not respond to questions about the subpoena.

Borrelli, Petersen, Toma and Ugenti-Rita are not the first Arizona officials to be subpoenaed by the Justice Department in connection to Trump's effort to convince GOP officials in battleground states he lost to overturn the election results in a bid to retain power. In November, officials in Maricopa County were among the first to receive subpoenas from Smith's office.

And before Smith was appointed late last year, the FBI subpoenaed at least two Republican state senators – then-President Karen Fann and Kelly Townsend – as part of its investigation into Trump's pressure campaign to overturn the 2020 election.

Those earlier subpoenas to Maricopa County and the former senators sought communication records with 19 different Trump campaign members, attorneys or surrogates, including Rudy Giuliani, Sidney Powell and L. Lin Wood.

Prior to that, the Department of Justice had subpoenaed Arizonans who signed a document that would have sent fake electors to Congress backing Trump. Among them was Kelli Ward, then the chair of the Arizona Republican Party.

Smith's probe appears to be intensifying and moving aggressively. This month, he issued a subpoena to former Vice President Mike Pence, and some sources have reportedly been called to testify to the grand jury multiple times.

SUPPORT NEWS YOU TRUST.

DONATE

REPUBLISH

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site. Please see our republishing guidelines for use of photos and graphics.*



## JIM SMALL

 

Jim Small is a native Arizonan and has covered state government, policy and politics since 2004, with a focus on investigative and in-depth policy reporting, first as a reporter for the Arizona Capitol Times, then as editor of the paper and its prestigious sister publications. He has also served as the editor and executive director of the Arizona Center for Investigative Reporting.

MORE FROM AUTHOR

## RELATED NEWS

**UPDATED Trump's fake electors: Here's the full list**

BY **KIRA LERNER**

June 29, 2022

**How David Stevens is making Cochise County a 'laboratory'...**

BY **JEN FIFIELD/VOTEBEAT**

February 7, 2023

INSIGHTFUL. INVESTIGATIVE. INDEPENDENT.

DEMOCRACY TOOLKIT 

Amplifying the voices of Arizonans whose stories are unheard; shining a light on the relationships between people, power and policy; and holding public officials to account.

DEIJ Policy | Ethics Policy | Privacy Policy

Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site.

2/24/23, 12:51 PM GOP Arizona legislators, including leaders of the House and Senate, subpoenaed to testify in special counsel probe of Trump

© Arizona Mirror, 2023

https://www.azmirror.com/blog/gop-arizona-legislators-including-leaders-of-the-house-and-senate-subpoenaed-to-testify-in-special-counsel-probe-of-tr… 5/5

2/24/23, 12:50 PM Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 175 of 304 Jared Kushner and Ivanka Trump Subpoenaed in Jan. 6 Investigation - The New York Times

The New York Times https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html

# *Jared Kushner and Ivanka Trump Subpoenaed in Jan. 6 Investigation*

The special counsel overseeing the inquiry into Donald Trump's efforts to retain power after the 2020 election wants the former president's daughter and son-in-law to testify to a grand jury.

 

**By Maggie Haberman and Michael S. Schmidt**

Feb. 22, 2023

3 MIN READ

Former President Donald J. Trump's daughter Ivanka and his son-in-law, Jared Kushner, have been subpoenaed by the special counsel to testify before a federal grand jury about Mr. Trump's efforts to stay in power after he lost the 2020 election and his role in a pro-Trump mob's attack on the Capitol on Jan. 6, 2021, according to two people briefed on the matter.

The decision by the special counsel, Jack Smith, to subpoena Ms. Trump and Mr. Kushner underscores how deeply into Mr. Trump's inner circle Mr. Smith is reaching, and is the latest sign that no potential high-level witness is off limits.

The disclosure about the subpoena comes two weeks after it was revealed that Mr. Smith had subpoenaed former Vice President Mike Pence to testify before the grand jury. Mr. Pence plans to fight the subpoena, invoking his role as the president of the Senate to argue that it violates the "speech or debate" clause of the Constitution.

It is unclear whether Mr. Trump will seek to block Ms. Trump and Mr. Kushner from testifying on the grounds of executive privilege, as he has tried with some other witnesses. Both of them served as White House officials in the Trump administration. Mr. Trump declined to try to stop them from testifying before the House special committee that investigated the Jan. 6 attack and what led to it.

An aide to Ms. Trump and Mr. Kushner did not respond to a request for comment. Josh Stueve, a spokesman for Mr. Smith, declined to comment. Aides to Mr. Trump did not respond to a request for comment.

Ms. Trump was in the Oval Office on Jan. 6 as her father placed a late-morning call to Mr. Pence to pressure him to block or delay congressional certification of the Electoral College results documenting Joseph R. Biden Jr.'s victory. As president of the Senate, Mr. Pence, who rejected Mr. Trump's demands, was to serve in a ceremonial role overseeing the process that day.

Ms. Trump also accompanied her father to the rally of his supporters at the Ellipse near the White House. Hundreds of his supporters moved from there to the Capitol, where they attacked the building, some chanting, "Hang Mike Pence!" for his refusal to do what Mr. Trump wished.

Mr. Kushner returned from the Middle East that day, ultimately going to the White House after the pro-Trump mob had been rioting for hours. Both he and his wife were involved in efforts to get Mr. Trump to tell the rioters to go home, and then to commit to a peaceful transfer of power to Mr. Biden.

Both testified before the Jan. 6 House select committee, appearing for videotaped interviews in which both provided memories about the day. The committee, in turn, repeatedly played clips of their testimony at some of its public hearings.

One clip that got considerable attention showed Ms. Trump making clear that she accepted Attorney General William P. Barr's declaration that there was no evidence of widespread fraud in the election, despite Mr. Trump's repeated claims otherwise.

Mr. Trump was infuriated by the clips and what was said in them, according to people in contact with him.

Since then, Mr. Kushner and Ms. Trump, who relocated with their three children to Florida after they left the White House, have maintained family contact with the former president. But while Mr. Kushner appeared at Mr. Trump's campaign kickoff in November, Ms. Trump declined to and put out a statement saying she would not be involved in her father's campaign this time.

Both were intimately involved in his 2016 race before going to work at the White House.

In December, Mr. Trump posted on his social media site, Truth Social, that he did not want them to be involved in his third campaign.

"Contrary to Fake News reporting, I never asked Jared or Ivanka to be part of the 2024 campaign for president and, in fact, specifically asked them not to do it," Mr. Trump wrote, going on to say the campaign would be "too mean and nasty."

"There has never been anything like this 'ride' before, and they should not be further subjected to it," he added.

https://www.nytimes.com/2023/02/22/us/politics/jared-kushner-ivanka-trump-jan-6.html? 1/1

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/mark-meadows-trumps-last-chief-of-staff-subpoenaed-by-grand-jury-8c7ad44e

POLITICS

# Mark Meadows, Trump's Last Chief of Staff, Subpoenaed by Grand Jury

Special counsel Jack Smith seeks former top aide's testimony in probe of efforts to reverse 2020 presidential election

The subpoena for Mark Meadows could set the stage for further court battles.
PHOTO: YURI GRIPAS/REUTERS

*By C. Ryan Barber* Follow *and Sadie Gurman* Follow
Updated Feb. 15, 2023 9:47 pm ET

WASHINGTON—Former White House chief of staff Mark Meadows has been subpoenaed by the special counsel investigating former President Donald Trump's efforts to overturn his loss in the 2020 election, according to a person familiar with the matter.

Mr. Meadows received the subpoena in late January, the person said, as special counsel Jack Smith's investigation escalated his probe into steps Mr. Trump and his allies took to keep him in office. As Mr. Trump's final White House chief of staff, Mr. Meadows would be among the closest advisers of the former president to be summoned before the grand jury.

The demand for his testimony predated a separate subpoena issued to former Vice President Mike Pence as part of the investigation. Two top aides to Mr. Pence—his former chief of staff

Marc Short and counsel Greg Jacob—are among the former Trump administration officials who have already appeared before the grand jury.

The subpoena for Mr. Meadows could set the stage for further court battles between prosecutors and Mr. Trump, whose lawyers have cited executive privilege in attempts to block or delay the testimony of top aides in investigations examining the former president. Mr. Pence plans to resist his subpoena by arguing that, as vice president, he served also as president of the Senate and is covered by the Constitution's Speech or Debate clause, which protects members of Congress from being questioned in court about legislative acts.



Former President Donald Trump's chief of staff Mark Meadows has been at the center of other investigations into efforts to overturn the 2020 presidential election.
PHOTO: MANDEL NGAN/AGENCE FRANCE-PRESSE/GETTY IMAGES

A lawyer for Mr. Meadows, George Terwilliger, and a Justice Department spokesman declined to comment. CNN earlier reported that Mr. Meadows has been subpoenaed.

Attorney General Merrick Garland appointed Mr. Smith as special counsel in November to take on the dual investigations into Mr. Trump's efforts to cling to power and the handling of classified documents at the former president's Mar-a-Lago estate in southern Florida. It couldn't immediately be determined whether prosecutors want to question Mr. Meadows also in connection with the Mar-a-Lago investigation.

Mr. Meadows has been at the center of other investigations into Mr. Trump's efforts to reverse his electoral defeat in 2020. Last year, the South Carolina Supreme Court ordered him

to testify before an Atlanta-area grand jury as part of a local prosecutor's investigation into the former president's efforts to interfere with election results in Georgia.

The House referred Mr. Meadows to the Justice Department for prosecution after holding him in contempt for refusing to testify before the panel that investigated the Jan. 6, 2021, attack on the Capitol. The Justice Department declined to prosecute him.

In the course of its investigation, the House Jan. 6 committee aired testimony that cast Mr. Meadows as a close Trump adviser with some awareness of the potential for violence on Jan. 6, 2021, the day Congress was set to certify Mr. Trump's loss to President Biden.

A top aide to Mr. Meadows, Cassidy Hutchinson, testified that he told her on Jan. 2, 2021, that "things might get real, real bad on Jan. 6." In videotaped testimony, Ms. Hutchinson said Messrs. Meadows and Trump were both told that members of the crowd for Mr. Trump's speech at the Ellipse on that day were armed with knives, guns, bear spray and other weapons.

The recent subpoenas suggest Mr. Smith's investigation is intensifying.

In the separate investigation of classified documents at Mar-a-Lago, prosecutors are asking a judge to compel further testimony from one of the former president's lawyers, in a bid to break through claims of executive privilege raised during a recent grand jury appearance, according to people familiar with the Justice Department's action.

The prosecutors have asked the chief judge in Washington's federal trial court to invoke the so-called crime-fraud exception, which would allow them to bypass attorney-client privilege and extract more testimony from Trump lawyer Evan Corcoran, the people said. The exception applies in instances where there is reason to believe legal advice has been used in furtherance of a crime.

The move to invoke the crime-fraud exception suggests that federal prosecutors suspect that Mr. Trump or his allies used Mr. Corcoran's services in such a way.

A spokesman for Mr. Trump declined to comment on the tactics of the investigation, which he called a "targeted, politically motivated witch hunt against President Trump, concocted to try and prevent the American people from returning him to the White House."

*—Alex Leary contributed to this article.*

Write to C. Ryan Barber at ryan.barber@wsj.com and Sadie Gurman at
sadie.gurman@wsj.com

*Appeared in the February 16, 2023, print edition as 'Special Counsel Subpoenas Meadows'.*

The New York Times https://www.nytimes.com/2023/02/09/us/politics/pence-subpoena-trump.html

# *Pence Gets Subpoena From Special Counsel in Jan. 6 Investigation*

The move by Jack Smith, the special counsel, is one of the most aggressive in his investigation of Donald Trump's efforts to stay in power and is likely to lead to a battle over executive privilege.

 

**By Maggie Haberman and Glenn Thrush**

Feb. 9, 2023 4 MIN READ

Former Vice President Mike Pence has been subpoenaed by the special counsel investigating former President Donald J. Trump's efforts to cling to office after he lost his bid for re-election, a person familiar with the matter said on Thursday.

The move by the Justice Department sets up a likely clash over executive privilege, which Mr. Trump has previously used to try to slow, delay and block testimony from former administration officials in various investigations into his conduct.

The existence of the subpoena was reported earlier by ABC News.

It was not immediately clear when the special counsel, Jack Smith, sought Mr. Pence's testimony. The move is among the most aggressive yet by Mr. Smith in his wide-ranging investigation into Mr. Trump's role in seeking to overturn the outcome of the 2020 election. He is also overseeing a parallel inquiry into Mr. Trump's handling of classified documents.

The New York Times previously reported that the Justice Department was seeking to question Mr. Pence in connection with the investigation into Mr. Trump's efforts to remain in power after he lost the 2020 election and had reached out to his team.

Mr. Pence is potentially a key witness because he is one of the people best positioned to provide information about Mr. Trump's state of mind at the time, even though his relationship with Mr. Trump reached the breaking point in the days leading up to the Jan. 6, 2021, riot at the Capitol, legal experts said.

Mr. Pence's team held discussions with the Justice Department about a voluntary interview, according to the person familiar with the matter, but those talks were at an impasse, leading Mr. Smith to seek the subpoena.

An aide to Mr. Pence declined to confirm the existence of the subpoena. A Justice Department official did not respond to a request for comment.

It is not clear whether investigators will also seek to question Mr. Pence in the matter of Mr. Trump's handling of classified material, or what he could have to share that would be relevant. Mr. Pence's advisers recently alerted the Justice Department that he had found some documents with classified markings at his home in Indiana, after conducting a search following the discovery of classified documents at President Biden's home in Delaware and at a think tank office he used in Washington.

Justice Department officials have signaled that they plan a more thorough search of Mr. Pence's home.

The subpoena from Mr. Smith comes at a moment of rising tension between the Pence team and the Justice Department over the discussions about searching the former vice president's home.

Lawyers with the department's national security division have been discussing the details of a possible agreement to search Mr. Pence's house in Indiana for additional government documents on a parallel track; Mr. Pence's advisers were incensed by the disclosure of a pending search last week and blamed the department for leaking details to pressure them.

Another former Trump administration official, the final national security adviser, Robert C. O'Brien, has received a subpoena in connection with the handling of the documents found to be in Mr. Trump's possession, according to a person familiar with the matter.

But Mr. Pence figures most centrally in the inquiry into Mr. Trump's efforts to use the government to remain in power. Mr. Trump seized on Mr. Pence's ceremonial role in overseeing the congressional certification of the Electoral College results to try to press his vice president into blocking or delaying the outcome on Jan. 6.

Mr. Pence refused, a fact highlighted publicly by Mr. Trump as he stirred up a crowd of supporters that day before they marched to the Capitol and breached it. Some of the rioters chanted, "Hang Mike Pence."

Mr. Pence described some of his ordeal in his recently published book, "So Help Me God."

Mr. Trump has frequently tried to assert executive privilege when officials have sought testimony from people who worked for him in the White House. He has generally been unsuccessful, but those battles over which matters privilege covers have slowed some of the investigations.

That included when two top aides to Mr. Pence — his former chief of staff, Marc Short, and his former counsel, Greg Jacob — were subpoenaed to testify before a grand jury.

Mr. Pence is being represented by Emmet T. Flood, a veteran lawyer who was the lead official in the White House Counsel's Office under Mr. Trump dealing with the special counsel investigation into whether Mr. Trump's 2016 campaign conspired with Russian officials, and whether the former president obstructed justice.

Mr. Pence is a potential rival to Mr. Trump for the 2024 Republican presidential nomination. Mr. Trump is so far the only declared candidate in that race. And Mr. Biden, who is also the subject of a recently named special counsel looking into the documents found at his home and the Penn Biden Center, is widely expected to declare another presidential campaign for a second term.

Mr. Smith has vowed to expedite the investigation into Mr. Trump, and has moved to consolidate and focus what was seen inside the department as a sprawling inquiry into Mr. Trump's efforts to overturn the election and the Jan. 6 attack, according to people familiar with the situation.

That has intensified in recent weeks, as Mr. Smith's staff — led by Thomas Windom, a veteran prosecutor who had been working out of the office of the U.S. attorney in Washington — has pored through hundreds of witness transcripts turned over by the House committee that investigated the Jan. 6 attack.

WATCH LIVE

Disgraced former lawyer Alex Murdaugh returns to the stand in his own defense at his double-murder trial

# Special counsel is locked in at least 8 secret court battles in Trump investigations

By Katelyn Polantz, Casey Gannon and Evan Perez, CNN

Published 6:00 AM EST, Thu February 16, 2023

Jack Smith, left, and Donald Trump

**(CNN) —** Special counsel Jack Smith is locked in at least eight secret court battles that aim to unearth some of the most closely held details about Donald Trump's actions after the 2020 election and handling of classified material, according to sources and court records reviewed by CNN.

The outcome of these disputes could have far-reaching implications, as they revolve around a 2024 presidential candidate and could lead courts to shape the law around the

presidency, separation of powers and attorney-client confidentiality in ways they've never done before.

Yet almost all of the proceedings are sealed, and filings and decisions aren't public.

The sheer number of grand jury challenges from potential witnesses is both a reflection of the scope of the special counsel's investigation and a hallmark of Trump's ultra-combative style in the face of investigations.

**RELATED ARTICLE**
Pence says he's willing to take fight against DOJ subpoena in Trump probe to Supreme Court

---

By comparison, Robert Mueller's grand jury investigation into Trump had a smattering of sealed proceedings where investigators used the court to pry for more answers, and independent counsel Kenneth Starr's Whitewater investigation ultimately totaled seven similar sealed cases.

A key sealed case revealed Wednesday is an attempt to force more answers about direct conversations between Trump and his defense attorney Evan Corcoran, where the Justice Department is arguing the investigation found evidence the conversations may be part of furthering or covering up a crime related to the Mar-a-Lago document boxes.

A spokesman for Smith's office declined to comment.

About half a dozen cases are still ongoing in court, either before Chief Judge Beryl Howell or in the appeals court above her, the DC Circuit. Most appear to follow the typical arc of miscellaneous cases that arise during grand jury investigations, where prosecutors sometimes use the court to enforce their subpoenas.

More challenges from subpoenaed witnesses – including former Vice President Mike Pence – are expected to be filed in the coming days, likely under seal as well. Pence may raise novel questions about the protections around the vice presidency.

Investigations that implicate government officials often beget sealed court proceedings, because confidential grand jury witnesses become more likely to assert privileges that prompt prosecutors to ask judges to compel more answers, criminal law experts say.

"I think we are in extraordinary times. Part of it is I think President Trump continues to assert these theories long after they've been batted away by the court," Neil Eggleston, a former White House counsel who argued for executive privilege during the Clinton

administration and the Whitewater investigation.

In Whitewater, after the court in DC ruled that privilege claims wouldn't hold up when a federal grand jury needed information, other witnesses shied away from trying to refuse to testify, Eggleston recalled. But in the Trump investigations, witnesses aligned continue to test whether he still may have special confidentiality protections.

Still, the number of cases is out of the ordinary.

The other known cases are:

The Justice Department's long-running effort to enforce a May 2022 subpoena for all classified records in Trump's possession. After a sealed December hearing, Howell gave Smith's investigators an avenue to ask more questions of two people hired to search Trump's properties in December and found more documents with classified markings. Those two people testified to the grand jury late last month. Sixteen national media outlets, including CNN, have asked Howell to make public transcripts of hearings and other records in the case.

An appeal over whether former Pence chief counsel Greg Jacob and chief of staff Marc Short should have been forced to answer questions about Trump interactions around January 6. Both went to the grand jury in DC on the same Friday last July and refused to give some answers because of Trump's attempted claims of confidentiality around the presidency. Court orders prompted them to testify a second time, seeking out more testimony from them in October last year, CNN previously confirmed. They both appeared a second time at the grand jury. The Trump team still has filed an appeal of Howell's decisions.

An appeal over whether former Trump White House counsel Pat Cipollone and deputy White House counsel Patrick Philbin could decline to answer questions about direct conversations with Trump from the end of his presidency. Both men cited various privileges when they testified to the grand jury in September, but were forced to appear a second time and give more answers after court rulings in November and December, CNN previously confirmed. Though they have already testified twice, Trump's team filed an appeal.

**RELATED ARTICLE**
Trump lawyer says searches for classified material at Trump properties are complete

Following the seizure of Pennsylvania GOP Rep. Scott Perry's cell phone in August in the January 6 investigation, lawyers for the congressman challenged the Justice Department's ability to access data taken from the phone, citing protection around Congress under the Constitution's Speech or Debate Clause. Howell refused to keep the records from investigators, but an appeals court panel has blocked the DOJ from seeing the records so far, according to indications in the court record. The case is set for oral arguments on February 23 at the appeals court in Washington. The circuit court also has a request from the Reporters Committee for Freedom of the Press to unseal documents in the case.

Both Republican and Democratic leadership in the US House have wanted a part in the case because of the implications for Congress, CNN has confirmed.

Howell has released redacted versions of two attorney confidentiality decisions she made last year giving prosecutors access to emails between Perry and three lawyers – John Eastman, Jeffrey Clark and Ken Klukowski – before January 6, 2021.

Howell separately denied Clark's attempt to keep from investigators a draft of his autobiography that discussed his efforts at the Justice Department on behalf of Trump before January 6. Clark had tried to mark the draft outline about his life as an attorney work product.

The Justice Department secured a court order for Trump adviser Kash Patel to answer questions under oath in the Mar-a-Lago investigation. Patel initially declined to answer questions before the grand jury in October, citing his Fifth Amendment protection against self-incrimination. Then prosecutors fought for more answers by immunizing his testimony from prosecution, CNN previously reported.

## Transparency is lacking

The suite of special counsel's office grand jury cases raises questions how transparent the courts will be regarding these cases, and how soon documents filed in court could become available.

The New York Times and Politico are trying to convince Howell to release redacted versions of any sealed court fights related to the grand jury where Trump or others in his administration have tried to limit the investigation with claims of executive privilege, according to court filings.

The media organizations argue there's a "profound national interest" in those legal papers.

But the Justice Department is against making disclosures related to the grand jury

investigations – and won't even admit the proceedings are taking place.



**RELATED ARTICLE**
Third Trump attorney appears before federal grand jury investigating Mar-a-Lago documents

On Monday, they argued to Howell that with the intense public interest around the cases, there should be even more secrecy than when the court releases other records.

"To advance the policy goals underlying grand jury secrecy, it may well be necessary for a court to more frequently decline to release judicial opinions ancillary to grand jury investigations that are the subject of intense press attention as opposed to matters that have attracted little public attention," lawyers from the DOJ's civil division wrote.

Howell is still deciding what to do.

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

FOLLOW CNN POLITICS

   

Terms of Use | Privacy Policy | Cookie Settings | Ad Choices | Accessibility & CC | About | Newsletters | Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Case 1:23-sc-00031-BAH *SEALED* Document 50-2 Filed 08/15/23 Page 188 of 304

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/trump-copes-with-facebook-twitter-ban-by-relying-on-email-media-interviews-11620226189

POLITICS

# Trump Copes With Facebook, Twitter Ban by Relying on Email, Media Interviews

Cut off from social media, the former president pursues other ways to get his message out



When he was president, Donald Trump relied on Twitter to communicate with supporters; now he relies on email. Supporters of the former president marched down Fifth Avenue in New York City on March 5.
PHOTO: JOHN MINCHILLO/ASSOCIATED PRESS

*By Alex Leary*  Follow
May 5, 2021 10:49 am ET

In the heat of the 2016 presidential campaign, then-candidate Donald Trump said, "I'm just not a believer in email." Since he was banned from social media earlier this year, it has been his go-to communication tool.

Unable since January to tweet, put videos on YouTube or post to Facebook—whose oversight board upheld the ban on Wednesday and gave the company six months to determine whether Mr. Trump should be permanently banned—the former president has been blast emailing statements to comment on daily news developments, endorse candidates and target critics.

He continues to claim in emailed statements and in private gatherings with supporters that the election was rigged. There is no evidence there was widespread fraud in the election, and Mr. Trump's campaign and his allies failed in dozens of court challenges to the results.

"They're really much more elegant. And the word is getting out," Mr. Trump said of his emailed statements in a recent Newsmax interview.

Mr. Trump spoke at the Conservative Political Action Conference, or CPAC, in Orlando, Fla., on Feb. 27.

**PHOTO:** ELIJAH NOUVELAGE/BLOOMBERG NEWS

"The tweeting gets you in trouble," Mr. Trump added. "You're retweeting people and you find out that the retweets were not so good, because the person—if you didn't do research—that you're retweeting is not the best. ... I like this better than Twitter. Actually, they did us a favor."

But while Mr. Trump once could instantly communicate to tens of millions of people, his email reach is smaller and slower, people familiar with the process say. News outlets that once hung on his every word are being more selective. Lawmakers too say they are relieved not to have to react to the barrage of tweets.

A spokesman declined to say how large the email list is.

Mr. Trump has floated the idea of creating his own social-media platform. On Tuesday, Mr. Trump's website added a section— titled "From the Desk of Donald J. Trump" —that contains his statements with buttons for people to share on Twitter and Facebook. Trump spokesman Jason Miller said in a tweet that the site is "not a new social media platform. We'll have additional information coming on that front in the very near future."



Mr. Trump made a speech at a dog-rescue fundraising event at Mar-a-Lago on March 12.
PHOTO: VALENTINA AVED VIA STORYFUL

Mr. Trump has done a handful of TV interviews, with Newsmax, One America News Network and Fox News, allowing him a broad audience. He has also appeared on podcasts and radio shows. In a conversation last week with conservative host Dan Bongino, Mr. Trump suggested he is planning to revive his campaign-style rallies, while he continues to tease the idea of running for president in 2024.

He has closely followed the news from his Mar-a-Lago club in Florida, aides say, and has regular talks with political advisers. A stream of candidates have visited him in hopes of an endorsement. Some are holding fundraisers at the club, in hopes the former president makes a personal appearance. Mr. Trump is planning to relocate to his Bedminster golf club in New Jersey for the summer.

Case 1:23-cv-00310-BAH *SEALED* Document 50-2 Filed 08/15/23 Page 192 of 304

The Trump statements are sent through his official office or political action committee, Save America PAC. They read like long versions of his former tweets, full of capital letters, exclamation points, boasts about his record in office, attacks on rivals and general musings.

“What used to be called The Academy Awards, and now is called the ‘Oscars’—a far less important and elegant name—had the lowest Television Ratings in recorded history, even much lower than last year, which set another record low,” he wrote last week.

“Why is it that every time the 2020 ELECTION FRAUD is discussed, the Fake News Media consistently states that such charges are baseless, unfounded, unwarranted, etc.?” he lamented on April 2. “Other than that, Happy Easter!”

Mr. Trump dictates the messages to an aide, according to two people familiar with the process, and the message is reviewed by staff before being sent out. He is given a printed-out copy and sometimes makes edits in black marker.

Some of the emails have generated news, such as one attacking Senate Minority Leader Mitch McConnell (R., Ky.) following his criticism of Mr. Trump’s rhetoric leading up to the Jan. 6 Capitol riot. Despite the Twitter ban, the statements have appeared in tweets from other users.

Republican adversaries are a frequent target, including House GOP Conference Chairwoman Liz Cheney of Wyoming, Utah Sen. Mitt Romney and his former national security adviser John Bolton.

The back and forth with Ms. Cheney escalated this week, after Mr. Trump issued an email statement calling the 2020 election “THE BIG LIE.” She responded on Twitter that calling the election stolen poisons the democratic system, prompting him to call her a “warmonger” who polls badly.

Regardless of the Facebook decision, Mr. Trump appears to have moved on from Twitter, which banned him permanently. Speaking on Fox News in late March, he said, “It’s become very, very boring.”

**Write to** Alex Leary at alex.leary@wsj.com

*Appeared in the May 6, 2021, print edition as 'Former President Turns To Email'.*

The New York Times https://www.nytimes.com/2023/01/25/us/politics/trump-texting.html

# *OMG. Trump Has Started Texting.*

The former president, averse to leaving records of his communications, had long avoided text and email.

**By Jonathan Swan and Maggie Haberman**

Jan. 25, 2023 3 MIN READ

One of former President Donald J. Trump's most consistent personal traits — one that his advisers say has helped keep him out of even worse legal jeopardy — has been his refusal to communicate by text or email.

Until now.

Mr. Trump, 76, who is heading into his third presidential campaign and is still under scrutiny by investigators on multiple fronts, has at last become a texter, according to three people with knowledge of his new habit. His messages have recently shown up in the phones of surprised recipients, they said.

The former president's resistance to texting frustrated investigators for the House Jan. 6 committee as they tried to track his thoughts and actions when he worked to overturn the 2020 election. In his testimony before the committee, the former president's eldest son, Donald Trump Jr., said he texted the White House chief of staff, Mark Meadows, during the Capitol attack because his father "doesn't text."

That changed around the beginning of this year. Friends, confidants and even people not especially close to Mr. Trump began receiving text messages from his cellphone, most of them described as innocuous, such as new year greetings or political observations. A spokesman for Mr. Trump declined to comment.

The former president has long been constantly on his phone, but only to talk into it — or, before he was kicked off Twitter, to send streams of tweets. (The former aide who helped set up his Twitter account once told Politico that when Mr. Trump, who initially relied on aides to write his posts, began to tweet on his own, it was akin to the scene in the film "Jurassic Park" when the velociraptors learned to open doors.)

For years, people corresponding with him sent him text messages, which always went unanswered. He was unreachable by email. He sometimes asked aides to send electronic messages to reporters, referring to the missives as "wires," like a telegram.

Now, his delayed embrace of what has long been a default mode of communication spanning generations signals not only a willingness to join in the world of LOL's and BRB's but also a small shift from his aversion to leaving paper or electronic trails.

People who have worked for Mr. Trump in the White House and in his private business say he has prided himself on being "smart" for leaving almost no documentation of his communications and discussions in meetings. That included snatching notes being taken in real time by a junior legal associate in his offices in the 1990s, when Mr. Trump spotted the man scribbling, according to a consultant working for him then.

Those who have witnessed firsthand his visceral aversion to record-keeping said they were shocked to learn about his new electronic habit.

"Has he now also started to take notes?" John R. Bolton, Mr. Trump's former national security adviser, dryly texted when told about the former president's texting.

Mr. Trump upbraided Mr. Bolton, who wrote one of the most searing book-length accounts of the Trump presidency, for taking notes during meetings.

Mr. Trump also chided Donald F. McGahn II, his first White House counsel, for notes he took. Mr. McGahn, when interviewed by the special counsel Robert S. Mueller III during the Russia investigation, described informing Mr. Trump that he took notes because he was a "real lawyer."

"I've had a lot of great lawyers, like Roy Cohn. He did not take notes," Mr. McGahn recounted Mr. Trump saying, referring to his ruthless longtime fixer and mentor who became the prototype for what Mr. Trump sought in a lawyer.

The fact that Mr. Trump is now sending texts has caused alarm among some of his associates, who are concerned about what he might say. Still, they have been relieved about another shift: His phone now sends calls that are not from numbers in his contacts to voice mail, according to two people familiar with the change.

That shift occurred this month, after an NBC reporter called Mr. Trump directly during Representative Kevin McCarthy's desperate fight to be elected speaker of the House. Mr. Trump picked up, giving a brief interview that created some political heartburn for Republicans.

Still unclear is Mr. Trump's position on emojis.

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/trump-lawyers-appeared-before-grand-jury-as-part-of-classified-documents-probe-3d1c8040

POLITICS

# Trump Lawyers Appeared Before Grand Jury as Part of Classified-Documents Probe

Evan Corcoran and Christina Bobb's appearances come as the Justice Department ramps up Mar-a-Lago investigation

Evan Corcoran has represented Donald Trump in dealings with the Justice Department over the classified documents.

PHOTO: MARCO BELLO/AGENCE FRANCE-PRESSE/GETTY IMAGES

*By C. Ryan Barber* Follow *and Alex Leary* Follow

Updated Feb. 11, 2023 6:57 pm ET

Two lawyers for Donald Trump appeared before a grand jury last month as part of the special counsel investigation into the handling of classified documents and other records discovered at the former president's South Florida residence and private club, according to people familiar with the matter.

Christina Bobb and Evan Corcoran, lawyers who have represented Mr. Trump in dealings with the Justice Department over the classified documents, made their appearances in the early weeks of January as the special counsel, Jack Smith, ramped up his investigation, the people said.

The two have faced scrutiny since last year, when the Federal Bureau of Investigation found a cache of classified documents at Mr. Trump's Mar-a-Lago estate during a court-authorized search. In a court filing after that search, the Justice Department said the discovery of documents during the Aug. 8 search "cast serious doubt" on a sworn statement Ms. Bobb had signed in June attesting that all materials requested by a subpoena to Mr. Trump had been turned over to the Justice Department. In fact, more records were later retrieved from the property.

The Justice Department declined to comment.

Ms. Bobb declined to comment on Saturday. Her grand jury appearance hasn't previously been reported.

Mr. Corcoran's appearance was earlier reported by Bloomberg News. He didn't respond to repeated requests for comment.

Their appearances came as the Justice Department ramped up the investigation into the potential mishandling of sensitive records at Mar-a-Lago. Attorney General Merrick Garland appointed Mr. Smith, a former public integrity and war crimes prosecutor, in November to oversee the dual investigations into the mishandling of classified records and Mr. Trump's efforts to overturn the 2020 election results.



A cache of classified documents was discovered last year at Donald Trump's Mar-a-Lago estate.
PHOTO: JOE RAEDLE/GETTY IMAGES

In recent weeks, Mr. Smith's office has moved aggressively with subpoenas to associates of Mr. Trump and requests for prompt productions of documents, according to people familiar with the investigation. The Wall Street Journal reported Thursday that the special counsel

subpoenaed former Vice President Mike Pence as part of the investigation into efforts to overturn the 2020 election.

Ms. Bobb had previously spoken with federal investigators. In an October interview, Ms. Bobb said Mr. Corcoran had assured her that he conducted a thorough search of Mar-a-Lago before he asked her to certify that all records requested by a subpoena had been returned, the Journal reported. Ms. Bobb at the time insisted on adding language to the certification that said she was acting "based upon the information that has been provided to me," and "to the best of my knowledge." She declined an offer of immunity, saying she didn't need it, according to people familiar with the process.

Mr. Corcoran handled Mr. Trump's responses to government requests for the return of records from his presidency. He accepted a subpoena requesting those documents, according to court records, and was present at Mar-a-Lago in June when federal officials arrived at the West Palm Beach estate to collect more materials.

In May, Mr. Corcoran wrote a letter to the Justice Department asserting that Mr. Trump had "readily and voluntarily agreed" to send the materials to the National Archives after the agency requested them. In the letter, which was revealed in court filings following the Mar-a-Lago search, Mr. Corcoran also warned it was critical that the Justice Department's steps "not involve politics," and he argued that a president's actions with classified documents aren't subject to criminal sanction.

Mr. Corcoran has more recently represented Mr. Trump in legal proceedings related to the investigation into mishandling of classified documents at Mar-a-Lago, which is also examining potential obstruction of justice. In December, he was observed entering the chambers of Chief Judge Beryl Howell for a sealed proceeding related to a grand jury matter.

A former federal prosecutor, Mr. Corcoran has also represented close allies of Mr. Trump. Last year, he defended Mr. Trump's former strategist Steve Bannon against criminal contempt of Congress charges stemming from his defiance of a subpoena issued by the House committee that investigated the Jan. 6, 2021, attack on the Capitol. A jury found Mr. Bannon guilty in July. Mr. Bannon was later sentenced to four months in prison, but a judge allowed him to remain free while Mr. Bannon challenges the criminal conviction in the U.S. Court of Appeals for the D.C. Circuit.

In January, just weeks after his grand jury appearance, Mr. Corcoran appeared on Mr. Trump's behalf in the contempt of Congress case against another onetime Trump White House adviser,

Peter Navarro. In a Jan. 23 letter, which was filed in federal court, Mr. Corcoran endorsed Mr. Navarro's decision to rebuff a subpoena from the House Jan. 6 committee by raising executive privilege claims.

Write to C. Ryan Barber at ryan.barber@wsj.com and Alex Leary at alex.leary@wsj.com

*Appeared in the February 13, 2023, print edition as 'Trump Lawyers Appeared Before Grand Jury in Probe'.*

WILMERHALE

February 8, 2023

George P. Varghese

+1 617 526 6524 (t)
+1 617 526 5000 (f)
george.varghese@wilmerhale.com

**UNDER SEAL**

**By Email**

Honorable Beryl A. Howell, Chief Judge
U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Chief Judge Howell:

On February 7, 2023, during the Court's hearing on the government's Motion for an Order to Show Cause, and in the Court's subsequent Minute Order, the Court ordered Twitter to "submit a list of each case in which Twitter has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the courts resolution of that challenge."

Below is a list of cases in which Twitter has identified that it filed or asserted a challenge to a non-disclosure order. This list was compiled based on a review of Twitter's available records, and may not be exhaustive. Due to the nature of these challenges, these cases were under seal at the time Twitter challenged the non-disclosure order. Where Twitter has been able to confirm that the case is no longer under seal, we have included the case number. Where Twitter has not been able to confirm that the case is no longer under seal, we have included only the date, jurisdiction, type of legal process, and outcome.

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | (not public) | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |

WILMERHALE

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Jan. 20, 2023 (asserted) | District Court for the District of Nevada | Not public | Grand Jury Subpoena and 2705 non-disclosure order | NDO amended and reissued |
| Dec. 13, 2022 (asserted) | State of Ohio | Not public | Warrant for Electronic Consumer Data and Information | NDO amended and reissued |
| Sept. 12, 2022 (asserted) | State of Mississippi | Not public | Search Warrant and Order for Non-Disclosure on Search Warrant | NDO amended and reissued |

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| Sept. 8, 2022 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and 2705 non-disclosure order | (pending LE response) |
| Sept. 8, 2022 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and 2705 non-disclosure order | (pending LE response) |
| March 10, 2021 (filed) | District Court for the District of Columbia | 1:20-03082 | Grand jury subpoena and section 2705 non-disclosure order | NDO withdrawn |
| March 9, 2021 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Feb. 23, 2021 (asserted) | District Court for the District of Columbia | Not public | Grand jury subpoena and section 2705 non-disclosure order | Subpoena withdrawn after NDO challenge |
| 2020 (asserted) | District Court for the Southern District of New York | Not public | Grand jury subpoena and non-disclosure order | Subpoena withdrawn after NDO challenge |
| Oct. 30, 2020 (filed) | District Court for the Eastern District of California | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO amended |

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| Apr. 26, 2019 (filed) | District Court for the Southern District of New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Oct. 19 2017 (decided) | District Court for the Northern District of Texas | 3:17-mc-40-M-BN, 2017 WL 9287146 adopted by 2017 WL 9287147 | Grand jury subpoena and section 2705 non-disclosure order | NDO vacated |
| 2017 (filed) | District Court for the Western District of Texas | Not public | National Security Letter and NDO | NDO upheld |
| June 15, 2016 (filed) | Ninth Circuit Court of Appeals | 16-16067 | National Security Letter and NDO | NDO upheld |
| 2016 (asserted) | District Court for the District of Columbia | 16-518 | National Security Letter and NDO | NDO upheld |
| June 2015 (asserted) | State of Iowa | N/A | Subpoena duces tecum and NDO | NDO amended |

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| December 2015 (asserted) | State of Minnesota | N/A | Administrative subpoena and NDO | Subpoena withdrawn after NDO challenge |
| 2015 (filed) | Supreme Court of Richmond County, New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO amended |
| 2015 (filed) | District Court for the District of Massachusetts | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO upheld |
| Oct. 7, 2014 (filed) | District Court for the Northern District of California | 4:14-cv-04480 | National Security Letter and NDO | NDO upheld |
| July 2015 (asserted) | State of Ohio | Not public | Grand jury subpoena and NDO | NDO amended |
| 2014 (filed) | Supreme Court of New York County, New York | Not public | Grand jury subpoena and section 2705 non-disclosure order | NDO vacated |
| 2013 (decided) | Fourth Circuit Court of Appeals | 11-5151 (*see also United States v. Appelbaum*, 707 F.3d | 2703(d) order and section 2705 non-disclosure order | NDO lifted |

| Date | Jurisdiction | Case Number | Type of Process | Outcome |
|---|---|---|---|---|
| | | 283 (4th Cir. 2013) | | |
| 2013 (filed) | District Court for the Northern District of California | Not public | National Security Letter and NDO | NDO upheld |
| Apr. 5, 2013 (asserted) | State of New York | Not public | Administrative subpoena and NDO | NDO upheld |
| May 2012 (asserted) | State of Arizona | Not public | Grand jury subpoena and statutory gag | Gag lifted |
| 2011 (asserted) | District Court for the District of Connecticut | Not public | Grand jury subpoena and NDO | Subpoena withdrawn after NDO challenge |

Sincerely,

George P. Varghese

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-00031-BAH<br><br>**UNDER SEAL** |
|---|---|

## NOTICE OF PAYMENT

Notice is hereby given that on March 24, 2023, Twitter, Inc. made payment of $350,000 to the Clerk of the United States District Court for the District of Columbia. Twitter made this payment under protest, and with the understanding that the funds will be held in escrow pending further order of this Court, per this Court's March 10, 2023, order.

Dated: March 27, 2023

Respectfully submitted,

George P. Varghese *(pro hac vice)*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
George.Varghese@wilmerhale.com
Tel: (617) 526-6000
Fax: (617) 526-6363

Ari Holtzblatt, D.C. Bar 1009913
Benjamin Powell, D.C. Bar 464823
Whitney Russell, D.C. Bar 987238
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20006

FILED UNDER SEAL

Ari.Holtzblatt@wilmerhale.com
Benjamin.Powell@wilmerhale.com
Whitney.Russell@wilmerhale.com
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Twitter, Inc.*

FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March 2023, I caused the foregoing motion to be served by email upon:

James Pearce, Assistant Special Counsel

George P. Varghese (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-6363

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>Under Seal |
|---|---|

**[PROPOSED] ORDER**

Upon consideration of the Government's Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant, and the entire record herein, it is hereby

**ORDERED**, this ____ day of February, 2023, that the Government's Motion is GRANTED and a hearing shall be held forthwith; and it is further

**ORDERED** that, on February ____, 2023, a company representative (in addition to any outside counsel) of Twitter Inc. shall personally appear before the Court, and show cause why Twitter Inc. should not be held in contempt for its failure to comply with the Warrant, ECF No. 4; and it is further

**ORDERED** that a copy of this Order shall be served on Twitter Inc. and the Government; and it is further

**ORDERED** that the Government's Motion, this Order, and any related materials are sealed until otherwise ordered by the Court.

**SO ORDERED.**

Date:

________________________________
CHIEF JUDGE BERYL A. HOWELL
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

cc:    Mary L. Dohrmann
        Assistant Special Counsel
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530
        (202) 714-9376

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 1:23-SC-31 - BAH<br><br>**UNDER SEAL** |
| --- | --- |

**EXHIBIT B**
**TO TWITTER'S OPPOSITION TO**
**GOVERNMENT'S MOTION FOR AN ORDER TO SHOW CAUSE**



POLITICO

CONGRESS

# 2 top Pence aides appear before Jan. 6 grand jury

Marc Short and Greg Jacob have both testified recently, according to two people familiar with the matter.

Marc Short, who served as chief of staff to former Vice President Mike Pence, is one of the most significant witnesses known to face grand jury questions related to Jan. 6. | Patrick Semansky/AP Photo

By **KYLE CHENEY**

07/25/2022 04:26 PM EDT

   

Two of former Vice President Mike Pence's top White House aides have testified recently to a federal grand jury investigating matters connected to the Jan. 6, 2021, attack on the Capitol, according to two people familiar with the matter.

Marc Short, Pence's former chief of staff, testified last week under subpoena, while Pence's former chief counsel Greg Jacob, also testified recently, though the timing and circumstances of his appearance were not immediately clear. Short was spotted by ABC cameras exiting the federal courthouse Friday, on the same day Donald Trump's ally Steve Bannon was convicted of contempt of Congress for defying a Jan. 6 select committee subpoena.

AD

Both Short and Jacob cooperated with the Jan. 6 select committee, testifying in January and February this year, respectively. Jacob was also a star witness for the panel, testifying at a public hearing in June about helping Pence fend off Donald Trump's effort to deputize the vice president to disrupt the transfer of power to Joe Biden.

Short and Jacob are two of the most significant witnesses known to face grand jury questions related to Jan. 6. Both were in key meetings on Jan. 4 and 5, 2021, as Trump attorney John Eastman worked to persuade Pence to adopt a fringe legal theory that would permit the then-vice president to single-handedly overturn the election certification on Jan. 6.

Trump was present for the Jan. 4 meeting, when Pence rejected his and Eastman's entreaties. Short and Jacob were also both with Pence on Jan. 6 as a

mob stormed the Capitol, sending them all fleeing for safety. Jacob's email exchanges with Eastman amid the chaos have become crucial pieces of evidence for Jan. 6 investigators, showing Eastman continuing to lean on Pence and Jacob even as violence raged.

Jacob's memos and notes, explaining why he viewed Eastman's effort as illegal, have proven significant documents for investigators. Among his conclusions: State legislatures had refused, as of Jan. 6, to certify alternate slates of electors, leaving the false slates assembled by pro-Trump activists in multiple states without any claim of authority.

Eastman had previously embraced that notion as well, according to emails and correspondence obtained by the Jan. 6 committee, but pushed ahead with Trump's plan anyway.

Short testified to the Jan. 6 select committee in January about Pence's efforts to convince Trump that he lacked the power to overturn the election, a message Pence relayed numerous times in the weeks before Jan. 6. But Trump, relying on a cadre of fringe attorneys, pushed a theory that Pence — who was charged by the Constitution with presiding over the count of electoral votes on Jan. 6 — could unilaterally refuse to count dozens of electors for Joe Biden, or postpone the count altogether.

Short's testimony was featured in the public hearings the House's Jan. 6 select committee has held over the last several weeks. Jacob testified publicly alongside former federal judge Michael Luttig, who helped Pence develop a

FILED UNDER: CONGRESS, MIKE PENCE, DONALD TRUMP, DONALD TRUMP 2020,

The select committee has publicly expressed uncertainty about whether it will

Huddle

A play-by-play preview of the day's congressional news

EMAIL

Your Email

INDUSTRY

Select Industry

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC



An official website of the United States government
Here's how you know

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE Friday, November 18, 2022

## Appointment of a Special Counsel

Attorney General Merrick B. Garland announced today the appointment of former career Justice Department prosecutor and former chief prosecutor for the special court in The Hague, Jack Smith, to serve as Special Counsel to oversee two ongoing criminal investigations. The first is the investigation, as described in court filings in the District of Columbia, into whether any person or entity unlawfully interfered with the transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021. The second is the ongoing investigation involving classified documents and other presidential records, as well as the possible obstruction of that investigation, referenced and described in court filings submitted in a pending matter in the Southern District of Florida.

"Based on recent developments, including the former President's announcement that he is a candidate for President in the next election, and the sitting President's stated intention to be a candidate as well, I have concluded that it is in the public interest to appoint a special counsel," said Attorney General Garland. "Such an appointment underscores the Department's commitment to both independence and accountability in particularly sensitive matters. It also allows prosecutors and agents to continue their work expeditiously, and to make decisions indisputably guided only by the facts and the law."

The Attorney General also stated, "Although the Special Counsel will not be subject to the day-to-day supervision of any official of the Department, he must comply with the regulations, procedures, and policies of the Department. I will ensure that the Special Counsel receives the resources to conduct this work quickly and completely. Given the work done to date and Mr. Smith's prosecutorial experience, I am confident that this appointment will not slow the completion of these investigations. The men and women who are pursuing these investigations are conducting themselves in accordance with the highest standards of professionalism. I could not be prouder of them. I strongly believe that the normal processes of this Department can handle all investigations with integrity. And I also believe that appointing a Special Counsel at this time is the right thing to do. The extraordinary circumstances presented here demand it. Mr. Smith is the right choice to complete these matters in an even-handed and urgent manner."

Special Counsel Smith has resigned as the chief prosecutor for the special court in The Hague charged with investigating and adjudicating war crimes in Kosovo.

---

**Attachment(s):**
Download 2022.11.18_order_5559-2022.pdf

**Component(s):**
Office of the Attorney General

**Press Release Number:**
22-1237

*Updated November 18, 2022*

POLITICO

LEGAL

# 'Decisions are imminent': Georgia prosecutor nears charging decisions in Trump probe

Fulton County District Attorney Willis' remark came as she urged a judge to oppose calls to publicly release the findings of her yearlong investigation.

Fani Willis has spent the last year investigating Donald Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. | Drew Angerer/Getty Images

By **KYLE CHENEY**

01/24/2023 03:55 PM EST

The Atlanta-area district attorney investigating Donald Trump's effort to subvert the 2020 election indicated on Tuesday that decisions on whether to seek the indictment of the former president or his associates were "imminent."

"Decisions are imminent," Fulton County District Attorney Fani Willis said during a Tuesday court hearing called by the Georgia trial court judge overseeing the "special purpose grand jury" that Willis has used to gather evidence over the last year.

AD

Willis' remark came as she urged the judge, Robert McBurney, to oppose calls to publicly release the findings of her yearlong probe, which she conducted alongside the special grand jury to examine Trump and his inner circle.

Willis has spent the last year investigating Trump's and his allies' effort to reverse the election results in Georgia, despite losing the state by more than 11,000 votes. The special grand jury probed Trump's Jan. 2 phone call to Georgia Secretary of State Brad Raffensperger, asking him to "find" just enough votes to put him ahead of Joe Biden in the state. And it pursued evidence about Trump's broader national effort to subvert the election, calling top allies like his White House chief of staff Mark Meadows, former national security adviser Michael Flynn, attorney John Eastman and Sen. Lindsey Graham (R-S.C.).

The special grand jury concluded its investigation earlier this month, dissolving in early January, and recommended that its findings be released publicly. McBurney then called for a hearing to discuss whether to follow the panel's recommendation or maintain the secrecy of the report. Willis told the judge that making the report public could jeopardize impending prosecutions.

"In this case, the state understands the media's inquiry and the world's interest. But we have to be mindful of protecting future defendants' rights," Willis said, emphasizing that multiple people could face charges.

Tuesday's discussion was the result of Georgia's unusual grand jury law, which permits prosecutors to impanel a "special purpose grand jury" that has no power to make formal indictments but can help prosecutors gather evidence about a specific topic. If Willis opts to pursue charges against Trump or others, she needs to present her evidence to a traditional grand jury, which could then issue indictments.

Thomas Clyde, an attorney representing several media outlets supporting the release of the report, urged McBurney to side with the grand jurors rather than Willis.

"We believe the report should be released now and in its entirety," Clyde said.

He noted that findings in criminal investigations are often released publicly even while investigations and grand jury proceedings continue.

McBurney noted that Willis' probe has been accompanied by an extraordinary release of information and evidence by the House Jan. 6 select committee and from witnesses being called before a federal grand jury probing the same matters, none of which had derailed Willis' probe. He also noted that there was little to stop individual grand jurors from simply telling others about the findings in their report.

But McBurney said he wanted more time to consider the arguments and said any ruling he made would provide significant advance notice before the potential release of the report.

**FILED UNDER:** DONALD TRUMP, DONALD TRUMP 2020, GEORGIA, ATLANTA, VOTING ISSUES,

**Huddle**

A play-by-play preview of the day's congressional news

EMAIL

Your Email

INDUSTRY

Select Industry

SIGN UP

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

# MaddowBlog

From The Rachel Maddow Show

ALL MADDOWBLOG POSTS
THE RACHEL MADDOW SHOW
FULL EPISODES
PODCASTS

PREVIOUS POST NEXT POST

TAP TO UNMUTE
“HOLDING THE LINE”
DEPARTMENT OF JUSTICE
QUI PRO DOMINA JUSTITIA SEQUITUR
00:00 /06:35
CC

# DOJ seizes Team Trump phones as part of intensifying Jan. 6 probe

*If the Mar-a-Lago scandal weren't enough, the Justice Department's investigation into Jan. 6 is intensifying in ways that should make Team Trump nervous.*

Sept. 13, 2022, 8:00 AM EDT

By Steve Benen

When it comes to the many ongoing scandals surrounding Trump World, it's tempting to think the Mar-a-Lago controversy is the most serious. After all, the former president stands accused of

stealing classified materials, refusing to give them back, and obstructing the retrieval process. There's an ongoing criminal investigation, and indictments are a distinct possibility.

But by some measures, the most dramatic scrutiny of Donald Trump and his team remains the Justice Department's criminal probe of the Jan. 6 attack and the Republicans' efforts to overturn the election results.

For months, there was ample speculation about whether investigators were moving forward with any vigor at all. As the latest New York Times reporting suggests, those questions continue to get answers.

> *Justice Department officials have seized the phones of two top advisers to former President Donald J. Trump and blanketed his aides with about 40 subpoenas in a substantial escalation of the investigation into his efforts to subvert the 2020 election, people familiar with the inquiry said on Monday. The seizure of the phones, coupled with a widening effort to obtain information from those around Mr. Trump after the 2020 election, represent some of the most aggressive steps the department has taken thus far in its criminal investigation into the actions that led to the Jan. 6, 2021, assault on the Capitol by a pro-Trump mob.*

According to the Times' reporting, much of which has been confirmed by NBC News, federal agents executed court-approved search warrants, taking the phones of at least two people — Trump lawyer Boris Epshteyn and campaign strategist Mike Roman — while also issuing subpoenas to a variety of figures, including Dan Scavino, Trump's former social media director, and Bernie Kerik.

The subpoenas, according to the Times, were related to the investigation into the fake electors scheme.

To quickly recap for those who might benefit from a refresher, let's revisit our earlier coverage and review how we arrived at this point. It was in March when the Times first reported that federal prosecutors "have substantially widened their Jan. 6 investigation to examine the possible culpability of a broad range of figures involved in former President Donald J. Trump's efforts to overturn the results of the 2020 election."

It raised a few eyebrows for a reason: The Justice Department hasn't made a lot of noise about its Jan. 6 probe, but the reporting suggested it was eyeing Team Trump, and not just rank-and-file

rioters who launched their assault in his name.

Around the same time, The Washington Post also reported that the federal grand jury had "issued subpoena requests to some officials in former president Donald Trump's orbit who assisted in planning, funding and executing the Jan. 6 rally."

## Recommended

MADDOWBLOG

**'Peaceful transition': Pompeo has a flawed memory of Jan. 6**

MADDOWBLOG

**McCarthy denounces 'turmoil' while imposing debt ceiling turmoil**

In the months that followed, the grand jury heard from top members of former Vice President Mike Pence's team. As part of the same probe, federal investigators descended on Jeffrey Clark's home; FBI agents executed a search warrant against Trump lawyer John Eastman; and Ali Alexander, the founder of the "Stop the Steal" group that organized a Jan. 6 rally, also testified.

We also learned a month ago that a grand jury subpoena made a sweeping demand for "all materials, in whatever form" that the National Archives had given to Congress' Jan. 6 committee, including "records from the files of Mr. Trump's top aides, his daily schedule and phone logs and a draft text of the president's speech that preceded the riot."

It's against this backdrop that federal law enforcement has seized some Trump advisers' phones and blanketed his aides with about 40 subpoenas.

It's unlikely that anyone would characterize the Justice Department's probe as swift or rushed, but let there be no doubt: This investigation exists and it's obviously intensifying.

For the former president and his political operation, this is not at all good news.

Steve Benen

Steve Benen is a producer for "The Rachel Maddow Show," the editor of MaddowBlog and an MSNBC political contributor. He's also the bestselling author of "The Impostors: How Republicans Quit Governing and Seized American Politics."

PREVIOUS POST

Monday's Mini-Report, 9.12.22

NEXT POST

Trump lawyers: Mar-a-Lago scandal is a 'document storage dispute'

LATEST POST

'Peaceful transition': Pompeo has a flawed memory of Jan. 6

Sponsored Stories by Taboola

FINITION

hotos] Hilarious Signs Employees Have Had To Deal With.

GHTY SCOOPS

ıe Oldest Stars Who Are Still Living in 2023.

SPONSORED / DICK'S SPORTING GOODS

Nike Zoom Freak 4 Basketball Shoes, Women's

SPONSORED / MACY'S

CeCe Sakura Delight Puff-Sleeve Dress

SPONSORED / DEFINITION

[Photos] Hilarious Signs Employees Have Had To Deal With.

SPONSORED / MIGHTY SCOOPS

The Oldest Stars Who Are Still Living in 2023.

SPONSORED / HOMEBUDDY

Here's What New Walk-in Shower Should Cost You In 2023

SPONSORED / HEALTHY BLOOD

Diabetes Might Not Be From Sweets! Meet The Number One Enemy

SPONSORED / DEFINITION

M*A*S*H: 15 Hidden Details You Never Noticed

SPONSORED / HEALTH BENEFITS

Dentists Are Surprised: BOSTON Man Relieves Tooth Decay With This Natural Ingredient

SPONSORED / THE MOTLEY FOOL

A Slam Dunk if you Need a Balance Transfer (21 months)

SPONSORED / TURBOTAX

Claiming the Home Office Tax Deduction

SPONSORED / RENUITY BATH EXPERTS

Your Bathroom Will Never Look The Same Thanks To This 1-Day Transformation

SPONSORED / BUZZDAILY WINNERS

2/3/23, 4:59 PM Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 227 of 304 DOJ seizes Team Trump phones as part of intensifying Jan. 6 probe

The Most Realistic PC Game of 2022

SPONSORED / HEALTHY GURU

New Weight Loss Delicacy Has Americans Dropping Pounds

SPONSORED / SUNVALUE

Massachusetts: Gov Will Cover The Cost To Install Solar if You Live In These Zip Codes

ABOUT

DO NOT SELL MY PERSONAL INFORMATION

CONTACT

CA NOTICE

HELP

TERMS OF SERVICE

CAREERS

MSNBC SITEMAP

MSNBC STORE

CLOSED CAPTIONING

AD CHOICES

ADVERTISE

PRIVACY POLICY

© 2023 NBC UNIVERSAL

NEWS MSNBC TODAY

https://www.msnbc.com/rachel-maddow-show/maddowblog/doj-seizes-team-trump-phones-part-intensifying-jan-6-probe-rcna47448 6/6

LEGAL

# DOJ sends some 40 subpoenas to Trump aides

The subpoenas are a step forward in the investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol.

Violent insurrectionists loyal to former President Donald Trump climb the west wall of the U.S. Capitol in Washington, D.C., on Jan. 6, 2021. | Jose Luis Magana/AP Photo

By **OLIVIA OLANDER**
09/12/2022 10:26 PM EDT

   

The Justice Department has issued some 40 subpoenas to aides of former President Donald Trump regarding Trump's efforts to overturn the 2020 presidential election, POLITICO confirmed Monday.

The subpoenas, first reported by The New York Times, are a major step forward in the ongoing investigation of the events leading up to the Jan. 6, 2021, attack on the Capitol. They also come as Trump is dealing with a separate inquiry into his handling of presidential records and classified material that he took with him to his home in Florida after the end of his presidency. Trump's lawyers and the Justice Department are currently in a protracted legal battle over the custody of those records.

AD

Former Trump adviser Stephen Bannon was the first to discuss the recent batch of subpoenas, saying on his podcast last week that 35 had been issued. That number appears to have been a slight lowballing of the actual figure.

Among matters that investigators are reportedly looking into is Trump's post-election fundraising and his efforts to overturn the election by appointing false electors. As POLITICO previously reported, a grand jury issued subpoenas last week seeking information about Trump's Save America PAC.

On his show Monday night, Fox News host Tucker Carlson said he had obtained a copy of a subpoena that was issued and that it pertained to "any claim that the vice president and/or the president of the Senate had the

authority to reject or to choose not to count presidential electors." POLITICO

**FILED UNDER:** FOX NEWS, TUCKER CARLSON, DEPARTMENT OF JUSTICE, DONALD TRUMP, 



About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

POLITICS

Subpoenas Add Topic

# Justice Department subpoenas dozens of Trump aides in apparent escalation of investigation, according to reports

*The investigation of Trump's effort to overturn the 2020 election and the Capitol attack on Jan. 6, 2021, is separate from the seizure of documents from Mar-a-Lago.*

**Bart Jansen**
USA TODAY

Published 7:43 p.m. ET Sept. 12, 2022 | **Updated 8:52 p.m. ET Sept. 12, 2022**

**Key Points**

- The Justice Department subpoenaed dozens of Trump aides and seized at least two phones.
- Some subpoenas sought information from people who challenged the 2020 election results.
- Some subpoenas focused on Trump fundraisers and organizers of his rally before the Capitol riot.

WASHINGTON – The Justice Department issued dozens of subpoenas to Donald Trump's aides and associates for information about the 2020 election and the Capitol attack on Jan. 6, 2021, according to The New York Times and CNN.

The flurry of subpoenas suggested the investigation, which is separate from the seizure of Trump administration documents from Mar-a-Lago, is picking up pace.

At least two Trump aides, Boris Epshteyn and Mark Roman, had their phones seized as evidence, according to the Times. Epshteyn declined comment.

The subpoenas seek information about the Trump campaign's plan to organize alternate slates of electors in states President Joe Biden won. Epshteyn had copied on emails in late 2020 from Trump lawyer John Eastman, who developed the plan.

Eastman has already been subpoenaed and had his phone seized. Eastman earlier refused to answer questions from the House panel investigating the Capitol attack or a grand jury in

Georgia based on his Fifth Amendment right against self-incrimination.

Another subpoena recipient was Bernard Kerik, the former New York City police commissioner, who coordinated the investigation of claims of voter fraud with Trump lawyer Rudy Giuliani.

Kerik's lawyer, Timothy Parlatore, told USA TODAY that Kerik was willing to testify to federal investigators as he had already before the House committee. Kerik had already turned over examples of probable case of election fraud to the Justice Department for further investigation in late 2020, Parlatore said.

Former Attorney General Bill Barr has testified to the House panel that the department found no evidence to support the Trump campaign's claims of widespread fraud.

Parlatore said the department's latest subpoena read as if the current investigation had no focus and asked Kerik about names he didn't recognize.

"The normal DOJ subpoena looks like rifle shots," Parlatore said. "This looks like a whole bunch of scatter-shot shotgun blasts, almost like a spray-and-pray mindset."

The latest subpoenas included one to Dan Scavino, Trump's former social-media director, according to the Times. Trump promoted his fundraising to fight the results of the 2020 election and his rally the morning of Jan. 6 through social media. Scavino's lawyer, Stanley Woodward Jr., declined comment.

Others who were subpoenaed include former Trump campaign manager Bill Stepien and Sean Dollman, the campaign's chief financial officer, according to CNN.

The Justice Department declined comment on the subpoenas.

The investigation is separate from the seizure of Trump administration documents, which included dozens of classified records, from Mar-a-Lago. In that probe, federal investigators said they were looking for evidence of violations of the Espionage Act for mishandling national defense documents or of obstruction of justice.

**More:** Will Trump or his allies face charges over Jan. 6? Legal experts explain hurdles DOJ faces

The investigation is also separate, but overlaps with a local investigation in Fulton County, Georgia. District Attorney Fani Willis has convened a special grand jury to investigate fake

electors and other potential election fraud by Trump and his campaign. The grand jury has subpoenaed Eastman and Giuliani, among others.

The Justice Department earlier declined without explanation to press charges against Scavino or former White House chief of staff Mark Meadows over defying subpoenas from the House committee investigating the attack. But the department charged Trump political strategist Steve Bannon, who was convicted of contempt, and former trade adviser Peter Navarro, who awaits trial.

The New York Times https://www.nytimes.com/2022/06/27/us/politics/john-eastman-jan-6.html

# Federal Agents Seized Phone of John Eastman, Key Figure in Jan. 6 Plan

The action suggests that the criminal inquiry is accelerating into the efforts to help overturn the results of the 2020 election.

**By Alan Feuer and Adam Goldman**

June 27, 2022

Federal agents armed with a search warrant have seized the phone of John Eastman, a lawyer who advised former President Donald J. Trump on key elements of the effort to overturn the results of the 2020 election, according to a court filing by Mr. Eastman on Monday.

The seizure of Mr. Eastman's phone is the latest evidence that the Justice Department is intensifying its sprawling criminal investigation into the various strands of Mr. Trump's efforts to remain in power after he was defeated for re-election.

In the past week alone, the department has delivered grand jury subpoenas to a variety of figures with roles in backing Mr. Trump's efforts and it carried out at least one other search of a key figure.

The filing by Mr. Eastman, a motion to recover property from the government, said that F.B.I. agents in New Mexico, acting on behalf of the Justice Department's Office of the Inspector General, stopped Mr. Eastman as he was leaving a restaurant last Wednesday and seized his iPhone.

A copy of the warrant included as an exhibit in Mr. Eastman's filing said that the phone would be taken to either the Justice Department or the inspector general's forensic lab in Northern Virginia.

According to the filing, the seizure of Mr. Eastman's phone came on the same day that federal agents raided the home and seized the electronic devices of Jeffrey Clark, a former Justice Department official who was central to Mr. Trump's attempts to coerce the department's leaders into backing his false claims of fraud in the election.

The inspector general's office, which has jurisdiction over investigations of Justice Department employees, also issued the warrant in the search of Mr. Clark's home, a person familiar with the investigation said. The warrant indicated that prosecutors are investigating Mr. Clark for charges that include conspiracy to obstruct the certification of the presidential election, the person familiar with the investigation said.

A spokesman for the U.S. attorney's office in Washington, which is overseeing the inquiry, declined to comment on Mr. Eastman's court filing.

With Mr. Eastman and Mr. Clark, the department is gathering information about two lawyers who were in close contact with Mr. Trump in the critical weeks before the Jan. 6, 2021, attack on the Capitol by a pro-Trump mob.

The advice they were giving Mr. Trump involved separate but apparently intersecting proposals to provide him with a means of averting his defeat, with Mr. Clark focused on using the power of the Justice Department on Mr. Trump's behalf and Mr. Eastman focused on disrupting the congressional certification of the election's outcome.

Jeffrey Clark at a news conference in October 2020. Yuri Gripas/Reuters

The search warrant executed on Mr. Eastman by the inspector general's office may have been issued because of his connections to Mr. Clark, which were briefly touched on at a hearing by the House select committee on Jan. 6 last week, a day after the raids on the two men.

At the hearing, Representative Liz Cheney, Republican of Wyoming and the panel's vice chairwoman, said that Ken Klukowski, a Justice Department lawyer who was in contact with Mr. Eastman, also helped Mr. Clark draft a letter to Gov. Brian Kemp of Georgia stating falsely that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

Did you find this information helpful? Yes No

The letter further recommended that Mr. Kemp call a special session of the state legislature to create "a separate slate of electors supporting Donald J. Trump."

Mr. Klukowski, who briefly served under Mr. Clark at the Justice Department and had earlier worked at the White House budget office, also "worked with John Eastman," Ms. Cheney said during the hearing. She went on to describe Mr. Eastman as "one of the primary architects of President Trump's scheme to overturn the election."

Ken Klukowski, center, a Justice Department lawyer who was in contact with Mr. Eastman, arrived for a meeting with the Jan. 6 House select committee late last year. Al Drago for The New York Times

The inspector general's office has the authority to look into any public corruption crimes committed by Justice Department personnel, said Michael R. Bromwich, a former department inspector general during the Clinton administration.

"Those investigations can lead to people and places outside the Justice Department," Mr. Bromwich said. "There must be a connection between Eastman and someone who worked at the department."

A former law professor in California, Mr. Eastman helped develop and promote a brazen plan to justify having Vice President Mike Pence single-handedly block or delay certification of the Electoral College results showing Joseph R. Biden Jr.'s victory in the 2020 election. In a series of meetings and phone calls, Mr. Trump and Mr. Eastman pressured Mr. Pence to put the plan into action when Mr. Pence presided over a joint session of Congress on Jan. 6, 2021.

Mr. Pence's refusal to go along helped fuel the violence that overwhelmed the Capitol that day and became a bloody symbol of Mr. Trump's efforts to subvert the outcome of the election. Earlier this a year, a federal judge in California considering a civil suit concerning the release of Mr. Eastman's emails to the House select committee concluded that Mr. Eastman and Mr. Trump most likely committed two felonies — obstruction of a proceeding before Congress and a conspiracy to defraud the United States — for their joint role in the pressure campaign against Mr. Pence.

Mr. Eastman was also instrumental in advising Mr. Trump to create purported slates of electors backing Mr. Trump in key swing states won by Mr. Biden. These false pro-Trump electors were intended to give Mr. Pence a quasi-legal rationale for delaying or blocking the Electoral College certification on Jan. 6, or even trying to throw the election to the House of Representatives.

Last week, a federal grand jury in Washington issued subpoenas to several people who prosecutors believe may have information about the so-called fake elector plan. Among those who received subpoenas were top Republicans in key swing states who served as purported pro-Trump electors, including Kelli Ward, the chairwoman of the Arizona Republican Party, and David Shafer, the chairman of the Georgia Republican Party.

The subpoenas, some of which have been obtained by The New York Times, show that prosecutors are seeking information about lawyers like Mr. Eastman who were close to Mr. Trump during the chaotic postelection period. The subpoenas also seek information on other lawyers like Rudolph W. Giuliani, who oversaw Mr. Trump's election challenges in general, and Kenneth Chesebro, who wrote legal memos laying out the viability of the fake elector plan.

In Mr. Eastman's court papers, filed in Federal District Court in New Mexico, he says that the search warrant did not mention what underlying crime prosecutors were looking into by seizing his phone.

On Monday night, Mr. Eastman appeared on Tucker Carlson's Fox News show and discussed the seizure of his phone, repeating his complaint that the warrant never specified what violation of the law prosecutors were investigating.

"There was no indication of any crime this is connected to," he said.

The New York Times https://www.nytimes.com/2022/06/23/us/politics/jeffrey-clark-trump-justice-dept.html

# Federal Authorities Search Home of Trump Justice Dept. Official

Investigators went to the suburban Washington home of Jeffrey Clark in connection with the sprawling inquiry into the Jan. 6 attack and the effort to overturn the 2020 election.

**By Alan Feuer, Adam Goldman and Maggie Haberman**

June 23, 2022

Federal investigators carried out an early-morning search on Wednesday at the home of Jeffrey Clark, a former Justice Department official, in connection with the department's sprawling criminal inquiry into efforts to overturn the 2020 election, people familiar with the matter and an associate of Mr. Clark said.

It remained unclear exactly what the investigators may have been looking for. But Mr. Clark was central to President Donald J. Trump's unsuccessful effort in late 2020 to strong-arm the nation's top prosecutors into supporting his claims of election fraud, and the search suggested that the criminal investigation could be moving closer to Mr. Trump.

The law enforcement action at Mr. Clark's home in suburban Virginia came just one day before the House committee investigating the Jan. 6, 2021, attack on the Capitol held a hearing setting out in vivid and powerful detail Mr. Trump's efforts to pressure the Justice Department to help him reverse his election defeat.

The committee explored Mr. Clark's role in particular in helping Mr. Trump try — ultimately unsuccessfully — to pressure the department into lending credence to his baseless assertions of election fraud and pressure officials in Georgia, a key swing state, into reconsidering their certification of Joseph R. Biden Jr.'s victory.

One of Mr. Clark's associates described the striking scene early Wednesday morning when a dozen federal law-enforcement officials raided the house, seized Mr. Clark's electronic devices and put him out on the street in his pajamas.

"All because Jeff saw fit to investigate voter fraud," said the associate, Russ Vought, who runs the Center for Renewing America, where Mr. Clark is a senior fellow. "This is not America, folks. The weaponization of government must end."

Mr. Clark told Tucker Carlson of Fox News on Thursday that he had been woken by agents banging on his door shortly before 7 a.m. on Wednesday. He said that "12 agents and two Fairfax County police officers went into my house, searched it for three and a half hours." The agents, he said, "took all of the electronics from my house."

Mr. Clark criticized the investigation as "highly politicized" and suggested that it was no coincidence that the raid took place just before the House committee's hearing. "We're living in an era I don't recognize," he said.

The search at Mr. Clark's home was a significant step in the Justice Department's many-tentacled inquiry into the efforts to subvert the democratic process after the 2020 election.

In the early spring, a separate strand of the investigation was revealed as grand jury subpoenas were issued seeking information on a wide cast of political organizers, White House aides and members of Congress connected in various ways to Mr. Trump's incendiary speech near the White House that directly preceded the storming of the Capitol.

Mr. Clark's involvement in the inquiry was also the latest sign that the department's investigation had nudged ever closer to Mr. Trump himself — and to some of his allies in Congress. Mr. Clark worked closely with Mr. Trump in the weeks leading up to the Jan. 6 attack on the Capitol, as Mr. Trump's options closed off, to use the Justice Department as a tool for achieving his political ends.

Encouraged by members of the far-right House Freedom Caucus, Mr. Trump considered and then abandoned a plan in the days just before the Jan. 6 attack to put Mr. Clark in charge of the Justice Department as acting attorney general.

At the time, Mr. Clark was proposing to send a letter to state officials in Georgia falsely stating that the department had evidence that could lead Georgia to rescind its certification of Mr. Biden's victory in that key swing state. The effort was cut short by his superiors in the department.

**How Times reporters cover politics.** We rely on our journalists to be independent observers. So while Times staff members may vote, they are not allowed to endorse or campaign for candidates or political causes. This includes participating in marches or rallies in support of a movement or giving money to, or raising money for, any political candidate or election cause.

Learn more about our process.

Did you find this information helpful?            Yes    No

Attorney General Merrick B. Garland has said little publicly about the criminal investigation other than that the Justice Department would follow the facts. But he has been under pressure from some Democrats, including members of the House select committee, to hold Mr. Trump and his allies to account for the effort to disrupt the peaceful transfer of power.

The developments regarding Mr. Clark came to light as a federal grand jury sitting in Washington continued to issue subpoenas to people involved in a related plan by Mr. Trump and his allies to overturn the election: an effort to subvert the normal workings of the electoral process by creating fake slates of pro-Trump electors in states that were actually won by Mr. Biden.

In the past two days, according to several people familiar with the matter, at least nine people in four different states have received subpoenas in connection with the fake-elector investigation. They were largely those who agreed to be electors for Mr. Trump themselves or were aides to Mr. Trump's campaign in states where the plan was carried out.

Among those who received subpoenas were Kelli Ward, the chairwoman of the Arizona Republican Party, and her husband, Michael, both of whom served as electors on Mr. Trump's purported slate in the state, according to a person familiar with the matter. Along with the Wards, subpoenas were issued to two other pro-Trump electors in Arizona, Nancy Cottle and Loraine B. Pellegrino, the person said.

Their lawyer, Alexander Kolodin, attacked the Justice Department's fake elector inquiry.

"This is an investigation based on allegations that our clients engaged in core First Amendment activity — petitioning Congress about grievances," Mr. Kolodin said.

On Wednesday evening, a local news outlet in Nevada reported yet another development in the fake-elector investigation: Federal agents armed with a search warrant had seized the phone of Michael McDonald, the chairman of the Nevada Republican Party who had served as pro-Trump elector in the state. A search warrant was also issued for the party's secretary, James DeGraffenreid, who had taken part in the scheme as an elector as well, the news outlet reported.

Lawyers for Mr. McDonald and Mr. DeGraffenreid did not return phone calls on Thursday seeking comment.

While several state officials and Trump campaign aides have received subpoenas in the fake-elector investigation, the inquiry is primarily focused on a group of lawyers who worked closely with Mr. Trump in devising the scheme. Those lawyers include Rudolph W. Giuliani, who oversaw Mr. Trump's challenges to the election in general, and John Eastman, who advised the former president on creating the fake electors, among other things.

Mr. Giuliani and Mr. Eastman have figured prominently in earlier hearings this month by the House select committee. The two men, the committee showed, were intimately involved in efforts to cajole state officials to throw the election to Mr. Trump and in pressuring Vice President Mike Pence to single-handedly grant Mr. Trump a victory in the Electoral College.

At the committee's last hearing, on Tuesday, investigators for the first time directly linked Mr. Trump to the fake elector plan. The committee introduced a recorded deposition from Ronna McDaniel, the chairwoman of the Republican National Committee, in which she recounted how Mr. Trump called her and put Mr. Eastman on the phone "to talk about the importance of the R.N.C. helping the campaign gather these contingent electors."

Mr. Clark's role in the efforts to subvert the election are arguably most closely related to the pressure campaign against state officials to create pro-Trump electors.

In late December 2020, Mr. Clark, while serving as the acting head of the Justice Department's civil division, helped to draft a letter to Gov. Brian Kemp of Georgia stating — without evidence — that the Justice Department had identified "significant concerns" about the "outcome of the election" in Georgia and several other states.

The letter advised Mr. Kemp, a Republican, to call a special session of his state's General Assembly to create "a separate slate of electors supporting Donald J. Trump."

Mr. Clark pressured the acting attorney general at the time, Jeffrey A. Rosen, to sign and send the letter to Mr. Kemp, but Mr. Rosen refused.

Mr. Rosen was among the former Justice Department officials who testified about Mr. Clark before the House committee at its hearing on Thursday.

Katie Benner contributed reporting.



Archivist *of the*
United States

February 18, 2022

The Honorable Carolyn B. Maloney
Chairwoman
Committee on Oversight and Reform
U.S. House of Representatives
2157 Rayburn House Office Building
Washington, DC 20515

Dear Madam Chairwoman:

I write to you pursuant to my authority under section 2203(e) of the Presidential Records Act (PRA), as amended (44 U.S.C. §§ 2201-2209), which establishes that I may "request the advice" of the appropriate committees of the House and the Senate when I consider that a proposed disposal of Presidential records by the incumbent President "may be of special interest to the Congress" or that "consultation with the Congress regarding the disposal of these particular records is in the public interest." While this provision specifically applies to disposals proposed by the incumbent President, the National Archives and Records Administration (NARA) has always interpreted it to apply to disposals of Presidential records of which I was not informed.

Under the PRA, all Presidential records automatically transfer to NARA's legal custody when the President leaves office. With respect to the Trump Presidential records, the legal transfer took place on January 20, 2021. However, it is not uncommon for there to be a delay before NARA takes physical custody of all of the records. The complex technical work needed to transfer hundreds of terabytes of electronic records, coupled with a one-term transition, meant that the physical transfer could not be completed between the Presidential election and Inauguration Day. It took until November 2021 for NARA to receive all of the electronic Trump Presidential records.

Included among the Trump Presidential electronic records are those created on social media platforms. NARA recognizes that social media records are a relatively recent phenomenon, that capturing records on social media platforms is an evolving process, and that different platforms pose different issues with respect to how records are defined and managed.

By this letter, I am advising you that the Trump Administration did not fully capture, and therefore NARA did not receive, all of the Presidential records created by President Trump and White House staff that were posted on social media platforms, as summarized in more detail below:

DAVID S. FERRIERO · T: 202.357.5900 · F: 202.357.5901 · *david.ferriero@nara.gov*
National Archives *and* Records Administration · 700 Pennsylvania Avenue, NW · Washington, DC 20408 · *www.archives.gov*

- Early in the Trump Administration, questions were raised about President Trump's use of his personal Twitter account to conduct official government business and whether deleted tweets were being captured and preserved as Presidential records.  In March 2017, NARA advised the Trump Administration that it should capture and preserve as Presidential records all tweets that the President posts in the course of his official duties, whether on his personal @realDonaldTrump account or on the official @POTUS account, including those tweets that were subsequently deleted.  As I reported in a March 30, 2017, letter to Senators Claire McCaskill and Tom Carper, NARA was "informed by White House officials that they [were], in fact, doing so."

  Since the end of the administration, we have learned that the White House initially used a manual process to capture tweets that were deleted from @realDonaldTrump and @POTUS by copying them from non-governmental organizations that were capturing them, such as Propublica and Factba.se.  The White House did not begin using the vendor ArchiveSocial to automate the capture of tweets and other social media records in real-time until January 2018. Moreover, @realDonaldTrump was not enrolled until August 2018 and the tool stopped capturing @realDonaldTrump in April 2020. The official @POTUS was enrolled in February 2018 and remained connected throughout the rest of the administration.

  When properly implemented, ArchiveSocial captures all versions of content as it appears on the platforms, along with any changes, such as deleted or edited content, changes to an account profile, and direct or private messages. However, it cannot capture such changes retroactively.  If a social media account is not enrolled or subsequently becomes disconnected from ArchiveSocial, any changes, including deleted or modified posts, cannot be captured.

  The Twitter account @realDonaldTrump was disconnected from ArchiveSocial in April 2020. A key feature of ArchiveSocial is that it sends automated alerts to the account owners/system administrators every three to five days to remind them to reconnect any disconnected accounts. The tool also displays information about the account status in the dashboard.  This account was not re-enrolled.

  When White House officials brought this problem to our attention near the end of the administration, Twitter had permanently suspended @realDonaldTrump. NARA contacted Twitter directly to ask if it retained the account data between April 20th and the account's suspension. Twitter provided us with a copy of the available account data. However, it did not include previously deleted tweets, which are not retained by the company.  Accordingly, we were unable to obtain a complete set of these Presidential records from the Trump Administration or Twitter.  While we do have access to copies of deleted tweets collected by other non-governmental sources, we do not consider them as official Presidential records and cannot ensure the completeness of their captured account data.

- The Trump White House did not take any steps to capture deleted content from any Trump Administration social media account other than @realDonaldTrump or @POTUS prior to enrolling them with ArchiveSocial. As with @realDonaldTrump, many other Trump Administration social media accounts were not enrolled until the summer or fall of 2018, even though these accounts were active for over a year prior to enrollment, during which time deleted or modified Presidential record content was not captured. Other accounts were not enrolled until just prior to the end of the administration.

- The ArchiveSocial tool included the ability to capture direct messages that may have been used on the platforms, but the Trump Administration opted not to enable capture of direct messages, and was unable to report whether direct messaging was actually used on any of the platforms by the account holders.

- NARA identified seven Twitter accounts that we think contain presidential record information, but were not captured by the Trump Administration. These accounts belonged to Andrew Giuliani, Chad Gilmartin, Ivanka Trump, Kayleigh McEnany, Kellyanne Conway, Mark Meadows, and Peter Navarro. After the end of the administration, NARA obtained the publicly available tweets from these accounts in order to supplement its archival collection.

- In January 2021, administration officials advised NARA that two social media accounts they thought contained Presidential record content were not enrolled in ArchiveSocial and could not be retroactively enrolled as they had been suspended by the platforms. These accounts were Donald J. Trump on Facebook and @realDonaldTrump on Instagram. NARA endeavored to work with Facebook, which operates Instagram, to obtain access to the accounts, but Facebook was not able to provide access.

- SnapChat was used by the Trump Administration (@realdonaldtrump and @whitehouse), which advised NARA that it was capturing content posted to the platform. NARA has not yet been able to locate any SnapChat content in the records transferred to us. SnapChat ultimately banned President Trump from the platform, and it is not possible to see any previous content. SnapChat advised NARA that the Trump Administration used the @whitehouse account approximately five times during four years. However, the administration regularly used the @realdonaldtrump account. News reports indicate that the account had 1.5 million followers on the platform. We do not know whether direct messaging was enabled on the account. We are not able to determine to what extent @realdonaldtrump SnapChat contained unique Presidential records as compared to content duplicative from other platforms, or purely campaign related information, which would not have been a Presidential record.

Please let me or my staff know if you have questions or would like to discuss this issue further.

Sincerely,

DAVID S. FERRIERO
Archivist of the United States

cc:  The Honorable James Comer, Ranking Member

# First on CNN: Top Trump adviser Stephen Miller testifies to January 6 federal grand jury

By Katelyn Polantz and Hannah Rabinowitz, CNN

Updated 8:09 PM EST, Tue November 29, 2022

Video Ad Feedback

What Stephen Miller's testimony tells legal analyst about Trump probe

01:18 - Source: CNN

**Washington (CNN) —** Former Trump adviser Stephen Miller testified on Tuesday to a federal grand jury in Washington, DC, as part of the January 6, 2021, investigation, CNN has learned, making him the first known witness to testify since the Justice Department appointed a special counsel to oversee the criminal investigations around the former president.

Miller was at the federal courthouse in downtown Washington for several hours throughout Tuesday, according to a person familiar with the investigation. January 6 lead prosecutor Thomas Windom was spotted at the same federal courthouse on Tuesday.

Windom is expected to join the newly created Special Counsel's Office led by longtime public corruption prosecutor Jack Smith and will continue leading the investigation into former President Donald Trump's role in efforts to impede the transfer of power following the 2020 election.

Federal investigators have for months sought information from Trump's inner circle in the White House, attempting to gather insight into Trump's state of mind before his supporters rioted on January 6.

Miller, a former White House speechwriter and senior adviser to Trump, could provide a firsthand account of the former president's preparations for his speech at the Ellipse in Washington on January 6, including how he wanted to inspire his supporters, many of whom went on to attack the Capitol and disrupt Congress.

Miller was first subpoenaed in the federal criminal investigation months ago.

In April, Miller testified virtually for roughly eight hours before the House select committee investigating January 6 – a completely separate probe from the criminal investigation being run by the Justice Department.

According to findings the committee presented at a public hearing in July, Miller spoke to Trump for several minutes on the morning of January 6 about his planned speech at the Ellipse. After talking with Miller, Trump added a line to his speech about then-Vice President Mike Pence, according to the committee's findings.

The committee said that Miller removed the lines about Pence after having a conversation with a White House lawyer, Eric Herschmann, who objected to the president's edits, according to testimony from Miller. Yet when Trump gave the speech, it included several references to Pence.

At the time, Trump and others were pressuring Pence to block certification of the election. Pence ultimately refused and told Trump and others he had no authority to do so. During the Capitol riot, Trump supporters chanted, "Hang Mike Pence" and broke into restricted areas of the complex, prompting Pence to be evacuated from the Senate chamber.

In recent months, the January 6 investigation team led by Windom has secured decisions ordering top Pence aides to testify to the grand jury about some of the most guarded conversations around Trump after the election. And a parade of top advisers to Trump have had their cell phones seized or received grand jury subpoenas for testimony and documents related to the effort to overturn Trump's electoral loss.

CNN's Kristen Holmes contributed to this report.

**Paid Links**

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

FOLLOW CNN POLITICS

   

Terms of Use Privacy Policy Cookie Settings Ad Choices Accessibility & CC About Newsletters Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

2/3/23, 4:57 PM Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 248 of 304 First on CNN: Top Trump adviser Stephen Miller testifies to January 6 federal grand jury | CNN Politics

https://www.cnn.com/2022/11/29/politics/stephen-miller-testifies-january-6-federal-grand-jury-trump/index.html 5/6

Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 249 of 304

2/3/23, 5:04 PM Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 250 of 304
Former President Trump Statement on Special Counsel Appointment | C-SPAN.org

QUICK GUIDE Search the Video Library SCHEDULE TV NETWORKS RADIO PODCASTS APP

CREATED BY CABLE IN 1979 All Series American History TV Book TV Washington Journal Congress Executive Supreme Court

LOGIN

NOVEMBER 18, 2022

Report Video Issue

## Former President Trump Statement on Special Counsel Appointment

Former President Trump made a statement Attorney General Merrick Garland's appointment of a special counsel to investigate him for the possible retention of classified documents at his Mar-a-Lago home and his involvement in the January 6, 2021, attack on the U.S. Capitol during the transfer of power for the presidency.
close

16:38

Clip Bookmark To MyC-SPAN Clipping Guide Share This Video

Text type: Text | Filter by Speaker: All Speakers | Search this text

00:00:00 THE AMAZING PART WAS THAT RICARDO --

00:00:00 LIVE NOW, A LOOK INTO INVESTIGATION SURROUNDING THE FORMER PRESIDENT. [APPLAUSE]

00:00:03 THANK YOU, VERY MUCH. THANK YOU. WHAT A JOB SHE DOES. [APPLAUSE]

00:00:44 THANK YOU, VERY MUCH. WE APPRECIATE YOU BEING THAT THIS INCREDIBLE EVENING. WE LOVE YOU AND WE LOVE THIS PLACE. IT HAS DONE SO MUCH GOOD AND RAY SO MUCH...

Show Full Text

00:16:27 FORMER PRESIDENT TRUMP HAS MOVED ONTO OTHER TOPICS. WE WILL TAKE THIS OPPORTUNITY TO MOVE ON WITH OUR PROGRAM SCHEDULE.

*This text was compiled from uncorrected Closed Captioning.*

## PEOPLE IN THIS VIDEO

Donald J. Trump
U.S. President (Former)
United States

## HOSTING ORGANIZATION

Save America PAC

https://www.c-span.org/video/?524379-1/president-trump-statement-special-counsel-appointment 1/3

**More information about**
*Former President Trump Statement on Special Counsel Appointment*

**Purchase a Download**
*Former President Trump Statement on Special Counsel Appointment*

## FEATURED CLIPS FROM THIS VIDEO

8:34 PM
### Former President Trump Responds to the Appointment of a Special Counsel
Former President Trump responds to the Department of Justice's appointment of a special counsel to investigate him for...

2 MINUTES | 6,289 VIEWS

## RELATED VIDEO

See all on TRUMP, DONALD J. JANUARY 6, 2021

NOVEMBER 18, 2022
### Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations
Attorney General Merrick Garland announced that his was appointing Jack Smith as special counsel to oversee investigations involving former President...

OCTOBER 22, 2022
### Bart Jansen on Subpoena of Former President Trump
Bart Jansen, *USA Today* Justice Department correspondent, talked about the January 6 Committee's subpoena of former...

JUNE 23, 2022
### Rep. Schiff Speaks to Reporters After Fifth January 6 Hearing
Rep. Adam Schiff (D-CA) spoke with reporters following the fifth hearing of the Select Committee to investigate the...

JUNE 23, 2022
### Rep. Thompson Speaks to Reporters After Fifth January 6 Hearing
Rep. Bennie Thompson (D-MS) spoke with reporters following the fifth hearing of the Select Committee to investigate the...

## USER CREATED CLIPS FROM THIS VIDEO

NOVEMBER 18, 2022
### Former President Trump Responds to the Appointment of a Special Counsel
2 MINUTES | 6,289 VIEWS

NOVEMBER 18, 2022
### User Clip: Election Manipulation?
27 SECONDS | 154 VIEWS

NOVEMBER 18, 2022
### User Clip: Trump DOJ Special Counsel
9 MINUTES | 122 VIEWS

NOVEMBER 18, 2022
### User Clip: Trump Gives Statement on Special Counsel Appointment
-1 SECONDS | 54 VIEWS

2/3/23, 5:04 PM Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 252 of 304 Former President Trump Statement on Special Counsel Appointment | C-SPAN.org

ABOUT C-SPAN

Our Mission
Our History
Cameras In The Court
Milestones
Leadership
Jobs
In The Community
Video Library
Viewer Guide

RESOURCES

C-SPAN Classroom
Blog
Series A-Z
Press Center
FAQs
Contact Us
Shop
C-SPAN's Book Collection
World Legislatures

MyC-SPAN Login

**C-SPAN Now App**
Download
Download

C-SPAN Podcasts

FOLLOW C-SPAN

© 2023 National Cable Satellite Corporation | Copyrights and Licensing | Terms and Conditions | Privacy

https://www.c-span.org/video/?524379-1/president-trump-statement-special-counsel-appointment 3/3

# Former Trump White House counsel and his deputy testify to Jan. 6 criminal grand jury

By Casey Gannon, Katelyn Polantz and Kristen Holmes, CNN
Updated 5:42 PM EST, Fri December 2, 2022

Sarah Silbiger/Getty Images

**(CNN) —** Former Trump White House counsel Pat Cipollone and deputy counsel Patrick Philbin testified to a federal grand jury for several hours in Washington, DC, on Friday, indicating the Justice Department had compelled the men to answer more questions in the January 6, 2021, criminal investigation despite challenges from Donald Trump's legal team.

The January 6 grand jury activity is the latest indication the investigation – now led by special counsel Jack Smith – has pushed in recent months to unearth new details about direct conversations with the former president and advice given to him after the election.

Cipollone was first seen entering the grand jury area with his attorney, Michael Purpura, before 9 a.m., and he was there for more than five hours. Purpura has not responded to

before 9 a.m., and he was there for more than five hours. Purpura has not responded to requests for comment. The grand jury proceedings themselves are confidential.

Philbin, whom Purpura also represents, headed into the grand jury area just before the lunch hour on Friday, staying until about 4 p.m.

Thomas Windom and Mary Dohrmann, prosecutors in the January 6 investigation who are now to be led by Smith, were also seen walking in with Cipollone.

The investigators are looking at efforts to obstruct the transfer of power at the end of Trump's presidency and have obtained testimony from several administration advisers closest to the former president after the election and as the Capitol was attacked by his supporters.

**RELATED ARTICLE**
Trump's classic delay and divert legal strategy is running out of road

---

CNN previously reported that Chief Judge Beryl Howell of the DC District Court, who oversees the federal grand juries in Washington, ordered Cipollone and Philbin to provide additional grand jury testimony this month, following up on their testimony in the fall. The judge has repeatedly rejected Trump's privilege claims in the Justice Department's criminal investigation of efforts to overturn the 2020 election, according to people briefed on the matter.

Philbin and Cipollone were both key witnesses to Trump's actions in the last days of his presidency. Cipollone repeatedly pushed back on efforts to overturn the 2020 election, and according to a Senate Judiciary Committee report, he and Philbin opposed a proposal to replace the attorney general with someone willing to look into false claims of election fraud.

Previously, the Justice Department compelled top advisers from Vice President Mike Pence's office to testify to the grand jury. They had sought to protect Pence in January 2021 from Trump's pressure campaign to overturn the election.

Earlier this week, Trump White House official Stephen Miller, who worked with Trump on his speech at the Ellipse, had his own day before the grand jury.

On Thursday, another leg of Smith's special counsel investigation – into the handling of documents at Mar-a-Lago after the presidency – was active in the courthouse. At least one Mar-a-Lago prosecutor was working in the secret grand jury proceedings, as three aides

to Trump, Dan Scavino, William Russell and Beau Harrison, each appeared, according to sources familiar with them. Their attorney declined to comment.

*This story has been updated with additional details.*

**Paid Links**

Search CNN...

Log In

Live TV

Audio

US

World

Politics

Business

Case 1:23-sc-00031-JEB Document 50-2 Filed 08/15/23 Page 256 of 304

Business

Markets

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

CNN Underscored

Coupons

Weather

More

FOLLOW CNN POLITICS

Terms of Use Privacy Policy Cookie Settings Ad Choices Accessibility & CC About Newsletters Transcripts

© 2023 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.



AP NEWS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

ADVERTISEMENT

**Farnoush Amiri**
Farnoush is a congressional reporter.
FarnoushAmiri
famiri@ap.org

  

**RELATED TOPICS**

Capitol siege
Politics
AP Top News
Donald Trump

# Jan. 6 panel urges Trump prosecution with criminal referral

By MARY CLARE JALONICK, ERIC TUCKER and FARNOUSH AMIRI December 19, 2022

ADVERTISEMENT

**You May Like** Promoted

Amazon Hates When You Do This, But They Can't Stop You
Promoted: Online Shopping Tools

Massachusetts Gov Will Cover The Cost To Install Solar If You Own A Home In These Zip Codes
Promoted: EnergyBillCruncher

Electric Companies Will Hate You for Doing This, but They Can't Stop You



AP NEWS

For By Medicare? (See How)

Learn More

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

40 Years Old

Promoted: BuzzDaily Winners

Finally Legal in Massachusetts, "You Gotta Try These THC Gummies!"

Promoted: Tommy Chong's CBD

by Taboola

ADVERTISEMENT

WASHINGTON (AP) — The House Jan. 6 committee urged the Justice Department on Monday to bring criminal charges against Donald Trump for the violent 2021 Capitol insurrection, calling for accountability for the former president and "a time of reflection and reckoning."

congressional

panel's seven Democrats and two Republicans are recommending criminal charges against Trump and associates who helped him launch a wide-ranging pressure campaign to try to overturn his 2020 election loss. The panel also released a lengthy summary of its final report, with findings that Trump engaged in a "multi-part conspiracy" to thwart the will of voters.

At a final meeting Monday, the committee alleged violations of four criminal statutes by Trump, in both the run-up to the riot and during the insurrection itself, as it recommended the former

AP NEWS

Department.
Among the

U.S. News   World New

Trending News    U.S. winter storms    Grammy Awards    Super Bowl    Russia-Ukraine war

prosecution is
aiding an
insurrection —
an effort to hold
him directly
accountable for
his supporters
who stormed the
Capitol that day.

The committee
also voted to
refer
conservative
lawyer John
Eastman, who
devised dubious
legal maneuvers
aimed at keeping
Trump in power,
for prosecution
on two of the
same statutes as
Trump:
conspiracy to
defraud the
United States
and obstructing
an official
proceeding.

While a criminal
referral is mostly
symbolic, with
the Justice
Department
ultimately
deciding
whether to
prosecute
Trump or others,

AP NEWS

almost singular

U.S. News     World New
Trending News     U.S. winter storms     Grammy Awards     Super Bowl     Russia-Ukraine war

start.

Chairman Bennie Thompson, D-Miss., said Trump "broke the faith" that people have when they cast ballots in a democracy and that the criminal referrals could provide a "roadmap to justice" by using the committee's work.

"I believe nearly two years later, this is still a time of reflection and reckoning," Thompson said. "If we are to survive as a nation of laws and democracy, this can never happen again."

ADVERTISEMENT

Wyoming Rep. Liz Cheney, the panel's

AP NEWS

opening remarks that every

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

has defended the orderly transfer of power, "except one."

The committee also voted 9-0 to approve its final report, which will include findings, interview transcripts and legislative recommendations. The full report is expected to be released on Wednesday.

The report's 154-page summary, made public as the hearing ended, found that Trump engaged in a "multi-part conspiracy" to overturn the election. While the majority of the report's main findings are not new, it altogether represents one of the most damning portraits of an American

great detail

overturn his own defeat and what the lawmakers say is his direct responsibility for the insurrection of his supporters.

The panel, which will dissolve on Jan. 3 with the new Republican-led House, has conducted more than 1,000 interviews, held 10 well-watched public hearings and collected more than a million documents since it launched in July 2021. As it has gathered the massive trove of evidence, the members have become emboldened in declaring that Trump, a Republican, is to blame for the violent attack on the Capitol by his supporters almost two years ago.

AP NEWS

After beating

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

many of them, the Jan. 6 rioters stormed the Capitol and interrupted the certification of Biden's presidential election win, echoing Trump's lies about widespread election fraud and sending lawmakers and others running for their lives.

The attack came after weeks of Trump's efforts to overturn his defeat — a campaign that was extensively detailed by the committee in its multiple public hearings, and laid out again by lawmakers on the panel at Monday's meeting. Many of Trump's former aides testified about his unprecedented pressure on

AP NEWS

to Biden's win. The committee

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

great detail how Trump riled up the crowd at a rally that morning and then did little to stop his supporters for several hours as he watched the violence unfold on television.

ADVERTISEMENT

The panel aired some new evidence at the meeting, including a recent interview with longtime Trump aide Hope Hicks. Describing a conversation she had with Trump around that time, she said he told her that no one would care about his legacy if he lost the election.

Hicks told the committee that Trump told her,

Trump's

respond to a request for comment, but the former president slammed members of the committee Sunday as "thugs and scoundrels" as he has continued to falsely dispute his 2020 loss.

While a so-called criminal referral has no real legal standing, it is a forceful statement by the committee and adds to political pressure already on Attorney General Merrick Garland and special counsel Jack Smith, who is conducting an investigation into Jan. 6 and Trump's actions.

ADVERTISEMENT

On the recommendation

AP NEWS

committee said

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

the former president "was directly responsible for summoning what became a violent mob" and refused repeated entreaties from his aides to condemn the rioters or to encourage them to leave.

For obstructing an official proceeding, the committee cites Trump's relentless badgering of Vice President Mike Pence and others to prevent the certification of the election results on Jan. 6. And his repeated lies about the election and efforts to undo the results open him up to a charge of conspiracy to defraud the United States,

by the panel is

statement, citing the scheme by Trump and his allies to put forward slates of fake electors in battleground states won by President Joe Biden.

Among the other charges contemplated, but not approved, by the committee was seditious conspiracy, the same allegation Justice Department prosecutors have used to target a subset of rioters belonging to far-right groups like the Oath Keepers and Proud Boys.

Thompson said after the hearing that the seditious conspiracy charge is “something that the committee didn’t come to agreement on.”

AP NEWS

after Senate

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

formation of what would have been a bipartisan, independent commission to investigate the insurrection. When that effort failed, the Democratic-controlled House formed an investigative committee of its own.

ADVERTISEMENT

House Republican leader Kevin McCarthy of California, a Trump ally, decided not to participate after House Speaker Nancy Pelosi rejected some of his appointments. That left an opening for two anti-Trump Republicans in the House —

AP NEWS

of Illinois — to join seven

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

unusually unified panel in the divided Congress.

Rep. Liz (

Rep. Liz Chene

McCarthy was one of four House Republicans who ignored congressional subpoenas from the panel and were referred to the House Ethics Committee on Monday for their non-compliance.

The Republican leader, who is hoping to become speaker of the House when his party takes the majority in January, has acknowledged he spoke with Trump on Jan. 6. The committee also referred Reps. Jim Jordan of Ohio, Scott Perry of Pennsylvania and Andy Biggs

AP NEWS

Trump or the

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

leading up to the attack.

While the committee's mission was to take a comprehensive accounting of the insurrection and educate the public about what happened, they've also aimed their work at an audience of one: the attorney general. Lawmakers on the panel have openly pressured Garland to investigate Trump's actions, and last month he appointed a special counsel, Smith, to oversee two probes related to Trump, including those related to the insurrection and the presence of classified documents at Trump's Florida estate.

The committee

AP NEWS

can only be

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

system.

"No one should get a pass," said Rep. Adam Schiff, D-Calif.

___

Associated Press writers Lisa Mascaro, Jill Colvin and Kevin Freking contributed to this report.

___

For full coverage of the Jan. 6 hearings, go to https://www.apnews.cc siege.

You May Like by Taboola

s

AP NEWS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

Amazon Left Scrambling As...
Online Shopping Tools

Massachusetts: Say Bye To Your Power Bill If Yo...
EnergyBillCruncher

Gronk's Favorite "Dressy" Shoes...
Wolf & Shepherd

If You Have Toenail Fungus...
Healthy Guru

This New Sleep Patch...
Zleep Learn More

Seniors Under 85 Yrs Old Get $50K In Life Insuranc...
Finance Daily

Ad Content

Experts Surprised: If You Have Mol...
Promoted: Healthy Living24

This New CPA...
Promoted: The Easy Blog by EasyBreathe.com

5.5% High Interest Savings Accounts. Fin...
Promoted: StuffAnswered

AP NEWS

WAS

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

today

## Ad Content

Protect Your Brain: The...

Ageless Mind Learn More

Volkswagen has done it again....

Volkswagen Deals | Top Search Now

Unsold Never-Used Laptops...

Tech Savings Learn More

Empty Alaska Cruise Cabins...

Alaska Cruise Deals | sponsored searches

Your Bathroom Will Never Look The Same Than...

Renuity Bath Experts

These travel vans have done it...

Camper Van Deals | Search Now

## Ad Content

Military Jobs For Seniors...

Promoted: Military Jobs | Search Ads

Look for any high school...

Promoted: Classmates.com

Your Memory Is Excellent If You

AP NEWS

US

U.S. News World New
Trending News U.S. winter storms Grammy Awards Super Bowl Russia-Ukraine war

HIN...

yesterda
y

Click to copy

AP NEWS
Top Stories
Video
Contact Us
Accessibility Statement
Cookie Settings
DOWNLOAD AP NEWS
Connect with the definitive source for global and local news
MORE FROM AP
ap.org
AP Insights
AP Definitive Source Blog
AP Images Spotlight
AP Explore
AP Books
AP Stylebook
FOLLOW AP

THE ASSOCIATED PRESS
About Contact Customer Support Careers Terms & Conditions Privacy
All contents © copyright 2023 The Associated Press. All rights reserved.

# *Manhattan Prosecutors Begin Presenting Trump Case to Grand Jury*

The Manhattan district attorney's decision represents a dramatic escalation of the inquiry, and potentially sets the case on a path toward criminal charges against the former president.

**By William K. Rashbaum, Ben Protess, Jonah E. Bromwich and Hurubie Meko**

Jan. 30, 2023

7 MIN READ

The Manhattan district attorney's office on Monday began presenting evidence to a grand jury about Donald J. Trump's role in paying hush money to a porn star during his 2016 presidential campaign, laying the groundwork for potential criminal charges against the former president in the coming months, according to people with knowledge of the matter.

The grand jury was recently impaneled, and the beginning of witness testimony represents a clear signal that the district attorney, Alvin L. Bragg, is nearing a decision about whether to charge Mr. Trump.

On Monday, one of the witnesses was seen with his lawyer entering the building in Lower Manhattan where the grand jury is sitting. The witness, David Pecker, is the former publisher of The National Enquirer, the tabloid that helped broker the deal with the porn star, Stormy Daniels.

As prosecutors prepare to reconstruct the events surrounding the payment for grand jurors, they have sought to interview several witnesses, including the tabloid's former editor, Dylan Howard, and two employees at Mr. Trump's company, the people said. Mr. Howard and the Trump Organization employees, Jeffrey McConney and Deborah Tarasoff, have not yet testified before the grand jury.

The prosecutors have also begun contacting officials from Mr. Trump's 2016 campaign, one of the people said. And in a sign that they want to corroborate these witness accounts, the prosecutors recently subpoenaed phone records and other documents that might shed light on the episode.

A conviction is not a sure thing, in part because a case could hinge on showing that Mr. Trump and his company falsified records to hide the payout from voters days before the 2016 election, a low-level felony charge that would be based on a largely untested legal theory. The case would also rely on the testimony of Michael D. Cohen, Mr. Trump's former fixer who made the payment and who himself pleaded guilty to federal charges related to the hush money in 2018.

Still, the developments compound Mr. Trump's legal woes as he mounts a third presidential campaign. A district attorney in Georgia could seek to indict him for his efforts to overturn his 2020 election loss in the state, and he faces a special counsel investigation into his removal of sensitive documents from the White House as well as his actions during the attack on the Capitol on Jan. 6, 2021.

Mr. Bragg's decision to impanel a grand jury focused on the hush money — supercharging the longest-running criminal investigation into Mr. Trump — represents a dramatic escalation in an inquiry that once appeared to have reached a dead end.

Under Mr. Bragg's predecessor, Cyrus R. Vance Jr., the district attorney's office had begun presenting evidence to an earlier grand jury about a case focused on Mr. Trump's business practices, including whether he fraudulently inflated the value of his assets to secure favorable loans and other benefits. Yet in the early weeks of his tenure last year, Mr. Bragg developed concerns about the strength of that case and decided to abandon the grand jury presentation, prompting the resignations of the two senior prosecutors leading the investigation.

One of them, Mark F. Pomerantz, was highly critical of Mr. Bragg's decision and has written a book that is scheduled to be published next week, "People vs. Donald Trump," detailing his account of the inquiry. Mr. Bragg's office recently wrote to Mr. Pomerantz's publisher, Simon & Schuster, expressing concern that the book might disclose grand jury information or interfere with the investigation.

District Attorney Alvin L. Bragg, center right, jump-started the inquiry last summer into Mr. Trump's role in the hush money paid to the porn star Stormy Daniels. Karsten Moran for The New York Times

Although he balked at charging Mr. Trump over the asset valuations, this is a different case, and Mr. Bragg is now a bolder prosecutor. He has ramped up the hush money inquiry in the weeks since his prosecutors convicted Mr. Trump's company in an unrelated tax case, a far cry from his unsteady early days in office, when Mr. Bragg was under fire from all quarters for unveiling a host of policies designed to put fewer people behind bars.

For his part, Mr. Trump has denied all wrongdoing and chalked up the scrutiny to a partisan witch hunt against him. He has also denied having an affair with Ms. Daniels. If Mr. Trump were ultimately convicted, he would face a maximum sentence of four years, though prison time would not be mandatory.

"This is just the latest act by the Manhattan D.A. in their never-ending, politically motivated witch hunt," the Trump Organization said in a statement, adding that reviving the case under what it called a "dubious legal theory" was "simply reprehensible and vindictive."

A spokeswoman for Mr. Bragg's office declined to comment. Mr. Pecker's lawyer, Elkan Abramowitz, did not immediately respond to a request for comment. A lawyer for Mr. McConney and Ms. Tarasoff declined to comment.

The panel hearing evidence is likely what's known as a special grand jury. Like regular grand juries, it is made up of 23 Manhattan residents chosen at random. But its members are sworn in to serve for six months to hear complex cases, rather than for 30 days, as is the case with panels that review evidence and vote on whether to bring charges in more routine matters.

The investigation, which has unfolded in fits and starts for more than four years, began with an examination of the hush money deal before expanding to include Mr. Trump's property valuations. Last summer, Mr. Bragg's prosecutors returned to the hush money anew, seeking to jump-start the inquiry after the departures of Mr. Pomerantz and Carey R. Dunne, the other senior prosecutor in the investigation.

**Sign up for the New York Today Newsletter** Each morning, get the latest on New York businesses, arts, sports, dining, style and more. Get it sent to your inbox.

The district attorney's office, working with the New York attorney general, Letitia James, is also continuing to scrutinize the way that the former president valued his assets, the people with knowledge of the matter said.

Over the course of the investigation into Mr. Trump, the hush money payment was discussed within the district attorney's office with such regularity that prosecutors came to refer to it as the "zombie theory" — an idea that just won't die.

The first visible sign of progress for Mr. Bragg came this month when Mr. Cohen appeared at the district attorney's office to meet with prosecutors for the first time in more than a year. He is expected to return for at least one additional interview in February, one of the people said.

The lawyer who represented Ms. Daniels in the hush money deal, Keith Davidson, is also expected to meet with prosecutors.

Mr. Trump's company was instrumental in the deal, court records from Mr. Cohen's federal case show.

Although Mr. McConney and Ms. Tarasoff were not central players, they helped arrange for Mr. Cohen to be reimbursed for the $130,000 he paid Ms. Daniels, whose real name is Stephanie Clifford.

Allen H. Weisselberg, the company's former chief financial officer, was also involved in reimbursing Mr. Cohen. And, according to Mr. Cohen, Mr. Weisselberg was involved in a discussion with Mr. Trump about whether to pay Ms. Daniels.

Mr. Weisselberg is serving jail time after pleading guilty to a tax fraud scheme unrelated to the hush money deal, a case that also led to the conviction of the Trump Organization in December. Although he was the star witness for the district attorney's office in that case, Mr. Weisselberg has never implicated Mr. Trump in any wrongdoing.

Without his cooperation, prosecutors could struggle to link Mr. Trump directly to the misconduct.

In 2018, when Mr. Cohen pleaded guilty to federal campaign finance charges stemming from his role in the hush money payments, he pointed the finger at Mr. Trump, saying the payout was done "in coordination with, and at the direction of" the president. Federal prosecutors agreed that Mr. Trump was behind the deal but never charged him or his company with a crime.

The cooperation of Allen H. Weisselberg, the Trump Organization's former chief financial officer, will be key to the prosecution's case against Mr. Trump.  Jefferson Siegel for The New York Times

There is some circumstantial evidence suggesting that Mr. Trump was involved: He and Mr. Cohen spoke by phone twice the day before Mr. Cohen wired the payment to Ms. Daniels's lawyer, according to records in the federal case.

For prosecutors, the core of any possible case is the way in which Mr. Trump reimbursed Mr. Cohen for the $130,000 he paid Ms. Daniels and how the company recorded that payment. According to court papers in Mr. Cohen's federal case, Mr. Trump's company falsely identified the reimbursements as legal expenses.

The district attorney's office now appears to be focusing on whether erroneously classifying the payments to Mr. Cohen as a legal expense ran afoul of a New York law that prohibits the falsifying of business records.

Violations of that law can be charged as a misdemeanor. To make it a felony, prosecutors would need to show that Mr. Trump falsified the records to help commit or conceal a second crime — in this case, violating a New York State election law, according to a person with knowledge of the matter. That second aspect has largely gone untested, and would therefore make for a risky legal case against any defendant, let alone the former president.

Defense lawyers might also argue that Mr. Trump, who was a first-time presidential candidate, did not know that the payments violated election law. And they could take aim at Mr. Cohen, arguing that he is a convicted criminal who has an ax to grind against Mr. Trump.

In its statement, the Trump Organization noted that "the narrow issue of whether payments to Michael Cohen were properly recorded in a personal accounting ledger back in 2017 was thoroughly examined" by the federal prosecutors who charged Mr. Cohen and concluded he had engaged in a "pattern of deception."

Mr. Pecker's testimony, however, could bolster the prosecution's contention that Mr. Trump was involved in planning the hush money payment. A longtime ally of Mr. Trump, the publisher agreed to look out for potentially damaging stories about Mr. Trump during the 2016 campaign. He agreed to this at a meeting in Mr. Trump's office.

In October 2016, Ms. Daniels's agent and lawyer discussed the possibility of selling exclusive rights to her story to The National Enquirer, which would then never publish it, a practice known as "catch and kill."

But Mr. Pecker balked at the deal. He and the tabloid's editor, Mr. Howard, agreed that Mr. Cohen would have to deal with Ms. Daniels's team directly.

When Mr. Cohen was slow to pay, Mr. Howard pressed him to get the deal done, lest Ms. Daniels reveal their discussions about suppressing her story. "We have to coordinate something," Mr. Howard texted Mr. Cohen in late October 2016, "or it could look awfully bad for everyone."

Two days later, Mr. Cohen transferred the $130,000 to an account held by Ms. Daniels's attorney.

Michael Rothfeld contributed reporting.

NATION Hardee's Add Topic

# MyPillow CEO, Trump ally Mike Lindell says FBI issued subpoena, seized phone at a Hardee's

Scott Gleeson
USA TODAY

Published 9:00 a.m. ET Sept. 14, 2022 | **Updated 2:36 p.m. ET Sept. 14, 2022**

MyPillow CEO Mike Lindell, a prominent Donald Trump supporter, said the FBI seized his cellphone and he was handed a subpoena from a Colorado grand jury Tuesday while he was in a Hardee's parking lot in Minnesota.

Lindell, who founded MyPillow in 2004, has been a key ally for Trump and has continued to protest the 2020 election by pushing baseless claims and conspiracy theories. In May, he was been banned from Twitter for a second time after trying to use a new account. Lindell's original account was permanently banned earlier in the year after he continued to perpetuate claims that Trump won.

On his podcast, "Frank Speech: The Lindell Report," Lindell detailed how he was issued the subpoena while waiting for his food and was questioned about a Colorado clerk, Tina Peters, who is being charged in what prosecutors say was a "deceptive scheme" to breach voting system technology used across the country. Lindell said the papers he was served labeled it an "official criminal investigation of a suspected felony" with the use of a federal grand jury.

**Anti-vaxxer, election denier:** And, in Michigan, perhaps secretary of state

**Critics call it intimidation:** Virginia's GOP attorney general sets up 'election integrity unit.'

Lindell said he also was questioned about his connection to Doug Frank, an Ohio educator who claims voting machines have been manipulated.

Lindell said on the podcast: "Cars pulled up in front of us, to the side of us and behind us, and I said, ‘These are either bad guys or the FBI.’ Well, it turns out they were the FBI. ... I want to say this for the record: They were pretty nice guys. None of them had an attitude."

In a separate interview with ABC News, Lindell said three cars with federal agents pulled in front of his vehicle while he was parked at the fast-food restaurant and handed him the search warrant for his cellphone. "I've been to many jails," Lindell told the outlet. "I'm not scared to go to jail. I'm trying to save my country."

"Without commenting on this specific matter, I can confirm that the FBI was at that location executing a search warrant authorized by a federal judge," FBI spokeswoman Vikki Migoya told The Associated Press.

*Contributing: The Associated Press*

# Records Released In Response to Presidential Records Act (PRA) questions under the Trump Administration

NARA officials are often consulted about the management of presidential and federal records. The Presidential Records Act governs access to records after the end of an administration.

The National Archives received records from the Trump Administration, which ended on January 20, 2021. We are in the process of preserving and providing access to these records, including all official Trump Administration social media content and deleted posts from @realDonaldTrump and @POTUS. As records are made available online, they may be accessed through the trumplibrary.gov website, which is part of NARA. The Trump Library will begin accepting FOIA requests on January 20, 2026, in accordance with the PRA.

Below are documents concerning records management-related inquiries about the Trump Administration's presidential records.

| Document Title | Document Date |
|---|---|
| White House letter to the Archivist of the United States : Trump PRA Designation | February 16, 2017 |
| White House memo to all personnel re PRA obligations (attached to Oct. 2 Compliance Reminder email) | February 22, 2017 |
| Letter from Sens. McCaskill and Carper to Archivist David S. Ferriero | March 7, 2017 |
| Archivist's response to Sens. McCaskill and Carper | March 30, 2017 |

| Document Title | Document Date |
|---|---|
| Attachments to March 30, 2017 letter:<br>• Briefing on the PRA<br>• Background on the PRA<br>• Guidance on Presidential Records (publication)<br>• Presidential Records, 44 U.S.C. Chapter 22<br>• Proposed rule on Presidential Records (note: now a final rule)<br>• Notification Procedures<br>• Approved Requests for Waiver of Incumbent President Privilege Review<br>• Approved Requests for Disposal of Incumbent Presidential Records<br>• NSC memo, Feb. 6, 2009 on procedure for access to PRA records of previous administration<br>• Archivist's memo to Senior Agency Officials for Records Management on Records Management Priorities for 2017<br>• Records Express Blog on Records Management of Social Media and Electronic Records | |
| White House email: Compliance Reminder PRA | October 2, 2017 |
| White House email: Monthly Legal Compliance and Ethics Training reminder | October 2, 2017 |
| American Oversight letter: Presidential Advisory Commission on Election Integrity and potential alienation of records | January 18, 2018 |
| NARA response letter to American Oversight: Presidential Advisory Commission on Election Integrity and potential alienation of records | January 25, 2018 |
| White House letter to the Archivist of the United States: Updated Trump Designation of PRA Representatives | January 19, 2021 |
| Letter from House Committee on Oversight and Reform regarding recovery of Trump PRA records | February 9, 2022 |
| Archivist's response to House Committee on Oversight and Reform regarding recovery of Trump PRA records<br>• NARA letter to Stefan Passantino, Deputy Counsel to the President regarding destruction of records, June 14, 2018 | February 18, 2022 |

| Document Title | Document Date |
|---|---|
| Archivist's letter to House Committee on Oversight and Reform regarding Trump social media records | February 18, 2022 |
| Archivist's letter to Senate Committee on Homeland Security and Governmental Affairs regarding Trump social media records | February 18, 2022 |
| Acting Archivist's Letter to Evan Corcoran regarding Trump boxes | May 10,2022 |
| Former President Trump's Letter to the Acting Archivist of the United States, Designating PRA Representatives | June 19 2022 |
| U.S. House of Representatives Permanent Select Committee on Intelligence (HPSCI) Ranking Member Michael R. Turner Letter to Acting Archivist | August 9, 2022 |
| Acting Archivist's Response Letter to August 9, 2022, Letter from HPSCI Ranking Member Michael Turner | August 16, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight and Reform, James Comer Letter to Acting Archivist | August 10, 2022 |
| Acting Archivist's Response Letter to August 10, 2022, Letter from House Committee on Oversight and Reform Ranking Member James Comer | August 16, 2022 |
| NARA Notice from Acting Archivist to All NARA Employees Update on Trump Administration Presidential Records | August 24, 2022 |
| U.S. House of Representatives Ranking Member Committee on Oversight Reform, James Comer Letter to Acting Archivist | August 30, 2022 |
| Acting Archivist's Response Letter to August 30, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | September 22, 2022 |
| U.S. Committee on Oversight and Reform Chairwoman, Carolyn B. Maloney Letter to Acting Archivist | September 13, 2022 |
| Acting Archivist's Response Letter to September 13, 2022, Letter from U.S. Committee on Oversight and Reform Chairwoman Carolyn B. Maloney | September 30, 2022 |
| U.S. House of Representatives Committee on Oversight Reform, Ranking Member James Comer Letter to Acting Archivist | October 4, 2022 |
| Acting Archivist's Response Letter to October 4, 2022, Letter from House Committee on Oversight Reform Ranking Member James Comer | October 7, 2022 |

| Document Title | Document Date |
|---|---|
| U.S. House of Representatives Committee on Oversight Reform, Ranking Member James Comer and Committee on the Judiciary Ranking Member Jim Jordan Letter   to Acting Archivist | October 14, 2022 |
| Acting Archivist's Response Letter   to October 14, 2022, Letter from House Committee on Oversight Reform Ranking Member and Committee on the Judiciary Ranking Member | October 25, 2022 |

**The U.S. National Archives and Records Administration**

1-86-NARA-NARA or 1-866-272-6272

POLITICS Scott Perry (politician) Add Topic

# Pennsylvania Rep. Scott Perry, a Trump ally, says FBI agents seized his cellphone

Ella Lee
USA TODAY

Published 9:08 a.m. ET Aug. 10, 2022

WASHINGTON — U.S. Rep. Scott Perry, R-Pa., said in a statement that while traveling Thursday morning with his family, his cellphone was confiscated by three FBI agents carrying a search warrant.

He compared the action to the Monday search of former President Donald Trump's Mar-a-Lago home, describing it as “banana republic tactics.”

“They made no attempt to contact my lawyer, who would have made arrangements for them to have my phone if that was their wish,” Perry said. “I’m outraged — though not surprised — that the FBI under the direction of Merrick Garland’s DOJ, would seize the phone of a sitting Member of Congress.”

The circumstances surrounding the seizure were not immediately known. The FBI declined to comment on the matter. USA TODAY requested comment from Perry's office.

Perry is one of a handful of House Republicans who allegedly helped the former president in his efforts to overturn the 2020 election.

**Jan. 6 committee:** Scott Perry, GOP congressman, refuses to cooperate with Jan. 6 investigation committee

**Presidential pardons:** At least 5 House Republicans sought pardons after Jan. 6, including Brooks, Gaetz, testimony reveals

The Pennsylvania lawmaker said in January 2021 that he introduced Trump and Department of Justice lawyer Jeffrey Clark, a top Justice official who was pushing Trump’s baseless claims of election fraud. Clark drafted a letter urging officials in six states won by Biden to

submit a different group of electors who supported Trump, according to evidence shown by the Jan. 6 committee.

Former senior Justice Department officials have testified that Perry had “an important role” in Trump’s effort to try to install Clark as the acting attorney general. Other administration lawyers rejected the idea as “asinine” and potentially criminal, and Trump relented only after top Justice Department and White House lawyers threatened to resign in protest.

Perry was one of five Congress members to request a pardon from the former president after the Jan. 6 Capitol attack, according to testimony from former White House officials during the Jan. 6 hearings.

Fox News first reported the seizure of Scott's cellphone.

*Contributing: Associated Press*

THE WHITE HOUSE

WASHINGTON

January 19, 2021

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Avenue, N.W.
Washington, D.C. 20408

Dear Mr. Ferriero:

In a letter dated February 16, 2017, I designated pursuant to 44 U.S.C. § 2204(d) three persons to act as my representatives with respect to exercising discretion or authority granted to me for the protection and disposition of the Presidential Records of my Presidency. I hereby revoke those designations.

With this letter, I hereby designate Mark R. Meadows, Pasquale A. Cipollone, John A. Eisenberg, Patrick F. Philbin, Scott F. Gast, Michael M. Purpura, and Steven A. Engel as my representatives in all respects that pertain to the records of my Presidency and, upon my death or disability, each representative may exercise all authority granted to me under chapter 22 of title 44, United States Code, or any other provision of law related to the records of my Presidency.

Sincerely,



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Under Seal**<br><br>Chief Judge Beryl A. Howell |
|---|---|

**MEMORANDUM AND ORDER**

Twitter seeks a stay pending its appeal ("Motion" or "Mot."), ECF No. 34, of the Court's March 3, 2023 Order Denying Twitter's Motion to Vacate or Modify Non-Disclosure Order ["NDO"] and Directing Twitter to Pay Contempt Sanctions ("Order"), ECF No. 29, in some form, including "an administrative stay of that order[,]" Twitter Reply In Supp. of Its Mot. For Stay Pending Appeal ("Twitter Reply") at 10, ECF No. 38. Twitter believes that the Order should be stayed pending appeal, *see* Twitter's Not. of Appeal, ECF No. 34, based on its belief that "once Twitter pays the $350,000 in contempt fines on March 13 and thereby purges its contempt," any appeal will be moot. Mot. at 1–2. This may be so, at least as to the contempt sanction, and may already be so as to Twitter's underlying challenge to the execution of the Warrant and NDO at issue. Mootness will be a matter for the D.C. Circuit to resolve as to all these issues on appeal. Nonetheless, saving an appeal from mootness is simply not sufficient to satisfy the extraordinary remedy requested. *See Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966) ("A stay pending appeal is always an extraordinary remedy[.]"); *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) ("CREW") (describing a stay pending appeal as "extraordinary relief"). Avoiding mootness is Twitter's main argument for a stay, however.

A stay request requires a court to "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis v. N. Am. Co.,* 299 U.S. 248, 244–45 (1936)), and balance the following factors as applied to the specific facts of the case: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation marks omitted).  The first two factors are the "most critical" to determining whether a stay is warranted, *CREW*, 904 F.3d at 1017 (quoting *Nken*, 556 U.S. at 434), while the third and fourth factors "merge" when the stay applicant so moves against the government, *Nken*, 556 U.S. at 435.  The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to [someone] else." *Landis*, 299 U.S. at 255.  The first two factors here weigh heavily against Twitter, with the irreparable injury boiling down to potential mootness of the contempt sanctions.  In this balancing, Twitter's Motion must be denied.

First, Twitter is unlikely to succeed on the merits of its appeal.  Twitter contends that the Court likely committed reversible error by (1) requiring Twitter's compliance with the Warrant prior to resolving its NDO challenge, and (2) rejecting Twitter's good-faith and substantial-compliance defense by ordering Twitter to pay contempt fines for failing to comply with the Show Cause Order, *see* Mot. at 6–11, but Twitter is wrong.  Even were Twitter's appeal of the Court's contempt order not mooted by compliance with the Warrant, the company's arguments on the merits are rejected for the same reasons outlined in the Court's March 3, 2023 Memorandum Opinion.  *See* Mem. Op. Re. Ord., ECF No. 30.  To summarize, Twitter (1) willfully violated an

unambiguous Warrant by conditioning compliance on obtaining a modification of a separate NDO that would allow disclosure of the Warrant to its account holder—one of the company's most prolific and high-profile political users—and thereby provide that account holder the opportunity to litigate pre-indictment motions; and (2) knowingly failed to take the requisite steps timely to comply with the Warrant, misrepresented to the Court its ability timely to comply with the Minute Order (Feb. 7, 2023) ("Show Cause Order"), and, ultimately, delayed the government's investigation into the user of the Twitter account at issue. Twitter essentially exploited its position as a large social media platform to usurp the Court's role to determine both the validity of the Warrant's execution methodology and the need for the NDO—despite the company's concededly incomplete information—due to the unique position of the Twitter account user. For these reasons, Twitter's counterarguments do not present a "'fair ground of litigation,'" as it posits in its reply. Twitter Reply at 2 (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)).

Second, Twitter unpersuasively complains about irreparable injury by paying the $350,000 contempt sanction because the Court's "contempt order [will be] purged and the dispute over it mooted." Mot. at 4. To be sure, Twitter has yet to pay the civil sanction required by the Order, but those funds will not disappear. Should Twitter prevail on its argument that the $350,000 contempt fine was unduly punitive, the Clerk of the Court can always return some or all of those funds to Twitter. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1057 (7th Cir. 1998) ("Payment of the sanction does not moot the appeal because the appellate court can fashion effective relief to the appellant by ordering that the sum paid in satisfaction of the sanction be returned."); 13B FED. PRAC. & PROC. JURIS. § 3533.2.2 ("An effective remedy is most clearly possible if the fine remains in the district court, not yet covered into the Treasury."). Indeed, Twitter provides no reason why holding payment of any fines in escrow will moot its challenge to

the Order regarding sanctions.  *See* Reply at 6 n.1 ("Twitter likewise agrees that holding the money Twitter pays in escrow will help reduce the risk of mootness.").  Moreover, the cases upon which Twitter relies to suggest that stays are appropriate to prevent mootness, Mot. at 1–3, are inapposite because, as the government points out, they concern "1) stays designed to prevent sanctions from *accruing* during an appeal by a contemnor who has not complied with the underlying order, and (2) mootness findings resulting from compliance with the underlying order itself, rather than mootness resulting from the payment of fully accrued contempt sanctions." Gov't's Opp'n at 12–13 (emphasis in original ) (citing *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, 2019 WL 2182436, at *5–6 (D.D.C. Apr. 10, 2019) (staying "accrual of the contempt sanctions" during the pendency of an "expedited appeal"); *In re Grand Jury Subpoena No. 7409*, 2018 WL 8334866, at *3–4 (D.D.C. Oct. 5, 2018) (similar); *United States v. Griffin*, 816 F.2d 1, 7 n.4 (D.C. Cir. 1987) (appeal of contempt order was mooted after defendant fully complied with the underlying restitution order); *In re Hunt*, 754 F.2d 1290, 1293–94 (5th Cir. 1985) (similar)).  Even were Twitter correct that payment of the sanctions may moot the pending appeal of the sanctions order, the company cites no case holding that avoiding mootness is a reason to grant a stay.

Twitter also raises the specter of an approach to preserve appellate rights of "refus[ing] to produce anything to the government even *after* being held in contempt—prolonging any harm to the government's investigations and quickly threatening financial ruin for the company as fines doubled daily."  Twitter Reply at 4 (emphasis in original).  This is an argument that may be persuasive on appeal to avoid a finding of mootness but still does not meet the prerequisites for a stay.

Given that Twitter is unlikely to succeed on the merits and will face no irreparable injury if it promptly pays the contempt sanctions, it is hereby:

**ORDERED** that Twitter's Motion for a Stay Pending Appeal, ECF No. 34, is **DENIED**; it is further

**ORDERED** that, upon payment by Twitter of the $350,000 sanction to the Clerk of the Court for failing to comply with the Show Cause Order, the Clerk of the Court shall not transmit the fine to the U.S. Department of the Treasury but hold those funds in escrow until further order from this Court.

**SO ORDERED**.

Date: March 10, 2023

____________________________
BERYL A. HOWELL
Chief Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| IN THE MATTER OF THE SEARCH OF: INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A | Case No. 23-SC-31<br><br>**Under Seal**<br><br>Chief Judge Beryl A. Howell |
|---|---|

**ORDER**

Upon consideration of Twitter, Inc.'s ("Twitter") motion to modify or vacate the non-disclosure order in this matter; the government's sealed and *ex parte* oppositions; the government's notice for accrued sanctions; Twitter's notice regarding the applicability of sanctions; the exhibits attached thereto; and the underlying record, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that Twitter's Motion to Vacate or Modify the Non-Disclosure Order and Stay Twitter's Compliance with the Search Warrant, ECF No. 7, is **DENIED**; it is further

**ORDERED** that the Non-Disclosure Order, ECF No. 3, shall remain in effect until, at least, July 16, 2023; it is further

**ORDERED** that the government submit to the Court, by March 3, 2023, at 2:00 P.M, any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to Twitter and its counsel; it is further

**ORDERED** that the parties shall submit a joint status report by March 10, 2023 at noon, advising the Court whether this Order and the Opinion may be unsealed, in whole or in part with redactions; it is further

**ORDERED** that Twitter is held in civil contempt for failing to comply with the Court's February 7, 2023, Minute Order, which ordered that Twitter would be held in contempt if it did not comply with the Search and Seizure Warrant, ECF No. 1, by 5:00 PM that day, and that Twitter

"shall be fined $50,000, a fine amount that shall double every day, for failing to comply[;]" it is further

**ORDERED** that Twitter is assessed a $350,000 sanction for failing to comply with the February 7, 2023 Minute Order, which sanction is promptly payable to the Clerk of this Court no later than March 13, 2023.

**SO ORDERED.**

Date: March 3, 2023

*This is a final and appealable order.*

BERYL A. HOWELL
Chief Judge

FILED UNDER SEAL

**From:** GDB (JSPT) <GDB@usdoj.gov>
**Sent:** Friday, February 3, 2023 11:58 AM
**To:** Howell Chambers; MLD (JSPT); Holtzblatt, Ari; Varghese, George; Powell, Benjamin; Russell, Whitney D.
**Cc:** JPC (JSPT); RNH (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel; TPW (JSPT)
**Subject:** RE: 23-SC-31: Minute Order (February 2, 2023)

**EXTERNAL SENDER**

Dear Chambers:

The parties submit this joint email in response to the minute order below. The parties did not reach an agreement on a joint briefing schedule. The government believes the order to show cause and NDO should be resolved on separate tracks, while Twitter believes the issues should be heard together. Our proposals are as follows:

**Government's proposed briefing schedule:**

*Order to show cause briefing schedule*
1. Opposition: February 6 at 12:00 p.m.
2. Reply: February 7 at 10:00 a.m.
3. Hearing: February 7 at 3 p.m.

*NDO briefing schedule*
1. Opposition: February 16
2. Reply: February 23
3. Hearing: Available at the Court's discretion

**Twitter's proposed briefing schedule:**

1. Oppositions: February 6 (end of day)
2. Replies: February 8 (end of day)
3. Hearing: February 9 (after 2 p.m.) or February 10 (whichever day is better for the Court)

Sincerely,

Gregory Bernstein
Assistant Special Counsel
202-705-4123 (cell)

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Thursday, February 2, 2023 4:53 PM
**To:** MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com

**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; GDB (JSPT) <GDB@usdoj.gov>; JIP (JSPT) <JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>
**Subject:** 23-SC-31: Minute Order (February 2, 2023)

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

### Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1 PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2, 2023. Counsel has been notified electronically.(lcbah4)**

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Thursday, February 2, 2023 4:53 PM
**To:** MLD (JSPT); Holtzblatt, Ari
**Cc:** JPC (JSPT); RNH (JSPT); GDB (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel
**Subject:** 23-SC-31: Minute Order (February 2, 2023)

**EXTERNAL SENDER**

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

## Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1 PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2, 2023. Counsel has been notified electronically.(lcbah4)**

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Friday, February 3, 2023 2:56 PM
**To:** GDB (JSPT); MLD (JSPT); Holtzblatt, Ari; Varghese, George; Powell, Benjamin; Russell, Whitney D.
**Cc:** JPC (JSPT); RNH (JSPT); JIP (JSPT); JMP (JSPT); Teresa Gumiel; TPW (JSPT)
**Subject:** 23-SC-31: Minute Order (February 3, 2023)

**EXTERNAL SENDER**

Counsel,

Good afternoon. Please see the Minute Order entered today in the above referenced matter. The Notice in the Minute Order refers to the email submitted by the government below. Thank you.

Best,
The Chambers of Chief Judge Howell

**U.S. District Court**

**District of Columbia**

## Notice of Electronic Filing

The following transaction was entered on 2/3/2023 at 2:35 PM EDT and filed on 2/3/2023

**Case Name:** IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A
**Case Number:** 1:23-sc-00031-BAH *SEALED*
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**MINUTE ORDER (paperless) Upon consideration of the parties' proposed briefing schedules submitted by email by the government, *see* [8] NOTICE of Proposed Briefing Schedule, ISSUING the following SCHEDULING ORDER regarding the government's [5] Motion for Order to Show Cause:**

**(1) By February 6, 2023 at 10:00 AM, Twitter, Inc. shall file any opposition to the government's motion;**
**(2) By February 6, 2023 at 6:00 PM, the government shall file any reply;**
**(3) On February 7, 2023 at 1:30 PM, the parties are DIRECTED to appear in-person in Courtroom 22A for a sealed hearing on the government's motion; and**

**ISSUING the following SCHEDULING ORDER regarding Twitter, Inc.'s [7] Motion to Vacate or Modify Non-Disclosure Order:**

**(1) By February 16, 2023 at 4:00 PM, the government shall file any opposition to Twitter, Inc.'s motion;**
**(2) By February 23, 2023 at 4:00 PM, Twitter, Inc. shall file any reply; and**
**(3) A hearing, if necessary, will be scheduled at a later date.**

**Signed by Chief Judge Beryl A. Howell on February 3, 2023. Counsel has been notified electronically.(lcbah4)**

---

**From:** GDB (JSPT) <GDB@usdoj.gov>
**Sent:** Friday, February 3, 2023 11:58 AM
**To:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>; MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com; Varghese, George <George.Varghese@wilmerhale.com>; Powell, Benjamin <Benjamin.Powell@wilmerhale.com>; Russell, Whitney D. <Whitney.Russell@wilmerhale.com>
**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; JIP (JSPT) <JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>; TPW (JSPT) <TPW@usdoj.gov>
**Subject:** RE: 23-SC-31: Minute Order (February 2, 2023)

**CAUTION - EXTERNAL:**

Dear Chambers:

The parties submit this joint email in response to the minute order below. The parties did not reach an agreement on a joint briefing schedule. The government believes the order to show cause and NDO should be resolved on separate tracks, while Twitter believes the issues should be heard together. Our proposals are as follows:

**Government's proposed briefing schedule:**

*Order to show cause briefing schedule*
1. Opposition: February 6 at 12:00 p.m.
2. Reply: February 7 at 10:00 a.m.
3. Hearing: February 7 at 3 p.m.

*NDO briefing schedule*
1. Opposition: February 16
2. Reply: February 23
3. Hearing: Available at the Court's discretion

**Twitter's proposed briefing schedule:**

1. Oppositions: February 6 (end of day)
2. Replies: February 8 (end of day)
3. Hearing: February 9 (after 2 p.m.) or February 10 (whichever day is better for the Court)

**FILED UNDER SEAL**

Sincerely,

Gregory Bernstein
Assistant Special Counsel
202-705-4123 (cell)

---

**From:** Howell Chambers <Howell_Chambers@dcd.uscourts.gov>
**Sent:** Thursday, February 2, 2023 4:53 PM
**To:** MLD (JSPT) <MLD@usdoj.gov>; ari.holtzblatt@wilmerhale.com
**Cc:** JPC (JSPT) <JPC@usdoj.gov>; RNH (JSPT) <RNH@usdoj.gov>; GDB (JSPT) <GDB@usdoj.gov>; JIP (JSPT) <JIP@usdoj.gov>; JMP (JSPT) <JMP@usdoj.gov>; Teresa Gumiel <Teresa_Gumiel@dcd.uscourts.gov>
**Subject:** 23-SC-31: Minute Order (February 2, 2023)

Counsel,

Good evening. Please see the below Minute Order entered today in the above referenced matter. Additionally, please submit all future filings in this matter electronically to dcd_cmecf_crspecial@dcd.uscourts.gov, with a courtesy copy to Howell_Chambers@dcd.uscourts.gov. Thank you.

Best,
The Chambers of Chief Judge Howell.

### Notice of Electronic Filing

The following transaction was entered on 2/2/2023 at 4:42 PM EDT and filed on 2/2/2023

| | |
|---|---|
| **Case Name:** | IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A |
| **Case Number:** | 1:23-sc-00031-BAH *SEALED* |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER (paperless) GRANTING Twitter, Inc.'s unopposed [6] Motion to Seal; and DIRECTING the government and Twitter, Inc. to confer and propose, by February 3, 2023 at 1 PM, a briefing schedule for the pending [5] government's Motion for an Order to Show Cause and [7] Twitter, Inc.'s Motion to Vacate or Modify Non-Disclosure Order, as well as a date for hearing on these pending motions. Signed by Chief Judge Beryl A. Howell on February 2, 2023. Counsel has been notified electronically.(lcbah4)**

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**From:** Howell Chambers
**To:** GDB (JSPT); JMP (JSPT); MLD (JSPT); Holtzblatt, Ari; Varghese, George; TPW (JSPT); JIP (JSPT); Russell, Whitney D.; Powell, Benjamin
**Cc:** Teresa Gumiel
**Subject:** 23-sc-31: Minute Order (February 7, 2023)
**Date:** Tuesday, February 7, 2023 3:58:00 PM

**EXTERNAL SENDER**

Counsel,

Please see the below Minute Order entered today in the above referenced matter. Thank you.

Best,
The Chambers of Chief Judge Howell

**U.S. District Court**

**District of Columbia**

## Notice of Electronic Filing

The following transaction was entered on 2/7/2023 at 3:53 PM EDT and filed on 2/7/2023

**Case Name:** IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A

**Case Number:** 1:23-sc-00031-BAH *SEALED*

**Filer:**

**Document Number:** No document attached

**Docket Text:**

**MINUTE ORDER (paperless) GRANTING the government's [5] Motion for Order to Show Cause; DIRECTING that Twitter, Inc.: (1) By February 7, 2023 at 5:00 PM, comply with the [4] Search and Seizure Warrant, which itself required compliance by January 27, 2023; and (2) by February 8, 2023 at 5 PM, submit a list of each case in which Twitter, Inc. has filed a challenge to a non-disclosure order, issued pursuant to 18 U.S.C. § 2705(b), summarizing for each case the court's resolution of that challenge; and further ORDERING that Twitter, Inc. shall be held in contempt if it fails to comply with the [4] Search and Seizure Warrant by February 7, 2023 at 5:00 PM, and that Twitter, Inc. shall be fined $50,000, a fine amount that shall double every day, for failing to comply with this Order, payable to the Clerk of this Court. Signed by Chief Judge Beryl A. Howell on February 7, 2023. Counsel has been notified electronically.(lcbah4)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY TWITTER INC. IDENTIFIED IN ATTACHMENT A** | **SC No. 23-SC-31**<br><br>**<u>Under Seal</u>** |

**ORDER**

This matter having come before the Court pursuant to the application of the United States to seal the above-captioned warrant and related documents, including the application and affidavit in support thereof and all attachments thereto and other related materials (collectively the "Warrant"), and to Twitter Inc. ("PROVIDER"), an electronic communication service provider and/or a remote computing service provider located in San Francisco, California, not to disclose the existence or contents of the Warrant pursuant to 18 U.S.C. § 2705(b), and to authorize the government to delay disclosure of the Warrant to the owners of the emails identified in Attachment A, ("TARGET ACCOUNT(S)") pursuant to 18 U.S.C. § 3101(a).

The Court finds reasonable grounds to believe that such disclosure will result in destruction of or tampering with evidence, intimidation of potential witnesses, and serious jeopardy to the investigation, as defined in 18 U.S.C. § 2705(b).

The Court further finds that the government has also provided facts giving good cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705(a)(2). Specifically, the Court finds that immediate notification to the customer or subscriber of the TARGET ACCOUNT(S) would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

The Court further finds that, because of such reasonable grounds to believe the disclosure will so impact the investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

1. IT IS THEREFORE ORDERED that, pursuant to 18 U.S.C. § 2705(b), PROVIDER and its employees shall not disclose the existence or content of the Warrant to any other person (except attorneys for PROVIDER for the purpose of receiving legal advice) for a period of 180 days (commencing on the date of this Order), unless the period of nondisclosure is later modified by the Court.

2. IT IS FURTHER ORDERED that the application is hereby GRANTED, and that the warrant, the application and affidavit in support thereof, all attachments thereto and other related materials, the instant application to seal, and this Order are sealed until otherwise ordered by the Court.

3. IT IS FURTHER ORDERED that the Clerk's office shall not make any entry on the public docket of the Warrant until further order of the Court.

Date: January 17, 2023

HON. BERYL A. HOWELL
CHIEF JUDGE

cc: GREGORY BERNSTEIN
Assistant Special Counsel